## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| STABIL LLC,<br>RUBENOR LLC,<br>RUSTEL LLC,<br>NOVEL-ESTATE LLC,<br>PII KIROVOGRAD-NAFTA LLC,<br>CRIMEA-PETROL LLC,<br>PIRSAN LLC,<br>TRADE-TRUST LLC,<br>ELEFTERIA LLC,<br>VKF SATEK LLC,<br>STEMV GROUP LLC,<br><br>*Petitioners*,<br><br>v.<br><br>THE RUSSIAN FEDERATION,<br><br>*Respondent*. | Case No. _____ |

## PETITION TO CONFIRM ARBITRATION AWARD

Petitioners Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC, Trade-Trust LLC, Elefteria LLC, VKF Satek LLC and Stemv Group LLC (collectively, "Petitioners"), by and through their attorneys, Hughes Hubbard & Reed LLP, state as follows:

### NATURE OF THE PROCEEDING

1.     Petitioners are Ukrainian companies seeking confirmation of an arbitral award (the "Award") awarding them compensation for the Russian Federation's seizure of their assets after its 2014 invasion of Crimea.  The Award was rendered on April 12, 2019, by a distinguished three-member arbitral tribunal ("Tribunal") sitting in Geneva, Switzerland under the auspices of the Permanent Court of Arbitration ("PCA").  *See* Declaration of James Boykin dated April 9, 2022 ("Boykin Decl."), Exh. A.  The arbitration was commenced pursuant to a bilateral investment treaty

1

between Ukraine and the Russian Federation, entitled the Agreement between the Cabinet of Ministers of Ukraine and the Government of the Russian Federation on the Encouragement and Mutual Protection of Investments of November 27, 1998 (the "Treaty"). *See* Boykin Decl., Exh. B. In the Treaty, the Russian Federation undertook binding obligations towards Ukrainian investors with investments in its territory, *see id.* Arts. 1-7, and made a standing offer to arbitrate any disputes that might arise with such investors with respect to their investments, *see id.* Art. 9.  The Petitioners filed a Notice of Arbitration on June 3, 2015, in which they accepted the Russian Federation's standing offer to arbitrate. *See* Boykin Decl., Exh. C.  The Tribunal, consisting of Professor Gabrielle Kaufmann-Kohler, Presiding Arbitrator, Mr. Daniel M. Price, and Professor Brigitte Stern, was constituted on October 7, 2015. *See* Award ¶ 16.

2.      The arbitration arose out of breaches of the Treaty by the Russian Federation in the Crimean Peninsula after the Russian occupation and annexation of that territory in 2014.  On June 26, 2017, after briefing and a hearing, the Tribunal issued an award on jurisdiction ("Award on Jurisdiction") in which it unanimously found that the Tribunal had jurisdiction over the dispute. Boykin Decl., Exh. D, Award on Jurisdiction; Award ¶ 40.  On August 14, 2017, the Russian Federation, which had theretofore refused to participate in the arbitration, filed an action for annulment of the Award on Jurisdiction before the Swiss Federal Supreme Court, which is the court with original jurisdiction to rule on awards issued in international arbitrations seated in Switzerland. *Id*. ¶ 44.  Following a public deliberation held on October 16, 2018, the Swiss Federal Supreme Court denied the Russian Federation's request for annulment, holding that the Tribunal had correctly interpreted the Treaty and declared itself to have jurisdiction over this dispute. *Id.* ¶ 45; Boykin Decl., Exh. E, 2018 Swiss Court Judgment.  The Court issued a reasoned judgment on November 15, 2018.

3.      On April 12, 2019, following further proceedings and a hearing on the merits, and another hearing on damages, the Tribunal issued its final Award in which it unanimously found that the Russian Federation breached Article 5 of the Treaty when it expropriated the Petitioners' investments located in the Crimean Peninsula.   Award ¶¶ 259, 430.   The Tribunal awarded Petitioners compensation for the business properties taken, plus interest from April 22, 2014 until payment in full, at the rate of LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually, in the following principal amounts:

     a.   to Stabil LLC: USD 2,964,057;

     b.   to Rubenor LLC: USD 534,105;

     c.   to Rustel LLC: USD 2,403,473;

     d.   to Novel-Estate LLC: USD 1,068,210;

     e.   to PII Kirovograd-Nafta LLC: USD 801,158;

     f.   to Crimea-Petrol LLC: USD 267,053;

     g.   to Pirsan LLC: USD 267,053;

     h.   to Trade-Trust LLC: USD 10,280,111;

     i.   to Elefteria LLC: USD 14,234,000;

     j.   to VKF Satek LLC: USD 871,478;

     k.   to Stemv Group LLC: USD 871,478.

*Id*. ¶ 430.

4.      The Tribunal also ordered payment to Stabil LLC for compensation for the expropriation of a residential apartment, in the amount of USD 27,238 plus interest from September 3, 2014 until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%,

compounded annually.  *Id*.  The principal amounts of compensation awarded by the Tribunal add up to USD $34,589,414.

5.      In addition, the Tribunal fixed the costs of the arbitration at EUR 687,085.01 and ordered that the Russian Federation bear 75% of the costs of arbitration plus the Petitioners' costs of legal representation and assistance, thus ordering the Russian Federation to pay EUR 46,846.71 and USD 363,621.88 to each Petitioner, plus interest from the date of the Award until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually. Award ¶¶ 424, 429, 430.

6.      On May 28, 2019, the Russian Federation filed an application to set aside the Award in the Swiss Federal Supreme Court.  On Dec. 12, 2019, following several rounds of written submissions and two months after ordering the proceedings closed, the Swiss Federal Supreme Court issued its judgment dismissing Russia's application, ordering it to bear all court expenses and Petitioners' legal costs.  Boykin Decl. Exh. F, 2019 Swiss Court Judgment.  That judgment is final and not subject to appeal.

7.      The Award is subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), in that it was made in the territory of a signatory of that Convention other than the United States. Art. I(1), 21 U.S.T. 2517, 330 U.N.T.S. 38; *see also* 9 U.S.C. § 201.  Pursuant to Chapter 2 of the Federal Arbitration Act, which implements the New York Convention into U.S. law, "[t]he court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.  No such grounds for refusal or deferral of recognition are present here.  The Court, accordingly, should confirm the Award.

## PARTIES, JURISDICTION, AND VENUE

8.      The Petitioners are companies organized under the laws of Ukraine.  Petitioners were claimants in the arbitration in which the Award was issued.

9.      The Russian Federation is a foreign state as defined in the Foreign Sovereign Immunities Act ("FSIA").  28 U.S.C. § 1603.  It was the respondent in the arbitration at issue.

10.      This Court has subject matter jurisdiction over this proceeding because it is an action to enforce an international arbitration award under the New York Convention and is therefore "deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203.  This Court also has subject matter jurisdiction because this action is brought against a foreign state within the meaning of 28 U.S.C. § 1603 and, as explained below, the state does not enjoy immunity from jurisdiction under the FSIA.  28 U.S.C. § 1330(a).

11.      The Russian Federation is not immune from the jurisdiction of this Court for two reasons.  First, the Russian Federation entered into the New York Convention and an agreement to arbitrate.  In so doing, it waived any immunity it may have otherwise possessed with respect to its actions in other states, which are parties to the New York Convention (including the United States) to confirm any award resulting from the arbitration.  28 U.S.C. § 1605(a)(1) ("a foreign state shall not be immune . . . [if it] has waived its immunity either explicitly or by implication"). *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019) (per curium), *cert. denied* No. 19-606 (Jan. 13, 2020) (waiver exception applies where sovereign is a party to the New York Convention and the confirmation action is in another state that is a party to the Convention) (citing *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 123 (D.C. Cir. 1999) (finding it "correct[] that when a country becomes a signatory to the Convention, by the very provisions of the Convention, the signatory state must have contemplated enforcement actions in other signatory states.") (internal

quotation omitted)); *see also Process & Ind. Devs. Ltd. v. Fed. Republic of Nigeria,* 506 F. Supp. 3d 1, 11 (D.D.C. 2020) ("All told, Nigeria offers no convincing reason to depart from the persuasive reasoning of *Seetransport*, *Creighton*, and *Tatneft*. The Court will therefore follow those precedents, hold that Nigeria has waived its sovereign immunity as to this case, and assert jurisdiction under the FSIA."); *Stati v. Republic of Kazakhstan*, 199 F. Supp. 3d 179, 189 (D.D.C. 2016) (citing *Creighton* and finding that Kazakhstan implicitly waived its sovereign immunity because it was party to the Convention and the action was to enforce a Convention award).

12.      Second, the Russian Federation is not immune from the jurisdiction of the Court because the action is brought to confirm an arbitration award that is "governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards," *i.e.*, the New York Convention. 28 U.S.C. § 1605(a)(6).

13.      This Court will have personal jurisdiction over the Russian Federation as soon as service is effected. *See* 28 U.S.C. § 1330(b) ("[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under 1608 of this title."); *see also Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n.11 (D.C. Cir. 1987) ("under the FSIA, subject matter jurisdiction plus service of process equal personal jurisdiction.") (internal quotation omitted); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002) ("foreign states are not 'persons' protected by the Fifth Amendment."); *id.* at 100 (recognizing "the unavailability of constitutional due process protections [to] foreign states"); *accord TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 299-300 (D.C. Cir. 2005) (Ginsburg, C.J.) (holding, in action to enforce an arbitration award under the New York Convention, that foreign states who lack sovereign immunity by operation of the exceptions in the FSIA need not have constitutionally sufficient "minimum

contacts" with the United States or a given state in order to be subject to the personal jurisdiction of federal courts).

14.     Venue is proper in this District since "the action is brought against a foreign state or political subdivision thereof."  28 U.S.C. § 1391(f)(4).

15.     This petition was timely filed because the final Award was made less than three years ago, on April 12, 2019.  9 U.S.C. § 207.

## FACTUAL BACKGROUND

### I.     THE UNDERLYING DISPUTE

16.     Petitioners are eleven Ukrainian companies that invested in the petrol retail business in the Autonomous Republic of Crimea and the City of Sevastopol (together, "Crimea")[1] prior to 2014, when Crimea was under the jurisdiction of Ukraine.  Together, the eleven Petitioners owned, operated, and supplied a chain of 31 petrol stations in Crimea.  Of these 31 petrol stations, 17 were located in the Autonomous Republic of Crimea and 14 were located in the City of Sevastopol.  Award ¶ 95.  Petitioners either owned or leased the land on which the petrol stations were built.  They also owned other real estate and a fleet of vehicles.  *Id.* ¶ 96.  Two of the Petitioners, VKF Satek LLC and Stemv Group LLC, owned two storage facilities in the cities of Simferopol and Sevastopol, respectively; these were used to store reserve fuel and supply petroleum products (which were largely sourced from outside Crimea) to the petrol stations.  *Id.* ¶ 98.

17.     Beginning on February 27, 2014, armed forces of the Russian Federation physically occupied Crimea and consolidated control over it by next day.  *Id.* ¶¶ 103-104.  On March 16, 2014

---

[1] Under the Constitution of Ukraine, the Crimean Peninsula was divided into two political units: the Autonomous Republic of Crimea and the City of Sevastopol.  After the Russian annexation, that distinction was preserved, but the units were re-named the Republic of Crimea and the City of Special Status Sevastopol. Award ¶ 94.

a public referendum took place on the "incorporation" of Crimea into the Russian Federation. According to the referendum's organizers, about 96 percent were in favor of the "incorporation," although numerous allegations of electoral fraud were received by the Office of the United Nations High Commissioner for Human Rights.[2]  *Id.* ¶ 106. On March 18, 2014, the self-proclaimed new authorities of Crimea (renamed "the Republic of Crimea" and the "City of Special Status Sevastopol") signed the "Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation" (the "Incorporation Treaty").  *Id.* ¶ 107.

18.     On March 21, 2014, President Putin held a signing ceremony for the Incorporation Treaty, which entered into force with retroactive effect to March 18, 2014.  *Id.* ¶ 108.  The Russian Federation enacted legislation implementing the annexation and guaranteeing pre-existing property rights in Crimea.  *Id.* ¶¶ 107-108.

19.     After the occupation and annexation of Crimea, the Russian authorities began a campaign to seize Ukrainian properties.   *Id.*  ¶¶ 111-112.   The Crimean authorities targeted Petitioners in particular because at that time one of the Petitioners' ultimate beneficial owners was

---

[2] The international community recognized this referendum as a farce.  *See* The White House, Office of the Press Secretary, Statement by Press Secretary on Ukraine (Mar. 16, 2014) ("This referendum is contrary to Ukraine's constitution, and the international community will not recognize the results of a poll administered under threats of violence and intimidation from a Russian military intervention that violates international law."); Herman Van Rompuy, President, Eur. Council, and  José Manuel Barroso, President, Eur. Comm'n, Joint Statement on Crimea EUCO 58/14 (Mar. 16, 2014) ("The referendum is illegal and illegitimate and its outcome will not be recognised."); *see also* G.A. Res. 68/262, ¶ 5 (Mar. 27, 2014) ("[T]he referendum held in the Autonomous Republic of Crimea and the city of Sevastopol on 16 March 2014, having no validity, cannot form the basis for any alteration of the status of the Autonomous Republic of Crimea or of the city of Sevastopol[.]").  The question of the legality of Russia's invasion and annexation of the Crimean Peninsula was not the subject of the arbitration and was not addressed by the Tribunal in the Award.  Award ¶ 100.

the Governor of the Dnipropetrovsk Region in Eastern Ukraine and an outspoken opponent of the annexation of Crimea. *Id.* ¶¶ 126, 239, 240.

20.      Between April 22, 2014 and April 25, 2014, members of Crimean "Self-Defense" forces, an armed paramilitary force organized by Russia,[3] seized and looted Petitioners' petrol stations and an office in Crimea.  *Id.* ¶¶ 113-121. On September 3, 2014, the State Council of the Republic of Crimea (the puppet government installed by the Russian Federation) amended the Annex to its earlier decree of April 30, 2014 that had listed the property of Ukraine in Crimea to be nationalized (the "Nationalization Decree") to add additional properties to the Annex and thereby declare them to be property of the Republic of Crimea. *Id.* ¶¶ 122, 125.  The properties listed in the Annex included many assets belonging to the Petitioners: (i) Stabil LLC's office in Feodosia; (ii) the Petitioners' petrol stations located in the Republic of Crimea (but not their petrol stations within the Federal City of Sevastopol, a separately administered entity under Russian law); (iii) the Petitioners' storage facility in Simferopol; and (iv) a residential apartment in Simferopol belonging to Stabil LLC.  *Id.* ¶ 125.

21.      The authorities installed by Russia made no secret that the primary motive for expropriation of the Petitioners' assets in Crimea was the pro-Ukrainian position of one of their ultimate beneficial owners who allegedly supported Ukrainian military resistance against the Russian invasion in southeast of Ukraine.  Mr. Sergei Aksyonov, the Acting head of the Crimean Administration installed by the Russian Federation, acknowledged the intent to expropriate the

---

[3] In a series of decrees, the Crimean authorities installed by Russia created Paramilitary or "Self-Defense" forces.  On October 16, 2014, Mr. Sergei Aksyonov, whom Russia had installed as governor of Crimea, made a statement proclaiming that it was necessary to grant amnesty to the Paramilitary Forces for their unlawful activities, , or else – according to a Mr. Aksyonov "[i]f we evaluate these actions under Russian law, then we will have to put 100,000 people in prison." Award ¶129.

Petitioners' properties when he announced how the Decree was amended in response to the fact that Ukrainians were resisting Russian occupation in other areas of Ukraine: "our compatriots are being killed [in southeast of Ukraine] therefore, it is our moral right and our moral duty to carry out this nationalization." ¶ 126 n. 62.

22.     Finally, on July 8, 2016, the Sevastopol Government installed by the Russian Federation issued Order No. 662-P, which stated that the Petitioners' petrol stations located in Sevastopol were now "property of the Federal City of Sevastopol." *Id.* ¶ 132.

23.     The Crimean authorities did not justify these takings by reference to any non-conformity of the Petitioners' properties with Russian or Ukrainian law. *Id.* ¶ 227. Rather, the only reason ever given by the Crimean authorities for nationalizing and seizing the Petitioners' properties was the pro-Ukrainian position of one of their owners.

## II.     THE ARBITRATION

24.     By letters dated October 15, 2014 and October 31, 2014, Petitioners notified the Russian Federation of the existence of a dispute, under Article 9 of the Treaty, between the Petitioners and the Russian Federation with respect to the Petitioners' investments in the Crimean Peninsula. *See* Boykin Decl., Exh. G, Letters to Russian Federation. On June 3, 2015, after waiting for six months as required by the Treaty, Petitioners served a Notice of Arbitration, in which they accepted Respondent's standing offer to arbitrate this dispute in accordance with the Arbitration Rules of the United Nations Commission for International Trade Law (the "UNCITRAL Rules").[4]

---

[4] A sovereign's accession to an investment treaty that provides for arbitration "'constitutes a standing offer to arbitrate disputes covered by the Treaty; a foreign investor's written demand for arbitration completes the 'agreement in writing' to submit the dispute to arbitration.'" *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 66 (D.D.C. 2013) (emphasis omitted) (quoting *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 392-93 (2d Cir. 2011)), *aff'd* 795 F.3d 200 (D.C. Cir. 2015).

*See* Boykin Decl., Exh. C, Notice of Arbitration.  Respondent's standing offer is contained in Article

9(2)(c) of the Treaty.[5]  In their Notice of Arbitration, pursuant to Article 7(1) of the UNCITRAL

Rules, Petitioners designated Mr. Daniel M. Price as their appointed arbitrator in the proceedings.

Award ¶ 10.  After the Respondent failed to appoint its arbitrator within thirty days of being notified

of the appointment of the first arbitrator, on August 6, 2015, the PCA, the authority administering

the arbitration, appointed Mr. Michael Hwang as the Appointing Authority to select a second

arbitrator.  *Id.* ¶ 12.

25.     On September 18, 2015, the PCA received what would be the only communication

from the Russian Federation in the arbitration.  It consisted of a letter from the Ambassador of the

Russian Federation to the Kingdom of the Netherlands, dated September 15, 2015, enclosing a letter

dated August 12, 2015 from the Ministry of Justice of the Russian Federation.  *Id.* ¶¶ 5-6.

26.     In the letter dated August 12, 2015, the Ministry of Justice wrote:

> We return you herewith the Notices of Arbitration on the arbitration
> proceedings initiated under Article 9 of the [Treaty] before the
> Permanent Court of Arbitration by [the Petrol Companies] vs. the
> Russian Federation […].
>
> It is manifest that such claims cannot be considered under the
> [Treaty] mentioned above and, therefore, the [Treaty] cannot serve
> as a basis for composing an arbitral tribunal to settle these claims.
>
> In accordance with paragraph 1 Article 1 of the [Treaty] the term
> "investment" means every kind of movable and immovable and
> intellectual property invested by an investor of one Contracting
> Party in the territory of the other Contracting Party in accordance
> with the legislation of the latter Contracting Party. The property in
> question which is the matter of the claims is situated in the territory

---

[5] Treaty, Art. 9(2) ("If the dispute cannot be resolved in this manner within six months after the date of the written notice mentioned in paragraph 1 of this article, it shall be referred to … (c) an 'ad hoc' arbitration tribunal, in accordance with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).").  The UNCITRAL Rules in effect at the time the Russian Federation made its offer were the rules as amended in 1976.

of Crimea and Sevastopol, *i.e.*, in the territory that was a part of Ukraine but at the present time pursuant to the will of people forms an integral part of the territory of the Russian Federation and cannot be regulated by the [Treaty].

On the basis of the above mentioned the Russian Federation does not recognize the jurisdiction of an international tribunal at the Permanent Court of Arbitration in settlement of the abovementioned claims.

*Id.* ¶ 5.

27.     In the cover letter dated September 15, 2015, the Ambassador indicated that:

Nothing in the attached letter of the Ministry of Justice of the Russian Federation can be interpreted as consent of the Russian Federation to constitution of an arbitral tribunal, participation in arbitral proceedings, or as procedural actions taken in the framework of the proceedings, mentioned therein, or as a waiver by the Russian Federation of the jurisdictional immunities in respect of itself and its property in relation to any judicial or administrative proceedings or procedures, connected directly or indirectly with these claims, including immunity from court jurisdiction and immunity from any measures of constraint that can be connected directly or indirectly with these claims, regardless of the jurisdiction (national or supranational) under which they are initiated.

*Id.* ¶ 6.

28.     On September 28, 2015, the Appointing Authority appointed Professor Brigitte Stern as the second arbitrator in the proceedings. *Id.* ¶ 15. On October 7, 2015, the two appointed arbitrators selected Professor Gabrielle Kaufmann-Kohler as the Presiding Arbitrator pursuant to Article 7(1) of the UNCITRAL Rules. *Id.* ¶ 16.  Each of the three arbitrators is eminently qualified and highly distinguished.  As of 2015, the arbitrators had collectively acted as arbitrators in more than 160 treaty arbitration cases.  Professor Gabrielle Kaufmann-Kohler is a Professor Emerita at Geneva University Law School, founder of the Geneva LLM in International Dispute Settlement, and, according to a 2016 study that measured the number of cited decisions and arbitral appointments, the "most influential arbitrator in the world." *See* Boykin Decl., Exh. H, Biographical

Information of Arbitrators.  Professor Brigitte Stern is the Emeritus Professor of International Law at the University of Paris I, recipient of the French Ordre national du Mérite, and former Vice-President of the United Nations Administrative Tribunal.  *Id*.  Mr. Daniel Price is the former United States lead negotiator of investment treaties with countries from the former Soviet Union.  *Id*.

29.     On December 16, 2015 and December 17, 2015, the Tribunal issued Procedural Orders Nos. 1 and 2, in which it fixed Geneva, Switzerland as the seat of the arbitration, appointed the PCA as registry, set forth provisions concerning the finances of the arbitration, and established a procedural timetable (the "Procedural Timetable").  Award ¶ 21.

30.     On January 15, 2016, Petitioners submitted their Statement of Claim, along with a fact witness statement and expert reports, including one detailing the damages they had sustained as a result of the Russian Federation's unlawful expropriation of their property.  *Id.* ¶ 22. The Respondent failed to submit a Statement of Defense within the time limit fixed by the Tribunal in the Procedural Timetable.  *Id.* ¶ 25.

31.     On April 22, 2016, the Tribunal informed the Parties of its decision to continue the proceedings pursuant to Article 28(1) of the UNCITRAL Rules, notwithstanding the Respondent's failure to communicate its Statement of Defense.[6]  *Id.* ¶ 26. That article provides, "If, within the period of time fixed by the arbitral tribunal, the respondent has failed to communicate his statement

---

[6] As the Tribunal explained: "unlike in court litigation in many jurisdictions, there is no 'default judgment' in arbitration.  In other words, in spite of the default, a tribunal cannot dispense with satisfying itself regarding whether or not the claims before it are well founded in fact and in law. This rule applies to jurisdiction as well as to the merits."  Award ¶ 148.

of defence without showing sufficient cause for such failure, the arbitral tribunal shall order that the proceedings continue."[7]

32.     On July 11, 2016, the Tribunal held a hearing on jurisdiction and admissibility in Geneva, Switzerland concurrently in this matter and in a related case, PCA Case No. 2015-34.  *Id.* ¶ 35. Counsel for Petitioners attended the hearing. Although invited, the Russian Federation did not attend or otherwise participate. *Id*. On August 26, 2016, Petitioners submitted a post-hearing brief. *Id.* ¶ 38. The Russian Federation did not make any post-hearing submissions. *Id*.

33.     On June 26, 2017, the Tribunal issued the Award on Jurisdiction, which forms an integral part of the Award.  *Id*. ¶ 40.  In the operative part, the Tribunal declared and decided as follows:  "(i) the Tribunal has jurisdiction over the dispute submitted to it in this arbitration; (ii) the Tribunal will take the necessary steps for the continuation of the proceedings toward the liability phase; (iii) the Tribunal reserves the decision on the costs of the jurisdictional phase for a later stage of the proceedings."  *Id*.

34.     As noted above, on August 14, 2017, the Russian Federation filed an action for annulment of the Award on Jurisdiction before the Swiss Federal Supreme Court.  *Id*. ¶ 44. The Russian Federation advanced three principal jurisdictional arguments in favor of annulment. Boykin Decl., Exh. E, 2018 Swiss Court Judgment at ¶ 4.  First, the Russian Federation contended that the territorial scope of each Contracting Party's obligations under the Treaty only encompassed each Contracting Party's territory at the time when the Treaty was signed in 1998 and thus, in the case of the Russian Federation, excluded Crimea absent a further agreement after 2014.  *Id*. ¶ 4.3.1.  The

---

[7] The text of the UNCITRAL Rules can be found on the website of the United Nations Commission on International Trade Law: https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/arb-rules.pdf.

Swiss Federal Supreme Court dismissed this argument, finding that the Russian Federation failed to adduce any evidence in support of its static interpretation of the term "territory." *Id.* ¶ 4.3.2. The Swiss Court agreed with the Tribunal's approach, interpreting the Treaty in light of general rules of public international law and Article 29 of the Vienna Convention on the Law of Treaties ("VCLT"). *Id.* ¶ 4.3.2. The Swiss Federal Supreme Court also rejected Russia's argument that a further agreement between the parties to the Treaty would have been necessary for the application of the Treaty to Crimea after the peninsula was formally annexed by Russia in March 2014. *Id.*

35.     Second, Russia argued that the Petitioners' assets in Crimea did not meet the definition of the term "investments" in the Article 1(1) of the Treaty. *Id.* ¶ 4.4.1. In particular, Russia alleged that the Tribunal failed to consider the "temporal" and the "territorial" elements of the term "investment" defined in the Treaty as "assets [which are] invested by an investor of one Contracting Party in the territory of the other Contracting Party." *Id.* ¶ 4.4.2 (alteration in original). The Swiss Federal Supreme Court rejected this argument. *Id.* ¶¶ 4.4.2-4.4.5. In its extensive analysis, the Swiss Court observed that the Tribunal correctly applied Article 31 of the VCLT to the definition of the term "investment" in the Treaty in light of the ordinary meaning, the context, the object and purpose as well as good faith interpretation of the Treaty. *Id.* ¶ 4.4.2. The Swiss Federal Supreme Court concluded that the Petitioners' assets were "investments" as that term is used in the Treaty. *Id.*

36.     Finally, Russia contested the jurisdiction of the Tribunal on the grounds that the Petitioners were not "investors" in the sense of the Treaty. *Id.* ¶ 4.4.6. The Swiss Court observed that Russia failed to address the Tribunal's detailed reasoning about Petitioners' conformity with Ukrainian law required by the Treaty, but based its "investor" argument only on the allegation that the Petitioners had made their investment when Crimea was still controlled by Ukraine. *Id.*

Considering that it had already found that the Petitioners had made a protected investment, the Swiss Federal Supreme Court dismissed Russia's third argument.  *Id.*

37.     Following a "public deliberation," on October 16, 2018, the Swiss Federal Supreme Court announced its judgment denying the request for annulment, holding that the Tribunal had correctly interpreted the Treaty and declared itself to have jurisdiction.  Award ¶ 45.  Shortly thereafter, on November 15, 2018, the Swiss Federal Supreme Court issued its reasoned written opinion in support of its judgment. Boykin Decl., Exh. E, 2018 Swiss Court Judgment.

38.     Having noted that Russia's request had been denied in its entirety, the Swiss Federal Supreme Court ordered the Russian Federation to pay the costs of the court proceedings in the amount of 110,000 Swiss Francs and compensation for the proceedings to Petitioners in the amount of 160,000 Swiss Francs. *Id.* ¶¶ 5.2–5.3.

39.     On February 5 and 6, 2018, the Tribunal held a hearing in Geneva on the merits of the dispute.  *Id.* ¶ 51.  The Respondent was invited to participate but did not take part in the hearing.  *Id.*  The hearing was held jointly with PCA Case No. 2015-34.  *Id.* ¶ 54.  At the hearing, Petitioners presented testimony of both fact and expert quantum witnesses and the Tribunal had the opportunity to question each of the witnesses as well as Petitioners' counsel.  *Id.* ¶ 53.

40.     On February 28, 2018, after having conducted a search for experts with appropriate qualifications, independence, and availability, the Tribunal sought the parties' comments on the prospective appointment of Mr. Thierry Sénéchal as the Tribunal Expert on quantum.  *Id.* ¶ 60.  Petitioners sought clarification on Mr. Sénéchal's experience in performing valuations in Russia and Ukraine.  Respondent submitted no comments.  *Id.*  ¶ 61.

41.      On March 17, 2018, the Tribunal issued a procedural order setting forth Mr. Sénéchal's terms of reference and the scope of his report.  *Id.* ¶ 62.  On July 16, 2018, Mr. Sénéchal submitted his final report.  *Id.* ¶ 74.

42.      On August 20, 2018, a hearing focused on quantum took place in Geneva.  *Id.* ¶ 78. During the hearing, the Tribunal had the opportunity to question Mr. Sénéchal as well as Petitioners' expert, Mr. Brent Kaczmarek, on quantum.  *Id.* ¶ 79.

43.      Following the hearing, the parties were invited to submit their statements of costs. Petitioners submitted their application for costs on November 2, 2018.  Respondent made no submission.  *Id.* ¶ 90.

## III.   **THE AWARD**

44.      The Tribunal issued its final Award, addressing merits, quantum and costs, on April 12, 2019.  In a 126-page, 430-paragraph reasoned decision, the Tribunal affirmed that Petitioners and their investments were entitled to protection under the Treaty and that the Russian Federation had violated its obligations towards Petitioners and its investment.

45.      The Tribunal first addressed the threshold question of whether the actions of the Crimean State Council, the Sevastopol Government, and the Paramilitary Forces could be attributed to the Russian Federation under customary international law codified in the United Nations' International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts, 2001 ("ILC Articles").   Award ¶¶ 161-162.   Under the ILC Articles, a State is legally responsible for the acts and omissions of its organs, as set forth in Article 4, and entities or persons empowered to exercise elements of governmental authority, if they carried out the relevant acts in such capacity, as set forth in Article 5.  In addition, Article 11 provides that conduct which a State

"acknowledges and adopts" as its own is also attributable to that State under international law. *Id*. ¶ 162.

46.     The Tribunal concluded that the Crimean State Council and the Sevastopol Government were both "organs" of the Russian Federation for purposes of ILC Article 4. *Id*. ¶¶ 173, 204. It also found that the actions of the Paramilitary Forces that raided Petitioners' offices and seized their property were attributable to the Russian Federal under ILC Articles 5 and 11. *Id*. ¶¶ 198, 204.

47.     The Tribunal then turned to Petitioners' claims under the Treaty. Petitioners claimed that the Russian Federation had violated the Treaty by (1) unlawfully expropriating their property, (2) acting towards Petitioners in a discriminatory manner, and (3) failing to provide them treatment no less favorable than the treatment given to its own investors or investors of any third state. *Id*. ¶¶ 134-136.

48.     The Tribunal first analyzed Petitioners' claim of unlawful expropriation. Under the Treaty, in order to be lawful, an expropriation must meet certain elements. The Tribunal concluded that those elements were not met and, therefore, the Russian Federation had unlawfully expropriated Petitioners' investment in breach of the Treaty. *Id*. ¶ 259. This unlawful expropriation occurred in two stages: First, through the physical seizure of Petitioners' property on April 22, 2014; and, second, through the legislative acts taken to nationalize Petitioners' investment in Crimea and Sevastopol. *Id*.

49.     Having found that Petitioners' investment was unlawfully expropriated and that the Russian Federation had breached its obligations under the Treaty, the Tribunal did not deem it necessary to address Petitioners' other claims under the Treaty. *Id*. ¶ 260.

50.     The Tribunal then turned to compensation and assessing the valuation of Petitioners investment as well as the appropriate interest calculation.   The Award devotes approximately 50 pages, over a third of its decision, analyzing the question of compensation.   *Id.* ¶¶ 261-412.   The Award discussed at length the expert report of Mr. Sénéchal as well as the report of Petitioners' quantum expert, Mr. Brent Kaczmarek, and addressed Petitioners' comments on the expert reports. *Id.* ¶ 269.   After a very detailed and thoughtful analysis, the Tribunal concluded that the appropriate measure of compensation under international law is the fair market value of each investment at the time immediately before the expropriation, *id.* ¶ 266, which it proceeded to fix for each of the Claimants as follows, plus interest from April 22, 2014 until payment in full, at the rate of LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually:

      a.   to Stabil LLC: USD 2,964,057;

      b.   to Rubenor LLC: USD 534,105;

      c.   to Rustel LLC: USD 2,403,473;

      d.   to Novel-Estate LLC: USD 1,068,210;

      e.   to PII Kirovograd-Nafta LLC: USD 801,158;

      f.   to Crimea-Petrol LLC: USD 267,053;

      g.   to Pirsan LLC: USD 267,053;

      h.   to Trade-Trust LLC: USD 10,280,111;

      i.   to Elefteria LLC: USD 14,234,000;

      j.   to VKF Satek LLC: USD 871,478;

      k.   to Stemv Group LLC: USD 871,478.

*Id.* ¶ 430.

51.     The Tribunal also ordered payment to Stabil LLC for compensation for the expropriation of its residential apartment, in the amount of USD 27,238 plus interest from September 3, 2014 until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually.  *Id*.  As the Court may be aware, LIBOR rates ceased being published on December 31, 2021.  The Petitioners therefore seek interest at the rate specified by the Tribunal through December 31, 2021, and interest from January 1, 2022 at a rate to be set by the Court after briefing, such as the Secured Overnight Financing Rate ("SOFR").

### IV.   SET ASIDE PROCEEDINGS

52.     On May 28, 2019, the Russian Federation again applied to the Swiss Federal Supreme Court, this time seeking to set aside the final Award.  Respondent challenged the Award on two grounds, both of which were rejected.  First, the Swiss Court rejected a new argument based on unsupported factual assertions, explaining that under Swiss law, it could not consider new factual allegations that were not raised during the arbitral proceedings.  Boykin Decl., Exh. F, 2019 Swiss Court Judgment, ¶ 3.4.

53.     Second, Respondent argued that the parties' dispute was not covered by the Treaty, because the status of Crimea had changed, the same challenge raised in its letter to the Tribunal dated August 12, 2015.  *See supra*, ¶ 26.  Respondent asserted that Crimea's integration into the Russian Federation necessarily meant that the Treaty no longer applied to the dispute between the parties and, therefore, that the Award should be annulled.  2019 Swiss Court Judgment, ¶ 4.1.  The Swiss Court disagreed.  It explained that, contrary to Respondent's assertions, the subject matter of the arbitration was not the status of Crimea but rather whether Petitioners' investments had been expropriated by the Russian Federation.  *Id*. ¶ 4.2.  The Swiss Court also referred to its earlier decision of October 16, 2018, upholding the Award on Jurisdiction, in which it held that the Crimean

Peninsula was to be regarded as part of the "territory" of the Russian Federation as defined in the Treaty.  *Id*.  The Swiss Court's Judgment is final and not subject to appeal.

## LEGAL STANDARD AND ARGUMENT

### I.   THE NEW YORK CONVENTION APPLIES TO THE AWARD

54.     The New York Convention applies "to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought[.]" New York Convention, art. I(1).   The United States is party to the New York Convention, subject to the reservation that it applies the Convention "on the basis of reciprocity, to the recognition and enforcement of only those awards made in the territory of another Contracting State." Declaration of the United States of America, Sept. 30, 1970, 21 U.S.T. 2566, 751 U.N.T.S. 398.  The Russian Federation is also a party to the Convention, subject to the same reservation. 374 U.N.T.S. 386 (Aug. 24, 1960). The Award was made in Switzerland, *see supra* ¶ 1, which is also party to the New York Convention.[8]

55.     "The New York Convention applies 'to the recognition and enforcement of arbitral awards made in the territory of State other than the State where the recognition and enforcement of such awards are sought.'"  *Process and Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 774 (D.C. Cir. 2022) (quoting New York Convention, art I(1)).   The Federal Arbitration Act ("FAA") implements the New York Convention into domestic law.  *See* 9 U.S.C. § 201 ("The [New York Convention] shall be enforced in United States courts in accordance with this chapter.").   The FAA provides that the Convention applies to an "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including

---

[8] The Swiss instrument of ratification can be found at 536 U.N.T.S. 477 (June 1, 1965).

a transaction, contract, or agreement" unless the relationship is between U.S. citizens and lacks other

significant foreign connection.  9 U.S.C. § 202.  The underlying commercial relationship here is the

Treaty between the Russian Federation and Ukraine in which the Russian Federation made binding

obligations towards Ukrainian investors with investments in its territory and made a standing offer

to arbitrate any disputes it might have which such investors.  *See BG Group PLC v. Republic of*

*Argentina*, 572 U.S. 25, 50 (2014) (Roberts, C.J., dissenting) (stating that a similar provision in a

bilateral investment treaty "constitutes in effect a unilateral offer to arbitrate, which an investor may

accept by complying with its terms."); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57,

66 (D.D.C. 2013  (citing *Republic of Ecuador v. Chevron Corp*. 638 F.3d 384 392-93 (2d Cir. 2011))

(holding that bilateral investment treaties create written agreements to arbitrate for purposes of the

New York Convention) ), *aff'd* 795 F.3d 200 (D.C. Cir. 2015).  Neither party to the arbitration is a

U.S. citizen, the arbitral award was made in Switzerland, and the underlying arbitration has no

significant connection to the United States.

56.     The New York Convention therefore applies to proceedings before this Court to

confirm the Award.

## II.     THE GROUNDS FOR REFUSING TO CONFIRM AN AWARD UNDER THE CONVENTION ARE EXTREMELY NARROW

57.     Under the New York Convention, while courts of the country in which (or under

the arbitration law of which) an award was made have "primary jurisdiction" over the award, United

States courts have secondary jurisdiction over a foreign award, and as a result lack subject matter

jurisdiction to vacate, set aside, or modify foreign awards.  *TermoRio S.A. E.S.P. v. Electranta S.P.*,

487 F.3d 928, 935 (D.C. Cir. 2007) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan*

*Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 287 (5th Cir. 2004)) ("The Convention provides a

carefully crafted framework for the enforcement of international arbitral awards.  Under the

Convention, '[o]nly a court in a country with primary jurisdiction over an arbitral award may annul that award.'").

58.     The FAA provides that, in proceedings to confirm a foreign award under the Convention, "the court shall confirm the award, unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.[9]  This Circuit has recognized that judicial review of an arbitral award under the Convention

---

[9] These grounds are listed in Article V of the Convention:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law, of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decision on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

is extremely limited. *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012)

(quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985))

("Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by

the Supreme Court as 'appl[ying] with special force in the field of international commerce,' [] the

FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral

awards[.]"). "Federal courts in the United States have minimal discretion to refuse to confirm an

award under the FAA[.]" *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 184 (D.D.C. 2018); *see also*

*Compagnie Sahélienne d'Entreprise v. Republic of Guinea*, No. 20-cv-1536, 2021 WL 2417105, at

*3 (D.D.C. June 14, 2021) ("[T]he Convention is clear that a court may refuse to enforce the award

only on the grounds explicitly set forth in Article V of the Convention.") (citations and internal

quotation marks omitted).  "Given that the New York Convention provides only several narrow

circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings

are generally summary in nature." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763

F. Supp. 2d 12, 20 (D.D.C. 2011); *see also Argentine Republic v. Nat'l Grid Plc*, 637 F.3d 365, 369

(D.C. Cir. 2011) ("Confirmation proceedings under the Convention are summary in nature, and the

court must grant the confirmation unless it finds that the arbitration suffers from one of the defects

listed in the Convention."); *Mediso Med. Equip. Developing Servs., Ltd v. Bioscan, Inc.*, 75 F. Supp.

3d 359, 363-64 (D.D.C. 2014) (noting the FAA's "strict enforcement requirements" and that it has

"little discretion" in refusing or deferring enforcement).

59.     Furthermore, the burden of proof is on the party who seeks to oppose confirmation.

New York Convention, art. V; *Pao Tatneft v. Ukraine*, No. 17-cv-582, 2020 WL 4933621, at *4

(D.D.C. Aug. 24, 2020) ("The party resisting confirmation bears a heavy burden of establishing that

one of the grounds for denying confirmation in Article V applies."); *Mediso Med. Equip. Developing*

*Servs., Ltd*, 75 F. Supp. 3d at 363-64 ("[The] Convention permits courts to set aside the arbitral award only where the party opposing the award's enforcement submits 'proof' to the court that the award" falls under one of the categories for non-enforcement.); *Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007) ("[T]he party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses. . . applies"). "[T]he showing required to avoid summary confirmation is high." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d at 20 (citation omitted). Courts will not second-guess arbitrators' determinations of facts and law, even if incorrect. *See id.* ("[T]his Court 'do[es] not sit to hear claims of factual or legal error by an arbitrator' in the same manner that an appeals court would review the decision of a lower court.") (quoting *Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)); *LaPrade v. Kidder, Peabody & Co., Inc.*, 94 F. Supp. 2d 2, 4 (D.D.C. 2000) ("[A] court must confirm an arbitration award where some colorable support for the award can be gleaned from the record.").

## III.   THERE IS NO REASON NOT TO CONFIRM THE FINAL AWARD

60.    None of the grounds for refusing or deferring confirmation is present here. The Award was the product of an unquestionably thorough and fair arbitration proceeding. The Tribunal gave both parties the opportunity to plead their case. The Tribunal bifurcated the proceeding to consider first Respondent's sole objection to jurisdiction raised in its letter of August 12, 2015. *See supra*, ¶¶ 26-27. In that jurisdictional phase, the Tribunal addressed *sua sponte* other questions of jurisdiction not raised in the Respondent's letter. In carefully analyzing its jurisdiction, the Tribunal ensured that Respondent would not suffer any prejudice as a result of its decision not to participate in the arbitration. The Tribunal's Award on Jurisdiction was subsequently upheld by the Swiss Federal Supreme Court on October 16, 2018.

61.     After affirming its jurisdiction, the Tribunal applied the same rigor to its critical evaluation of the Petitioners' claims, particularly their valuation of the expropriated properties.  The record in the arbitration fully supports the Tribunal's ultimate findings.

62.     The Award is final and binding on the Parties.  The Respondent again approached the Swiss Federal Supreme Court, this time to challenge the final Award.   The Swiss Federal Supreme Court is the court with primary jurisdiction over the arbitration and the "competent authority" within the meaning of Article V(1)(e) of the New York Convention and thus the only court with authority to vacate, modify, or set aside the final Award.  The Swiss Federal Supreme Court dismissed Respondent's challenge of the Award, upholding the Tribunal's decision on the merits.

63.     Finally, U.S. law readily recognizes the use of investor-state treaty arbitration to settle pecuniary claims arising out of a state's sovereign misconduct towards a foreign investment, and recognition of the Award would not be contrary to any applicable U.S. public policy.  *See*, *e.g.*, *BG Group PLC v. Republic of Argentina,* 572 U.S. 25, 44 (2014); *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 69 (D.D.C. 2013) ("The public-policy exception under the New York Convention is construed extremely narrowly and applied 'only where enforcement would violate the forum state's most basic notions of morality and justice.'"), *aff'd* 795 F.3d 200 (D.C. Cir. 2015).

64.     Accordingly, Respondent cannot meet its heavy burden of demonstrating that it has any defense to confirmation of the Award.

## <u>CONCLUSION</u>

65.     For the foregoing reasons, Petitioners respectfully request that the Court confirm the Award in its entirety, together with such other and further relief as the Court deems just and proper and enter judgment against the Respondent accordingly.

WHEREFORE, Petitioners respectfully request that this Court enter an order:

(i)      Recognizing and confirming in its entirety the Award issued on April 12, 2019 that is attached as Exhibit A to the accompanying Declaration of James H. Boykin;

(ii)     Directing judgment to be entered for Petitioners in the following amounts, plus interest from April 22, 2014 until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually:[10]

        a.  to Stabil LLC: USD 2,964,057;
        b.  to Rubenor LLC: USD 534,105;
        c.  to Rustel LLC: USD 2,403,473;
        d.  to Novel-Estate LLC: USD 1,068,210;
        e.  to PII Kirovograd-Nafta LLC: USD 801,158;
        f.  to Crimea-Petrol LLC: USD 267,053;
        g.  to Pirsan LLC: USD 267,053;
        h.  to Trade-Trust LLC: USD 10,280,111;
        i.  to Elefteria LLC: USD 14,234,000;
        j.  to VKF Satek LLC: USD 871,478;
        k.  to Stemv Group LLC: USD 871,478;

(iii)    Directing judgment to be entered in favor of Stabil LLC for compensation for the expropriation of its residential apartment, in the amount of USD 27,238 plus interest from September 3, 2014 until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually;

(iv)    Directing judgment to be entered for Petitioners for the 75% of the costs of the arbitration, which are fixed at EUR 687,085.01, plus Petitioners' costs of legal representation and assistance, thus directing Respondent to pay EUR 46,846.71 and USD 363,621.88 to each Petitioner, plus interest from the date of the Award until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually; and

(v)     Granting such other and further relief as the Court may deem just and proper.

---

[10] Due to the fact that LIBOR rates ceased being published on December 31, 2021, Petitioners seek interest at the rate specified by the Tribunal through December 31, 2021, and interest from January 1, 2022 at a rate to be set by the Court after briefing, such as the SOFR.

Dated: April 9, 2022
     Washington, D.C.

HUGHES HUBBARD & REED LLP

By:   <u>/s/ John M. Townsend</u>
     John M. Townsend (D.C. Bar No. 422674)
     James H. Boykin (D.C. Bar No. 490298)
     Vitaly Morozov (D.C. Bar No. 1013985)
     Eleanor Erney (D.C. Bar No. 1048544)
     Alexander Bedrosyan (D.C. Bar No. 1044386)
     Shayda Vance (D.C. Bar No. 263031)


     1775 I Street, N.W.
     Washington, D.C. 20006-2401
     Telephone:  +1 (202) 721-4600
     Fax:  +1 (202) 721-4646

     *Attorneys for Petitioners*