**PCA Case No. 2015-35**

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL
CONSTITUTED IN ACCORDANCE WITH THE UNCITRAL ARBITRATION RULES 1976
AND THE AGREEMENT BETWEEN THE GOVERNMENT OF THE RUSSIAN
FEDERATION AND THE CABINET OF MINISTERS OF UKRAINE ON THE
ENCOURAGEMENT AND MUTUAL PROTECTION OF INVESTMENTS DATED
27 NOVEMBER 1998**

**- between -**

**(i) STABIL LLC (UKRAINE)
(ii) RUBENOR LLC (UKRAINE)
(iii) RUSTEL LLC (UKRAINE)
(iv) NOVEL-ESTATE LLC (UKRAINE)
(v) PII KIROVOGRAD-NAFTA LLC (UKRAINE)
(vi) CRIMEA-PETROL LLC (UKRAINE)
(vii) PIRSAN LLC (UKRAINE)
(viii) TRADE-TRUST LLC (UKRAINE)
(ix) ELEFTERIA LLC (UKRAINE)
(x) VKF SATEK LLC (UKRAINE)
(xi) STEMV GROUP LLC (UKRAINE)**

**the Claimants**

**- and -**

**THE RUSSIAN FEDERATION**

**the Respondent**

_____

**FINAL AWARD**
_____

**The Arbitral Tribunal:**
Professor Gabrielle Kaufmann-Kohler (Presiding Arbitrator)
Mr. Daniel M. Price
Professor Brigitte Stern

**Secretary of the Tribunal:**
Ms. Eva Kalnina

**Registry:**
The Permanent Court of Arbitration
Ms. Evgeniya Goriatcheva

12 April 2019

TABLE OF CONTENTS

I.      THE PARTIES AND THEIR REPRESENTATIVES ........................................................ 1

II.     OVERVIEW OF THE DISPUTE ........................................................................................ 1

III.    PROCEDURAL HISTORY ................................................................................................. 3

        A.      INITIAL PHASE ......................................................................................................... 3

        B.      JURISDICTIONAL PHASE .......................................................................................... 5

        C.      MERITS AND QUANTUM PHASE ................................................................................ 8

IV.     STATEMENT OF FACTS ................................................................................................ 16

        A.      THE CLAIMANTS AND THEIR INVESTMENTS IN CRIMEA ........................................ 17

        B.      THE INCORPORATION OF CRIMEA BY THE RUSSIAN FEDERATION .......................... 18

        C.      THE FACTS RELATING TO THE CLAIMANTS' INVESTMENTS ..................................... 22

V.      POSITIONS OF THE PARTIES ..................................................................................... 28

        A.      SUMMARY OF THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF ..................... 28

        B.      SUMMARY OF THE RUSSIAN FEDERATION'S POSITION ............................................ 32

VI.     ANALYSIS ......................................................................................................................... 32

        A.      PRELIMINARY MATTERS ........................................................................................ 32

                1. Law Governing the Procedure of this Arbitration ...................................... 32

                2. Subject Matter of this Award ........................................................................ 32

                3. Coordination of Parallel Proceedings .......................................................... 33

                4. Default of the Respondent ............................................................................. 33

                5. Law Governing the Merits ............................................................................. 33

        B.      RELEVANT PROVISIONS ......................................................................................... 34

        C.      ATTRIBUTION ......................................................................................................... 36

                1. The Claimants' Position ................................................................................ 36

                2. Analysis .......................................................................................................... 38

                        (a) Attribution under international law ................................................... 38

                        (b) Are the actions of the Crimean State Council and the
                            Sevastopol Government attributable to the Russian
                            Federation? ...................................................................................... 39

                                i.  ILC Article 4 ........................................................................... 39

                        (c) Are the actions of the Paramilitary Forces attributable to the
                            Russian Federation? ........................................................................ 42

                                i.  ILC Article 5 ........................................................................... 42

                                ii. ILC Article 11 ......................................................................... 50

                        (d) Conclusion ...................................................................................... 51

        D.      LIABILITY ............................................................................................................... 51

                1. The Claimants' Position ................................................................................ 51

                        (a) The expropriation claim .................................................................. 51

**(b) Discriminatory measures** ................................................................ **52**

**(c) Most favored nation protections** ................................................. **53**

    i.  Fair and equitable treatment ................................................ 54

    ii.  Full protection and security ................................................. 55

**(d) Complete and unconditional legal protection of investments** .......... **56**

**2. Analysis** ............................................................................................ **57**

**(a) Expropriation** ....................................................................... **57**

    i.  The legal standard .............................................................. 57

    ii.  Did the Russian Federation expropriate the Claimants'
       investment? ........................................................................ 58

    iii. Was the Russian Federation's expropriation of the Claimants'
       investment lawful? ............................................................. 60

    iv. Conclusion ......................................................................... 69

**(b) Other alleged treaty breaches** ............................................ **69**

**E.**    Reparation ........................................................................................ **69**

**1. Standard of Compensation and Date of Valuation** ....................... **69**

**(a) The Claimants' position** ........................................................ **69**

**(b) Analysis** ............................................................................... **70**

**2. Valuation** .......................................................................................... **72**

**(a) Mr. Kaczmarek's valuation** ................................................... **73**

    i.  Discounted cash flow (DCF) approach ............................... 73

    ii.  Comparable publicly traded company (CPTC) approach .......... 79

    iii. Weighting of the DCF and CPTC approaches .................. 79

    iv. Stabil LLC's residential apartment .................................... 79

    v.  Allocation of damages between the Claimants .................. 80

**(b) Mr. Sénéchal's views** ........................................................... **82**

**(c) The Claimants' comments on Mr. Sénéchal's views** .......... **89**

**(d) Analysis** ............................................................................... **93**

    i.  Selection and weighting of the valuation methods .............. 93

    ii.  Discounted cash flow (DCF) approach ............................... 94

    iii. Comparable publicly traded company (CPTC) approach .......... 115

    iv. Stabil LLC's residential apartment .................................... 115

    v.  Conclusion ........................................................................ 117

**(e) Interest** ............................................................................... **118**

    i.  The Claimant's position .................................................... 118

    ii.  Analysis ............................................................................ 119

**VII.**   **COSTS** ................................................................................................ **120**

**A.**    The Claimants' Position ................................................................. **120**

**B.   RELEVANT PROVISIONS** ....................................................................... **120**

**C.   COSTS OF THE TRIBUNAL, THE APPOINTING AUTHORITY AND THE PCA** ............... **121**

**D.   COSTS OF LEGAL REPRESENTATION AND ASSISTANCE** ....................... **123**

**E.   ALLOCATION OF COSTS** ...................................................................... **123**

**VIII.  OPERATIVE PART** ....................................................................................... **124**

## ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| **Award on Jurisdiction** | Award on Jurisdiction issued in these proceedings on 26 June 2017 |
| **BIT (or Treaty)** | Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated 27 November 1998 |
| **Canada-USSR BIT** | Agreement between the Government of Canada and the Government of the Union of Soviet Socialist Republics for the Promotion and Reciprocal Protections of Investments, dated 20 November 1989 |
| **CAPM** | Capital asset pricing model |
| **CDS** | Credit default swap |
| ***Chorzów*** | *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, Judgment No. 13, Merits (13 September 1928) |
| **Claimants (or the Petrol Companies)** | Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC, Trade-Trust LLC, Elefteria LLC, VKF Satek LLC, and Stemv Group LLC |
| **Claimants' Answers on Merits** | Claimants' Answers to the Tribunal's Questions on Merits Issues, dated 20 November 2017 |
| **Claimants' Comments on the Sénéchal Second Supplementary Report** | Claimants' Comments on the Sénéchal Second Supplementary Report, dated 1 March 2019 |
| **Claimants' Comments on the Sénéchal Supplementary Report** | Claimants' Comments on the Sénéchal Supplementary Report, dated 23 October 2018 |
| **CPTC** | Comparable publicly traded company |
| **Crimea (or Crimean Peninsula)** | Geographical area composed of the administrative units "Autonomous Republic of Crimea" and "City of Special Status Sevastopol," identified in the Ukrainian Constitution |
| **Crimean Property Law** | Law of the Republic of Crimea No. 345-ZRK/2016 "On peculiarities of regulation of particular property relations in the Republic of Crimea" dated 28 December 2016 |
| **Crimean State Council** | State Council of the Republic of Crimea |
| **DCF** | Discounted cash flow |
| ***Everest*** | PCA Case No. 2015-36, *Everest Estate LLC et al. v. The Russian Federation* |
| **FET** | Fair and equitable treatment |
| **First Maggs Report** | Expert report by Professor Peter B. Maggs, dated 9 January 2016 and submitted with the Claimants' Statement of Claim |

| | |
|---|---|
| **FPS** | Full protection and security |
| **Galnaftogaz** | OJSC Concern Galnaftogaz |
| **Hearing on the Merits** | The hearing on the merits that took place in Geneva from 5-6 February 2018 |
| **ILC Articles** | United Nations' International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts, 2001 |
| **ILC Commentary** | United Nations' International Law Commission's Commentary to the Articles on Responsibility of States for Internationally Wrongful Acts |
| **Incorporation** | Incorporation of the Crimean Peninsula to the Russian Federation |
| **Incorporation Treaty** | Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation, dated 18 March 2014 |
| **Kaczmarek Report** | Expert Report of Mr. Brent C. Kaczmarek, CFA, dated 15 January 2016 and submitted with the Claimants' Statement of Claim |
| **Laber Statement** | Witness Statement of Mr. Uriel Laber, dated 6 January 2016 and submitted with the Claimants' Statement of Claim |
| **Militia Order** | Order No. 173-6/14 of the Supreme Council of the Autonomous Republic of Crimea "On the People's Militia of Crimea," dated 11 March 2014 |
| **MFN** | Most favored nation |
| **Nationalization Decree** | Decree No. 2085-6/14 of the Crimean State Council "On Issues of Managing Property of the Republic of Crimea," dated 30 April 2014 |
| **Notice of Arbitration** | The Claimants' Notice of Arbitration, dated 3 June 2015 |
| **Paramilitary Forces** | Paramilitary forces operating on the Crimean Peninsula whose alleged conduct in April 2014 forms a basis for the dispute |
| **Parties** | The Claimants and the Respondent |
| **PCA** | Permanent Court of Arbitration |
| **PCA Case No. 2015-34** | PCA Case No. 2015-34, *PJSC Ukrnafta v. The Russian Federation* |
| **People's Militia** | The People's Militia of Crimea, created by the Militia Order |
| **Petrol Companies (or the Claimants)** | Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC, Trade-Trust LLC, Elefteria LLC, VKF Satek LLC, and Stemv Group LLC |
| **Petrol Station Lessees** | Trade-Trust LLC and Elefteria LLC |
| **Petrol Station Owners** | Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, and Pirsan LLC |

| | |
|---|---|
| **Petrol Ljubljana** | Petrol d.d. Ljubljana |
| **PO1** | Procedural Order No. 1, dated 17 December 2015 |
| **PO2** | Procedural Order No. 2, dated 16 December 2015 |
| **PO6** | Procedural Order No. 6, dated 9 August 2017 |
| **PO9** | Procedural Order No. 9, dated 17 March 2018 |
| **PO12** | Procedural Order No. 12, dated 25 August 2018 |
| **Procedural Timetable** | Procedural timetable established in PO2 |
| **Respondent (or Russia)** | The Russian Federation |
| **Respondent's Letters** | The Respondent's letters dated 12 August and 15 September 2015 |
| **Russia (or Respondent)** | The Russian Federation |
| **Sénéchal Report** | Report dated 16 July 2018 by the Tribunal-appointed expert, Mr. Thierry Sénéchal |
| **Sénéchal Second Supplementary Report** | Second Supplementary Report dated 1 March 2019 by the Tribunal-appointed expert, Mr. Thierry Sénéchal |
| **Sénéchal Supplementary Report** | Supplementary Report dated 13 October 2018 by the Tribunal-appointed expert, Mr. Thierry Sénéchal |
| **Sevastopol Government** | Government of the Federal City of Sevastopol |
| **Sevastopol Order** | Order No. 401 of the Sevastopol Government "On the assignment of property under right of economic management to SUE City Petrol Station Complex," dated 11 November 2014 |
| **Sevastopol Resolution** | Resolution No. 67-PP of the Sevastopol Government, dated 8 February 2018 |
| **Simferopol District Court** | Kievskiy District Court in the City of Simferopol |
| **Statement of Claim** | The Claimants' Statement of Claim, dated 15 January 2016 |
| **Storage Facility Owners** | VKF Satek LLC and Stemv Group LLC |
| **Treaty (or BIT)** | Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated 27 November 1998 |
| **Ukrnafta** | PJSC Ukrnafta, the claimant in PCA Case No. 2015-34 |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law 1976 |
| **VCLT** | Vienna Convention on the Law of Treaties, dated 23 May 1969 |
| **WACC** | Weighted Average Cost of Capital |

## I.    THE PARTIES AND THEIR REPRESENTATIVES

1.    The claimants are Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC (the "Petrol Station Owners"), Trade-Trust LLC, Elefteria LLC (the "Petrol Station Lessees"), VKF Satek LLC, and Stemv Group LLC (the "Storage Facility Owners"), all companies incorporated and existing under the laws of Ukraine (hereinafter collectively referred to as the "Claimants" or the "Petrol Companies"). The Claimants are represented in these proceedings by: Messrs. John M. Townsend, James H. Boykin and Vitaly Morozov, and Ms. Eleanor Erney of Hughes Hubbard & Reed LLP, 1775 I Street NW, Washington, D.C. 20006, United States of America; and Mr. Leon Ioannou of Hughes Hubbard & Reed LLP, 8 rue de Presbourg, 75116 Paris, France.

2.    The respondent is the Russian Federation ("Russia" or the "Respondent," and together with the Claimants, the "Parties"). The Respondent has not appointed any agents or representatives in these proceedings.

## II.   OVERVIEW OF THE DISPUTE

3.    The Claimants seek compensation for a series of measures taken by the Respondent "that disrupted and eventually destroyed [their] Crimean operations," culminating in the dispossession and nationalization of their network of 31 petrol stations and associated assets in Crimea. [1] According to the Claimants, the Respondent's conduct was motivated by hostility toward Mr. Igor Valerievich Kolomoisky, "a well-known Ukrainian businessman and the former Governor of the Dnepropetrovsk State Administration in Ukraine, [who] is one of the Petrol Companies' beneficial owners." [2] The Claimants submit that, by its conduct, the Respondent has violated Articles 2, 3, and 5 of the Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated 27 November 1998 (the "Treaty" or "BIT").

4.    Although invited by the Tribunal to do so, the Respondent did not file a Statement of Defense or otherwise participate in these proceedings. Its only communications in the context of these proceedings were a letter dated 12 August 2015 from its Ministry of

---

[1]    Statement of Claim, § 1.3.

[2]    Statement of Claim, §§ 1.4, 3.63.

Justice and a cover letter dated 15 September 2015 from its Ambassador to the Kingdom of the Netherlands (the "Respondent's Letters").

5.   In its letter dated 12 August 2015, the Ministry of Justice wrote as follows:

> We return you herewith the Notices of Arbitration on the arbitration proceedings initiated under Article 9 of the [Treaty] before the Permanent Court of Arbitration by [the Petrol Companies] vs. the Russian Federation [...].

> It is manifest that such claims cannot be considered under the [Treaty] mentioned above and, therefore, the [Treaty] cannot serve as a basis for composing an arbitral tribunal to settle these claims.

> In accordance with paragraph 1 Article 1 of the [Treaty] the term "investment" means every kind of movable and immovable and intellectual property invested by an investor of one Contracting Party in the territory of the other Contracting Party in accordance with the legislation of the latter Contracting Party. The property in question which is the matter of the claims is situated in the territory of the Crimea and Sevastopol, *i.e.*, in the territory that was a part of Ukraine but at the present time pursuant to the will of people forms an integral part of the territory of the Russian Federation and cannot be regulated by the [Treaty].

> On the basis of the above mentioned the Russian Federation does not recognize the jurisdiction of an international tribunal at the Permanent Court of Arbitration in settlement of the abovementioned claims.

6.   In his cover letter of 15 September 2015 forwarding the one just quoted, the Ambassador of the Russian Federation to the Kingdom of the Netherlands stated:

> Nothing in the attached letter of the Ministry of Justice of the Russian Federation can be interpreted as consent of the Russian Federation to constitution of an arbitral tribunal, participation in arbitration proceedings, or as procedural actions taken in the framework of the proceedings, mentioned therein, or as waiver by the Russian Federation of the jurisdictional immunities in respect of itself and its property in relation to any judicial or administrative proceedings or procedures, connected directly or indirectly with these claims, including immunity from court jurisdiction and immunity from any measures of constraint that can be connected directly or indirectly with these claims, regardless of the jurisdiction (national or supranational) under which they are initiated.

7.  As noted at paragraph 81 of the Award on Jurisdiction of 26 June 2017 (the "Award on Jurisdiction"), the Tribunal understood the Respondent's Letters to constitute an objection to jurisdiction. The objection to jurisdiction was addressed in the Award on Jurisdiction. For purposes of this Award, the Tribunal understands the Respondent's Letters as an objection to the Claimants' requested relief.

## III.   PROCEDURAL HISTORY

8.  The Award on Jurisdiction recounts in detail the procedural history of this arbitration from its commencement until the date on which that Award was issued. In this Section, the Tribunal recalls only the key procedural details from the early phase of the proceedings and describes the developments since June 2017.

### A.   INITIAL PHASE

9.  On 3 June 2015, the Claimants submitted a Notice of Arbitration (the "Notice of Arbitration"), invoking Article 9 of the Treaty and the Arbitration Rules of the United Nations Commission on International Trade Law 1976 (the "UNCITRAL Rules"). According to the Claimants, the Notice of Arbitration was served on Russia on 15 June 2015. [3] On the same day, PJSC Ukrnafta ("Ukrnafta"), a Ukrainian entity represented by the same counsel as the Claimants, also filed a notice of arbitration against Russia under the Treaty (*see* PCA Case No. 2015-34, *PJSC Ukrnafta v. The Russian Federation* ("PCA Case No. 2015-34")).

10.  In their Notice of Arbitration, the Claimants appointed Mr. Daniel M. Price as the first arbitrator in this matter pursuant to Article 7(1) of the UNCITRAL Rules.

11.  The Respondent did not appoint an arbitrator within 30 days of the Claimants' notification of the first arbitrator. Accordingly, on 17 July 2015, the Claimants requested the Secretary-General of the Permanent Court of Arbitration (the "PCA") to designate an appointing authority for the appointment of a second arbitrator pursuant to Article 7(2)(b) of the UNCITRAL Rules.

12.  On 6 August 2015, having sought comments from the Respondent but having received no reply, the Secretary-General of the PCA designated Dr. Michael Hwang as the appointing authority in this matter for all purposes under the UNCITRAL Rules.

---

[3]   Letter from the Claimants to the Secretary-General of the PCA, dated 17 July 2015.

13.  On 18 September 2015, the PCA received the Respondent's Letters. Their contents are set out in paragraphs 5 and 6 above.

14.  In a letter of 25 September 2015, on the invitation of Dr. Hwang, the Claimants provided their comments on the Respondent's Letters, stating that they showed that the Respondent "does not intend to participate in these proceedings." Referring to Articles 7(2) and 28(1) of the UNCITRAL Rules, the Claimants suggested that "nothing stated in the Respondent's [Letters] should prevent the Appointing Authority from proceeding with the appointment of a second arbitrator in this case."

15.  On 28 September 2015, Dr. Hwang appointed Professor Brigitte Stern as the second arbitrator in these proceedings.

16.  On 7 October 2015, the Tribunal was constituted when the co-arbitrators agreed to the appointment of Professor Gabrielle Kaufmann-Kohler as the Presiding Arbitrator pursuant to Article 7(1) of the UNCITRAL Rules. A tribunal comprised of the same members was constituted on the same date in PCA Case No. 2015-34. The PCA informed the Parties of Professor Kaufmann-Kohler's appointment in both cases on 13 October 2015.

17.  By letter of 3 November 2015, the Tribunal (i) accepted the Claimants' proposal for the PCA to act as registry in the present proceedings; (ii) invited the Parties to comment on draft terms of appointment and a draft procedural order (which included the PCA's tasks as fund holder and registry); (iii) proposed dates for a first procedural conference; and (iv) proposed that Ms. Eva Kalnina be appointed as the Secretary of the Tribunal, a description of her tasks being set out in that same letter.

18.  On 6 November 2015, the Claimants agreed to the appointment of Ms. Kalnina as the Secretary of the Tribunal and to the PCA serving as the depository of funds.

19.  On 3 December 2015, the Tribunal held a first procedural telephone conference, concurrently in this matter and in PCA Case No. 2015-34. Although both Parties were invited to participate, the Respondent did not take part in the telephone conference.

20.  On 14 December 2015, the Tribunal wrote to His Excellency Mr. Alexander Vasilievich Shulgin, Ambassador of the Russian Federation to the Netherlands, advising him that, "failing receipt of other instructions […], the Tribunal and the Parties will serve all documents in relation to these proceedings by email on [Mr. Shulgin] as the sole

representative of the Russian Federation in [this matter]," with a copy to the e-mail address of the Russian Ministry of Justice.

21.     On 16 and 17 December 2015, the Tribunal issued Procedural Orders Nos. 1 and 2 ("PO1" and "PO2"), in which it fixed Geneva (Switzerland) as the seat of the arbitration, appointed the PCA as registry, set forth provisions concerning the PCA's remuneration, and established a procedural timetable (the "Procedural Timetable"). In PO1, the Tribunal indicated that, "[i]n light of the commonalities of fact and law involved […] and of the identical composition of the Tribunal in [this matter and the related PCA Case No. 2015-34]," the Tribunal would "seek to structure both proceedings […] in such a manner as to minimize duplication and avoid unnecessary costs whenever possible."[4] Accordingly, the Tribunal determined that correspondence and hearings would in principle be common to both cases, while written submissions as well as the Tribunal's awards would remain separate.

**B.     JURISDICTIONAL PHASE**

22.     On 15 January 2016, the Claimants submitted their Statement of Claim (the "Statement of Claim"), which included, *inter alia*, (i) the witness statement of Mr. Uriel Laber, dated 6 January 2016 (the "Laber Statement"); (ii) the expert report on Russian law of Professor Peter B. Maggs, dated 8 January 2016 (the "First Maggs Report"); and (iii) the valuation report of Mr. Brent C. Kaczmarek, CFA, dated 15 January 2016 (the "Kaczmarek Report"). The Claimants included among their exhibits English translations of the BIT from both its Ukrainian and Russian original versions.

23.     On 16 March 2016, the Claimants submitted a "revised English translation" of the BIT, noting that the new translation "conform[ed] more closely to Russian treaty practice than the translation previously submitted."

24.     On 5 April 2016, the Tribunal invited the Parties to state whether they had any objection to the PCA occasionally publishing information about the progress of this arbitration in a press release. The Claimants agreed to such publication on 18 April 2016, while the Respondent did not reply.

25.     The Respondent failed to submit its Statement of Defense by 15 April 2016, the time limit fixed by the Tribunal in the Procedural Timetable.

---

[4]     PO1, § 5.2.

26.   On 22 April 2016, the Tribunal ordered that the proceedings continue notwithstanding the Respondent's failure to communicate its Statement of Defense pursuant to Article 28(1) of the UNCITRAL Rules and informed the Parties that, accordingly, Scenario 2 of the Procedural Timetable would apply.

27.   As foreseen in Scenario 2 of the Procedural Timetable, by letter dated 22 April 2016, the Tribunal posed questions to the Parties with respect to issues of jurisdiction. In the same letter, the Tribunal also (i) invited the Parties to state whether they had any objection to a counsel from the PCA assisting the Tribunal Secretary in her tasks as outlined in the Tribunal's letter of 3 November 2015, and (ii) asked the Parties to provide their comments on a draft press release prepared by the PCA concerning certain procedural steps in the present proceedings. On 1 May 2016, the Claimants confirmed that they had no objection to the PCA providing assistance to the Tribunal Secretary and provided their comments on the press release. The Respondent submitted no comments.

28.   On 2 May 2016, the PCA issued a press release in the present proceedings, which was published on its website.

29.   On 23 May 2016, having sought the Parties' comments on the possible appointment and choice of, as well as instructions to be given to, a translator, the Tribunal appointed Mr. Igor Vesler, a translator, to produce a new English translation of the BIT from its Russian and Ukrainian original versions. Copies of the translation produced by Mr. Vesler were subsequently communicated to the Parties for their comments.

30.   On 3 June 2016, the Claimants submitted their answers to the Tribunal's questions on jurisdiction. The Respondent filed no responses to the Tribunal's questions.

31.   On 8 June 2016, the Tribunal, the Claimants, and the claimant in PCA Case No. 2015-34 held an organizational pre-hearing telephone conference. Although the Respondent was invited to participate in the conference, it did not do so. Following the conference, the Tribunal issued Procedural Order No. 3 on 13 June 2016.

32.   On 17 June 2016, the Claimants submitted their comments on Mr. Vesler's translation of the BIT. The Respondent did not submit comments.

33.   On 21 June 2016, having consulted the Parties, the Tribunal issued Procedural Order No. 4, admitting into the record of these proceedings a submission of Ukraine as non-disputing party to the Treaty and granting the Parties until 28 June 2016 to submit

comments on Ukraine's submission. The Claimants provided their comments within this time. The Respondent remained silent.

34.     On 1 July 2016, having consulted the Parties, the Tribunal denied an application from Ukraine to attend and make oral submissions at the hearing on jurisdiction.

35.     The hearing on jurisdiction was held on 11 July 2016 in Geneva, concurrently in this matter and in PCA Case No. 2015-34. The Respondent was invited to participate, but did not do so.

36.     On 18 July 2016, the Tribunal issued Procedural Order No. 5, in which it provided post-hearing directions, including questions to be addressed in the Parties' post-hearing briefs.

37.     On 4 August 2016, after inviting the Parties' comments on a draft, the PCA issued a second press release regarding the present proceedings.

38.     On 26 August 2016, the Claimants submitted their post-hearing brief on jurisdiction. The Respondent did not submit a post-hearing brief.

39.     In March 2017, with the permission of the Tribunal, the Claimants submitted into the record of these proceedings the jurisdictional awards issued in February and March 2017 in (i) PCA Case No. 2015-07, *Aeroport Belbek LLC and Mr. Igor Valerievich Kolomoisky v. The Russian Federation*; (ii) PCA Case No. 2015-21, *JSC CB PrivatBank and Finance Company Finilon LLC v. The Russian Federation*; and (iii) PCA Case No. 2015-36, *Everest Estate LLC et al. v. The Russian Federation* ("*Everest*").

40.     On 26 June 2017, the Tribunal issued the Award on Jurisdiction, which forms an integral part of the present Award. In the operative part, the Tribunal declared and decided as follows:

(i)     The Tribunal has jurisdiction over the dispute submitted to it in this arbitration;

(ii)    The Tribunal will take the necessary steps for the continuation of the proceedings toward the liability phase;

(iii)   The Tribunal reserves the decision on the costs of the jurisdictional phase for a later stage of the proceedings.

41. In concluding that it had jurisdiction over the present dispute, the Tribunal held that "the dispute falls within the territorial and temporal scope of application of the Treaty and that the Claimants qualify as 'investors' under the Treaty, having made an 'investment' in the territory of Russia in accordance with its legislation."[5]

42. The tribunal in PCA Case No. 2015-34, comprised of the same members as the Tribunal in this case, also rendered an award on jurisdiction on 26 June 2017.

43. On 4 July 2017, after inviting the Parties' comments on a draft, the PCA issued a third press release regarding these proceedings.

44. On 14 August 2017, the Russian Federation filed an action for annulment of the Award on Jurisdiction before the Swiss Supreme Court or Federal Tribunal, which is the court with jurisdiction to rule on awards issued in international arbitrations seated in Switzerland. In addition to the annulment, the Respondent requested the Federal Tribunal to stay the arbitration pending the annulment proceedings. This request was withdrawn on 5 January 2017 and the arbitration was continued while the Federal Tribunal considered the annulment action.

45. Having received two rounds of written submissions and issued various orders on the conduct of the proceedings, including an order denying a request for security for costs, in a public deliberation held on 16 October 2018, the Swiss Supreme Court denied the request for annulment, holding that the arbitral tribunal had correctly interpreted the Treaty and declared itself to have jurisdiction over this dispute.

**C.   MERITS AND QUANTUM PHASE**

46. On 9 August 2017, having sought the views of the Parties and circulated a draft for their comments, the Tribunal issued Procedural Order No. 6 ("PO6"), establishing a procedural calendar for the merits phase of the proceedings.

47. On 21 September 2017, in accordance with the timetable established in PO6, the Tribunal posed questions on merits issues to the Parties.

---

[5]   Award on Jurisdiction, § 233.

48.   On 20 November 2017, the Claimants submitted their responses to the Tribunal's questions on merits issues (the "Claimants' Answers on Merits"). The Respondent did not submit any responses.

49.   On 7 December 2017, the Tribunal, the Claimants, and the claimant in PCA Case No. 2015-34 held a pre-hearing telephone conference to discuss issues pertaining to the organization of the hearing on the merits scheduled to take place from 5-6 February 2018 in Geneva, concurrently in this matter and PCA Case No. 2015-34 (the "Hearing on the Merits"). Although the Respondent was invited to participate in the conference, it did not do so.

50.   On 8 December 2017, the Tribunal circulated an audio-recording of the teleconference to the Parties and issued Procedural Order No. 7, deciding the outstanding issues pertaining to the organization of the Hearing on the Merits.

51.   The Hearing on the Merits took place from 5-6 February 2018 in Geneva as scheduled. The Respondent was invited to participate, but did not take part in the Hearing. The following individuals were in attendance:

**Tribunal:**
Professor Gabrielle Kaufmann-Kohler (presiding)
Mr. Daniel M. Price
Professor Brigitte Stern

**Secretary of the Tribunal:**
Ms. Eva Kalnina

**PCA Legal Counsel:**
Ms. Evgeniya Goriatcheva

**Claimants:**
Mr. John M. Townsend, Hughes Hubbard and Reed LLP
Mr. James H. Boykin, Hughes Hubbard and Reed LLP
Mr. Marc-Olivier Langlois, Hughes Hubbard and Reed LLP
Mr. Leon Ioannou, Hughes Hubbard and Reed LLP
Mr. Vitaly Morozov, Hughes Hubbard and Reed LLP
Ms. Eleanor Erney, Hughes Hubbard and Reed LLP
Mr. Alexander Bedrosyan, Hughes Hubbard and Reed LLP
Ms. Ekaterina Botchkareva, Hughes Hubbard and Reed LLP
Mr. Iegor Sierov, representative of the claimant in PCA Case No. 2015-34
Mr. Anatoliy Keda, representative of the claimant in PCA Case No. 2015-34
Mr. Uriel Laber, Claimants' fact witness
Mr. Vyacheslav Kartashov, fact witness for the claimant in PCA Case No. 2015-34
Mr. Brent C. Kaczmarek, Claimants' quantum expert
Ms. Alayna Tira, assistant to Mr. Kaczmarek

**Court reporter:**
Mr. David Kasdan

**Interpreters:**
Mr. Sergei Mikheyev
Mr. Yuri Somov

52.  At the request of the claimant in PCA Case No. 2015-34, one of its representatives, Ms. Viktoriia Ishchenko, also received a live feed of the hearing transcript in Kyiv.

53.  In the course of the Hearing on the Merits, Mr. Townsend addressed the Tribunal in an opening statement on behalf of the Claimants and the claimant in PCA Case No. 2015-34. The Tribunal heard the following fact and expert witnesses presented by the Claimants: (i) Mr. Uriel Laber, a shareholder and representative of shareholders of the Claimants, who was responsible for managing all financial and commercial aspects of the Claimants' businesses (as well as a minority shareholder and member of the supervisory board of the claimant in PCA Case No. 2015-34); and (ii) Mr. Brent C. Kaczmarek, the Claimants' expert on quantum. The Tribunal put questions to each of these fact and expert witnesses. It also put questions to the Claimants' counsel.

54.  As the Hearing on the Merits in these proceedings was held concurrently with the hearing in PCA Case No. 2015-34, the Tribunal also heard Mr. Vyacheslav Kartashov, a legal director of Ukrnafta, whose witness statement had been filed in PCA Case No. 2015-34 only. At the end of the hearing, the Claimants made an application "that the Tribunal consider that all of the evidence it ha[d] heard [during the Hearing on the Merits] be considered to have been presented in both cases."[6]

55.  The court reporter sent electronic copies of the hearing transcript to the Parties at the end of each hearing day.

56.  On 7 February 2018, the Tribunal issued Procedural Order No. 8, in which it (i) denied the Claimants' application that the Tribunal consider that all of the evidence it had heard during the Hearing on the Merits be considered to have been presented in both this case and PCA Case No. 2015-34; and (ii) informed the Parties that, in accordance with Article 27 of the UNCITRAL Rules and Paragraph 6.4 of PO2, it intended to appoint an expert to prepare a written report responding to specific questions regarding the quantum of damages.

57.  On 13 February 2018, the Tribunal sent the audio-recording of the Hearing on the Merits to the Parties.

---

[6]   Transcript 6 February 2018, 333/13-19.

58.   On 19 February 2018, after inviting the Parties' comments on a draft, the PCA issued a fourth press release regarding these proceedings.

59.   On 22 February 2018, arbitrator Price made a disclosure regarding the hiring of a trade policy advisor, Ms. Tuninetti, at a consulting firm of which he is a partner, Rock Creek Global Advisors LLC (RCGA). Arbitrator Price noted that Ms. Tuninetti had previously been part of the legal team representing Ukraine in several unrelated matters. Arbitrator Price also stated that during her employment at RCGA, "she will not be involved in any capacity, neither administrative nor substantive, in my work as an arbitrator in the cases captioned above. She will not have access to the files in either electronic or hard copy form. She will be screened completely." The PCA transmitted arbitrator Price's letter to the Parties on 23 February 2018. Neither side provided any comments.

60.   On 28 February 2018, having conducted a search for experts with appropriate qualifications, independence, and availability, the Tribunal sought the Parties' comments on the prospective appointment of Mr. Thierry Sénéchal as the Tribunal expert on quantum and his draft terms of reference. It also provided the Parties with Mr. Sénéchal's *curriculum vitae*.

61.   By letter dated 6 March 2018, the Claimants sought a clarification regarding Mr. Sénéchal's experience in performing valuations in Russia and Ukraine. On 9 March 2018, following Mr. Sénéchal's reply to their queries, the Claimants stated that they had no further comments on the proposal to appoint Mr. Sénéchal as a Tribunal expert. The Respondent submitted no comments.

62.   On 17 March 2018, the Tribunal issued Procedural Order No. 9 ("PO9"), setting forth Mr. Sénéchal's terms of reference. The scope of his task was circumscribed by 11 specific questions addressing various aspects of the Kaczmarek Report. PO9 also provided for the expert procedure as follows: (i) the expert was to submit his draft report by 30 May 2018; (ii) after reviewing the expert's draft report and possibly asking for clarifications from the expert, the Tribunal was to afford the Parties a period of 21 days to submit their comments on the expert's draft report as well as to state whether they wished to examine the expert in person; and (iii) the expert was then to submit his final report, on which the Parties had an opportunity to make supplemental comments within 14 days.

63.   On 31 March 2018, after having sought the Parties' comments, the Tribunal issued Procedural Order No. 10, establishing a timetable for the Tribunal expert procedure

and in particular providing that, after receiving Mr. Sénéchal's draft report and the Parties' comments thereon, the Tribunal would, if needed, fix a place and time (no later than 20 August 2018) for a one-day hearing to examine Mr. Sénéchal.

64.   On 28 May 2018, upon the Claimants' proposal and having sought the Respondent's comments to no avail, the Tribunal invited the Claimants to submit into the record of this arbitration the Award on the Merits issued on 2 May 2018 in the *Everest* case, which the Claimants did on 29 May 2018.

65.   The Tribunal also invited the Parties to provide it with a copy of the Law of the Republic of Crimea No. 345-ZRK/2016 entitled "On peculiarities of regulation of particular property relations in the Republic of Crimea" dated 28 December 2016 (the "Crimean Property Law"), and invited the Parties' comments.

66.   On 30 May 2018, Mr. Sénéchal submitted his draft report, which the Tribunal reviewed as provided in PO9 and communicated to the Parties on 13 June 2018.

67.   On 15 June 2018, the Claimants submitted a copy of the Crimean Property Law and provided their comments thereon. The Claimants also filed an analogous decree issued by the Government of the Federal City of Sevastopol (the "Sevastopol Government"), namely Resolution No. 67 entitled "On approval of the procedure for issuing decisions on compensation for the value of property declared to be property of the city of Sevastopol that was previously private property" dated 8 February 2018 (the "Sevastopol Resolution"). In addition, the Claimants sought to introduce into the record eight exhibits in support of their comments on the Crimean Property Law. The Respondent did not submit any comments on the Crimean Property Law.

68.   By letter dated 16 June 2018, the Tribunal invited the Respondent to comment on the Claimants' request to file additional exhibits. The Respondent did not reply.

69.   By letter of 2 July 2018, the Tribunal informed the Parties that the Claimants' request to introduce additional exhibits into the record was granted with respect to three exhibits (which were official publications) and denied with respect to four exhibits (which were news publications). With respect to the eighth exhibit that the Claimants sought to file – an article published in the newspaper Kommersant on 13 October 2017 – the Tribunal invited further submissions from the Parties. Specifically, the Tribunal noted the Claimants' assertions of 15 June 2018, based on the Kommersant article, that "[t]he Russian Ministry of Justice was itself reported by the press to have argued before the Constitutional Court that the Crimean Property Law violates the Russian Constitution,

because it contains so many exceptions." The Tribunal invited the Respondent to comment on the Claimants' assertions by 9 July 2018 and to provide, within the same time limit, a copy of any submissions or comments made by the Russian Ministry of Justice or any other State organ regarding the Crimean Property Law, indicating that it would make a decision on admission of the Kommersant article thereafter. The Respondent submitted no reply. In light of its findings regarding the Crimean Property Law in this Award (see paragraphs 247-253 below), the Tribunal can dispense with making any finding based on the Kommersant article. Accordingly, the Claimants' request to introduce the Kommersant article is hereby denied.

70.   In its letter of 2 July 2018, the Tribunal also informed the Parties that on 18 June 2018, the PCA had received a Note Verbale from the Embassy of the Russian Federation in the Kingdom of the Netherlands, stating that:

> In accordance with the President's decree No 271 of 28 May 2018 the Regulations of the Ministry of Justice have been amended. The Ministry is henceforth entrusted with representation of the Russian Federation and/or protection of the interests of the Russian Federation in international arbitration bodies (except for inter-state disputes and disputes involving international organisations to which the Russian Federation is a party, as well as disputes arising of contractual obligations of diplomatic representations and consulates of the Russian Federation), unless otherwise explicitly stipulated in corresponding decisions of the Governments or decisions of the President of the Russian Federation.
>
> The responsible structural division of the Ministry of Justice of the Russian Federation is the Department of International Law and Cooperation (address: 14 Zhitnaya str. Moscow, GSP-1 119991, Russia; fax: +7 (495 677-06087; e-mail: legalprotection@minjust.ru).

71.   The Tribunal informed the Parties that the address of the Department of International Law and Cooperation of the Ministry of Justice of the Russian Federation would be added to all future correspondence in this matter.

72.   On 3 July 2018, the Claimants submitted their comments on Mr. Sénéchal's draft report. They noted that they did not deem it necessary to hear Mr. Sénéchal in person. The Respondent did not submit comments.

73.  By letter from the PCA dated 13 July 2018, the Tribunal (i) informed the Parties that it wished to hear Mr. Sénéchal at a hearing; (ii) confirmed that the hearing would take place on 20 August 2018 in Geneva; (iii) requested that the Claimants make their expert on quantum, Mr. Kaczmarek, available at the hearing in the event that the Tribunal had questions for him after hearing Mr. Sénéchal; and (iv) circulated a draft hearing agenda for the Parties' comments.

74.  On 16 July 2018, Mr. Sénéchal submitted his final report, which was communicated to the Parties the following day (the "Sénéchal Report").

75.  On 20 July 2018, the Claimants submitted their comments on the draft hearing agenda. The Respondent did not submit comments.

76.  On 26 July 2018, after having consulting the Parties, the Tribunal issued Procedural Order No. 11, setting forth its hearing directions and agenda.

77.  On 31 July 2018, the Claimants submitted their comments on the Sénéchal Report. The Respondent did not submit comments.

78.  On 20 August 2018, the hearing took place in Geneva, as scheduled. The Respondent was invited to participate, but did not take part in the hearing. The following individuals were in attendance:

**Tribunal:**
Professor Gabrielle Kaufmann-Kohler (presiding)
Mr. Daniel M. Price
Professor Brigitte Stern

**Secretary of the Tribunal:**
Ms. Eva Kalnina

**PCA Legal Counsel:**
Ms. Evgeniya Goriatcheva

**Tribunal-appointed expert on quantum:**
Mr. Thierry Sénéchal

**Claimants:**
Mr. John M. Townsend, Hughes Hubbard and Reed LLP
Mr. James H. Boykin, Hughes Hubbard and Reed LLP
Mr. Leon Ioannou, Hughes Hubbard and Reed LLP
Mr. Vitaly Morozov, Hughes Hubbard and Reed LLP
Ms. Eleanor Erney, Hughes Hubbard and Reed LLP
Ms. Viktoriia Ishchenko, representative of the claimant in PCA Case No. 2015-34
Mr. Anatoliy Keda, representative of the claimant in PCA Case No. 2015-34
Mr. Brent C. Kaczmarek, Claimants' quantum expert

**Court reporter:**
Mr. David Kasdan

79.   During the hearing and in accordance with the agenda, the Tribunal first put questions to Mr. Sénéchal and then to Mr. Kaczmarek. The Claimants were also allowed to put questions to the experts within the scope of the Tribunal's examination and of the few paragraphs in the Sénéchal Report that had not appeared in his draft report. At the end of the hearing, the Claimants' counsel made brief closing remarks and the Tribunal discussed next steps with the two experts and the Claimants.

80.   The court reporter provided electronic copies of the hearing transcript to the Parties at the end of the hearing.

81.   On 22 August 2018, as requested by the Tribunal at the hearing, the Claimants submitted into the record a copy of Mr. Kaczmarek's model for his discounted cash flow analysis.

82.   On 23 August 2018, also as requested during the hearing, the Claimants submitted a written response to a question put to them by Professor Stern.

83.   On the same day, the Tribunal sent the audio-recording of the hearing to the Parties.

84.   On 25 August 2018, the Tribunal issued Procedural Order No. 12 ("PO12"), setting forth the post-hearing directions discussed at the end of the hearing. *Inter alia*, the Tribunal requested the Claimants to submit into the record the model for Mr. Kaczmarek's comparable companies' analysis. The Tribunal also expanded Mr. Sénéchal's terms of reference, requesting that he (i) review Mr. Kaczmarek's models for the discounted cash flow and comparable companies' analyses for the accuracy of the calculations and the consistency of the models; and (ii) prepare a supplementary report containing an alternative valuation of the Claimants' petrol stations, remedying any inaccuracies or inconsistencies identified in the models and adjusting as he deemed appropriate two variables used in Mr. Kaczmarek's discounted cash flow analysis. These variables, namely, the projected revenues arising from a planned renovation program of the petrol stations and the long-term growth rate used in the calculation of the terminal value, were the ones which Mr. Sénéchal had identified as inaccurate in his examination. The Tribunal indicated that it would provide specifications regarding the date of valuation and the benchmark market shortly after 31 August 2018.

85.   On 27 August 2018, the Claimants submitted a copy of Mr. Kaczmarek's model for his comparable companies' analysis into the record.

86.   On 28 August 2018, the Claimants submitted an additional appendix to the Kaczmarek Report "further particularizing the damages claimed by each Claimant."

87.   On 12 September 2018, the Tribunal informed the Parties that it had requested Mr. Sénéchal to carry out his alternative valuation pursuant to PO12 using 22 April 2014 as the valuation date and Russia as the benchmark market.

88.   On 13 October 2018, the Tribunal transmitted Mr. Sénéchal's supplementary report (the "Sénéchal Supplementary Report") to the Parties and invited their comments.

89.   On 23 October 2018, the Claimants submitted comments on the Sénéchal Supplementary Report (the "Claimants' Comments on the Sénéchal Supplementary Report"). The Respondent did not comment.

90.   On 29 October 2018, the Tribunal invited the Parties to submit their statements of costs in accordance with PO12, which the Claimants did by filing their Application for Costs on 2 November 2018, while the Respondent made no submission.

91.   On 19 February 2019, the Tribunal informed the Parties that it would request Mr. Sénéchal to prepare a further valuation of the Claimants' Crimean petrol stations and storage facilities implementing specific assumptions identified by the Tribunal.

92.   On 5 March 2019, the Tribunal transmitted Mr. Sénéchal's second supplementary report (the "Sénéchal Second Supplementary Report") to the Parties and invited their comments.

93.   The Claimants submitted their comments on 15 March 2019 (the "Claimants' Comments on the Sénéchal Second Supplementary Report"). The Respondent did not comment.

## IV.   STATEMENT OF FACTS

94.   As a preliminary matter, the Tribunal notes that in this Award it uses the terms "Crimea" and "Crimean Peninsula" interchangeably to refer to the geographical area composed of the administrative units "Autonomous Republic of Crimea" and "City of Special Status Sevastopol" identified in the Ukrainian Constitution. The Tribunal uses the latter two terms or "Republic of Crimea" and "Federal City of Sevastopol" (which are the

terms used under Russian law to refer to the region and city within the Russian Federation) for descriptive purposes only, without expressing any view about their legal status.

## A.   THE CLAIMANTS AND THEIR INVESTMENTS IN CRIMEA

95.   Together, the eleven Claimants owned, operated, and supplied a chain of 31 petrol stations in Crimea.[7] Of these 31 petrol stations, 17 were located in the Autonomous Republic of Crimea and 14 were located in the city of Sevastopol.[8]

96.   The Petrol Station Owners – Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, and Pirsan LLC – acquired title to or built the 31 petrol stations between 2000 and 2010.[9] Further, the Petrol Station Owners either owned or leased the land on which the petrol stations were built. They also owned other real estate and a fleet of vehicles.[10] Stabil LLC, one of the Petrol Station Owners, owned an office building in Feodosia, Crimea, which served as the management headquarters for the Claimants' petrol stations, as well as for the petrol stations of Ukrnafta, the claimant in PCA Case No. 2015-34.[11]

97.   From 2010 to 2011, the Petrol Station Lessees, Trade-Trust LLC and Elefteria LLC, obtained rights to lease and operate the petrol stations and the adjoining convenience stores from the Petrol Station Owners.[12]

98.   The Storage Facility Owners, VKF Satek LLC and Stemv Group LLC, owned two storage facilities in the cities of Simferopol and Sevastopol, respectively; these were

---

[7]   Laber Statement, § 1 (CWS-1).

[8]   Laber Statement, §§ 35-37 (CWS-1); Transcript 5 February 2018, 12/9-13 (the Claimants' opening statement).

[9]   Statement of Claim, § 2.1, *referring to* Laber Statement, § 10 (CWS-1); Stabil LLC Documents Establishing Ownership of Property (2002-2010) (C-8); Rubenor LLC Documents Establishing Ownership of Property (2007-2008) (C-10); Rustel LLC Documents Establishing Ownership of Property (26 April 2014) (C-73); Novel-Estate LLC Documents Establishing Ownership of Property (2008-2010) (C-11); PII Kirovograd-Nafta LLC Documents Establishing Ownership of Property (2000) (C-5); Crimea-Petrol LLC Extract from Register of Proprietary Rights to Real Estate (25 July 2006) (C-9); Pirsan LLC Extract from Register of Proprietary Rights to Real Estate (21 March 2011) (C-22); VKF Satek LLC Extract from Register of Proprietary Rights to Real Estate (1 August 2013) (C-23); Stemv Group LLC Extract from Register of Proprietary Rights to Real Estate (30 December 2013) (C-24).

[10]   Laber Statement, § 10 (CWS-1).

[11]   Laber Statement, § 12 (CWS-1); Transcript 5 February 2018, 14/15-19 (the Claimants' opening statement).

[12]   Laber Statement, § 13 (CWS-1).

used to store reserve fuel and supply petroleum products (which were largely sourced from outside Crimea[13]) to the petrol stations.[14]

99.  Mr. Kolomoisky, whose connections both to the Claimants in this matter and to the claimant in PCA Case No. 2015-34, Ukrnafta, are alleged to have been the motivating factor for the Respondent's expropriation of their assets, is a beneficial owner of the Claimants.[15]

### B.   THE INCORPORATION OF CRIMEA BY THE RUSSIAN FEDERATION

100.  As noted in the Award on Jurisdiction, the dispute before the Tribunal arose in the context of the incorporation of Crimea into the Russian Federation (the "Incorporation"). These events have been extensively documented and feature prominently in the Claimants' pleadings. The following account, excerpted from media reports contained in the record, provides an overview of the most relevant events for present purposes. The Tribunal emphasizes that it is using the term "Incorporation" and later "Incorporation Treaty", rather than the terms "annexation" or "Annexation Treaty" used by the Claimants, to make clear that it expresses no view on the legality of the inclusion of Crimea into the Russian Federation, because it need not resolve that issue in order to decide the dispute before it.

101.  On 22 February 2014, then-Ukrainian President Viktor Yanukovych left Ukraine following a series of protests in the country against his administration.[16] Media outlets have reported that Russian President Vladimir Putin "ordered work on 'returning Crimea'" immediately following President Yanukovych's departure.[17]

102.  On 23 February 2014, the leader of the Crimean "Russian Unity Party," Mr. Sergei Aksyonov, described the formation of "rapid-response groups" and patrols in Simferopol to defend "the interests of the Crimeans and Crimean Russians who live in

---

[13]  Laber Statement, §§ 17-18 (CWS-1).

[14]  Laber Statement, § 14 (CWS-1).

[15]  Statement of Claim, §§ 1.4, 3.63; Transcript 5 February 2018, 109-110 (testimony of Mr. Laber), where Mr. Laber explains that Mr. Kolomoisky and his business partner Mr. Bogolyubov together had a majority shareholding in each of the Claimants.

[16]  *Putin: Russia helped Yanukovych to flee Ukraine*, BBC (24 October 2014) (C-93).

[17]  *Putin reveals secrets of Russia's Crimea takeover plot*, BBC (9 March 2015) (C-101).

the autonomous republic."[18] Mr. Alexey Chaly, a Russian national, "emerged as the de facto mayor" of Sevastopol on 25 February 2014.[19]

103. On 27 February 2014, gunmen "dressed in fatigues" stormed Crimea's regional administrative complex in Simferopol, establishing control over the parliament and ministerial building of the Autonomous Republic of Crimea, and raised the Russian flag above the building.[20] These forces also surrounded Ukrainian military bases and seized control of the Simferopol and Belbek airports. In a special session, the parliament of the Autonomous Republic of Crimea named Mr. Aksyonov as prime minister.[21]

104. On 28 February 2014, Russian military forces consolidated control over the Crimean Peninsula. A Russian Black Sea Fleet missile boat blocked the exit to Balaklava Harbor in Sevastopol to Ukrainian State Border Service ships; a Russian armored personnel carrier was observed on the streets of Sevastopol;[22] and Russian military transport planes landed outside Simferopol.[23]

105. On 1 March 2014, President Putin submitted an appeal to the Russian Federation Council, the upper house of Russia's federal legislature, to "use the armed forces of the Russian Federation on the territory of Ukraine until the social and political situation in that country is normalized."[24] The request was granted on the same day.[25]

---

[18] *Aksyonov: Rally of volunteer patrols in Simferopol is a celebration of February 23*, Center for Journalistic Investigations (23 February 2014) (C-26).

[19] Paul Sonne, *In Crimea, backlash to uprising lifts pro-Russia leader*, Wall Street Journal (25 February 2014) (C-27).

[20] Harriet Salem, *Crimean parliament seized by unknown pro-Russian gunmen*, Guardian (27 February 2014) (C-29).

[21] Alissa de Carbonnel, *How the separatists delivered Crimea to Moscow*, Reuters (12 March 2014) (C-48); Paul Sonne, *Crimea checkpoints raise secession fears*, Wall Street Journal (28 February 2014) (C-33); David M. Herszenhorn, Mark Landler, and Alison Smale, *With military moves seen in Ukraine, Obama warns Russia*, New York Times (28 February 2014) (C-31).

[22] *In Crimea, a Russian Black Sea Fleet missile boat has blocked the exit [to the sea] for Ukrainian border patrol ships – source*, UNIAN (28 February 2014) (C-32).

[23] *13 Planes with Russian Paratroopers Arrived in Crimea – Kunitsyn*, UNIAN (28 February 2014) (C-30).

[24] *Vladimir Putin submitted appeal to the Federation Council*, Official Site of the President of Russia (1 March 2014) (C-36).

[25] Kathy Lally, Will Englund, and William Booth, *Russian parliament approves use of troops in Ukraine*, Washington Post (1 March 2014) (C-35).

106.  A public referendum took place on 16 March 2014 on the Crimean Peninsula.[26] Of the votes cast, 96% were reportedly in favor of the Incorporation, although numerous allegations of electoral fraud were received by the Office of the United Nations High Commissioner for Human Rights.[27]

107.  On 18 March 2014, the "Republic of Crimea" and the "City of Special Status Sevastopol," the latter of which became known as the "Federal City of Sevastopol" under Russian law, signed the "Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation" (the "Incorporation Treaty"). [28] The Russian Constitutional Court ruled that the Incorporation Treaty was "consistent with the Russian Federation Constitution" on 19 March 2014,[29] and the Incorporation Treaty was approved by the lower and upper houses of Russia's parliament on 20 and 21 March 2014, respectively. [30] The parliament also approved legislation implementing the Incorporation.[31]

108.  On 21 March 2014, President Putin held a signing ceremony for the Incorporation Treaty,[32] which entered into force with retroactive effect as of 18 March.[33] On 25 and

---

[26]   David M. Herszenhorn, *Crimea vote deepens crisis and draws denunciations*, New York Times (6 March 2014) (C-42).

[27]   *Report on Human Rights Situation in Ukraine*, Office of the United Nations High Commissioner for Human Rights (15 April 2014), § 22 (C-68).

[28]   Article 2 of the Incorporation Treaty provides: "From the date of acceptance of the Republic of Crimea into the Russian Federation, new constituent parts shall be formed within the Russian Federation: the Republic of Crimea and the federal city of Sevastopol." (C-58).

[29]   Resolution of the Constitutional Court of the Russian Federation No. 6-P (19 March 2014), p. 14 (C-59). *See also* First Maggs Report, § 31 and its exhibit 12.

[30]   Federal Law of the Russian Federation No. 36-FZ "On Ratification of the Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation" (21 March 2014) (C-63). *See also* First Maggs Report, §§ 37-38 and its exhibit 14.

[31]   Federal Constitutional Law of the Russian Federation No. 6-FKZ "On Accepting the Republic of Crimea and Establishing New Constituent Entities in the Russian Federation: the Republic of Crimea and the Federal City of Sevastopol" (21 March 2014) (C-164.1). *See also* First Maggs Report, § 38 and its exhibit 13.

[32]   *Ceremony signing the laws on admitting Crimea and Sevastopol to the Russian Federation*, Official Site of the President of Russia (21 March 2014) (C-61). *See also* First Maggs Report, § 39 and its exhibit 15.

[33]   Incorporation Treaty, Art. 10 (C-58).

31 July 2014, the Respondent enacted legislation guaranteeing pre-existing property rights in Crimea.[34]

109. According to the Claimants, despite initial denials,[35] President Putin recognized in a television appearance dated 17 April 2014 that Russian armed forces had been involved in the seizure of control in Crimea. On that occasion, President Putin made the following statement:

> [O]ur goal was to ensure proper conditions for the people of Crimea to be able to freely express their will. And so we had to take the necessary measures in order to prevent the situation in Crimea unfolding the way it is now unfolding in southeastern Ukraine. We didn't want any tanks, any nationalist combat units or people with extreme views armed with automatic weapons. Of course, the Russian servicemen did back the Crimean self-defence forces. They acted in a civil but a decisive and professional manner, as I've already said.
>
> […]
>
> Russia did not annex Crimea by force. Russia created conditions – with the help of special armed groups and the Armed Forces, I will say it straight – but only for the free expression of the will of the people living in Crimea and Sevastopol. It was the people themselves who made this decision. Russia answered their call and welcomed the decision of Crimea and Sevastopol. This was natural, and it could not have been any other way.[36]

110. Ukraine, as stated in its non-disputing party submission, considers that Crimea remains an "inseparable part of Ukraine" and that the events described above constitute an unlawful occupation.[37]

---

[34]   Federal City of Sevastopol Law No. 46-ZS "On the Peculiarities of Regulation of Property and Land Relations on the Territory of the City of Sevastopol" (25 July 2014) (C-84); Law of the Republic of Crimea No. 38-ZRK "On the Peculiarities of Regulation of Property and Land Relations on the Territory of the Republic of Crimea" (31 July 2014) (C-119). *See also* First Maggs Report, §§ 60, 63 and its exhibits 24, 26.

[35]   Bill Chappell and Mark Memmott, *Putin says those aren't Russian forces in Crimea*, National Public Radio (4 March 2014) (C-39) (describing the armed men as "local self-defense forces").

[36]   *Direct Line with Vladimir Putin*, Official Site of the President of Russia (17 April 2014), pp. 8, 16 (C-70).

[37]   Submission of Ukraine as Non-Disputing Party to the Treaty, dated 6 June 2016, § 2.

**C.    THE FACTS RELATING TO THE CLAIMANTS' INVESTMENTS**

111.    During his television appearance on 17 April 2014 mentioned above, President Putin also discussed the Crimean economy and banking system. In this context, when responding to the question of a Crimean resident as to whether he needed to make his lease payments for a car leased from PJSC Privatbank, a Ukrainian bank in which Mr. Kolomoisky had a significant shareholding, President Putin made the following statement:

> [President Putin reads out the question] Here is an interesting question about the Crimean economy and banking system. The first part of the question concerns certain difficulties, including economic issues. The second part is as follows: "I hired a car on lease from Privatbank. It will take me only two years to repay the loan. The car officially belongs to AvtoprivatGroup in Kiev. Privatbank no longer operates in Crimea. What am I supposed to do?"

> [President Putin answers the question] Please use the car and don't worry. If Mr. Kolomoisky […] do[esn't] want your money, it's [his] problem.[38]

112.    In an earlier televised appearance on 4 March 2014, President Putin had also called Mr. Kolomoisky, who had just been appointed Governor of the Eastern Ukrainian region of Dnipropetrovsk, a "scoundrel" and an "imposter".[39] The Claimants argue that these statements by President Putin foreshadowed the eventual expropriation of their investments.[40]

113.    In this regard, the Claimants assert that their Feodosia office and Crimean petrol stations were seized by members of the Crimean "self-defence" or "paramilitary" forces (the "Paramilitary Forces") between 22 and 25 April 2014.[41] An account of those events is provided by the Claimants' witness Mr. Uriel Laber, a minority shareholder and

---

[38]    *Direct Line with Vladimir Putin*, Official Site of the President of Russia (17 April 2014), pp. 44-45 (C-70). The Claimants played the video of Mr. Putin's television appearance during the Hearing on the Merits. The video showed President Putin bursting into laughter after saying "Катайтесь спокойно", which can be translated from Russian into English as "enjoy the drive" or, literally, "drive without any worry." Claimants' Opening Presentation of 5 February 2018, Slide 6; https://www.youtube.com/watch?v=Lz1B8o9p0Ts (video last accessed 11 March 2019).

[39]    Statement of Claim, § 2.44; Transcript 5 February 2018, 15/9-17 (the Claimants' opening statement).

[40]    Transcript 5 February 2018, 15/9-17 (the Claimants' opening statement).

[41]    Statement of Claim, § 1.3.

representative of the Claimants' shareholders, who was responsible for managing all financial and commercial aspects of their businesses.[42]

114.  In his witness statement, Mr. Laber recalls that, on the morning of 23 April 2014, he learned of the seizure of the Feodosia office, which had occurred the previous day:

> I was awoken by an early call at my home in Miami from Mr. Yuriy Topchiy, one of our executive managers in continental Ukraine who reports directly to me. Because he usually waited until I was in the office to call me, I immediately suspected some emergency and went to the office to take Mr. Topchiy's call from there.
>
> After arriving at my office in Miami, I called Mr. Topchiy in Dnepropetrovsk, Ukraine. He described to me the following events that had transpired earlier [in the day before[43]]:

- Mr. Karyagin, a director of Stabil LLC (the company that owned the Petrol Companies' headquarters in the City of Feodosia), was supposed to travel from Crimea to Dnepropetrovsk (in continental Ukraine), but the Paramilitary Forces prevented Mr. Karyagin from leaving Crimea.

- By 10:00 a.m. (Ukraine time), we could no longer reach the office in Feodosia by telephone. At 10:30 a.m., an employee in the Feodosia office managed to reach Mr. Topchiy and told him that the office had been seized by approximately 20 gunmen. Before she could provide any additional details, the phone line went dead.

- At about 2:30 p.m. (Ukraine time), Mr. Topchiy received another call from the Feodosia office. The caller said that he had only 15 seconds to talk, and that the Feodosia office had been seized. The connection was then cut. Fearing for our employees' safety, Mr. Topchiy repeatedly tried to call them throughout the day, but he could not get through.[44]

---

[42]  Laber Statement, § 1 (CWS-1).

[43]  Transcript 5 February 2018, 94/12-95/12 (testimony of Mr. Laber).

[44]  Laber Statement, §§ 27-28 (CWS-1).

115. Mr. Laber further recounts that, according to Mr. Topchiy, the armed men who took control of the Feodosia office had arrived in "official-looking vehicles", [45] had confiscated mobile phones, and had abducted from the office premises a director of Elefteria LLC and three other managers, telling them they had to choose between the "old" and the "new" management. [46]

116. At the Hearing on the Merits, Mr. Laber explained that when they were released and returned home approximately one week later, these employees "told us the story, [namely that they were] taken there [to the cemetery], and told, hey, listen, either you continue the work that you've done on the ground, continue selling the fuel products, which is – there's going to be your old management, your old owners are now null and void, and we're the new guys in charge, and everything will be fine. If you don't listen, this is where you are going to end up [the cemetery]." [47]

117. The office employees later reported that the office had been "looted" of computers, permits and licenses, commercial documentation, and the equivalent of US$ 800,000 in cash. In his witness statement, Mr. Laber explains that while this "was an unusually large amount of cash to have at our headquarters, […] the Russian invasion affected the banking system, and the Petrol Station Lessees were unable to deposit cash as they usually would. For this reason, we started storing cash at the Feodosia headquarters." [48]

118. Mr. Laber states that, following the seizure of the Feodosia office on 22 April 2014, the Claimants' employees were never again able to access the building as the Paramilitary Forces continued to occupy it. [49] The Claimants thus lost managerial control of their petrol stations, which were managed from the Feodosia office. [50]

119. According to Mr. Laber, by 25 April 2014, the Claimants also lost physical control of their Crimean petrol stations:

---

[45]   Transcript 5 February 2018, 101/21-23 (testimony of Mr. Laber).

[46]   Laber Statement, § 29 (CWS-1); Transcript 5 February 2018, 102/22-103/6 (testimony of Mr. Laber).

[47]   Testimony of Laber, Transcript 5 February 2018, 102/22-103/6 (testimony of Mr. Laber).

[48]   Laber Statement, § 30 (CWS-1); Claimants' Answers on Merits, § 1.1.

[49]   Laber Statement, § 32 (CWS-1).

[50]   Laber Statement, § 32 (CWS-1).

By 25 April 2014, numerous sources on the ground in Crimea reported to us that individuals – either the Paramilitary Forces or individuals affiliated with them – were illegally selling the Petrol Stations' remaining inventory of fuel and other products at substantially lower prices than the prices set by the Petrol Companies. These individuals abandoned the Petrol Stations around June 2014, probably because there was no remaining inventory to be sold. The Petrol Companies received none of the revenues from this illegal sale of their fuel and other goods since 22 April 2014.[51]

120.   Finally, Mr. Laber indicated that, while the Petrol Companies reported the 22 April 2014 raid of their Feodosia office, "the police – who were controlled by the new Russian-installed 'authorities' – took no meaningful action to remedy the situation."[52] He also explained that the Claimants did not file an official complaint with the local authorities, as they had decided to first see what would happen to the complaints filed by Ukrnafta, the claimant in PCA Case No. 2015-34.[53]

121.   In addition to Mr. Laber's account of the events of 22-25 April 2014, the Claimants have submitted into the record an article published on 4 June 2014 in *Sobytia Cryma* (Crimean Events). They rely on the article in respect of certain events of 23 April 2014,[54] which it describes as follows:

That very evening [of 22 April 2014], Sergey Ryabichenko [identified in the article as the director of Elefteria LLC] telephoned all the employees and told them to come to a meeting at the office in the morning.

On the morning of April 23, Ryabichenko arrived at the office accompanied by two persons – the man who had been in command of the "self-defense" forces on the day of the raid, and a young woman. The woman introduced herself as Yulia, an attorney, and announced that she was "representing the interests" of the self-proclaimed prime minister of Crimea, Sergey Aks[yo]nov. She offered the employees of the office a choice: either continue working for the "new owner," or leave Crimea immediately. As a result of the conversation, the Crimean

---

[51]   Laber Statement, § 34 (CWS-1).

[52]   Laber Statement, § 31 (CWS-1); Transcript 5 February 2018, 101/21-102/12 (testimony of Mr. Laber).

[53]   Transcript 5 February 2018, 104/14-16, 133/18-19 (testimony of Mr. Laber).

[54]   Transcript 5 February 2018, 23/10-20 (the Claimants' opening statement).

employees of Ukrnafta voluntarily-compulsorily agreed to live and work under the new system.[55]

122.  Eight days after the raid, on 30 April 2014, the State Council of the Republic of Crimea (the "Crimean State Council") adopted a decree (the "Nationalization Decree"), which was later expanded to nationalize the Claimants' assets (see paragraph 125 below). In its initial form, the Nationalization Decree provided, *inter alia*, that by:

> no later than January 1, 2015, all state property  (of the State of Ukraine) and all abandoned property located in the Republic of Crimea shall be considered the property of the Republic of Crimea.[56]

123.  On 18 June 2014, the Investigative Committee of the Russian Federation, the principal federal investigative organ in Russia, opened a criminal investigation against Mr. Kolomoisky for allegedly funding and cooperating in the "organiz[ation of] a military operation for the purpose of killing civilians" in Eastern Ukraine.[57] The Basmanny District Court in Moscow ordered Mr. Kolomoisky's arrest on 2 July 2014.[58]

124.  On 18 August and 1 September 2014, the Kievskiy District Court in the City of Simferopol (the "Simferopol District Court") granted two requests submitted by the Ministry of Internal Affairs of the Republic of Crimea to attach properties owned by companies believed to be affiliated with Mr. Kolomoisky, including several petrol stations owned by the Claimants.[59] As explained by the Court, its decision was motivated by the alleged failure of PJSC Privatbank, a Ukrainian bank "owned by" Mr. Kolomoisky, to perform its obligations under bank deposit contracts with Crimean depositors.[60]

125.  The Nationalization Decree was amended on 3 September 2014 to include, among other assets, (i) Stabil LLC's office in Feodosia; (ii) the Claimants' petrol stations

---

[55]  Artem Prokhorov, *The "new Crimeans" have euthanized the fuel business*, Crimean Events (5 June 2014) (C-77).

[56]  Decree of the Crimean State Council No. 2085-6/14 dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-001).

[57]  *Russia opens criminal case against top Ukrainian officials Avakov and Kolomoisky*, RAPSI (18 June 2014) (C-79).

[58]  *Moscow court sanctions arrest of Ukraine tycoon Governor Kolomoisky*, Moscow Times (2 July 2014) (C-81).

[59]  Decision of the Simferopol District Court, Case No. 3/6-291/2014 (18 August 2014) (C-85); Decision of the Simferopol District Court, Case No. 3/6-319/2014 (1 September 2014) (C-86).

[60]  Decision of the Simferopol District Court, Case No. 3/6-291/2014 (18 August 2014) (C-86).

located in the Republic of Crimea (but not their petrol stations within the Federal City of Sevastopol, a separately administered entity under Russian law); (iii) the Claimants' storage facility in Simferopol; and (iv) a residential apartment in Simferopol belonging to Stabil LLC.[61]

126. In announcing these amendments, Mr. Aksyonov, Chairman of the new Council of Ministers of the Republic of Crimea, declared that "Kolomoisky is one of the oligarchs who initiated and has been financing military operations in the southeast of Ukraine where our compatriots are being killed; therefore it is our moral right and our moral duty to carry out this nationalization."[62]

127. On 24 September 2014, a spokesperson for the Russian Investigative Committee, Mr. Vladimir Markin, indicated that "all of Mr. Kolomoisky's assets in Russia" would be seized.[63]

128. On 7 October 2014, the Council of Ministers of the Republic of Crimea enacted Order No. 1016-r, transferring the "right of economic management" of the Claimants' stations located in the Republic of Crimea to a Russian State-owned enterprise, Feodosia Enterprise for Supply of Petroleum,[64] which was later renamed SUE Crimean Fuel Alliance.

129. On 16 October 2014, Mr. Aksyonov made a statement according to which it was necessary to grant amnesty to the Paramilitary Forces for their acts of detaining persons and sealing the Crimean border in spring 2014, or else – so said Mr. Aksyonov

---

[61] Decree of the Crimean State Council No. 2085-6/14 dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-002-006). The Claimants' petrol stations and other properties were identified in the amendment of 3 September 2014 under line items 47-52, 54-55, 58, 61, 63-66, 68-69, 83, 86, and 110-111.

[62] *Crimea's State Council rules to nationalize [Igor Kolomoisky's] property in Crimea*, ITAR-TASS (3 September 2014) (C-87); Crimean State Council Press Release, Property belonging to the Ukrainian oligarch Kolomoisky will be nationalized in Crimea, 3 September 2014 (C-178).

[63] *Crimean authorities nationalize Kolomoisky's tourist resorts*, RAPSI News (24 September 2014) (C-90).

[64] Order No. 1016-r of the Council of Ministers of the Republic of Crimea (7 October 2014) (C-92). *See also* Order No. 918-r of the Council of Ministers of the Republic of Crimea (11 September 2014) (C-88).

– "[i]f we evaluate these actions under Russian law, then we will have to put 100,000 people in prison."[65]

130. On 11 November 2014, the Federal City of Sevastopol issued an order (the "Sevastopol Order") assigning the "right of economic management" of the Claimants' petrol stations and storage facility in Sevastopol to a Russian State-owned entity called State Unitary Enterprise (SUE) Gorodskoy Avtozapravochniy Kompleks.[66]

131. On 11 March 2015, the Council of Ministers of the Republic of Crimea issued a decree merging SUE Crimean Fuel Alliance with SUE Chernomorneftegaz, another Russian State-owned entity.[67] By the time of the filing of the Claimants' Statement of Claim, the 17 petrol stations formerly owned or leased by the Claimants in the Republic of Crimea were under the operation of that company, under the brand "GOST".[68]

132. Finally, on 8 July 2016, the Sevastopol Government issued Order No. 662-P, which stated that the Claimants' petrol stations located in Sevastopol were now "property of the Federal City of Sevastopol."[69]

## V.    POSITIONS OF THE PARTIES

### A.    SUMMARY OF THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF

133. As noted above, the Claimants consider that the Respondent has breached Articles 2, 3, and 5 of the Treaty.

---

[65]    Claimants' Answers on Merits, § 1.20, *referring to* Yulia Vishnevetskaya, *The people of Sergei Aksyonov, or the limits of the permissible "self-defense" in Crimea*, Deutsche Welle (16 December 2014) (C-174).

[66]    Order No. 401 of the Sevastopol Government "On the assignment of property under right of economic management to SUE City Petrol Station Complex" (11 November 2014) (C-94). Transcript 5 February 2018, 50/3-13.

[67]    Order No. 182-r of the Council of Ministers of the Republic of Crimea (11 March 2015) (C-102). According to the Statement of Claim, SUE Chernomorneftegaz "is the property of the Republic of Crimea" (p. 26, fn. 122). *See also* Charter of the State Unitary Enterprise of the Republic of Crimea "Chernomorneftegaz," entered into the Ukrainian Unified State Register of Legal Entities, Individual Entrepreneurs and Civic Organizations on 29 November 2014 (C-98).

[68]    *Chernomorneftegaz Real Time Overview of Fuel Supplies at GOST Gasoline Stations*, SUE Chernomorneftegaz website (15 December 2015) (C-116); *Kolomoisky's chain of petrol stations in Crimea will be offered for sale no earlier than next year*, Novosti Kryma (13 October 2015) (C-114); Transcript 5 February 2018, 137/7-138/3. *See also* Statement of Claim, § 2.41 (table tracing the ownership and control of each of the petrol stations).

[69]    Sevastopol Government Order No. 662-P dated 8 July 2016 (C-176).

134. Their principal case is that their investments in Crimea have been nationalized in breach of Article 5 of the Treaty. In this connection, the Claimants argue that, as of April 2014, Crimea's Paramilitary Forces "seized and looted" the Feodosia office building and began to operate the Claimants' petrol stations.[70] The Claimants additionally recall that the Crimean authorities nationalized their properties (including their petrol stations, storage facilities, and other real estate) located in the Republic of Crimea on 3 September 2014 and in the Federal City of Sevastopol on 11 November 2014.[71] In the Claimants' view, all of these measures are attributable to the Russian Federation and qualify as a nationalization within the meaning of Article 5 of the Treaty. The Claimants submit that the nationalization was unlawful as it did not satisfy any of the conditions of legality set forth in the Treaty.[72]

135. In particular, the Claimants assert that the measures of which they complain were taken in a discriminatory manner and without a public purpose. These measures resulted from the Claimants' affiliation with Mr. Kolomoisky, one of their beneficial owners, as well as a former governor of Ukraine's Dnipropetrovsk region and a staunch opponent of the Incorporation.[73] In the Claimants' view, Mr. Kolomoisky's assets were "the target of a campaign by Russian and Russian-controlled authorities in Crimea that resulted in the taking of all properties in Crimea known or perceived to be associated with him."[74]

136. In addition, the Claimants submit that the Respondent violated Article 3 of the Treaty. Article 3(1) requires Contracting Parties to refrain from "measures discriminatory in nature that could interfere with the management and disposal" of protected investors' investments. The article also includes a most favored nation ("MFN") clause that requires host States to provide protected investors treatment that is "no less favorable than the treatment given to its own investors or investors of any third state."

---

[70]   Statement of Claim, § 3.59.

[71]   Statement of Claim, § 3.59, *referring to* Decree No. 2085-6/14 of the Crimean State Council dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-002-006); Order No. 401 of the Sevastopol Government, "On the assignment of property under right of economic management to SUE City Petrol Station Complex" (11 November 2014) (C-94).

[72]   Statement of Claim, § 3.60.

[73]   Statement of Claim, § 1.4.

[74]   Statement of Claim, § 1.4.

137. In this connection, the Claimants first assert a claim under a theory of discriminatory treatment flowing from the first clause of Article 3(1).[75] Relying on *AES Summit Generation Ltd. v. Hungary*, the Claimants suggest that discrimination is shown where a State "benefit[s] or harm[s] someone more in comparison with the generality."[76] In the Claimants' view, the Respondent "left no doubt" that its actions discriminated against the Claimants and were motivated by "political animus towards Mr. Kolomoisky."[77] The Claimants submit that such conduct is devoid of an "objective or reasoned basis."[78]

138. Further, the Claimants invoke the MFN clause in Article 3.[79] They refer in this connection to Article 3(1) of the bilateral investment treaty between Canada and the Union of Soviet Socialist Republics (the "Canada-USSR BIT"), which guarantees investors fair and equitable treatment ("FET") and full protection and security ("FPS").[80] The Claimants consider the Treaty to incorporate, and the Respondent to have violated, these guarantees.[81]

139. The Claimants also claim a breach of Article 2 of the Treaty, which requires the Respondent to guarantee "the full and unconditional legal protection of investments by investors of the other Contracting Party." According to the Claimants, the Russian Federation failed to grant such protection when it "targeted" the Claimants based on their connection with Mr. Kolomoisky, "ultimately destroying" their investments through physical seizure and nationalization.[82]

---

[75] Statement of Claim, § 3.70.

[76] Statement of Claim, § 3.72, *referring to AES Summit Generation Ltd. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, § 10.3.53 (23 September 2010) (CLA-27). *See also Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, § 210 (27 December 2010) (CLA-79).

[77] Statement of Claim, § 3.72.

[78] Statement of Claim, § 3.72.

[79] Statement of Claim, §§ 3.73-3.75, *referring to* Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2nd ed. 2012), p. 211 (CLA-94); *MTD Equity Sdn. Bhd. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, §§ 100, 107, 190, 197 (25 May 2004) (CLA-63). *See also White Indus. Australia Ltd. v. Republic of India*, UNCITRAL, Final Award, §§ 11.2.1-11.2.9 (30 November 2011) (CLA-83).

[80] Statement of Claim, §§ 3.77, 3.89, *referring to* Agreement between the Government of Canada and the Government of the Union of Soviet Socialist Republics for the Promotion and Reciprocal Protection of Investments (20 November 1998) (CLA-2).

[81] Statement of Claim, § 3.70.

[82] Statement of Claim, § 3.96.

140. Ultimately, the Claimants request the Tribunal to issue an award remedying the harm caused by these breaches in the following terms:

(a) Ordering the Russian Federation to pay compensation for the injury to the Claimants in the amount of $47,406,455, allocated among the Claimants as follows:

(i) $4,065,584 to Stabil LLC;

(ii) $732,594 to Rubenor LLC;

(iii) $3,296,672 to Rustel LLC;

(iv) $1,465,187 to Novel-Estate LLC;

(v) $366,297 to Crimea-Petrol LLC;

(vi) $1,098,891 to PII Kirovograd-Nafta LLC;

(vii) $366,297 to Pirsan LLC;

(viii) $14,100,490 to Trade-Trust LLC;

(ix) $19,523,755 to Elefteria LLC;

(x) $1,195,344 to VKF-Satek LLC; and

(xi) $1,195,344 to Stemv-Group LLC;

b) Ordering the Russian Federation to pay interest on the above amounts at a reasonable commercial rate compounded from 22 April 2014 until full payment has been made;

c) Ordering the Russian Federation to pay the Petrol Companies' costs in these arbitration proceedings in an amount to be specified later, together with interest thereon, including all attorneys' fees and expert witness fees, and as between the parties, alone to bear the responsibility for compensating the Arbitral Tribunal, the Appointing Authority, and the Permanent Court of Arbitration; and

d) Ordering any other relief that the Tribunal may deem appropriate.[83]

---

[83] Claimants' Amended Request for Relief dated 7 March 2018 (attached as Annex A to the Claimants' letter dated 7 March 2018). *See also* Statement of Claim, § 4.1.

**B.**   **SUMMARY OF THE RUSSIAN FEDERATION'S POSITION**

141.  The Respondent did not participate in these proceedings despite invitations to do so from the Tribunal. Nevertheless, the Tribunal considers the Respondent's Letters, quoted in full in paragraphs 5 and 6 above, to manifest the latter's opposition to the relief sought by the Claimants.

**VI.   ANALYSIS**

142.  In this Section, the Tribunal will first address a number of preliminary matters (A) and set out the text of relevant legal provisions (B). It will then address the issues on attribution (C), liability (D), and reparation (E).

**A.**   **PRELIMINARY MATTERS**

143.  Prior to considering the merits of the Parties' positions, the Tribunal will address the law governing this arbitration (1); the subject matter of this Award (2); the coordination of the parallel proceedings (3); the default of the Respondent (4); and the law applicable to the merits (5).

**1.   Law Governing the Procedure of this Arbitration**

144.  This investment arbitration is seated in Geneva, Switzerland, and is thus governed by Chapter 12 of the Swiss Private International Law Act.[84] It is also governed by any procedural rules found in the BIT and in the 1976 UNCITRAL Rules.

**2.   Subject Matter of this Award**

145.  The present proceedings were bifurcated between jurisdiction and merits in accordance with the Procedural Timetable (Scenario 2) in PO2. As mentioned above, the Tribunal rendered its Award on Jurisdiction on 26 June 2017. This final Award deals with the merits of the dispute submitted to the Tribunal, as well as with quantum and costs.

---

[84]   PO1, Arts. 9.1, 11.1.

### 3.    Coordination of Parallel Proceedings

146. In accordance with Article 5 of PO1, the present proceedings were conducted in parallel with PCA Case No. 2015-34, *PJSC Ukrnafta (Ukraine) v. The Russian Federation*. In light of the commonalities of fact and law and of the identical composition of the tribunals in the two cases, the Tribunal sought to structure the arbitral proceedings in such a manner as to minimize duplication and avoid unnecessary costs whenever possible. In particular, joint hearings were held for both matters. However, as provided in PO1, the Tribunal deals with the two cases in separate Awards.

### 4.    Default of the Respondent

147. Although it has been advised of all procedural steps in this arbitration and invited to participate in each of them, the Respondent has not taken part in the proceedings aside from submitting the Respondent's Letters. After the Respondent failed to submit a Statement of Defense, the Tribunal ordered the proceedings to continue in accordance with Article 28(1) of the UNCITRAL Rules.[85]

148. As noted in the Award on Jurisdiction,[86] under the UNCITRAL Rules and the *lex arbitri*, an arbitration must proceed even if the respondent defaults. This said, unlike in court litigation in many jurisdictions, there is no "default judgment" in arbitration. In other words, in spite of the default, a tribunal cannot dispense with satisfying itself regarding whether or not the claims before it are well founded in fact and in law. This rule applies to jurisdiction as well as to the merits.

### 5.    Law Governing the Merits

149. The claims before this Tribunal are brought on the basis of the BIT between Russia and Ukraine, which, interpreted in accordance with Articles 31 to 33 of the Vienna Convention on the Law of Treaties (the "VCLT"),[87] is the primary source of law for this Tribunal. In addition, the Tribunal may also look to other rules of international law as

---

[85]   Pursuant to Article 28(1) of the UNCITRAL Rules, "[i]f, within the period of time fixed by the arbitral tribunal, the respondent has failed to communicate his statement of defence without showing sufficient cause for such failure, the arbitral tribunal shall order that the proceedings continue."

[86]   Award on Jurisdiction, § 89.

[87]   1155 UNTS 331 (1969) (CLA-24). Both Russia and Ukraine are parties to the VCLT since 1986. Its Articles 31 to 33 also reflect customary international law.

may be applicable. National law may also be relevant depending on the issues involved.

150. When applying the governing law, be it international or national, the Tribunal is not bound by the arguments and sources invoked by the Parties. Under the maxim *iura novit curia* – or, better, *iura novit arbiter* – the Tribunal may apply the law of its own motion, provided it seeks the Parties' views if it intends to base its decision on a legal theory that was not addressed and that the Parties could not reasonably anticipate.[88]

## B.   RELEVANT PROVISIONS

151. Turning next to the specific treaties applicable in the present case, in particular the BIT and the VCLT, the Tribunal notes that the following BIT provisions are relevant to the merits of the present dispute:[89]

- Article 2 of the BIT reads, in relevant part, as follows:

  2. Each Contracting Party guarantees, in accordance with its legislation, the full and unconditional legal protection of investments by investors of the other Contracting Party.

- Article 3 of the BIT states, in relevant, part, as follows:

  1. Each Contracting Party shall ensure in its territory for the investments made by investors of the other Contracting Party, and activities in connection with such investments, treatment no less favorable than that which it accords to its own investors or to investors of any third state, which precludes the use of measures discriminatory in nature that could interfere with the management and disposal of the investments.

- Further, Article 5 of the BIT provides that:

  1. Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall not be expropriated, nationalized or subject to other measures equivalent in effect to expropriation (hereinafter referred to as "expropriation"), except in cases where such measures are taken in the public interest under due process of law, are

---

[88]   Swiss Supreme Court decisions 4P.114/2001 of 19 December 2001, §§ 3a, 20 *ASA Bulletin* (2002), pp. 493, 511 and 4A_214/2013 of 5 August 2013, § 4. *See also, inter alia, Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, § 118 (15 April 2016); *Daimler Financial Services A.G. v. Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment, § 295 (7 January 2015).

[89]   In general, when quoting the provisions of the Treaty, the Tribunal adopts the language of the Claimants' second translation of the Treaty's Russian original version (CLA-129). For completeness, the Tribunal also notes that no decision turns on the differences between the Claimants' translation in CLA-129 and that of Mr. Vesler, the Tribunal-appointed translator.

not discriminatory and are accompanied by prompt, adequate and effective compensation.

2. The amount of such compensation shall correspond to the market value of the expropriated investments immediately before the date of expropriation or before the fact of expropriation became officially known, while compensation shall be paid without delay, including interest accruable from the date of expropriation until the date of payment, at the interest rate for three-month deposits in US dollars on the London Interbank Market (LIBOR) plus 1%, and shall be effectively disposable and freely transferable.

152. Furthermore, it is recalled that Article 31 of the VCLT provides the following rules on treaty interpretation:

(1) A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

(2) The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

   a. Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

   b. Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

(3) There shall be taken into account, together with the context:

   a. Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

   b. Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

   c. Any relevant rules of international law applicable in the relations between the parties.

(4) A special meaning shall be given to a term if it is established that the parties so intended.

- Article 32 of the VCLT adds the following:

Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

   (a) Leaves the meaning ambiguous or obscure; or

   (b) Leads to a result which is manifestly absurd or unreasonable.

153.  Additionally, as these are referred to below, it is useful to reproduce here certain provisions of the United Nations' International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts (the "ILC Articles"):

- Article 4 provides that:

  1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.

  2. An organ includes any person or entity which has that status in accordance with the internal law of the State.

- Further, Article 5 states:

  The conduct of a person or entity which is not an organ of the State under article 4 but which is empowered by the law of that State to exercise elements of the governmental authority shall be considered an act of the State under international law, provided the person or entity is acting in that capacity in the particular instance.

- Article 8 adds:

  The conduct of a person or group of persons shall be considered an act of a State under international law if the person or group of persons is in fact acting on the instructions of, or under the direction or control of that State in carrying out the conduct.

- Finally, Article 11 provides:

  Conduct which is not attributable to a State under the preceding articles shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.

## C.  ATTRIBUTION

### 1.  The Claimants' Position

154.  As outlined in paragraph 134 above, the Claimants argue that the Russian Federation has violated the Treaty through the actions, first, of the Crimean State Council and the Sevastopol Government, and, second, of the Paramilitary Forces. Relying on the ILC

Articles, they argue that the acts of each of these entities are attributable to the Russian Federation.[90]

155. First, the Claimants submit that the Crimean State Council and the Sevastopol Government are State organs of the Russian Federation within the meaning of ILC Article 4.[91] They argue that the reference in this provision to "any State organ" is "in the most general sense […] not limited to organs of the central government [and] extends to organs of government of whatever kind or classification, exercising whatever functions, and whatever level in the hierarchy." [92] In any event, the Claimants emphasize that in the present case it is undisputed that under Article 2 of the Incorporation Treaty, the Republic of Crimea and the Federal City of Sevastopol became "federal subjects" of the Russian Federation.[93]

156. Second, as far as the conduct of the Paramilitary Forces is concerned, the Claimants make a distinction between acts committed before and after 21 March 2014, but note that they were only affected by the Paramilitary Forces' acts as of 22 April 2014. In the Claimants' view, the Paramilitary Forces' conduct between the end of February 2014 and 21 March 2014 is attributable to the Russian Federation under ILC Article 8. [94] According to the Claimants, at the time the Paramilitary Forces were "an armed militia consisting of supporters of the Russian occupation recruited from among the Crimean population and supported by the Russian military."[95] This was admitted by President Putin when he stated, in the interview quoted at greater length in paragraph 109 above, that "Russian servicemen […] back[ed] the Crimean self-defense forces." [96] The Claimants further rely on "reputable international sources"

---

[90]   Statement of Claim, § 3.54; Claimants' Answers on Merits, §§ 1.21-1.23; Transcript 5 February 2018, 26/17-27/12 (the Claimants' opening statement).

[91]   Statement of Claim, § 3.53; Claimants' Answers on Merits, § 1.21.

[92]   Statement of Claim, § 3.53; ILC Articles Commentary, Art. 4, §§ 1, 5-6, 8 (CLA-103); Claimants' Answers on Merits, § 1.23.

[93]   First Maggs Report, § 28 (CER-1); Incorporation Treaty, Art. 2 (C-58); Claimants' Answers on Merits, § 1.22.

[94]   Claimants' Answers on Merits, §§ 1.2-1.3.

[95]   Claimants' Answers on Merits, § 1.5.

[96]   Claimants' Answers on Merits, § 1.5, *referring to Direct Line with Vladimir Putin*, Official Site of the President of Russia (17 April 2014), p. 8 (C-70).

referring to the cooperation between the Russian military and the local self-defense forces in Crimea.[97]

157.   In respect of the acts of the Paramilitary Forces after 21 March 2014, including their seizure of the Claimants' properties in April 2014, the Claimants rely on ILC Article 5.[98]

158.   They submit that, by 22 April 2014, the Russian-installed civil authorities in Crimea had empowered the Paramilitary Forces to exercise police powers and therefore to "exercise elements of governmental authority" within the meaning of Article 5.

159.   The Claimants also recall that, pursuant to ILC Article 7, "[t]he conduct of an organ of a State or of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the State under international law if the organ, person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions."[99]

160.   Alternatively, the Claimants proffer ILC Article 11 as a basis for the Tribunal to find that the Russian Federation is responsible for the acts of the Paramilitary Forces.[100]

### 2.   Analysis

#### (a)   Attribution under international law

161.   The BIT contains no guidance on matters of attribution in the context of State responsibility. The Tribunal thus needs to resort to rules of attribution under customary international law, as codified by the ILC Articles.

162.   Under the ILC Articles, a State is legally responsible for the acts and omissions of (i) its organs, as set forth in Article 4; (ii) entities or persons empowered to exercise elements of governmental authority, if they carried out the relevant acts in such capacity, as set

---

[97]   Claimants' Answers on Merits, § 1.6, *referring to Locals join Crimean defense forces, allied with Russia*, National Public Radio (8 March 2014) (C-31); *2014 Human Rights Reports: Ukraine (Crimea)*, U.S. Department of State website, p. 54 (25 June 2016) (C-95); *OSCE Team Say Crimea Roadblock Gunmen Threatened to Shoot at Them*, Reuters (12 March 2014) (C-36).

[98]   Statement of Claim, § 3.55; Claimants' Answers on Merits, § 1.9, *referring to EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, § 194 (8 October 2009) (CLA-271); *Jan de Nul N.V. & Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, § 163 (6 November 2008) (CLA-273); *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, § 176 (18 June 2000) (CLA-56).

[99]   Transcript 5 February 2018, 32/8-13, 49/4-13 (the Claimants' opening statement).

[100]   Claimants' Answers on Merits, § 1.16.

forth in Article 5; and (iii) entities or persons acting in accordance with the instructions of, or under the direction or control of, the State in relation to the specific acts in question, as provided in Article 8. Furthermore, Article 11 provides that conduct which a State "acknowledges and adopts" as its own is also attributable to that State under international law.

> **(b)   Are the actions of the Crimean State Council and the Sevastopol Government attributable to the Russian Federation?**
>
> i.   ILC Article 4

163. The Claimants argue that the actions taken against them by the Crimean State Council and the Sevastopol Government are attributable to the Russian Federation under ILC Article 4, because both entities were acting as "organs" of the Russian State.[101]

164. ILC Article 4 provides as follows:

> 1. The conduct of any State organ shall be considered an act of that State under international law, whether the organ exercises legislative, executive, judicial or any other functions, whatever position it holds in the organization of the State, and whatever its character as an organ of the central Government or of a territorial unit of the State.
>
> 2. An organ includes any person or entity which has that status in accordance with the internal law of the State.

165. The Commentary to the ILC Articles (the "ILC Commentary") emphasizes the broad meaning of organ in the following terms:

> […] the reference to a State organ in article 4 is intended in the most general sense. It is not limited to the organs of the central government, to officials at a high level or to persons with responsibility for the external relations of the State. It extends to organs of government of whatever kind or classification, exercising whatever functions, and at whatever level in the hierarchy, including those at provincial or even local level. No distinction is made for this purpose between legislative, executive or judicial organs.[102]

---

[101]   Claimants' Answers on Merits, § 1.21.

[102]   ILC Commentary, p. 40 (CLA-103).

166. ILC Article 7 specifies that the conduct of a State organ is attributable to the State even if it is unlawful: a State is responsible for acts of its organs that exceeded authority or contravened instructions, acting thus *ultra vires*.[103]

167. Article 4 speaks of attribution whatever the position that an organ holds within the State organization. Accordingly, international tribunals have consistently attributed to the State actions by a wide variety of State organs, including actions by government ministers, the state treasury, the legislature, the courts, and the armed forces.[104]

168. Furthermore, Article 4 covers conduct of an organ "whatever its character as an organ of the central government or of a territorial unit of the State." Further, as stressed by the ILC Commentary, "[i]t does not matter for this purpose whether the territorial unit in question is a component unit of a federal State or a specific autonomous area, and it is equally irrelevant whether the internal law of the State in question gives the federal parliament power to compel the component unit to abide by the State's international obligations."[105] Indeed, international tribunals have consistently applied the principle that the central government is responsible for the acts of its territorial units, such as provinces, constituent states, and municipalities.[106] For example, the tribunal in *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic (Vivendi I)* underlined that acts of a province are attributable to the State irrespective of the State's constitutional structure:

> [I]t is well established that actions of a political subdivision of federal state, such as the Province of Tucumán in the federal state of the Argentine Republic, are attributable to the central government. It is equally clear that the internal constitutional structure of a country cannot alter these obligations.[107]

169. The factual background of the present case, including the Incorporation of Crimea by the Russian Federation, has been described in detail in the Award on Jurisdiction[108] and summarized in Section IV.B above. For the present purposes, suffice it to note that

---

[103]  ILC Commentary, p. 40 (CLA-103).

[104]  Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2nd ed. 2012), p. 217, with reference to case law by numerous international arbitral tribunals (CLA-94).

[105]  ILC Commentary, p. 41 (CLA-103).

[106]  ILC Commentary, p. 41 (CLA-103). *See also* Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2nd ed. 2012), p. 219, with references to cases (CLA-94).

[107]  *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic (Vivendi I)*, ICSID Case No. ARB/97/3, Award, 21 November 2000, § 49.

[108]  Award on Jurisdiction, Section IV.B.

the Incorporation Treaty established that the Republic of Crimea and the Federal City of Sevastopol became "constituent parts" of the Russian Federation. This is reflected in the title of the Incorporation Treaty, which explicitly refers to "Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation." More specifically, Articles 1 and 2 of the Incorporation Treaty provide as follows:

> Article 1(1)
>
> [T]he Republic of Crimea shall be considered accepted into the Russian Federation from the date of signing of this Treaty.
>
> Article 2
>
> From the date of acceptance of the Republic of Crimea into the Russian Federation, new constituent parts shall be formed within the Russian Federation: the Republic of Crimea and the federal city of Sevastopol. [109]

170. In addition, by virtue of Russian federal legislation implementing the Incorporation Treaty, the Crimean State Council was explicitly empowered to exercise the functions of a governing body in the Republic of Crimea,[110] while the Russian "Law of the City of Sevastopol" of 30 April 2015 established the Sevastopol Government as the "permanent executive body of state power of the city of Sevastopol."[111]

171. The Claimants' expert, Professor Maggs, elaborated upon these legislative acts in his expert report, noting *inter alia* that "[t]he Russian Federation in many respects became the legal successor of Ukraine," and that "[w]ith respect to the subordinate bodies of the Republic of Crimea and the Federal City of Sevastopol, the Russian courts have held that bodies performing functions similar to those of pre-annexation bodies are legal successors of the pre-annexation bodies."[112]

---

[109]   Incorporation Treaty, Art. 2 (C-44); Claimants' Answers on Merits, § 1.22; First Maggs Report, § 28 (CER-1).

[110]   Claimants' Answers on Merits, § 1.22.1, *referring to* Federal Constitutional Law of the Russian Federation No. 6-FKZ "On Accepting the Republic of Crimea into the Russian Federation and Establishing New Constituent Entities in the Russian Federation: the Republic of Crimea and the Federal City of Sevastopol" (21 March 2014), Art. 7.2 (C-164.1).

[111]   Claimants' Answers on Merits, § 1.22.2, *referring to* Law of the Federal City of Sevastopol No. 5-ZS "On the Government of Sevastopol" (30 April 2015), Art.1 (C-175).

[112]   First Maggs Report, §§ 28 ff, §§ 44-45 (CER-1).

172.  For completeness, the Tribunal notes that the *Everest* tribunal, having recalled the relevant facts regarding the incorporation of the Republic of Crimea and the Federal City of Sevastopol into the Russian Federation, concluded that "there is no doubt that by taking the preceding steps Respondent [*i.e.*, the Russian Federation] became responsible under international law for the acts of the authorities of the Republic of Crimea as from March 18, 2014."[113]

173.  In light of the foregoing analysis, it is clear that the Crimean State Council and the Sevastopol Government are structurally part and thus "organs" of the Russian Federation for purposes of ILC Article 4. Consequently, the conduct of the Crimean State Council and the Sevastopol Government is attributable to the Russian Federation.

**(c)    Are the actions of the Paramilitary Forces attributable to the Russian Federation?**

174.  The Claimants argue that the acts of the Paramilitary Forces are attributable to the Russian Federation because the Russian-installed civil authorities in Crimea empowered the Paramilitary Forces to "exercise elements of governmental authority" within the meaning of ILC Article 5. In the alternative, the Claimant relies on ILC Article 11 as a basis for the Russian Federation's responsibility for the acts of the Paramilitary Forces.[114]

i.    ILC Article 5

175.  In accordance with ILC Article 5, a State is responsible under international law for the conduct of persons or entities that exercise elements of delegated governmental authority, "provided the person or entity is acting in that capacity in the particular instance."

176.  Thus, for the conduct of a person or entity to become attributable to a State under Article 5, it must be demonstrated that (i) the person or entity under consideration was authorized to exercise governmental authority, and (ii) the person or entity exercised such authority in carrying out the conduct in question. The ILC Commentary further clarifies that entities under ILC Article 5 may include public corporations, semi-public

---

[113]   *Everest*, Award on the Merits, § 194 (2 May 2018) (CLA-278).

[114]   Claimants' Answers on Merits, § 1.16.

entities, public agencies of various kinds, and even private companies.[115] Numerous international tribunals have held an entity's conduct to be attributable to a State under Article 5, where (i) the entity was "empowered by the internal law" of the State to exercise elements of governmental authority ("*prérogatives de puissance publique*"), and (ii) the specific acts in question were performed by the entity "in the exercise of any such delegated governmental authority."[116] Arbitral tribunals have also consistently held that entities charged with implementing State policies satisfy the ILC Article 5 requirement for such entities to be authorized "to exercise governmental authority." For example, in *Bosh v. Ukraine,* the tribunal held that a university exercises governmental authority for purposes of ILC Article 5, since "the provision by the University of, *inter alia,* higher education services and the management of State-owned property [...] constitute forms of governmental authority that the University is empowered by the law of Ukraine to exercise."[117]

177. Similarly, in *Helnan v. Egypt,* the tribunal found that conduct of the Egyptian Company for Tourism and Hotels engaged the responsibility of Egypt due to the pivotal role it played during the implementation of Egypt's privatisation of its tourism industry.[118]

178. Another example of "elements of governmental authority" referred to in the ILC Commentary relates to the exercise of police powers:

> [F]or example, the conduct of a railway company to which certain police powers have been granted will be regarded as an act of the State under international law if it concerns the exercise of those powers, but not if it concerns other activities (e.g. the sale of tickets or the purchase of rolling stock).[119]

179. The Tribunal also notes that the practical application of ILC Article 5 was intended to be flexible. As noted by the tribunal in *FW Oil Interests v. Trinidad and Tobago,* "the notion is intended to be a flexible one, not amenable to general definition in advance; and the

---

[115]   ILC Commentary, p. 43 (CLA-103).

[116]   Claimants' Answers on Merits, § 1.9, with reference to *EDF (Services) Limited v. Romania*, ICSID Case No. ARB/05/13, Award, § 194 (8 October 2009) (CLA-271); *Jan de Nul N.V. & Dredging International N.V. v. Arab Republic of Egypt*, ICSID Case No. ARB/04/13, Award, § 163 (6 November 2008) (CLA-273); *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, § 176 (18 June 2000) (CLA-56).

[117]   *Bosh International, Inc. and B&P Ltd Foreign Investments Enterprise v. Ukraine*, ICSID Case No. ARB/08/11, Award, 25 October 2012, § 173.

[118]   *Helnan International Hotels A/S v. Egypt,* Decision of the Tribunal on Objection to Jurisdiction, 17 October 2006, § 85.

[119]   ILC Commentary, p. 43 (CLA-103); Claimants' Answers on Merits, § 1.9.

elements that would go in its definition in particular cases would be a mixture of fact, law and practice." [120] In essence, the practice of international tribunals clearly demonstrates that delegating a State's activities to separate entities will not permit avoidance of responsibility for breach of a treaty.[121]

180. In the present case, the following questions are relevant to determine whether the conduct of the Paramilitary Forces is attributable to the Russian Federation under ILC Article 5. First, were the Paramilitary Forces that allegedly seized the Claimants' property part of the so-called People's Militia, whose conduct was *inter alia* formalized by a specific order issued by the Supreme Council of the Autonomous Republic of Crimea, as further discussed in paragraph 193 below? Second, were the Paramilitary Forces/People's Militia authorized to exercise governmental authority? Third, did the Paramilitary Forces/People's Militia exercise governmental authority in carrying out the conduct that resulted in the alleged violation of the Claimants' Treaty rights?

181. The first question is thus whether the Paramilitary Forces that raided the Claimants' offices and seized their property in April 2014[122] formed part of the so-called People's Militia or whether these were single acts of armed individuals, which could not give rise to State responsibility. On the basis of the evidence on record, the Tribunal has come to the conclusion that the Paramilitary Forces indeed formed part of the so-called People's Militia.

182. In reaching this conclusion, the Tribunal has in particular considered the testimony of Mr. Laber, which it found credible, regarding the events of 22 and 23 April 2014. These events became known to Mr. Laber through the information provided to him by Mr. Topchiy.[123]

183. More specifically, the Tribunal has considered the Claimants' evidence that the persons who seized their office in Feodosia during the raid of 22 April 2014 arrived in "official-

---

[120] *F-W Oil Interests, Inc. v. Trinidad and Tobago*, ICSID Case No. ARB/01/14, Award, 3 March 2006, § 203.

[121] Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2nd ed., Oxford, 2012), p. 225 (CLA-94).

[122] The Tribunal notes that the same building served as headquarters for the Claimants and the claimant in PCA Case No. 2015-34. *See* Laber Statement, § 12 (CWS-1), noting that "[t]o reduce overhead costs, the same employees managed the Petrol Companies' stations and Ukrnafta's stations from this shared headquarters in Feodosia."

[123] Transcript 5 February 2018, 94/12-95/12, 172/16-176/11 (testimony of Mr. Laber).

looking vehicles" and wore uniforms with insignia of "polite people," the Russian term for the militia that was deployed in Crimea.[124]

184. The Tribunal has also noted the account of Mr. Yaroslav Burch, Ukrnafta director, given to the Ukrainian Independent Information News Agency, that during the raid of the Feodosia office on 22 April 2014, he heard the Paramilitary Forces identify themselves as members of the Crimean self-defense forces and members of the Crimean Security Service.[125]

185. The Tribunal also finds it telling that the Crimean police appeared powerless when called upon to intervene during the raid. Mr. Laber explained that after a brief conversation with members of the raiding force, the police officers left without more ado:

> At some point that morning, the police did come, the local Crimean police. But after a few brief words with the armed individuals, they, you know, sort of put their hands up and said this is sort of not something that we can deal with. This is above what we could help you with, so it was obvious to everyone there that there was – it was a Russian military, you know, takeover, not a – 30 bandits who came in with automatic rifles.[126]

186. The factual account of the Claimants' witness is consistent with the press report from the *Sobytiya Kryma* (Crimean Events) news service, which provided the following summary of the April 2014 events that took place at the Claimants' offices:

> According to the information that Ukrnafta provided to law-enforcement agencies, the events unfolded as follows. On the morning of April 22, at the Office of Ukrnafta's Petroleum Products Sales Division for the Autonomous Republic of Crimea in Feodosia located at 84 Krymskaya Street, a bus pulled up, and about 30 armed persons got out dressed in camouflage uniforms without identifying marks, with chevron insignia reading "polite people." The armed visitors calling themselves "Crimean Self-defense Forces" broke into the building and forced the entire staff to gather in the lobby. The attackers confiscated the employees'

---

[124]   Transcript 5 February 2018, 101/21-23 (testimony of Mr. Laber).

[125]   Claimants' Answers on Merits, § 1.13.1, *referring to Three Ukrnafta employees kidnapped in Ukraine*, Unian (23 April 2014) (C-57). *See also* Artem Prokhorov, *The "new Crimeans" have euthanized the fuel business*, Crimean Events (5 June 2014), describing the raid and subsequent measures taken against the Claimants' properties (C-77).

[126]   Transcript 5 February 2018, 102/5-12 (testimony of Mr. Laber).

mobile phones and put them in a box which they took away with them. The Director of the division, Andrey Khabarov, Deputy Director Vladimir Minkin and the Director of Elefteria LLC, Sergey Ryabichenko were taken into their offices where "discussions" were held with each of them individually, the contents of which can only be guessed. Fifteen minutes later, all three were taken outside and driven away in an unknown direction. When a squad of Feodosia police officers arrived, responding to a call from the employees of the office they were very quickly neutralized and taken out of commission by the "polite people."[127]

187.  According to the same press report, on 23 April 2014, a woman named Yulia arrived at the Feodosia office, announced that she was representing the interests of Mr. Aksyonov, the Crimean Prime Minister, and gave the Claimants' employees the choice between working for the "new owner" or leaving Crimea immediately.[128]

188.  On the basis of these facts, the Tribunal has no doubt that the Paramilitary Forces were indeed members of the People's Militia or the Crimean Self-Defense Force and that their conduct did not constitute random acts by some unorganized criminal gang.[129]

189.  For the sake of completeness, the Tribunal observes that it has taken note of the factual reality that some of the evidence before it came from indirect sources, in part due to the obvious difficulties for the Claimants to gather evidence in Crimea.

190.  In this context, and with due regard to Article 25(6) of the UNCITRAL Rules, pursuant to which the Tribunal has considerable discretion in matters of evidence, the Tribunal accepts the Claimants' explanation that direct evidence on the identity of the Paramilitary Forces is under the exclusive control of the Russian Federation. Consequently, the Claimants may establish such identity through indirect evidence, a method of proof also recognized by the International Court of Justice. For example, in the *Corfu Channel* case, the International Court of Justice held that "the fact of this

---

[127]  Artem Prokhorov, *The "new Crimeans" have euthanized the fuel business*, Crimean Events (5 June 2014) (C-77).

[128]  Artem Prokhorov, *The "new Crimeans" have euthanized the fuel business*, Crimean Events (5 June 2014) (C-77).

[129]  Claimants' Answers on Merits, § 1.14. At the Hearing on the Merits, the Claimants' counsel confirmed that the People's Militia of Crimea, the Crimean Security Services, and the Crimean Self-Defence Forces were "all the same people." Transcript 5 February 2018, 30/15-24. The Tribunal also notes that while it has established that the Paramilitary Forces formed part of the so-called People's Militia, for the sake of consistency, the Tribunal will continue referring to the armed forces that seized the Claimants' property in April 2014 as "Paramilitary Forces".

exclusive territorial control exercised by a State […] has bearing on the methods of proof […] [where] the other State, a victim of a breach of international law, is often unable to furnish direct proof [and thus] should be allowed a more liberal recourse to inferences of fact and circumstantial evidence."[130]

191. The second question arising in the context of attribution is whether the Paramilitary Forces had been authorized to exercise governmental authority. The record shows that this question can only be answered affirmatively.

192. On 1 March 2014, President Putin submitted an appeal to the Russian Federation Council, the upper house of Russia's federal parliament, to "use the armed forces of the Russian Federation on the territory of Ukraine until the social and political situation in that country is normalized," which request was granted on the same day.[131]

193. More importantly in our precise context, ten days later, on 11 March 2014, the Supreme Council of the Autonomous Republic of Crimea issued an order (the "Militia Order"), institutionalizing the People's Militia as an entity authorized to "conduct raids" and "participate in patrols."[132] Specifically, in accordance with Section II(3) of the Militia Order, the People's Militia was assigned the tasks of participating in patrols, setting up posts on streets and in other public places, and conducting raids to uncover and stop violations of the law. The People's Militia was also charged with uncovering circumstances contributing to violations of the law and reporting such circumstances to law enforcement and other authorities of the Autonomous Republic of Crimea, and delivering offenders to Internal Affairs authorities.

194. Again, ten days later, on 21 March 2014, when the Republic of Crimea became a federal subject of the Russian Federation, the Militia Order was "affirmed".[133] The Militia Order was eventually superseded by an act of the Republic of Crimea passed on

---

[130] Claimants' Answers on Merits, § 1.14, *referring to United Kingdom v. Albania*, Judgment, Merits, ICJ GL No. 1 [1949] I.C.J. Reports 4, ICGJ 199 (9 April 1949) (CLA-276).

[131] *Vladimir Putin submitted appeal to the Federation Council*, Official Site of the President of Russia (1 March 2014) (C-36). *See also* Kathy Lally, Will Englund, and William Booth, *Russian parliament approves use of troops in Ukraine*, Washington Post (1 March 2014) (C-34).

[132] Statement of Claim, § 3.56; Claimants' Answers on Merits, §§ 1.10 1.11, *referring to* Order No. 173-6/14 of the Supreme Council of the Autonomous Republic of Crimea "On the People's Militia of Crimea" (11 March 2014), Section II(3) (C-171).

[133] Claimants' Answers on Merits, § 1.10, *referring to* Federal Constitutional Law of the Russian Federation No. 6-FKZ "On Accepting the Republic of Crimea into the Russian Federation and Establishing New Constituent Entities in the Russian Federation: the Republic of Crimea and the Federal City of Sevastopol" (21 March 2014), Art. 23(2) (C-164.1).

17 June 2014,[134] which defines the People's Militia as "an association that is being created for the purpose of assisting government agencies of the Republic of Crimea and law-enforcement agencies in maintaining public order, and shall be made up of citizens of the Russian Federation who have been recruited into it in accordance with the prescribed procedure" (Article 1.1). Article 2.1 of the same act clarifies that the legal foundation of the People's Militia is "the Constitution of the Russian Federation, federal laws and other normative legal acts of the Russian Federation, the Constitution of the Republic of Crimea, this Law, and other normative legal acts of the Republic of Crimea."

195.   As a consequence, the Tribunal has no hesitation to conclude that the People's Militia was empowered under the internal law of the Republic of Crimea to exercise governmental functions and, specifically, police powers.

196.   The third question in the three-prong test to assess attribution set out in paragraph 180 above, *i.e.*, whether the People's Militia did exercise governmental powers when taking control of the Claimants' operations, must also receive an affirmative response.

197.   The best evidence for the fact that the Paramilitary Forces/People's Militia exercised governmental authority in carrying out the conduct at issue is that the Crimean State Council and the Sevastopol Government effectively ratified the Paramilitary Forces' acts by issuing the 3 September 2014 amendment to the Nationalization Decree and the Sevastopol Order.[135]  It is also noteworthy that, on 16 April 2014, Mikhail Sheremet, the head of the Self-Defense Forces, became the Deputy Prime Minister of Crimea and was specifically charged with supervising law enforcement bodies of Crimea.[136] Last

---

[134]   *See* Law of the Republic of Crimea No. 22-ZRK "On People's Militia/ People's Patrol of the Republic of Crimea," 17 June 2014 (C-78).

[135]   Claimants' Answers on Merits, § 1.13.4; Transcript 5 February 2018, 36/3-9; Decree No. 2085-6/14 of the Crimean State Council dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (C-74); Statement of Claim, § 2.41. *See also* Order No. 401 of the Sevastopol Government "On the assignment of property under right of economic management to SUE City Petrol Station Complex," 11 November 2014 (C-94); Statement of Claim, § 2.42; Order No. 662-PP of the Sevastopol Government "On amending the order of the Sevastopol Government No. 123-PP dated 28 February 2015 'On certain questions of nationalization of property,'" 8 July 2016 (C-176).

[136]   *Former commander of Crimean self-defense nominated for deputy premier*, ITAR-TASS (16 April 2014 (C-69).

but not least, the Claimants' properties were eventually put under control of State-owned enterprises by the Republic of Crimea and the city of Sevastopol.[137]

198. All of the above facts lead to the conclusion that the Paramilitary Forces were empowered under ILC Article 5 to exercise elements of governmental authority and in fact exercised such authority by their conduct affecting the Claimants' investment in Crimea and Sevastopol. The Tribunal's conclusion is in line with the findings of the *Everest* tribunal, which was faced with a similar factual pattern and concluded that, "[i]n view of the governmental character of the functions entrusted to the People's Militia and the fact that these functions are based on the law of the Republic of Crimea, […] the alleged acts of the People's Militia shall be considered acts of the Russian Federation under international law."[138]

199. Lastly, some additional observations are in order. First, the fact that the Paramilitary Forces may have violated Russian law in their exercise of police powers has no impact on the attribution of their conduct to the Russian Federation.[139]

200. Second, the Tribunal observes that it has noted the distinction drawn by the Claimants in relation to the acts committed by the Paramilitary Forces before and after 21 March 2014, which potentially impacts the attribution of the acts complained of under ILC Articles 5 or 8.[140] However, considering that the Claimants have only been affected by the acts of the Paramilitary Forces as of 22 April 2014, it is unnecessary for the Tribunal to seek to characterize the acts preceding that date. The Tribunal can thus dispense with the analysis of attribution of the conduct of the Paramilitary Forces under ILC Article 8.

---

[137]  Statement of Claim, §§ 2.40-2.41.

[138]  *Everest*, Award on the Merits, § 199 (2 May 2018) (CLA-278).

[139]  As stated in ILC Article 7: "The conduct of an organ of a State or of a person or entity empowered to exercise elements of the governmental authority shall be considered an act of the State under international law if the organ, person or entity acts in that capacity, even if it exceeds its authority or contravenes instructions." (CLA-102). The ILC Commentary provides the following further explanation: "The State cannot take refuge behind the notion that, according to the provisions of its internal law […] their actions or omissions ought not to have occurred or ought to have taken a different form." p. 45 (CLA-103).

[140]  See above at § 156.

ii.    ILC Article 11

201.  Finally, for the sake of completeness, the Tribunal notes that the Claimants have also argued that the acts of the Paramilitary Forces are attributable to Russia under ILC Article 11, which reads as follows:

> Conduct which is not attributable to a State under the preceding articles shall nevertheless be considered an act of that State under international law if and to the extent that the State acknowledges and adopts the conduct in question as its own.

202.  In addition to being attributable under ILC Article 5, the Tribunal is of the opinion that the acts of the Paramilitary Forces are attributable to the Russian Federation under ILC Article 11. Indeed, the record shows that the Russian Federation has acknowledged and adopted the conduct by the Paramilitary Forces as its own. The Tribunal has made this finding taking into account the facts mentioned in paragraph 197 above as well as the following circumstances:

(i) on 17 April 2014, President Putin acknowledged in a televised interview that "Russian servicemen did back the Crimean Self-Defense Forces";[141]

(ii) by June 2014, the Crimean Parliament had confirmed the role of the Paramilitary Forces as an organ of the Crimean government through the enactment of a number of laws and regulations specifying their status and organizational structure;[142]

(iii) on 3 September and 11 November 2014, respectively, the Crimean State Council and the Sevastopol Government ratified the actions of the Paramilitary Forces by the amendment to the Nationalization Decree and the issuance of the Sevastopol Order;[143] and

---

[141]  Claimants' Answers on Merits, § 1.18.1, *referring to Direct Line with Vladimir Putin*, Official Site of the President of Russia (17 April 2014), p. 16 (C-70).

[142]  Claimants' Answers on Merits, § 1.18.2, fn. 37, *referring to* Law of the Republic of Crimea No. 22-ZRK "On the People's Militia," (17 June 2014) (C-78); Resolution of the Cabinet of Ministers of the republic of Crimea No. 217 "On Matters of Activities of the People's Militia of the Republic of Crimea" (23 July 2014) (C-83). The Tribunal has also noted the Claimants' explanation that under this legislation the People's Militia is controlled and financed by the Crimean Government, while the head of the Militia is appointed and removed from office by decree of the head of the Crimean Republic.

[143]  Claimants' Answers on Merits, § 1.18.3.

(iv) there was no attempt by the Russian Federation or any of its authorities to prosecute or hold the Paramilitary Forces accountable in any manner.[144]

203. Since the acts of the Paramilitary Forces have already been held attributable to the Russian Federation under ILC Article 5, it is not strictly necessary to reach a conclusion on attribution under Article 11. It was nevertheless discussed here because it was raised by the Claimants and adds weight to the already clear finding under Article 5.

### (d)   Conclusion

204. In light of all of the above, the Tribunal concludes that (i) the acts of the Crimean State Council and the Sevastopol Government are attributable to the Russian Federation under ILC Article 4 and (ii) the acts of the Paramilitary Forces/People's Militia are attributable to the Russian Federation under ILC Article 5 and ILC Article 11.

## D.   LIABILITY

### 1.   The Claimants' Position

205. The Claimants argue that the Russian Federation breached its obligations under the BIT. They primarily rely on Article 5 of the BIT, contending that the Russian Federation unlawfully expropriated the Claimants' investment in breach of this Article. Moreover, the Claimants argue that the Respondent also breached Articles 2 and 3 of the BIT.[145]

### (a)   The expropriation claim

206. According to the Claimants, the Russian Federation "interfered with and nationalized" their properties when: (i) the Paramilitary Forces "seized and looted" the Feodosia office and began operating the Claimants' petrol stations in April 2014;[146] (ii) the Crimean State Council nationalized the Claimants' petrol stations, office in Feodosia, storage facility, and other real properties located in the Republic of Crimea by the 3 September 2014 amendment to the Nationalization Decree;[147] and (iii) the

---

[144] Transcript 5 February 2018, 47/14-20 (the Claimants' opening statement).

[145] See above at §§ 136-139.

[146] Statement of Claim, § 3.59.

[147] Statement of Claim, § 3.59, *referring to* Decree No. 2085-6/14 of the Crimean State Council of the dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-002-006).

Sevastopol Government nationalized the Claimants' petrol stations and storage facility in that city by the Sevastopol Order of 11 November 2014.[148]

207. The Claimants argue that these measures constitute an unlawful "nationalization" under Article 5 of the BIT.[149] According to the Claimants, for expropriation to be lawful under that provision, it must: (i) be in the public interest; (ii) not be discriminatory; (iii) be in accordance with the procedures established by law; and (iv) be "accompanied by prompt, adequate and effective compensation."[150] The Claimants submit that the Respondent failed to meet any of these requirements.

### (b)    Discriminatory measures

208. The Claimants contend that Article 3(1) of the BIT enjoins the Russian Federation from adopting "discriminatory measures that could interfere with the management and disposal" by Ukrainian investors of their investments. [151] Accordingly, there is discriminatory treatment when a "state benefit[s] or harm[s] someone more in comparison with the generality." [152] In the determination of whether there is discriminatory treatment, the Claimants aver that it is "necessary to compare the treatment challenged with the treatment of persons or things in a comparable situation."[153] The Claimants add that "tribunals generally favor an approach that looks at the consequences of a particular measure," although discriminatory intent may also be relevant.[154]

209. In the present case, the Claimants argue that the Russian Federation's actions were discriminatory because they were motivated solely by its "political *animus*" against Mr. Kolomoisky.[155] Thus, due to the absence of an "objective or reasoned" basis for its

---

[148]   Statement of Claim, § 3.59, *referring to* Order No. 401 of the Sevastopol Government "On the assignment of property under right of economic management to SUE City Petrol Station Complex" (11 November 2014) (C-94).

[149]   Statement of Claim, § 3.59.

[150]   Statement of Claim, § 3.60.

[151]   Statement of Claim, §§ 3.69, 3.71.

[152]   Statement of Claim, § 3.72, *quoting AES Summit Generation Ltd. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, § 10.3.53 (23 September 2010) (CLA-27).

[153]   Statement of Claim, § 3.72, *referring to Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, § 210 (27 December 2010) (CLA-79).

[154]   Statement of Claim, § 3.72, *referring to* Rudolf Dolzer and Christoph Schreuer, Principles of International Investment Law (2nd ed. 2012), p. 197 (CLA-94).

[155]   Statement of Claim, § 3.72.

actions against the Claimants, the Russian Federation exhibited discriminatory behavior in breach of Article 3(1) of the BIT.[156]

### (c)   Most favored nation protections

210.   The Claimants assert that, in addition to the preclusion against discriminatory measures discussed in paragraph 208 above, Article 3 of the BIT guarantees investments of Ukrainian investors "treatment no less favorable than the treatment to [the Russian Federation's] own investors or investors of any third State."[157] For the Claimants, this is an MFN clause, which imports into the BIT substantive guarantees from other investment treaties ratified by the Respondent. The Claimants submit that "[t]he weight of authority clearly supports the view that an MFN rule grants a claimant the right to benefit from substantive guarantees contained in third treaties." [158] In support of this argument, the Claimants refer to *MTD Equity Sdn. Bhd. v. Republic of Chile* and *White Indus. Australia Ltd. v. Republic of India*.[159]

211.   In the present case, the Claimants seek to import into the Treaty Article 3(1) of the Canada-USSR BIT, specifically its substantive FET and FPS protections.[160] In relevant part, Article 3(1) of the Canada-USSR BIT provides:

> Investments or returns of investors of either Contracting Party shall at all times be accorded fair and equitable treatment in accordance with principles of international law and shall enjoy full protection and security in the territory of the other Contracting Party.

---

[156]   Statement of Claim, § 3.73.

[157]   Statement of Claim, §§ 3.70-3.71, 3.73.

[158]   Statement of Claim, § 3.75, *referring to* Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2nd ed. 2012), p. 211 (CLA-94).

[159]   Statement of Claim, § 3.75 and fn. 305-306, *referring to MTD Equity Sdn. Bhd. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, §§ 100, 107, 190, 197 (25 May 2004) (CLA-63); *White Indus. Australia Ltd. v. Republic of India*, UNCITRAL, Final Award, §§ 11.2.1-11.2.9 (30 November 2011) (CLA-83); *ATA Constr. Indus. and Trading Co. v. Hashemite Kingdom of Jordan*, ICSID Case No. ARB/08/2, Award, § 125, fn. 16 (18 May 2010) (CLA-33); *Rumeli Telekom v. Republic of Kazakhstan*, ICSID Case No. Arb/05/16, Award, §§ 581, 591, 609 (29 July 2008) (CLA-71).

[160]   Statement of Claim, §§ 3.77-3.96; Agreement between the Government of Canada and the Government of the Union of Soviet Socialist Republics for the Promotion and Reciprocal Protection of Investments, Art. III(1) (20 November 1989) (CLA-2).

i.      Fair and equitable treatment

212.   The Claimants submit that the FET standard "ensures that [a] foreign investor is not unjustly treated […] and is a means to guarantee justice to foreign investors,"[161] asserting that it "is more than a 'minimum standard' of conduct."[162] In this regard, the Claimants recalls the following factors identified in *Rumeli Telekom v. Republic of Kazakhstan* as relevant to an FET standard analysis: (i) "the State must act in a transparent manner"; (ii) "the State is obliged to act in good faith"; (iii) "the State's conduct cannot be arbitrary, grossly unfair, unjust, idiosyncratic, discriminatory, or lacking in due process"; and (iv) "the State must respect procedural propriety and due process."[163] In addition, the Claimants cite *Tecnicas Medioambientales Tecmed S.A. v. United Mexican States*, *Jan Oostergetel v. Slovak Republic*, *Vivendi v. Argentine Republic* (*Vivendi II*), and *MTD v. Chile*.[164] Reading these cases together, the Claimants submit that the FET standard mandates States: (i) "to act in good faith and to refrain from acting in an arbitrary and discriminatory manner"; and (ii) "to afford foreign investors due process under the law."[165]

213.   In the present case, the Claimants contend that the Russian Federation violated the FET standard because it acted in a "blatantly discriminatory manner" against the Petrol Companies and their investments in Crimea.[166] In particular, the Claimants argue that the Russian Federation's acts that specifically targeted the Petrol Companies and their investments for "extralegal and political reasons" constitute a clear infringement of the FET standard.[167] Additionally, the Claimants submit that the Respondent's measures

---

[161]   Statement of Claim, § 3.78, *referring to Swisslion DOO Skopje v. F.Y.R. Macedonia*, ICSID Case No. ARB/09/16, Award, § 273 (6 July 2012) (CLA-76).

[162]   Statement of Claim, § 3.81, *referring to Vivendi v. Argentine Republic* (*Vivendi II*), ICSID Case No. ARB/97/3, Award, § 7.4.8 (20 August 2007) (CLA-80).

[163]   Statement of Claim, § 3.83, *referring to Rumeli Telekom v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, § 609 (29 July 2008) (CLA-71).

[164]   Statement of Claim, § 3.84, *referring to Tecnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, § 246 (19 January 2007) (CLA-77); *Jan Oostergetel v. Slovak Republic*, UNCITRAL, Final Award, § 221 (23 April 2012) (CLA-58); *Vivendi v. Argentine Republic* (*Vivendi II*), ICSID Case No. ARB/97/3, Award, § 7.4.8 (20 August 2007) (CLA-80); *MTD Equity Sdn. Bhd. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, § 109 (25 May 2004) (CLA-63).

[165]   Statement of Claim, § 3.86.

[166]   Statement of Claim, § 3.86, *referring to* Statement of Claim, §§ 2.1-2.9.

[167]   Statement of Claim, § 3.86, *referring to Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18, Award, § 123 (26 July 2007) (CLA-78); *Glamis Gold, Ltd. v. United States of America*, NAFTA/UNCITRAL, Award, § 542 fn.1087 (8 June 2009) (CLA-51).

"violated '[t]he general, if not cardinal, principle of customary international law that States must act in good faith'."[168]

214. Finally, the Claimants assert that the Russian Federation failed to satisfy its obligation to afford the Petrol Companies due process of law when the Respondent failed to "provide the Petrol Companies a meaningful opportunity or mechanism to challenge the unlawful takeover and nationalization of their stations and other properties" and when it rebuffed the Claimants' efforts to seek legal recourse.[169]

ii.   Full protection and security

215. The Claimants are of the view that the FPS standard complements the FET standard.[170] Referring to *Occidental Exploration & Production Co. v. Republic of Ecuador*, the Claimants state that "treatment that is not fair and equitable automatically entails an absence of full protection and security of the investment."[171] Further, the Claimants emphasize that the FPS standard imposes an "obligation of vigilance" on a State to take all measures necessary to ensure an investor's "full enjoyment of protection and security of its investments."[172]

216. The Claimants submit further that the scope of protection guaranteed by the FPS standard includes not only physical security, but also legal protection of an investor's rights.[173] In support, the Claimants rely on *CME Czech Republic v. Czech Republic*, where the tribunal found the Government's "actions and inactions" aimed at removing

---

[168]  Statement of Claim, § 3.87, *quoting Waguih Elie George Siag and Clorinda Vecchi v. The Arab Republic of Egypt*, ICSID Case No. ARB/06/15, Award, § 450 (1 June 2009) (CLA-81).

[169]  Statement of Claim, § 3.88.

[170]  Statement of Claim, § 3.90.

[171]  Statement of Claim, § 3.90, *referring to Occidental Exploration & Production Co. v. Republic of Ecuador*, LCIA Case No. UN 3467, Final Award, § 187 (1 July 2004) (CLA-65). The Claimants also cite *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Award, § 334 (21 June 2011) (CLA-57), *Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, § 408 (14 July 2006) (CLA-34), and Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2nd ed. 2012), p. 161 (CLA-94).

[172]  Statement of Claim, § 3.90, *referring to American Manufacturing & Trading v. Democratic Republic of Congo*, ICSID Case No. ARB/93/1, Award, § 6.05 (21 February 1997) (CLA-29).

[173]  Statement of Claim, § 3.90, *referring to Renée Rose Levy de Levi v. Republic of Peru*, ICSID Case No. ARB/10/17, Award, § 406 (26 February 2014) (CLA-69); *Vivendi v. Argentine Republic* (*Vivendi II*), ICSID Case No. ARB/97/3, Award, § 7.4.15 (20 August 2007) (CLA-80); *Frontier Petroleum Services Ltd. v. Czech Republic*, UNCITRAL, Final Award, § 263 (12 November 2010) (CLA-49).

the security and legal protection of the claimant's investment to be in breach of the FPS standard.[174]

217. The Claimants argue that, similarly, in the present case, the Respondent breached the FPS standard when it intentionally targeted and destroyed the Petrol Companies' investments in Crimea based on their connection with Mr. Kolomoisky and without due process of law.[175]

218. In addition, the Claimants submit that, even if the FPS standard only guaranteed physical security of investments, the Russian Federation would still be in breach of the BIT.[176] The Claimants rely on the holding in *Wena Hotels Ltd. v. Arab Republic of Egypt*, where the tribunal found that Egypt failed to accord full protection and security to the investor when it did not prevent the seizure of the investor's hotel by private actors, or return the hotel to the investor's control.[177]

219. Applying *Wena Hotels* to this case, the Claimants aver that the Respondent breached the FPS standard when it refused to take any action to protect the Claimants' properties and employees after the Paramilitary Forces raided the Feodosia office and began operating the Claimants' petrol stations, and when the Crimean authorities did not act on the Claimants' complaints.[178] To the contrary, the Russian Federation "actively participated" in the actions against the Claimants by nationalizing their properties in Crimea.[179]

(d)   **Complete and unconditional legal protection of investments**

220. The Claimants also argue that the Russian Federation violated its obligation to "guarantee[], in accordance with its legislation, the full and unconditional legal protection of investments by investors of the other Contracting Party" under Article 2 of the BIT when it "targeted the Petrol Companies based on their connection with Mr. Kolomoisky," which ultimately resulted in the destruction of their investments in

---

[174] Statement of Claim, § 3.91, *referring to CME Czech Republic v. Czech Republic*, UNCITRAL, Partial Award, § 613 (13 September 2001) (CLA-43).

[175] Statement of Claim, § 3.92.

[176] Statement of Claim, § 3.93.

[177] Statement of Claim, § 3.93, *referring to Wena Hotels Ltd. v. Arab Republic of Egypt* ICSID Case No. ARB/98/4, Award, §§ 84, 92-93 (8 December 2000) (CLA-82).

[178] Statement of Claim, § 3.94.

[179] Statement of Claim, § 3.95.

Crimea.[180] According to the Claimants, the protection under Article 2 of the BIT is "concerned not merely with physical protection but also with legal protection."[181]

221. The Claimants add that assuming there was no act of nationalization on 22 April 2014, the fact that the Respondent failed to protect their properties on that day constitutes a breach of Article 2 of the BIT.[182]

**2.    Analysis**

    **(a)    Expropriation**

        i.    The legal standard

222. Article 5(1) of the Treaty establishes the following protection from unlawful expropriation:

> Investments made by investors of one Contracting Party in the territory of the other Contracting Party shall not be expropriated, nationalized or subject to other measures equivalent in effect to expropriation (hereinafter referred to as "expropriation"), except in cases where such measures are taken in the public interest under due process of law, are not discriminatory and are accompanied by prompt, adequate and effective compensation.

223. The Tribunal will first assess whether there has been an expropriation. In the affirmative, it will proceed to examine whether the expropriation was lawful in accordance with the test set forth in the Treaty. As is apparent from the wording of Article 5(1), the Treaty conditions the legality of any expropriatory measure on the following elements:

    (i)    public interest;

    (ii)    non-discrimination;

    (iii)    due process of law; and

    (iv)    prompt, adequate and effective compensation.

---

[180]    Statement of Claim, § 3.96, *referring to Yury Bogdanov v. Republic of Moldova*, SCC Arbitration No. V (114/2009), Final Award, §§ 30, 50 (30 March 2010) (CLA-85).

[181]    Transcript 5 February 2018, 59/18-24 (the Claimants' opening statement).

[182]    Transcript 5 February 2018, 75/16 (the Claimants' opening statement).

224. The language of the Treaty leaves no doubt that the four requirements are cumulative. Indeed, arbitral tribunals have frequently held that when a treaty requires several conditions for a lawful expropriation, failure to meet any one of those conditions makes the expropriation wrongful.[183]

225. Furthermore, the prohibition of unlawful expropriation in Article 5(1) of the Treaty encompasses both direct expropriation and measures "equivalent in effect to expropriation" (*i.e.*, "indirect" expropriation). The Treaty's protection thus covers an outright physical taking of property or measures that affect legal title, as well as acts that deprive an investor of the use and enjoyment of its investment without affecting possession or formal title to the investment. In other words, in cases of direct expropriation, there is an open and unequivocal intent, which is reflected in a physical act or a formal law or decree, to deprive the owner of his or her property through the transfer of title or outright seizure. In cases of indirect expropriation, it is the measure's economic impact on the investment that matters, whereas an open and unequivocal intent to expropriate may not be present.

  ii. Did the Russian Federation expropriate the Claimants' investment?

226. In the context of the analysis of its *ratione materiae* jurisdiction in the Award on Jurisdiction, the Tribunal held that "there can be no serious doubt that the resources committed by the Claimants fully correspond to the meaning of 'investment' set forth in Article 1(1) of the BIT."[184] In this context, the Tribunal also analyzed the relevant Ukrainian, Crimean, and Russian legislation and concluded that the Claimants' property rights and their investment complied with both Ukrainian and Russian law,[185] with the result that the Claimants' investment fully met the requirement set forth in

---

[183] Statement of Claim, § 3.60. *See, e.g.*, *Ron Fuchs v. Republic of Georgia*, ICSID Case No. ARB/07/15, Award, § 390 (3 March 2010) (CLA-70) (finding the Respondent's expropriation unlawful even where (i) the expropriation was potentially taken in the public interest and (ii) despite Respondent's argument that no compensation was due, but where (iii) the expropriation was not carried out under due process of law; *Vivendi v. Argentine Republic (Vivendi II)*, ICSID Case No. ARB/97/3, Award, § 7.5.21 (20 August 2007) (CLA-80), noting as follows: "If we conclude that the challenged measures are expropriatory, there will be violation of Article 5(2) of the Treaty, even if the measures might be for a public purpose and non-discriminatory, because no compensation has been paid."). *See also Bernardus Henricus Funnekotter & Ors. v. Zimbabwe*, ICSID Case No. ARB/05/6, Award, § 98 (22 April 2009): "The Tribunal observes that the conditions enumerated in Article 6 are cumulative. In other terms, if any of those conditions is violated, there is a breach of Article 6."

[184] Award on Jurisdiction, § 213.

[185] Award on Jurisdiction, §§ 214-232.

Article 1(1) of the BIT for the investment to be made in accordance with the host State's legislation.

227. The Tribunal also observed in its Award on Jurisdiction that the Respondent had never put forward an argument of any alleged non-conformity of the Claimants' properties with either Russian or Ukrainian laws as a justification of the measures that are the subject of this arbitration.[186] The Tribunal hereby confirms its earlier findings and adds that the Respondent's recognition of the Claimants' title over their properties before the nationalization is also confirmed by the Crimean Property Law,[187] the purpose of which was to deal with certain effects "as a result of the termination of the title of the previous proprietor and the acquisition by the Republic of Crimea of title to such property."[188]

228. Turning to the facts related to the alleged expropriation, the Tribunal recalls that it is the Claimants' position in this arbitration that the Russian Federation nationalized their properties when (i) the Paramilitary Forces "seized and looted" the Feodosia office and deprived the Claimants of all control over their petrol stations in April 2014;[189] (ii) the Crimean State Council nationalized their petrol stations, storage facility, and other real estate assets (in particular, Stabil LLC's residential apartment in Simferopol) located in the Republic of Crimea by the 3 September 2014 amendment to the Nationalization Decree;[190] and (iii) the Sevastopol Government nationalized their petrol stations and storage facility located in Sevastopol by the Sevastopol Order of 11 November 2014.[191]

229. With reference to paragraph 113 and following above and in view of its findings on attribution, the Tribunal finds that the above three sets of facts alleged by the Claimants are established. Therefore, it considers that the Russian Federation carried out a direct expropriation of the Claimants' petrol stations and storage facilities when it seized the Claimants' headquarters in Feodosia on 22 April 2014. This expropriation was subsequently formalized through the 3 September 2014 amendment to Nationalization Decree[192] and the Sevastopol Order,[193] the terms of which are clear and leave no

---

[186]   Award on Jurisdiction, p. 72, fn. 300.

[187]   *See* Crimean Property Law, Art. 8 (C-181).

[188]   Crimean Property Law, Art. 1(1) (C-181).

[189]   Statement of Claim, § 3.59.

[190]   Statement of Claim, § 3.59.

[191]   Statement of Claim, § 3.59.

[192]   Decree No. 2085-6/14 of the Crimean State Council dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-001).

doubt that the Republic of Crimea and the Sevastopol Government expropriated the Claimants' properties. Stabil LLC's residential apartment in Simferopol was expropriated through the 3 September 2014 amendment to the Nationalization Decree.

230. As to the date of the expropriation, the Tribunal notes Mr. Laber's testimony that, following the seizure of the Feodosia office on 22 April 2014, Ukrnafta employees were denied access to the building by the Paramilitary Forces, and thus the Claimant lost all managerial control of its Crimean petrol stations:[194]

> By 25 April 2014, numerous sources on the ground in Crimea reported to us that individuals – either the Paramilitary Forces or individuals affiliated with them – were illegally selling the Petrol Stations' remaining inventory of fuel and other products at substantially lower prices than the prices set by the Petrol Companies. These individuals abandoned the Petrol Stations around June 2014, probably because there was no remaining inventory to be sold. The Petrol Companies received none of the revenues from this illegal sale of their fuel and other goods since 22 April 2014. In short, the Petrol Companies had lost control of their operations.[195]

231. Consequently, the Tribunal concludes that the Respondent expropriated the Claimants' Crimean petrol stations and storage facilities on 22 April 2014, and Stabil LLC's residential apartment in Simferopol on 3 September 2014.

       iii.    Was the Russian Federation's expropriation of the Claimants' investment lawful?

232. With reference to the test set out in paragraph 223 above, the Tribunal will now examine whether the Respondent's expropriatory measures were contrary to the public interest (a); discriminatory (b); not in accordance with due process of law (c); and lacking compensation (d).

---

[193]   Order No. 401 of the Sevastopol Government "On the assignment of property under right of economic management to SUE City Petrol Station Complex" (11 November 2014) (C-94).

[194]   Laber Statement, § 32 (CWS-1).

[195]   Laber Statement, § 34 (CWS-1); Transcript 5 February 2018, 178/5-14 (testimony of Mr. Laber).

(a) Public interest

233. Under Article 5(1) of the BIT, in order for an expropriation to be lawful it must be "taken in the public interest." This requires a concrete, genuine interest of the public that is furthered by the expropriation.

234. The Special Rapporteur on International Responsibility highlights the importance of the public purpose requirement for the legality of an expropriation:

> [T]he least that can be required of the State is that it should exercise [its] power only when the measure is clearly justified by the public interest. Any other view would condone and even facilitate the abusive exercise of the power to expropriate and give legal sanction to manifestly arbitrary acts of expropriation. [...] It is accordingly sufficient to require that all States should comply with the condition or requirement which is common to all; namely, that the power to expropriate should be exercised only when expropriation is necessary and is justified by a genuinely public purpose or reason. If this *raison d'etre* is plainly absent, the measure of expropriation is "arbitrary."[196]

235. The Tribunal agrees with the Claimants that the expropriation of their investment lacked a public purpose. In view of all the circumstances surrounding the expropriation, which were discussed in the context of attribution in paragraphs 154-160 above and are further addressed below, the Tribunal can discern no public purpose that could justify the challenged measure. In this context, the Tribunal finds it particularly telling that the amendments to the Nationalization Decree and the Sevastopol Order, which nationalized the Claimants' properties and proclaimed them to be the property of the Republic of Crimea and Sevastopol, made no attempt to justify the taking by reference to a public purpose.

236. The Tribunal thus concludes that the Respondent's expropriation of the Claimants' properties lacked public interest, which is even more visible if one also considers the discriminatory nature of the expropriation, to which the Tribunal turns next.

(b) Discrimination

237. Under Article 5(1) of the Treaty, an expropriation is unlawful if it is discriminatory.

---

[196] F.V. García Amador, State Responsibility: Fourth Report by the Special Rapporteur on International Responsibility, Yearbook of the International Law Commission, Doc. A/CN.4/119, § 59 (1959) (CLA-86).

238. The Claimants argue that the requirements of public interest and lack of discrimination are intertwined, such that when the expropriation is motivated by personal *animus* against an investor, the expropriation necessarily contravenes the public interest, regardless of an ostensible public purpose for the measure.[197] In this regard, the Claimants refer to *British Caribbean Bank Ltd. v. Belize*, where the tribunal found that the public statements of the Prime Minister of Belize according to which the expropriation targeted the assets of the investor, who was an "enemy of Belize," belied the public interest justification for the expropriation.[198] Drawing a parallel between the present case and *British Caribbean*, the Claimants argue that the Russian Federation's actions against the Claimants were motivated by its "hostility" against Mr. Kolomoisky,[199] and reiterate that, unlike the Government of Belize in *British Caribbean*, the Russian Federation did not even proffer a public interest objective when it expropriated the Claimants' properties.[200]

239. In connection with the motivation behind the expropriation, the Tribunal notes that the record contains numerous manifestations of the Respondent's hostility towards Mr. Kolomoisky. The statement of the Chairman of the Council of Ministers of Crimea to the Crimean Parliament that it was a "moral right and a moral duty to carry out th[e] nationalization" because Mr. Kolomoisky "is one of the oligarchs who initiated and has been financing military operations in the southeast of Ukraine where our compatriots are being killed"[201] is self-explanatory. Bearing in mind that Mr. Kolomoisky holds a significant share of the Claimants' equity (see paragraph 99 above), there is no need for further evidence of the Respondent's discriminatory intent when carrying out the expropriation of Mr. Kolomoisky's property.

240. Nonetheless, for completeness, the Tribunal also notes the following circumstances which prove the discriminatory nature of the Respondent's expropriation:

---

[197] Statement of Claim, § 3.62.

[198] Statement of Claim, § 3.62, *referring to British Caribbean Bank Ltd. v. Belize*, PCA Case No. 2018-18, Award, § 237 (9 December 2014) (CLA-37).

[199] Statement of Claim, § 3.63; Transcript 5 February 2018, 53/21-55/21, 57/21-58/14 (the Claimants' opening statement).

[200] Statement of Claim, § 3.64.

[201] Statement of Claim, § 3.63, *referring to Crimea's State Council rules to nationalize [Igor Kolomoisky's] property in Crimea*, ITAR-TASS (3 September 2014) (C-87).

(i) the 24 September 2014 statement of a spokesperson for the Russian Investigative Committee, Mr. Vladimir Markin, that "all of Mr. Kolomoisky's assets in Russia" would be seized;[202]

(ii) President Putin's interviews of 4 March and 17 April 2014, where he called Mr. Kolomoisky a "scoundrel" and an "impostor,"[203] and told a Crimean resident not to bother repaying his car loan to PJSC Privatbank, a Ukrainian bank in which Mr. Kolomoisky was a significant shareholder;[204]

(iii) the order by the Basmanny District Court of Moscow to arrest Mr. Kolomoisky for his alleged support to the Ukrainian Defense Forces in their skirmishes against the Russian military in Crimea and Eastern Ukraine;[205] and, finally,

(iv) the August and September 2014 orders of the Simferopol District Court for the attachment of properties believed to be associated with Mr. Kolomoisky.[206]

241.  On this basis, the Tribunal has no hesitation to conclude that the Russian Federation's measures were targeted specifically at the Claimants and their investments, and were therefore by definition discriminatory, which renders the expropriation unlawful under the Treaty.

(c) Due process

242.  The Claimants submit that the nationalization of their properties was not carried out "under due process of law," as required by Article 5 of the BIT. They assert that they pursued "all avenues available to them to regain control of their Crimean operations" by reporting the illegal actions to the local police (as described at paragraph 120 above). [207] However, those authorities "failed to take any actions to remove the perpetrators from the Petrol Companies' property. Further, the Crimean authorities

---

[202]  Statement of Claim, § 2.47, *referring to* Crimean authorities nationalize Kolomoisky's tourist resorts, RAPSI News (24 September 2014) (C-90).

[203]  Statement of Claim, § 3.63, *referring to* Katya Golubkova and Natalia Zinets, *Russia puts subsidiary of Ukraine's PrivatBank in temporary administration*, Reuters (6 March 2014) (C-43).

[204]  Statement of Claim, § 3.63, *referring to Direct Line with Vladimir Putin*, President of Russia Official Website (17 April 2014), pp. 44-45 (C-70); Transcript 5 February 2018, 18/19-19/10.

[205]  Statement of Claim, § 3.63, *referring to Moscow Court Sanctions Arrest of Ukraine Tycoon Governor Kolomoisky*, The Moscow Times (2 July 2014) (C-81).

[206]  Statement of Claim, § 3.63, *referring to* Decision of the Simferopol District Court, Case No. 3/6-291/2014 (8 August 2014) (C-85); Decision of the Simferopol District Court, Case No. 3/6-319/2014 (1 September 2014) (C-86).

[207]  Claimants' Answers on Merits, §§ 2.2, 2.2.1, 2.2.2; Statement of Claim, § 3.66.

failed to afford the Petrol Companies a forum in which to challenge the nationalization of their properties or to petition for the rights to resume operations at their stations and storage facilities."[208]

243. The Tribunal first observes that in providing that an expropriation is wrongful unless taken "under due process of law," the Treaty does not distinguish between substantive and procedural due process. International tribunals have held that a lawful exercise of the right to expropriate requires compliance with both substantive and procedural due process.

244. Substantive due process is breached through a "substantively unfair" result.[209] Procedural due process is violated when certain procedural safeguards are not provided: tribunals have required a fair hearing within a reasonable time by an impartial adjudicator, as well as a procedure under domestic law for the investor to raise claims against the expropriation measure and compliance with that procedure. As aptly summarized by the tribunal in *ADC v. Hungary:*

> "[D]ue process of law", in the expropriation context, demands an actual and substantive legal procedure for a foreign investor to raise its claims against the depriving actions already taken or about to be taken against it. Some basic legal mechanisms, such as reasonable advance notice, a fair hearing and an unbiased and impartial adjudicator to assess the actions in dispute, are expected to be readily available and accessible to the investor to make such legal procedure meaningful. In general, the legal procedure must be of a nature to grant an affected investor a reasonable chance within a reasonable time to claim its legitimate rights and have its claims heard. If no legal procedure of such nature exists at all, the argument that "the actions are taken under due process of law" rings hollow.[210]

---

[208] Statement of Claim, § 3.66.

[209] *See, e.g., Compañia de Aguas del Aconquija SA and Compagnie Générale des Eaux v. Argentina (Vivendi I)*, ICSID Case No. ARB/97/3, Award, § 80 (21 November 2000).

[210] *ADC Affiliate Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, § 435 (2 October 2002) (CLA-25); Statement of Claim, § 3.65.

245. Additionally, the Claimants submit that Russia failed to afford them the guarantees of Article 35 of the Russian Constitution and of the Russian investment law. [211] Article 35(3) of the Russian Constitution indeed provides that "[n]o one may be deprived of his property except pursuant to a judicial decision. Property can be forcibly taken for state needs only on condition of prior and equal compensation."

246. In view of the facts on record, the manner in which control was taken over (see paragraphs 113-132 above) and in particular the lack of any response to the Claimants' complaints by the Crimean and Russian authorities (see paragraph 120 above), the Tribunal can only conclude that the expropriation did not meet the requirement of due process of law, be it under international or Russian law.

247. In this context and for completeness, the Tribunal also notes that, on 28 May 2018, it invited the Parties to provide a copy of, and comment upon, the Crimean Property Law.[212] In their response of 15 June 2018, the Claimants filed the Crimean Property Law and responded to the Tribunal's enquiry that such act purported to regulate "relations involving compensation for the value of property […] as a result of the termination of the title of the previous proprietor and the acquisition by the Republic of Crimea of title to such property, which is included in the List of Property Recorded as Property of the Republic of Crimea […]" (the "List").[213] The Claimants further observed that the List referenced in the Crimean Property Law enumerated the properties nationalized pursuant to the Nationalization Decree and the amendments thereto, and included the Claimants' properties in Crimea at issue in this arbitration.

248. The Tribunal notes that, pursuant to the Crimean Property Law, "[a]ny individual or legal entity that was the owner of property included in the List [...] as of February 21, 2014, and at the time the property was added to the List [...] shall be eligible to receive compensation." [214] The Crimean Property Law further sets out the procedure for submitting applications and calculating compensation. By the same token, under the Sevastopol Resolution adopted on 8 February 2018, an individual or legal entity that

---

[211] Transcript 5 February 2018, 55/16-56/10 (the Claimants' opening statement), *referring* in particular to the Federal Law of the Russian Federation No. 160-FZ "On Foreign Investment in the Russian Federation," (9 July 1999, as amended on 19 July 2011) (C-158).

[212] *See* Crimean Property Law, Art. 8 (C-181).

[213] Crimean Property Law, Art. 1 (C-181).

[214] Crimean Property Law, Art. 2 (C-181).

owned property taken pursuant to Sevastopol nationalization decrees is eligible for compensation.[215]

249. However, the Crimean Property Law also provides for categories of individuals and entities that are not entitled to compensation, such as individuals against whom a criminal case has been instituted for an extremism-related offense before the issuance of a not-guilty verdict.[216] As for the Sevastopol Resolution, it only covers legal entities listed in the Russian corporate register, with the result that Ukrainian entities such as the Claimants have no right to be compensated.[217]

250. The Claimants argue that "the creation after the fact of an illusory remedy does not trigger any duty on the part of the Claimants […] to make a futile effort to mitigate [their] damages" and refer to international jurisprudence in support of their position.[218]

251. Indeed, the injured party's duty to mitigate its losses, to the extent such a duty derives from the general principles of law, is a reasonable one: evidently futile attempts at mitigation are not required.[219]  On the basis of the facts of the present case and the limited scope of the Crimean Property Law and the Sevastopol Resolution, the Tribunal accepts that the Claimants could reasonably conclude that any attempt to obtain compensation would have been futile. This is particularly so in view of the Respondent's open hostility towards Mr. Kolomoisky due to his alleged support to the military forces in Eastern Ukraine engaged in opposing Russian forces.

252. This is further true considering that acceding to the compensation mechanism created by the Crimean authorities may have resulted in a violation of Ukrainian law by the Claimants, which law views the Crimean authorities established by the Russian

---

[215] Resolution of the Sevastopol Government No. 67-PP "On approval of the procedure for issuing decisions on compensation for the value of property declared to be property of the city of Sevastopol that was previously private property" (8 February 2018) (C-167).

[216] Crimean Property Law, Art. 1(2) (C-181).

[217] Crimean Property Law, p. 2 (C-181).

[218] *See* Claimants' letter of 15 June 2018 *referring to Hrvatska Elektroprivreda D.D. v. Republic of Slovenia*, ICSID Case No. ARB/05/24, Award, §§ 215, 386 (17 December 2015) (CLA-272). *See also* Claimants' Responses on Merits, p. 11, fn.45. In response to the Tribunal's question regarding the Claimants' duty to mitigate its damages, the Claimants explained that they had pursued all reasonably available avenues to regain control of their Crimean operations, but the Crimean authorities failed to take any action (Claimants' Responses on Merits, § 2.2). As noted above at § 120), the Tribunal has found these facts to be established.

[219] *See Hrvatska Elektroprivreda D.D. v. Republic of Slovenia*, ICSID Case No. ARB/05/24, Award, §§ 215, 386 (17 December 2015) (CLA-272), finding that the victim of wrongful conduct is expected to act reasonably when confronted by injury but clarifying that "the victim must act reasonably when confronted by injury; in other words, at the time of the wrong."

Federation as "illegal bodies" and their acts as "invalid."[220] It was thus reasonable for the Claimants to refrain from making any – most probably futile – attempts to obtain compensation from the Crimean authorities.

253.   In any event, having considered the two laws, the Tribunal notes that neither satisfies the BIT requirement of "prompt, adequate, and effective" compensation. In reaching this conclusion, the Tribunal bears in mind the Report of the United Nations Human Rights Commission, which made the following finding:

> The confiscation of public and private property, referred to as "nationalization" under the Russian Federation legislation, which began in Crimea after the referendum in March 2014 continued. As of 12 May 2017, 4,575 public and private real estate assets had been "nationalized".

> The Russian Federation authorities took steps to compensate owners of property "nationalized" since March 2014 by adopting special legislation on 28 December 2016. However, the compensation is limited and does not offer a fair remedy to those affected. Indeed, the scheme is only applicable to private property and excludes individuals accused of "extremism". The latter limitation raises particular concerns in view of the arbitrary application of anti-extremism legislation by the Russian Federation authorities in Crimea. The amount of compensation will be determined by reference to the market value of the object on 21 February 2014, a date which precedes the application of Russian Federation legislation in Crimea and the "nationalization". Moreover, payment of compensation can be postponed for 10 years.[221]

254.   The Tribunal also notes the statement by the United Nations Commissioner on Human Rights in his report of September 2017 on Crimea, which was approved by the United Nations' General Assembly in December 2017, according to which although "[r]egulatory acts have been adopted to provide legitimacy to the nationalization process," the fact remains that "[l]arge scale expropriation of public and private

---

[220]   *See* Law of Ukraine No. 1207-VII, "On guaranteeing the rights and freedoms of citizens and on the legal regime on the temporarily occupied territory of Ukraine," Art. 9 (titled "Illegal bodies, their officials and officers") (15 April 2014) (C-67).

[221]   Office of the United Nations High Commissioner for Human Rights, Report on the human rights situation in Ukraine 16 February to 15 May 2017, §§ 157-158 (13 June 2017) (C-187) (emphasis added).

property has been conducted without compensation or regard for international humanitarian law provisions protecting property from seizures or destruction."[222]

255. To conclude, the Russian Federation failed to respect the Claimants' substantive and procedural due process rights under Article 5(1) of the Treaty in carrying out the expropriation. Thus the Respondent's expropriation was unlawful.

(d) Compensation

256. Article 5(1) of the BIT requires that expropriatory measures shall be accompanied by "prompt, adequate and effective compensation." Article 5(2) of the BIT states that compensation must equate the investment's market value and gives further indication on how it must be computed:

(2) The amount of such compensation shall correspond to the market value of the expropriated investments immediately before the date of expropriation or before the fact of expropriation became officially known, while compensation shall be paid without delay, including interest accruable from the date of expropriation until the date of payment, at the interest rate for three month deposits in US dollars on the London Interbank Market (LIBOR) plus 1%, and shall be effectively disposable and freely transferable.

257. The Claimants assert that the Respondent failed to offer them prompt, adequate and effective compensation or, indeed, any "compensation whatsoever."[223]

258. With due regard to, *inter alia*, its observations on the Crimean Property Law above, the Tribunal deems it established that the Respondent has failed to pay any compensation to the Claimant, let alone "adequate and effective" compensation, as required by Article 5(1) of the BIT.

---

[222] Office of the United Nations High Commissioner for Human Rights Situation of human rights in the temporarily occupied Autonomous Republic of Crimea and the city of Sevastopol, § 16 (25 September 2017) (C-188); UN GA Resolution 72/190, Situation of human rights in the Autonomous Republic of Crimea and the city of Sevastopol, Ukraine (19 December 2017) (C-190). The Tribunal has also noted that the U.N. Resolution 72/190 urges the Russian Federation "to repeal laws imposed in Crimea by the Russian Federation that allow for forced evictions and the confiscation of private property in Crimea, in violation of applicable international law."

[223] Statement of Claim, § 3.67.

iv.    Conclusion

259.  The Tribunal concludes that the Respondent expropriated the Claimants' investment in breach of Article 5 of the Treaty as a result of (i) the physical seizure of the Claimants' property on 22 April 2014 by the Paramilitary Forces, and (ii) the legislative acts by the Crimean State Council and the Sevastopol Government that nationalized the Claimants' investment in Crimea and Sevastopol. In particular, the Tribunal holds that Russia's expropriation of the Claimants' investment did not meet any of the four cumulative requirements set forth in Article 5 of the Treaty for the lawfulness of an expropriation.

### (b)    Other alleged treaty breaches

260.  The Claimants do not assert that the alleged treaty breaches other than expropriation caused them separate or greater harm than the harm that they suffered through the expropriatory measures. As a result, since it held that the Respondent is liable for expropriation, the Tribunal considers that it can dispense with answering the merits of the allegations of additional treaty breaches for the sake of procedural economy. [224]

### E.    REPARATION

261.  Having held that the Respondent expropriated the Claimants' investment in breach of Article 5 of the Treaty, the Tribunal now turns to the question of reparation, addressing the standard of compensation and the date of valuation (1); the valuation of the Claimants' investment (2); and the application of interest (3).

### 1.    Standard of Compensation and Date of Valuation

### (a)    The Claimants' position

262.  The Claimants submit that the BIT does not define a standard of compensation for unlawful expropriations or breaches of Articles 2 and 3.[225] In the absence of a *lex specialis*, the standard for damages is the customary international law principle of full reparation according to which, in the words of the Permanent Court of International Justice in the *Case Concerning the Factory at Chorzów* ("*Chorzów*"), "reparation must,

---

[224]  *See, e.g.*, *Standard Chartered Bank v. The United Republic of Tanzania*, ICSID Case No. ARB/10/12, Award, § 272 (2 November 2012).

[225]  Statement of Claim, § 3.98.

as far as possible, wipe out all the consequences of the illegal act and re-establish the situation which would, in all probability, have existed if that act had not been committed."[226] That principle is codified in the ILC Articles, specifically in Articles 31, 34, and 36.[227]

263. The Claimants further submit that full reparation implies granting the fair market value of the investment.[228] They also state that, "[w]hen a host State has undertaken a series of measures that culminate in a final act of expropriation," valuation must be carried out on the "date prior to the 'first completed breach' by the Respondent."[229] In the present case, this date is 22 April 2014, when the Respondent seized the Claimants' headquarters in Feodosia,[230] which resulted in the "actual and permanent deprivation" of their investment.[231]

(b)   **Analysis**

264. The Tribunal has held that the Claimants' investment in Crimea was expropriated in breach of Article 5 of the Treaty. It has also held that the breach was attributable to the Russian Federation. Thus, the Russian Federation has committed an internationally wrongful act, which gives rise to an obligation to make full reparation for the injury caused by that act.[232]

265. While Article 5(2) of the Treaty (reproduced at paragraph 151 above) provides a standard of compensation, that standard applies only in the event of an expropriation

---

[226] *Case Concerning the Factory at Chorzów*, PCIJ Ser. A, No. 17, Judgment No. 13, Merits, 47 (13 September 1928) (CLA-38).

[227] Statement of Claim, §§ 3.98-3.103, *referring to ADC Affiliate Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, §§ 483-484, 494 (2 October 2002) (CLA-25); *Flughafen Zürich A.G. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, §§ 746-748 (18 November 2014) (CLA-48); *Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, § 350 (6 February 2007) (CLA-74); *ConocoPhillips v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/30, Decision on Jurisdiction and the Merits, § 339 (3 September 2013) (CLA-44).

[228] Statement of Claim, § 3.102, *referring to Flughafen Zürich A.G. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, §§ 746-748 (18 November 2014) (CLA-48).

[229] Statement of Claim, § 3.103, *referring to Gemplus v. United Mexican States,* ICSID Case No. ARB(AF)/04/3 & ARB(AF)/04/4, Award, § 12-43-15-45 (16 June 2010) (CLA-50); *SAUR International S.A. v. Argentine Republic*, ICSID Case No. ARB/04/4, Award, §§ 168-169, 255-256 (22 May 2014) (CLA-73).

[230] Statement of Claim, § 3.103; Kaczmarek Report, § 8.

[231] Transcript 5 February 2018, 64/20 (the Claimants' opening statement).

[232] ILC Articles 2, 31 (CLA-102).

that is lawful under the test provided in Article 5(1). As the expropriation in the present case was held to be unlawful, the standard of Article 5(2) does not apply. The Tribunal will therefore resort to customary international law and, in particular, to the principle set forth in *Chorzów:*

> The essential principle contained in the actual notion of an illegal act – a principle which seems to be established by international practice and in particular by the decisions of arbitral tribunals – is that reparation must, as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed. Restitution in kind, or, if this is not possible, payment of a sum corresponding to the value which a restitution in kind would bear; the award, if need be, of damages for loss sustained which would not be covered by restitution in kind or payment in place of it.[233]

266. Under the circumstances of this case, the Tribunal considers that the principle of full reparation just referred to will be adequately implemented by granting the Claimants a monetary award equal to the fair market value of their investment immediately prior to expropriation. The fair market value of an investment is the price at which an asset would change hands, or more specifically "[the] price […] at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller acting, at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts."[234]

267. Having concluded that the Claimants' petrol stations and storage facilities were expropriated on 22 April 2014, the Tribunal also takes this date as the date of valuation. In other words, the value to be assessed is the value of these properties just before their expropriation on that day. In the Tribunal's opinion, 22 April 2014 is the relevant date, irrespective of the exact date of seizure of each petrol station and storage facility. Indeed, what matters is that the Claimants lost control of these assets on 22 April 2014 at the time of the seizure of the headquarters in Feodosia, which controlled all of the Claimants' Crimean operations. The valuation date for Stabil LLC's residential apartment is 3 September 2014, the date of its expropriation through the amendment to the Nationalization Decree.

---

[233]   *Chorzów*, p. 47 (CLA-38).

[234]   "Business Valuation Standards", American Society of Appraisers 2008, p. 27 (NAV-25).

268.  The Claimants have computed their damage claim using only *ex ante* information, *i.e.*, information, including forecasts, available on the date of valuation to the exclusion of *ex post* information, *i.e.*, information available after the date of valuation and especially at the time of the judgment or award. Both the Claimants' expert and the Tribunal's expert concur with this approach, which the Tribunal will thus adopt.

### 2.    Valuation

269.  As described in the procedural history above, the Claimants based their compensation claim on an expert report by Mr. Brent C. Kaczmarek. The Tribunal studied the Kaczmarek Report and put numerous questions to its author during the Hearing on the Merits. Having heard the Claimants' expert, it determined that it would be assisted in its assessment of the quantum by receiving evidence from an expert that it would appoint itself. Following consultations with the Parties, the Tribunal appointed Mr. Thierry Sénéchal to fulfill this role. On the basis of expert terms of reference, Mr. Sénéchal prepared a report addressing 11 specific questions put to him by the Tribunal regarding various aspects of the Kaczmarek Report. The Parties were given the opportunity to comment on a draft as well as on the final version of the Sénéchal Report and to examine Mr. Sénéchal in the course of a further hearing, at which the Tribunal put questions to both Messrs. Sénéchal and Kaczmarek. As will be seen in greater detail below, during this hearing Mr. Sénéchal identified two variables in Mr. Kaczmarek's valuation which he considered to require adjustment. Following the hearing, the Tribunal instructed Mr. Sénéchal to verify the accuracy and consistency of the financial model used by Mr. Kaczmarek and to prepare an alternative valuation of the Claimants' investment, changing the two variables which he had identified at the hearing. Mr. Sénéchal submitted a Supplementary Report presenting his alternative valuation, on which the Parties were given an opportunity to comment. After studying his Supplementary Report, the Tribunal asked Mr. Sénéchal to implement further specific assumptions in his valuation, which he did in a Second Supplementary Report, on which the Parties were invited to comment. Only the Claimants availed themselves of the opportunity to comment on Mr. Sénéchal's reports and to examine him orally.

270.  As will be seen below, the Claimants' and the Tribunal's experts concur on many aspects of the valuation and disagree about a few issues. In discharge of its duty to satisfy itself that the claims before it are well founded, the Tribunal will examine all of the aspects of the quantum and form its own view on the value of the Claimants' investment. This being so, it will give particular attention to the matters on which the experts diverge. To this end, the Tribunal will first describe Mr. Kaczmarek's valuation

(a), then turn to Mr. Sénéchal's views (b) and to the Claimants' comments on the latter (c), before reaching its own analysis (d).

### (a)   Mr. Kaczmarek's valuation

271.  Mr. Kaczmarek defined the subject-matter of the valuation as the enterprise value of the Claimants' network of 31 petrol stations and two storage facilities located in the Crimean Peninsula.[235] To value these assets as of 22 April 2014, Mr. Kaczmarek employed two methods: (i) the discounted cash flow ("DCF") approach;[236] and (ii) the comparable publicly traded company ("CPTC") approach.[237] The values reached under the two approaches were then weighted based on the relative quality of the data available to execute each approach.[238] Additionally, Mr. Kaczmarek valued a residential apartment owned by Stabil LLC.[239]

### i.   Discounted cash flow (DCF) approach

272.  According to the Claimants, investment tribunals recognize the DCF approach as a valid methodology to calculate the market value of companies able to generate future revenue.[240] Mr. Kaczmarek describes the DCF approach as a "practical implementation of the theoretical financial concept that an income-producing asset's value is equal to the present value of the future cash flows produced by the asset."[241] In implementing this approach, the "valuation practitioner first creates a projection of the expected future performance of the business that is to be valued. Then, using the projected performance, the practitioner calculates the relevant cash flows, determines an appropriate discount rate, and discounts the future cash flows to present value."[242]

273.  In implementation of the DCF method, Mr. Kaczmarek projected free cash flows for 2014 to 2018 by relying on historical data regarding the performance of the Claimants'

---

[235]  Kaczmarek Report, §§ 7, 98-102, 119.

[236]  Kaczmarek Report, §§ 119-205.

[237]  Kaczmarek Report, §§ 206-217.

[238]  Kaczmarek Report, § 14.

[239]  Kaczmarek Report, § 14.

[240]  Statement of Claim, § 3.106, *referring to Flughafen Zürich A.G. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, § 781 (18 November 2014) (CLA-48).

[241]  Statement of Claim, § 3.106, *referring to* Kaczmarek Report, § 104.

[242]  Kaczmarek Report, § 104.

Crimean petrol stations and storage facilities for 2008 to 2013, adjusted for their new circumstances and outlook following the Incorporation.[243]

274. As the Claimants' own financial records could no longer be accessed after the seizure of the headquarters in Feodosia, Mr. Kaczmarek recreated financial statements for the Claimants based on daily financial and operational information from 2008 to 2013 contemporaneously submitted by them to Avanta-S LLC, a centralized service company based in Dnipropetrovsk that tracked market data and set up pricing strategies for the Claimants.[244]

275. With respect to the revenue component of the cash flow projections for the petrol stations, Mr. Kaczmarek relied on historical volumes of fuel sold and prices at each of the petrol stations.[245] To project these figures over the five-year forecast period from 2014 to 2018, he used forecasts of oil prices and Russian petroleum consumption as of 22 April 2014.[246] Mr. Kaczmarek carried out an *ex ante* valuation in that he made assumptions on the basis of the reasonable expectations of a hypothetical buyer and seller on 22 April 2014, eschewing *ex post* information.[247] For the forecast of petrol consumption in Russia, Mr. Kaczmarek relied on the growth projections of the Economist Intelligence Unit for 2014 to 2018.[248] For his forecast of retail fuel prices, he relied on Brent futures prices.[249] As a result, he found that, but for the Respondent's measures, the volume of fuel sales at the Claimants' petrol stations would have increased from 2014 to 2018,[250] while the average fuel prices at the Claimants' petrol stations would have slightly decreased during the same period.[251]

276. Additionally, Mr. Kaczmarek assumed that in 2014 the Claimants would have renovated 19 out of their 31 Crimean petrol stations. He based this assumption on

---

[243]  Statement of Claim, § 3.108-3.110, *referring to* Kaczmarek Report, §§ 122-144.

[244]  Kaczmarek Report, § 53, *referring to* NAV-137 and NAV-138. *See also* Laber Statement, § 38 (CWS-2); Transcript 6 February 2018, 243/11-22, 244/12-21 (testimony of Mr. Kaczmarek).

[245]  Statement of Claim, § 3.108.

[246]  Statement of Claim, § 3.108, *referring to* Kaczmarek Report, §§ 122-144.

[247]  Kaczmarek Report, §§ 9, 11, 97. *See also* Transcript 6 February 2018, 264/25-268/7 (testimony of Mr. Kaczmarek).

[248]  Kaczmarek Report, § 124, *referring to* Economist Intelligence Unit, Automotive Industry Report: Russia, April 2014, p. 8 (NAV-105).

[249]  Kaczmarek Report, §§ 134-147. *See also* Transcript 6 February 2018, 252/3-11 (testimony of Mr. Kaczmarek).

[250]  Kaczmarek Report, § 124.

[251]  Kaczmarek Report, § 140.

renovation plans prepared by the Claimants between November 2013 and January 2014,[252] which he describes as including "(1) the replacement of fuel pumps with modernized, faster pumps, which would allow the stations to more efficiently serve customers, (2) the replacement and repair of fuel tanks, (3) the replacement and improvement of road surfaces, (4) the repair of canopies and operator rooms, and (5) the replacement of price and advertisement pylons."[253] According to Mr. Kaczmarek, the renovations would first have reduced sales volumes by 30% in 2014 and 10% in 2015 (during renovations) and then produced a one-time increase in sales volumes by "an average of approximately 150% […] in 2015."[254]

277. Further, Mr. Kaczmarek included in his cash flow computations projected revenues from sales of goods at the convenience stores attached to the petrol stations,[255] stating that these would also have increased as a result of the planned renovations.[256] Taking these factors into consideration, Mr. Kaczmarek projected that the Claimants would have earned revenues of US$ 29.8 million in 2014, increasing to US$ 56.6 million in 2018.[257]

278. Mr. Kaczmarek calculated the revenue component for the storage facilities based on storage volumes in 2012-2013, projected over the five-year forecast period using the expected increase in Russian petroleum consumption, and a storage fee equal to 1.5% of the wholesale price of petrol.[258]

279. With respect to the costs component of the cash flow projections, Mr. Kaczmarek analyzed historical costs of procurement of fuel and related goods, as well as of station operations, depreciation, and taxes.[259] He benchmarked fuel procurement costs against Russian industry data to confirm reasonableness.[260] In summary, Mr. Kaczmarek found that the Claimants would have incurred costs ranging from

---

[252] Kaczmarek Report, § 85, *referring to* Laber Statement, § 22; Report on the Crimean Branch (NAV-77); Minutes of conference call, 20 January 2014 (NAV-87).

[253] Kaczmarek Report, § 85.

[254] Kaczmarek Report, §§ 85, 126-127, *referring to* Examples of Gas Station Reconstructions 2013-2015 (NAV-141), and Appendix 3.C.

[255] Kaczmarek Report, § 86.

[256] Kaczmarek Report, §§ 86, 122, 142-144.

[257] Kaczmarek Report, § 144 and Figure 30.

[258] Kaczmarek Report, §§ 170-172.

[259] Kaczmarek Report, § 145.

[260] Statement of Claim, § 3.109, *referring to* Kaczmarek Report, §§ 145-153.

US$ 28.8 million in 2014 to US$ 54.5 million in 2018 for the petrol stations and US$ 550,145 in 2014 to US$ 566,806 in 2018 for the storage facilities.[261]

280.  In connection with the capital expenditures component of the cash flow projections, Mr. Kaczmarek projected that the planned renovations would have required investments amounting to US$ 1.9 million.[262]

281.  As the final component of the cash flow projections, Mr. Kaczmarek calculated the change in the net working capital of the Claimants' Crimean petrol stations and storage facilities.[263]

282.  On the basis of the components just referred to, Mr. Kaczmarek forecast the free cash flows of the petrol stations as negative US$ 202,591 for 2014, reflecting the reduction in operations due to renovations, US$ 1.4 million in 2015, and approximately US$ 2.4 to 2.6 million from 2016 to 2018.[264] He also forecast the free cash flows of the storage facilities as decreasing from US$ 175,000 to US$ 115,000 from 2014 to 2018.[265]

283.  After determining the projected cash flows for 2014 to 2018, Mr. Kaczmarek discounted these cash flows back to the valuation date of 22 April 2014.[266] As discount rate, he adopted the weighted average cost of capital ("WACC"), i.e., the weighted average of the cost of equity and debt used or contemplated to finance the business.[267]

284.  In this context, Mr. Kaczmarek assumed an optimal capital structure, based on the average capital structure of two comparable companies (described at paragraph 293 below), further averaged with the capital structure of the automotive retail industry in Europe.[268]

_____

[261]  Kaczmarek Report, §§ 158, 175.

[262]  Kaczmarek Report, §§ 163, 173.

[263]  Kaczmarek Report, § 164.

[264]  Kaczmarek Report, § 167.

[265]  Kaczmarek Report, §§ 178-179.

[266]  Statement of Claim, § 3.107, 3.111.

[267]  Kaczmarek Report, § 107.

[268]  Kaczmarek Report, §§ 107, 201.

285. The cost of equity was estimated by applying the capital asset pricing model (the "CAPM"), captured by the following formula:

$$CAPM = Rf + \beta * EMRP + CRP$$

*Where:*

Rf = Risk Free Rate of Return

β = Beta

EMRP = Equity Market Risk Premium

CRP = Country Risk Premium[269]

286. For purposes of this formula, Mr. Kaczmarek estimated the risk free return rate using the ten-year trailing average of the 20-year U.S. Treasury bond yield as of 22 April 2014, which amounted to 4.09%.[270]

287. For the beta, which is another element in the CAPM formula measuring the systematic risk or volatility of an asset as compared to the market as a whole, Mr. Kaczmarek relied on the betas of the same two companies used to assess the optimal capital structure, as well as on the index for the European automotive retail industry, arriving at an unlevered beta for the Claimants of 0.56.[271]

288. Mr. Kaczmarek further adopted an equity risk premium of 5.5% and a country risk for Russia of 2%, arriving at a nominal cost of equity of 11.32%.[272] With respect to the country risk, Mr. Kaczmarek stated that the primary risk factors to be considered in a "valuation analysis in the context of an arbitral proceedings such as this are currency risk, macroeconomic risks, and social risks," while "the level of legal risk, regulatory risk, and political risk […] should be excluded because these risks are controlled by the state (and arguably protected against under the BIT)."[273]

---

[269] Kaczmarek Report, §§ 107, 181.

[270] Kaczmarek Report, § 182.

[271] Kaczmarek Report, §§ 183-184.

[272] Kaczmarek Report, §§ 186, 199.

[273] Kaczmarek Report, § 194

289.  The Claimants' expert further assumed that the Petrol Companies' cost of debt would "be equal to the weighted average interest rate on US dollar denominated loans to nonfinancial organizations with terms of more than 3 years extended in Russia," arriving at an after-tax cost of debt of 4.34% and an overall cost of capital (WACC) of 8.06%.[274]

290.  Finally, in considering the Claimants' investment as a going concern, Mr. Kaczmarek opined that the DCF method should consider cash flows projected beyond the five-year period.[275] However, as he deemed it "not practical to create cash flow projections over long periods of time," he used a constant growth method, called the "terminal value" or "continuing value" to determine the value of the Claimants' petrol stations and storage facilities beyond 2018.[276] He explained that through this method, the cash flow from 2018, *i.e.*, the final year of projection, "is adjusted by an expected long-term growth rate for the company and then capitalized by dividing the adjusted cash flow by the difference between the WACC and the same long-term growth rate."[277] Mr. Kaczmarek assumed a growth rate of 3.02%, equal to the sum of expected U.S. inflation in 2018 (1.98%) and 50% of the estimated growth in Russian petrol consumption in the same year (2.09% divided by two, which equals 1.04%).[278]

291.  Taking into account the projected cash flows for the petrol stations and storage facilities in 2018 of US$ 2,507,711 and US$ 116,086, respectively, the WACC of 8.06%, and the projected growth rate of 3.02%, Mr. Kaczmarek determined the total undiscounted terminal value to be US$ 53,629,647.[279] After discounting, Mr. Kaczmarek concluded that on 22 April 2014 the total fair market value of the Claimants' Crimean petrol stations and storage facilities amounted to US$ 46,340,006.[280]

---

[274]   Kaczmarek Report, pp. 73-74, Tables 6 and 7.

[275]   Kaczmarek Report, § 202.

[276]   Kaczmarek Report, § 202.

[277]   Kaczmarek Report, § 202.

[278]   Kaczmarek Report, §§ 203-204.

[279]   Kaczmarek Report, § 204 and p. 76, Table 8.

[280]   Statement of Claim, § 3.111; Kaczmarek Report, § 205 and p. 76, Table 9.

ii.    Comparable publicly traded company (CPTC) approach

292.   Mr. Kaczmarek also employed the CPTC approach, a process by which the fair market value of a company is determined by reference to the value of the shares of comparable companies traded on a public exchange.[281]

293.   As comparables, Mr. Kaczmarek identified two companies: OJSC Concern Galnaftogaz ("Galnaftogaz"), which is based in Ukraine and "is one of the leaders of Ukraine's petrol retail industry," and Petrol d.d. Ljubljana ("Petrol Ljubljana"), which is based in Slovenia and is "a principal strategic supplier of oil and energy products to the Slovenian market."[282] He then computed a weighted average enterprise value to earnings before interest, taxes and depreciation (EV/EBITDA) multiple of 12.2x for the comparable set (giving 75% value to the 13.2 EV/EBITDA multiple of Galnaftogaz and a 25% value to the 9.3 multiple of Petrol Ljubljana), and used the Petrol Companies' EBITDA from 2014 to 2018 to calculate an implied enterprise value of the Claimants' Crimean business of US$ 53,207,543 million on 22 April 2014.[283]

iii.    Weighting of the DCF and CPTC approaches

294.   To combine the two approaches, Mr. Kaczmarek assigned 85% to the DCF approach and 15% to the CPTC approach, based on his "assessment of the relative quality and reliability of the information available to implement each approach."[284] Accordingly, the Claimants' network of 31 petrol stations and two storage facilities located in the Crimean Peninsula was valued at US$ 47,370,137.[285]

iv.    Stabil LLC's residential apartment

295.   Mr. Kaczmarek separately valued a residential apartment owned by Stabil LLC located at 20 Marka Donskogo Street in Simferopol. As the apartment was not related to the Claimants' petroleum business, Mr. Kaczmarek considered that its value was not captured by the DCF and CPTC analyses described above. Mr. Kaczmarek valued the apartment by considering the listing prices in December 2015 of two other apartments

---

[281]   Kaczmarek Report, § 206.

[282]   Kaczmarek Report, §§ 12, 212-213.

[283]   Kaczmarek Report, §§ 12, 215-217.

[284]   Kaczmarek Report, § 220.

[285]   Kaczmarek Report, §§ 221-222.

located on the same street in Simferopol. From these listing prices, he derived an estimated price per square meter (US$ 963), which he applied to the surface area of Stabil LLC's apartment (37.7 m²), arriving at a value of US$ 36,318.[286]

v.    Allocation of damages between the Claimants

296.  In order to allocate the value of the expropriated investment between the Claimants, Mr. Kaczmarek first broke down the total enterprise value of the Claimants' network of 31 petrol stations and two storage facilities (US$ 47,370,137, as seen at paragraph 294 above) among the Petrol Station Owners, the Storage Facility Owners, and the Petrol Station Lessees.[287]

297.  Mr. Kaczmarek explained that, in practice, the 31 petrol stations and the two storage facilities were operated in an integrated manner, such that costs came out of an overall budget and the Storage Facility Owners and the Petrol Station Lessees did not pay fees to the Petrol Station Owners.[288] Nevertheless, in order to allocate the enterprise value between the Claimants, under the DCF approach, Mr. Kaczmarek estimated that the enterprise value of the Petrol Station Owners amounted to their expected income stream under the leases with the Petrol Station Lessees, discounted to the valuation date of 22 April 2014.[289] The expected income stream under the leases was based on the lease agreements of two petrol stations, as the other available lease agreements either did not specify a rental fee or pertained to petrol stations that were not fully operative.[290] The enterprise value of the Storage Facility Owners was based on the implementation of the DCF method as described at paragraphs above.[291] The enterprise value of the Petrol Station Lessees was taken to equal the total enterprise value minus the enterprise values of the Petrol Station Owners and the Storage Facility Owners.[292] Under the CPTC approach, the total enterprise value was allocated

---

[286]  Kaczmarek Report, § 206.

[287]  Claimants' Letter dated 7 March 2018, § 1.

[288]  Transcript 6 February 2018, 234/15-235/5 (testimony of Mr. Kaczmarek). *See also* Transcript 5 February 2018, 114/1-115/23 (testimony of Mr. Laber).

[289]  Claimants' Letter dated 7 March 2018, p. 2, fn. 2. *See also* Kaczmarek Report, Appendices 6.B and 6.C; Transcript 6 February 2018, 282/22-283/11 (testimony of Mr. Kaczmarek).

[290]  Kaczmarek Report, Appendix 6.D.

[291]  Claimants' Letter dated 7 March 2018, p. 2, fn. 3. *See also* Kaczmarek Report, Appendix 6.B, fn. 6.

[292]  Claimants' Letter dated 7 March 2018, p. 2, fn. 4. *See also* Kaczmarek Report, Appendix 6.B, fn. 7.

proportionally based on each Claimant's percentage claim of the total enterprise value under the DCF approach.[293]

298. In summary, the total enterprise value (US$ 47,370,137) was allocated as follows:

- Petrol Station Owners: US$ 11,355,203

- Storage Facility Owners: US$ 2,390,688

- Petrol Station Lessees: US$ 33,624,246

299. Mr. Kaczmarek then allocated the enterprise value for each category of Claimant to the individual Claimants proportionally based on the number of petrol stations or storage facilities they owned or leased:[294]

| Claimant | Type | No. of Stations | Enterprise Value (in US$) |
|---|---|---|---|
| Stabil | Station Owner | 11 | 4,029,266 |
| Rubenor | Station Owner | 2 | 732,594 |
| Rustel | Station Owner | 9 | 3,296,672 |
| Novel-Estate | Station Owner | 4 | 1,465,187 |
| Crimea-Petrol | Station Owner | 1 | 366,297 |
| Kirovograd-Nafta | Station Owner | 3 | 1,098,891 |
| Pirsan | Station Owner | 1 | 366,297 |
| *Subtotal* | | *31* | *11,355,203* |
| Trade Trust | Lessee | 13 | 14,100,490 |
| Elefteria | Lessee | 18 | 19,523,755 |
| *Subtotal* | | *31* | *33,624,246* |
| VKF Satek | Storage Facility Owner | 1 | 1,195,344 |
| Stemv Group | Storage Facility Owner | 1 | 1,195,344 |

---

[293] Kaczmarek Report, Appendix 6, fn. 9. *See also* Kaczmarek Report, Appendix 6.B, fn. 9.

[294] Claimants' Letter dated 7 March 2018, § 2, referring to Transcript 6 February 2018, 282/18-283/12 (testimony of Mr. Kaczmarek). *See also* Kaczmarek Report, Appendix 6.A & 6.B, fn. 8.

| | | | |
|---|---|---|---|
| *Subtotal* | | 2 | *2,390,688* |
| **Total (US$)** | | | **47,370,137** |

300. Finally, for Stabil LLC, Mr. Kaczmarek added the value of its residential apartment, arriving at a total loss of US$ 4,065,584 for Stabil LLC and US$ 47,406,455 for all of the Claimants.[295]

### (b)   Mr. Sénéchal's views

301. In many respects, Mr. Sénéchal agreed with the valuation of Mr. Kaczmarek. Where relevant, the Tribunal takes note of specific areas of agreement in its analysis below. In the present section, however, it focuses on areas where Mr. Sénéchal raised doubts and criticisms.

302. In his first report, Mr. Sénéchal raised four main issues. First, he drew the attention of the Tribunal to the importance of the selection of the benchmark market in the implementation of the DCF analysis. Observing that Mr. Kaczmarek had used Russia as the benchmark for his forecasts and risk assessments, Mr. Sénéchal noted that another option would have been to use the Ukrainian market for this purpose, given that, from an economic point of view, "the Crimean economy was very dependent on the Ukrainian economy before the annexation."[296] Mr. Sénéchal explained that, if Ukraine were chosen as the benchmark market, this would significantly affect numerous parameters of the DCF analysis, such as projected petrol consumption and country risk.[297] For example, whereas Russia's country risk is in the vicinity of 2%, the country risk for Ukraine is approximately 8.8%, calculated on the basis of credit default swaps ("CDS") spreads.[298]

303. Second, Mr. Sénéchal opined that, even for the Russian market, Mr. Kaczmarek's revenue projections in the DCF analysis were overstated. In Mr. Sénéchal's view, Mr. Kaczmarek had not fully taken into account the uncertainty of both the macroeconomic and political environment at the time of the valuation.[299] Relying on

---

[295]   Claimants' Letter dated 7 March 2018, § 3. *See also* Kaczmarek Report, Appendix 6.A.

[296]   Sénéchal Report, p. 8 § 6, pp. 38-40 §§ 29-33.

[297]   Sénéchal Report, p. 8 § 6, p. 15 § b, p. 17 § g, pp. 38-39 §§ 29-33.

[298]   Sénéchal Report, p. 74 § 102.

[299]   Sénéchal Report, pp. 7-8 §§ 3-5. *See also* Transcript 20 August 2018, 28/19-23, 47/2-13 (testimony of Mr. Sénéchal).

historical trends in GDP and income per capita, Mr. Sénéchal observed that Russia was undergoing a structural crisis.[300] Deteriorating market conditions "would be a major constraint on the steady growth potential of the petrol distribution and retail market."[301] More specifically, Mr. Sénéchal relied on UN statistics to opine that Mr. Kaczmarek had overstated his projections for Russian petrol consumption from 2014 to 2018.[302] Mr. Sénéchal also considered that there was a high risk of overstatement with respect to the planned renovation of the petrol stations. In his view, there was insufficient evidence to conclude that the renovations would have been implemented and, if implemented, would have generated the revenues projected by Mr. Kaczmarek.[303] In addition, Mr. Sénéchal considered that the political and social conditions in Crimea in early 2014 would have heightened the risk perception of a hypothetical buyer at that time.[304]

304.   Third, Mr. Sénéchal expressed the view that Mr. Kaczmarek's proposed growth rate of 3.02% used to calculate the terminal value in the DCF analysis was unreasonably high in light of prevailing macroeconomic conditions and data on historical petrol consumption in Russia.[305] He suggested that a growth rate based solely on the U.S. inflation rate of 1.98% may be more appropriate.[306]

305.   Fourth and finally, Mr. Sénéchal agreed with Mr. Kaczmarek that, in an *ex ante* valuation of an investment at a historical date, such as this one, it would not be appropriate to use *ex post* data.[307] However, Mr. Sénéchal suggested that, in situations of high uncertainty and volatility, a scenario-based DCF valuation should be preferred over "a single-path model […] likely to be proven wrong in hindsight."[308] For example, a scenario-based model could anticipate the likelihood of various events occurring, such as a sharp fall in oil prices.[309] Mr. Sénéchal noted that, while Mr. Kaczmarek's indexing using historical data available on 22 April 2014 "predicted a stability in the forecast,

---

[300]   Sénéchal Report, p. 26 § 16, p. 29 § 21, p. 31 § 23.

[301]   Sénéchal Report, p. 37 § 27(ii). *See also* p. 31 § 25(i).

[302]   Sénéchal Report, p. 33 § 25(iv).

[303]   Sénéchal Report, p. 10 §§ 13-14, p. 17 § f, pp. 50-53.

[304]   Sénéchal Report, p. 41 § 36.

[305]   Sénéchal Report, pp. 12-13 §§ 21-23, p. 17 § h.

[306]   Sénéchal Report, p. 13 § 23.

[307]   Sénéchal Report, p. 46 § 48.

[308]   Sénéchal Report, p. 48 § 53.

[309]   Sénéchal Report, p. 48 § 53.

with only a slight increase in the oil price over the period 2014 to 2018," in fact "oil prices changed radically after the annexation of Crimea, with major market corrections in mid-2014 and oil prices falling from USD100 to below USD50."[310]

306.   Nevertheless, at the hearing, Mr. Sénéchal did not insist on a scenario-based DCF approach and testified that Mr. Kaczmarek's forecast of oil prices reflected "market expectations". [311] Mr. Sénéchal also stated that his concerns regarding Mr. Kaczmarek's DCF analysis would be addressed by adjusting two variables, namely the revenue expected to be generated from the renovation of the petrol stations and the growth rate used in the calculation of the terminal value. His views as they emerged at the hearing were summarized in the following exchange with the Presiding Arbitrator:

> PRESIDENT KAUFMANN-KOHLER: […] With respect to Date of Valuation and Reference Market, you say these are legal questions, but at the same time you say that if we take a Date of Valuation of 22nd of April, it would be correct economically to take the Russian market as a reference?
>
> THE WITNESS: Yes.
>
> PRESIDENT KAUFMANN-KOHLER: Is that right?
>
> THE WITNESS: Yeah.
>
> PRESIDENT KAUFMANN-KOHLER: Then you say that the cash flows must be adjusted, and you say what needs to be adjusted is the renovation income, and the long-term growth rate in the Terminal Value.
>
> THE WITNESS: Correct.
>
> PRESIDENT KAUFMANN-KOHLER: And you do not say any more that the petrol consumption prices need to be adjusted, or value – or volume. It's volume and prices; yes?
>
> THE WITNESS: Correct.
>
> PRESIDENT KAUFMANN-KOHLER: That is right [?]
>
> THE WITNESS: Yeah.

---

[310]   Sénéchal Report, p. 45 § 45.

[311]   Transcript 20 August 2018, 62/20-63/14 (testimony of Mr. Sénéchal).

PRESIDENT KAUFMANN-KOHLER: And I also understand that, in terms of the Discount Rate, you consider that the Country Risk Premiums that are put forward by Mr. Kaczmarek, be it 2 percent for Russia or 8 or 8.8 – now I don't remember – for Ukraine are correct.

THE WITNESS: I think Mr. Kaczmarek has been only proposing a Discount Rate for Russia and not for Ukraine.

PRESIDENT KAUFMANN-KOHLER: Apologies.

THE WITNESS: The Ukrainian example was coming from myself.

PRESIDENT KAUFMANN-KOHLER: Was yours, yeah, thank you. But you have no issue with the Russian Country Risk Premium as put forward by Mr. Kaczmarek; is that right?

THE WITNESS: Yeah, that's completely right. Yeah.

PRESIDENT KAUFMANN-KOHLER: Thank you. Then I also understand that beyond that, there is no adjustments to be made to the Cost of Capital because of the conditions?

THE WITNESS: The Cost of Capital, altogether with the Country Risk Premium of 2 percent is fine.

PRESIDENT KAUFMANN-KOHLER: It's fine, yes, that's what I understand. I had just one follow-up question – that summarizes your evidence, or do I miss something?

THE WITNESS:  No, I think you didn't miss anything. I think that's correct, yeah.[312]

307.  After the hearing, upon the request of the Tribunal, Mr. Sénéchal further addressed the issues of the renovations and terminal growth rate in his Supplementary Report. In this report, Mr. Sénéchal confirmed his prior assessment that Mr. Kaczmarek had overstated the revenues that would have been generated by the renovations. He observed that, in Mr. Kaczmarek's valuation, the impact of the renovations was to

---

[312]   Transcript 20 August 2018, 104/23-106/21 (testimony of Mr. Sénéchal).

increase the enterprise value by US$ 19.4 million.[313] For many petrol stations, the growth rates in fuel sales fluctuated between 120% and 200%, while for some stations, these rates were significantly higher.[314] For example, according to Mr. Kaczmarek, the fuel sales at Stabil Station #30 would rise by 697% between 2013 and 2015, as a result of a capital expenditure of only US$ 140,000, leading to an annual return on investment of 751%.[315] Even more drastically, the convenience store sales for different petrol stations displayed growth rates from 2013 to 2015 in the range of 1,740% and 81,582%.[316]

308. For Mr. Sénéchal, such growth was unsupported by economic logic or evidence for a number of reasons. First, Mr. Sénéchal explained that he would not expect such growth to arise from the type of renovations planned, which he assimilated to "maintenance operations (replacement of equipment) and some refurbishment," as opposed to "strategic investment plans aimed at differentiating the cross-selling offer and maximizing sales by unusually high multiples."[317] Second, given that the petrol stations were "operating in a period of economic uncertainty in early 2014," characterized by an "economic downturn and market vulnerabilities, as well as lower growth expectations and depressed demand," he found that the high growth rate proposed by Mr. Kaczmarek would require a fuller explanation.[318] Third, Mr. Sénéchal noted that exhibit NAV-141, a document submitted by the Claimants summarizing the actual growth in fuel sales that arose from the renovation of a number of petrol stations in mainland Ukraine in 2014 showed an average growth of only 167%. Fourth, Mr. Sénéchal considered that there was little evidence of such fast growth in the Claimants' historical operational data for 2011, 2012, and 2013.[319] Finally, Mr. Sénéchal indicated that Mr. Kaczmarek's financial models referred to embedded constants, which did not always have a clear audit trail and seemed arbitrarily set.[320]

309. In view of these criticisms, Mr. Sénéchal proposed to modify Mr. Kaczmarek's analysis by deriving a market proxy based on the available information. In particular,

---

[313]   Sénéchal Supplementary Report, § 17.

[314]   Sénéchal Supplementary Report, § 20.

[315]   Sénéchal Supplementary Report, § 20.

[316]   Sénéchal Supplementary Report, p. 16, Table 3 and § 28.

[317]   Sénéchal Supplementary Report, § 21. *See also* § 29.

[318]   Sénéchal Supplementary Report, § 22.

[319]   Sénéchal Supplementary Report, § 24. *See also* § 30.

[320]   Sénéchal Supplementary Report, § 25. *See also* § 30, fn. 15.

Mr. Sénéchal proposed to take the average of Mr. Kaczmarek's estimates for the impact of planned renovations on the Claimants' business, as well as on Ukrnafta's business in PCA Case No. 2015-34, and the 167% growth rate derived from the renovation program in mainland Ukraine that had actually been realized. By averaging these data points, Mr. Sénéchal arrived at a growth rate of 216%, which he applied to estimate the fuel sales volumes for 16 of the 19 petrol stations to be renovated.[321] With respect to the other three petrol stations, which were inoperative before the Incorporation, Mr. Sénéchal did not propose to make any adjustments to Mr. Kaczmarek's revenue estimates.[322] Mr. Sénéchal further favored applying the same growth rate of 216% to the sales of the convenience stores, in particular because the planned renovations did not include the construction of any additional revenue-generating facilities.[323]

310.   Upon the Tribunal's request, Mr. Sénéchal also carried out a further valuation of the Claimants' petrol stations and storage facilities in his Second Supplementary Report, assuming a growth rate in fuel and convenience store sales resulting from renovations of 167% (which, as noted above, reflects the growth rate set out in exhibit NAV-141 derived from the renovation program in mainland Ukraine that had actually been realized).[324]

311.   With respect to the second adjustment to Mr. Kaczmarek's analysis which Mr. Sénéchal proposed, *i.e.*, the adjustment of the growth rate used in the calculation of the terminal value, Mr. Sénéchal reiterated in his Supplementary Report that Mr. Kaczmarek's use of 3.02% did "not seem to reflect the deteriorating macroeconomic conditions in the pre-annexation period," including the "falling GDP in Russia and Ukraine, a protracted economic downturn in Ukraine, and structural crisis in Russia."[325] Accordingly, Mr. Sénéchal considered it "important to recognize that the terminal value has risk and that the businesses may never actually achieve the expected performance, due to economic vulnerabilities and regional economic volatility."[326] Noting that Mr. Kaczmarek had based his proposed growth rate on the U.S. inflation rate and growth in Russian petrol consumption in 2018, Mr. Sénéchal

---

[321]   Sénéchal Supplementary Report, § 34.

[322]   Sénéchal Supplementary Report, § 36.

[323]   Sénéchal Supplementary Report, § 38.

[324]   Sénéchal Second Supplementary Report, p. 3.

[325]   Sénéchal Supplementary Report, § 41.

[326]   Sénéchal Supplementary Report, § 41.

asserted that "the year 2018 cannot be expected to serve as a stable benchmark for the cash flow to grow at a constant rate over the future, due to the many uncertainties in the regional economy."[327] Accordingly, Mr. Sénéchal favored using averages from 2014 to 2018 in order to establish the growth rate to be used in the terminal value. On this basis, he arrived at a growth rate of 2.62%, comprised of half of the average change in Russian gasoline consumption from 2014-2018 (1.73% divided by 2) plus the average U.S. inflation rate for the same period (1.76%).[328]

312.   The impact of the adjustments put forward by Mr. Sénéchal is illustrated in the following table (all amounts in US$):[329]

| DCF approach | Enterprise value per Kaczmarek Report | 46,340,006 |
|---|---|---|
| | Renovation plans adjustment per Sénéchal Supplementary Report | (6,962,335) |
| | Further renovation plans adjustment per Sénéchal Second Supplementary Report | (3,937,605) |
| | Growth rate adjustment per Sénéchal Supplementary Report | (2,520,195) |
| | Adjusted enterprise value per Sénéchal Supplementary Report | 36,857,476 |
| | Adjusted enterprise value per Sénéchal Second Supplementary Report | 32,919,871 |
| CPTC approach | Enterprise value per Kaczmarek Report | 53,207,543 |
| | Adjusted enterprise value per Sénéchal Supplementary | 48,606,592 |

---

[327]   Sénéchal Supplementary Report, § 43.

[328]   Sénéchal Supplementary Report, § 44 and p. 24, Table 6.

[329]   Sénéchal Supplementary Report, §§ 46-48 and pp. 25-26, Tables 8-10.

| | Report[330] | |
|---|---|---|
| | Adjusted enterprise value per Sénéchal Second Supplementary Report | 43,868,564 |
| **Weighted DCF and CPTC approaches (85% and 15%, respectively)** | Enterprise value per Kaczmarek Report (excluding Stabil LLC's apartment) | 47,370,137 |
| | Adjusted enterprise value per Sénéchal Supplementary Report (excluding Stabil LLC's apartment) | 38,619,843 |
| | Adjusted enterprise value per Sénéchal Second Supplementary Report (excluding Stabil LLC's apartment) | 34,562,175 |

313.  Mr. Sénéchal also provided a breakdown of the total adjusted enterprise value among the Claimants following Mr. Kaczmarek's methodology.[331]

### (c)   The Claimants' comments on Mr. Sénéchal's views

314.  The Claimants submit that Mr. Sénéchal's adjustments to Mr. Kaczmarek's valuation entail the risk that the Claimants would not be compensated adequately. They also argue that the Tribunal's expert's criticisms "lack any evidentiary support and are incorrect."[332]

315.  In respect of the growth rate of the terminal value, the Claimants criticize Mr. Sénéchal's use of the averages from 2014 to 2018 in respect of the U.S. inflation rate and petrol consumption[333] as inconsistent with the testimony of both quantum experts regarding the correct methodology for calculating the terminal value, according to which the terminal value must be calculated on the basis of the cash flows in the last

---

[330]  The changes proposed by Mr. Sénéchal to Mr. Kaczmarek's DCF analysis had an impact on the Claimants' average EBITDA for 2014-2018, which required a corresponding adjustment in the CPTC model. Sénéchal Supplementary Report, § 47.

[331]  Sénéchal Supplementary Report, §§ 49-52; Sénéchal Second Supplementary Report, p. 4.

[332]  Claimants' Comments on the Supplementary Report, §§ 7, 13, 29.

[333]  Claimants' Comments on the Supplementary Report, § 11.

year of the projection.[334] The Claimants also point out that, in line with Mr. Sénéchal's own evidence, the growth rate is supposed to reflect a "constant average compounded rate of growth in perpetuity," while asserting that in this instance projected cash flows are not constant before 2018, primarily as a result of the renovations, which depress revenues in 2014 and increase them rapidly in 2015.[335]

316. Further, the Claimants argue that the unusually low U.S. inflation rates for 2014 to 2018 used by Mr. Sénéchal are inconsistent with both historical and projected long-term rates, which all point to a normal inflation rate of 2%. Historical data are available from the International Monetary Fund, the United Nations, the U.S. Bureau of Labor Statistics and the U.S. Federal Reserve. The Federal Reserve also projects the long-term inflation rate at 2%.[336]

317. The Claimants further submit that Mr. Sénéchal's petrol consumption growth rates are unsupported by the data. In this respect, they first assert that Mr. Sénéchal acknowledged that the petrol consumption growth rate on which Mr. Kaczmarek relied (2.08%) was consistent with pre-Incorporation data, from which Mr. Sénéchal derived a 2.31% growth rate between 2011 and 2013.[337] The Claimants add that if data for 2010 were included, the historical average would be lifted to 3.37%.[338]

318. The Claimants further contend that the economic uncertainty to which Mr. Sénéchal refers does not justify his downward adjustment of the growth rate. For the Claimants, "volatility and growth are not mutually exclusive," as demonstrated by the 2010-2013 historical data, which shows not only overall growth but also volatility, with jumps from 6.57% in 2010, to 1.29% in 2011, to 3.84% in 2012, and 1.79% in 2013.[339] Still according to the Claimants, the poor pre-Incorporation market conditions to which Mr. Sénéchal refers are "already internalized in the inputs taken from reliable third-party and market participants" that Mr. Kaczmarek used in his cash flow projection.[340] To the extent that the growth rate must be reduced to account for uncertainties, the Claimants

---

[334] Claimants' Comments on the Supplementary Report, § 14, *referring to* Sénéchal Report § 107; Kaczmarek Report § 202.

[335] Claimants' Comments on the Supplementary Report, § 14, *referring to* Sénéchal Report § 108 (emphasis by the Claimants).

[336] Claimants' Comments on the Supplementary Report, § 16.

[337] Claimants' Comments on the Supplementary Report, § 17, *referring to* Sénéchal Report, § 111.

[338] Claimants' Comments on the Supplementary Report, § 17.

[339] Claimants' Comments on the Supplementary Report, § 19.

[340] Claimants' Comments on the Supplementary Report, § 20.

submit that Mr. Kaczmarek has already done that by taking only 50% of the estimated growth rate in Russian petrol consumption in 2018.[341]

319. Finally with respect to the growth rate, the Claimants submit that Mr. Sénéchal's adjustment is "not based on the scientific approach," as he is guided only by his "overall assessment of the general economic conditions."[342] For the Claimants, the fact that Mr. Sénéchal changed his views between the hearing of 20 August 2018, when he asserted that the growth rate should be the U.S. inflation rate of 1.98%, and his Supplementary Report, where he proposed a growth rate of 2.62%, shows that his opinion lacks a firm basis.[343]

320. With respect to the renovations, the Claimants dispute Mr. Sénéchal's assessments that it cannot be satisfactorily concluded that (i) the renovation plans would have been implemented and that (ii) they would have led to the forecast revenues.[344]

321. With respect to the first assessment, the Claimants submit that they only need to establish that it was probable that the renovations would have been realized,[345] which they have done by demonstrating that they had plans to carry out renovations in 2014 and had already carried out such renovations in the past.[346]

322. In relation to Mr. Sénéchal's second assessment, the Claimants assert that the evidence shows that "revenues/profits can be increased by improving the provision of the core, existing services of selling petrol and related goods."[347] They point out that during the hearing of 20 August 2018, Mr. Sénéchal recognized that the renovations "produced 'a big impact on sales'."[348] To this, the Claimants add that Mr. Sénéchal's

---

[341] Claimants' Comments on the Supplementary Report, § 23.

[342] Claimants' Comments on the Supplementary Report, § 24.

[343] Claimants' Comments on the Supplementary Report, § 25.

[344] Claimants' Comments on the Supplementary Report, § 28.

[345] Claimants' Comments on the Sénéchal Supplementary Report, § 32, *referring Chorzów*, p. 47 (CLA-38); Sergey Ripinsky with Kevin Williams, DAMAGES IN INTERNATIONAL LAW, p. 167 (2008) (expanded CLA-116).

[346] Claimants' Comments on the Sénéchal Supplementary Report, § 33, *referring to* Laber Statement, §§ 22-23 (CWS-2); "Example of remodeling of filling stations, 2013-2015" (NAV-141), "Report by Crimean Branch," 11 December 2013 (NAV-077) and Crimean Branch Meeting Minutes Regarding Construction and Modernization, 20 January 2014 (NAV-087).

[347] Claimants' Comments on the Sénéchal Supplementary Report, § 40.

[348] Claimants' Comments on the Sénéchal Supplementary Report, § 40, *referring to* Transcript 20 August 2018, 126/19-128/9 (testimony of Mr. Sénéchal).

belief that economic conditions would have dampened the revenue increase arising from the renovations is unsupported by evidence.[349]

323.   Moreover, the Claimants stress that the "evidence supports the forecast increase in revenues and profits after renovations."[350] According to the Claimants, Mr. Sénéchal himself acknowledged "evidence on the positive impact of renovation plans on fuel sales," with an average increase of 67%.[351]

324.   The Claimants emphasize that the renovation plans incorporated into Mr. Kaczmarek's financial model should be taken on a station-to-station basis.[352] The Claimants illustrate this on a micro and macro level.

325.   At a micro level, the Claimants stress that the "renovation plans were for specific 'stations […] [involving] specific amounts […] different for each station, [resulting in different and specific effects for each station]'."[353] The Claimants thus identify two petrol stations at which Mr. Kaczmarek's projected sales volumes post-renovation did not exceed their sales volumes pre-renovation.[354] While acknowledging that other stations' projected post-renovation revenues did exceed their revenues pre-renovation, "sometimes by many times," the Claimants argue that this was because, in some cases, pre-renovation revenues were negligible and, for the three inoperative stations, non-existent.[355] The Claimants add that Mr. Sénéchal's assumption that the same growth rate would apply for petrol and convenience store sales also leads to unrealistically low convenience store revenue forecasts, particularly for stations with a "low or non-existent base."[356]

---

[349]   Claimants' Comments on the Sénéchal Supplementary Report, § 42.

[350]   Claimants' Comments on the Sénéchal Supplementary Report, § 46.

[351]   Claimants' Comments on Sénéchal Supplementary Report, § 46, *referring to* Sénéchal Supplementary Report, § 23.

[352]   Claimants' Comments on the Sénéchal Supplementary Report, § 51, *referring to* Transcript 20 August 2018, 137/15-140/14 (testimony of Mr. Kaczmarek).

[353]   Claimants' Comments on the Sénéchal Supplementary Report, § 52, *referring to* Transcript 20 August 2018, 136/22-25, 137/7-10, 138, 139/11-14 (testimony of Mr. Kaczmarek).

[354]   Claimants' Comments on the Sénéchal Supplementary Report, § 53, *referring to* Kaczmarek Report, Appendix 3.C.

[355]   Claimants' Comments on the Sénéchal Supplementary Report, § 54, *referring to* Transcript, 5 February 2018, 120-122 (testimony of Mr. Laber); Kaczmarek Report, Appendix 3.C.

[356]   Claimants' Comments on the Sénéchal Supplementary Report, §§ 48-49; Claimants' Comments on the Sénéchal Second Supplementary Report, pp. 1-3.

326. At the macro level, the Claimants assert that, from 2014 to 2015, the renovations raised Mr. Kaczmarek's volume forecasts by 41%, [357] a conservative increase compared to that of 67% experienced for the mainland stations.[358] The Claimants note that, while Mr. Sénéchal's proposed overall volume increase (of 116%) is greater than Mr. Kaczmarek's (of 41%), his final valuation is less than Mr. Kaczmarek's, due to the difference in volumes of fuel sold at the different stations.[359]

### (d)   Analysis

327. In this Section, the Tribunal addresses the selection and weighting of the valuation methods (i); the DCF approach (ii); the CPTC approach (iii); the claim for the value of Stabil LLC's residential apartment (iv); and, finally, its conclusion (v).

i.      Selection and weighting of the valuation methods

328. Mr. Kaczmarek employed two valuation methods, the DCF approach and the CPTC approach, assigning a weight of 85% to the former and 15% to the latter.[360]

329. The Tribunal considers that this overall approach is appropriate. Both the DCF and the CPTC methodologies are frequently used for the valuation of income-producing assets in investor-State arbitration.[361] Here, the historical data for the years 2008 to 2013 show that the Claimants' Crimean petrol stations had a track record of profitability,[362] with the result that a valuation applied to income-producing assets is appropriate.

330. The weight assigned to each approach is based on Mr. Kaczmarek's assessment of the quality and reliability of the evidence available to implement each valuation method.[363] At the Hearing on the Merits, Mr. Kaczmarek explained that greater weight

---

[357] Claimants' Comments on the Sénéchal Supplementary Report, § 54, *referring to* Kaczmarek Report, § 110.

[358] Claimants' Comments on the Sénéchal Supplementary Report, § 54, *referring to* Kaczmarek Report, § 110.

[359] Claimants' Comments on the Sénéchal Supplementary Report, p. 143, fn. 143.

[360] Kaczmarek Report, § 14.

[361] *See, e.g. Flughafen Zürich A.G. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/19, Award, §§ 746-748 (18 November 2014) (CLA-48); *Yukos Universal Limited v. Russian Federation*, PCA Case No. AA 227, Final Award, § 1787 (18 July 2014) (CLA-84); *Everest*, Award on the Merits, §§ 265-284 (2 May 2018) (CLA-278).

[362] For a summary of the stations' free cash flows from 2008 to 2013 see Kaczmarek Report, p. 30, Figure 17.

[363] Kaczmarek Report, § 220.

is given to the DCF approach due to the high level of "granularity" in the data used to construct the DCF model.[364] For the CPTC approach, the expert acknowledged some "hesitation" due to the gap between the EV/EBITDA multiples for the two comparable companies, which was larger than what one might find in other valuations.[365] In spite of this hesitation, Mr. Kaczmarek maintained that the CPTC approach was reliable and that, "more evidence of value [being] always better," the CPTC approach should not be discarded.[366]

331.   Importantly, the Tribunal-appointed expert shared this assessment. Although he suggested improvements to the CPTC approach (see paragraph 381 below), in answer to a question from the Tribunal at the hearing of 20 August 2018, Mr. Sénéchal confirmed that the CPTC approach should not be rejected.[367]

332.   In view of this evidence, the Tribunal will combine the DCF and CPTC approaches in the proportions used by the experts, *i.e.*, 85% for the former and 15% for the latter.

ii.   Discounted cash flow (DCF) approach

(a)   Available evidence

333.   As a preliminary matter, the Tribunal is mindful that the DCF approach requires the use of data about the past operations of the Claimants' petrol stations and that some of the relevant documentation is lacking. Mr. Laber testified that documents such as originals and copies of invoices, as well as original title documents, were left behind when the Respondent took over the Claimants' headquarters in Feodosia on 22 April 2014.[368] The Tribunal has no reason to doubt Mr. Laber's testimony, the lack of access to documents appearing as a natural consequence of the loss of control over the operations. For purposes of quantification of damages, what matters in situations such as this one is that the damage be substantiated by other credible means, which is the case here.

---

[364]   Transcript 6 February 2018, 257/2-11 (testimony of Mr. Kaczmarek).

[365]   Transcript 6 February 2018, 279/20-280/5 (testimony of Mr. Kaczmarek).

[366]   Transcript 6 February 2018, 278/15-280/5 (testimony of Mr. Kaczmarek).

[367]   Transcript 20 August 2018, 49/21-53/7, especially 49/21-50/4, 51/21 (testimony of Mr. Sénéchal).

[368]   Laber Statement, §§ 31, 33 (CWS-2); Transcript 5 February 2018, 158/24-159/13 (testimony of Mr. Laber).

334. In the absence of the documents left on the Feodosia premises, the Claimants collected financial and operational information which they had previously submitted to Avanta-S LLC, the group's centralized service company which tracked market data and set up pricing strategies for the Claimants.[369] On the basis of this information and the summaries drawn up by the Claimants, Mr. Kaczmarek re-created final statements for the petrol stations.[370]

335. For the following reasons, the Tribunal considers that these re-created financial statements are sufficient to meet the Claimants' burden of proof in respect of the past operations of their investment in the Crimean Peninsula.

336. The information collated by Avanta-S LLC is very detailed[371] and was provided in the normal course of operations;[372] it represents contemporaneous evidence as opposed to data prepared for litigation purposes. Although Avanta-S LLC summarized the existing information for these proceedings and the experts have not reviewed the underlying documentation, there is no indication on record casting doubt on the reliability of the information provided. To the contrary, Mr. Kaczmarek testified that he had reviewed this information at a high level without finding anything "surprising" or "suspicious". [373] Similarly, while in his first report Mr. Sénéchal stated that the unavailability of the underlying data created a risk of overstatement,[374] he confirmed at the Hearing on the Merits that, upon examining the information, he had no "particular reason" to believe that the re-created financial statements were overstated or inaccurate.[375] Mr. Laber also testified that Avanta-S LLC had verified the information against bank statements.[376]

---

[369] *See* Laber Statement (CWS-2), exhibit 9, which is also NAV-137. *See also* Kaczmarek Report, § 62; Transcript 5 February 2018, 140-145 (testimony of Mr. Laber); Transcript 6 February 2018, 243/11-22 (testimony of Mr. Kaczmarek).

[370] Kaczmarek Report, § 62.

[371] *See* Laber Statement (CWS-2), exhibit 9, which is also NAV-137.

[372] Transcript 5 February 2018, 140-145 (testimony of Mr. Laber).

[373] Transcript 6 February 2018, 244/5-246/22 (testimony of Mr. Kaczmarek).

[374] Sénéchal Report, p. 82, § 116. At the hearing of 20 August 2018, Mr. Sénéchal clarified that he was in fact referring to a risk of inaccuracy, one way or the other (Transcript 20 August 2018, 15/6-15.

[375] Transcript 20 August 2018, 14/22-25, 16/10-15 (testimony of Mr. Sénéchal).

[376] Transcript 5 February 2018, 140-145 (testimony of Mr. Laber).

(b)   Benchmark market

337. A number of variables in the DCF analysis such as forecasts of petrol consumption or country risk must be determined by reference to a benchmark market. This raises a difficulty in the present case, as the DCF analysis is carried out in a peculiar situation where the enterprise to be valued operated in one State, Ukraine, until close to the valuation date and then shortly before that date found itself operating on territory over which another State, the Russian Federation, exercised *de facto* control.

338. Under these unusual circumstances, one could ask whether the most accurate valuation of the Claimants' investment should not use exclusively regional or subnational data, *i.e.*, Crimean data. This is so because – as Mr. Sénéchal testified – the "intrinsic value of the assets is derived from where they are located," [377] which, in this case, is the Crimean Peninsula. Be this as it may, the experts concur that no reliable information exists for Crimea as a subnational market. [378]

339. As indicated by Mr. Sénéchal at the hearing of 20 August 2018, where the relevant market information is not available at the subnational level, a relevant proxy must be chosen, in this case, Russia or Ukraine. [379]

340. While Mr. Kaczmarek selected Russia as the benchmark market, Mr. Sénéchal in his first report indicated that Ukraine might also be relevant, as "the Crimean economy was very dependent on the Ukrainian economy before the annexation." [380] In the same report, Mr. Sénéchal also explained that the choice of the benchmark market would depend on the Tribunal's determination of the valuation date, with the consequence that a valuation done after the Incorporation must use Russian parameters:

> If we assume valuation is based on assets still operated under Ukrainian sovereignty immediately before annexation, key valuation parameters would need to be changed to measure risk, which would be done from a Ukrainian perspective and not the Russian perspective suggested by Mr. Kaczmarek. On the other hand, if it is assumed claimants' assets were de facto under the responsibility of Russia at the date of valuation [used by Mr. Kaczmarek] (22 April

---

[377]   Transcript 20 August 2018, 19/5-25 (testimony of Mr. Sénéchal).

[378]   Transcript 20 August 2018, 19/5-25, 20/13-14 (testimony of Mr. Sénéchal).

[379]   Transcript 20 August 2018, 19/5-25, 102/14-18 (testimony of Mr. Sénéchal). Specifically with respect to country risk see 20/11-23, 101/22-25.

[380]   Sénéchal Report, p. 8 § 6, pp. 38-39 §§ 29-33.

2014) because Russia had ratified on 21 March 2014 the legislation that formally incorporated Crimea as a subject of the Russian Federation in accordance with the Russian Constitution, then the cash flow forecast could be done from a Russian market perspective.[381]

341.  At the hearing of 20 August 2018, Mr. Sénéchal restated the pivotal role of the timing of the valuation for the selection of the relevant data, *i.e.*, Ukrainian data prior to the Incorporation and Russian data thereafter:

> If you assume that on 22 April the assets are located on the Russian territory, I think you have to base your assumption on the Russian market, and I think the Russian market in that sense is the right approach; right?

> To put it differently, if you would say we need to do the value or what is a value of the assets for a marginal investor just before the annexation, that would be a different answer than I would have because, here, I would be looking at the assets still located in Ukraine with no annexation taking place or – the risk of annexation that would be looming, but there is no annexation yet being done.[382]

342.  Mr. Sénéchal re-iterated on other occasions during the hearing that the Russian market is the appropriate benchmark for a valuation carried out as of 22 April 2014:

> PRESIDENT KAUFMANN-KOHLER: […] So, do I understand that you're really connecting the date and the market? Do I understand that if we were to take as a Date of Valuation the 22nd of April 2014, you would say, from an economic point of view – not from a legal point of view – then that would mean that the Russian market is the appropriate benchmark?

> THE WITNESS: Yes, that's correct. I think if you take the date of 22 April, you would assume that the assets are located in Crimea, annexed by Russia, so you don't look at the incorporation, really, of the firm […]. You would look at the location of the assets; and, if you assume that the assets are located in Russia on 22 – o[n] the Russian territory on 22 April, you would do that valuation according to the Russian-market perspective.[383]

---

[381]   Sénéchal Report, p. 39 § 31.

[382]   Transcript 20 August 2018, 24/6-17 (testimony of Mr. Sénéchal).

[383]   Transcript 20 August 2018, 17/5-20 (testimony of Mr. Sénéchal).

[…]

> PRESIDENT KAUFMANN-KOHLER: […] With respect to Date of Valuation and Reference Market, you say these are legal questions, but at the same time you say that if we take a Date of Valuation of 22nd of April, it would be correct economically to take the Russian market as a reference?
>
> THE WITNESS: Yes.[384]

343.   In the same vein, Mr. Sénéchal also indicated at the hearing that he would not recommend relying on a combination of Ukrainian and Russian parameters.[385]

344.   Having regard to the conclusion reached above that 22 April 2014 was the date of valuation as well as to the views of the quantum experts and particularly to the evidence of its own expert, who opined that Russia would be the appropriate benchmark for a valuation post-Incorporation, the Tribunal requested Mr. Sénéchal to carry out an alternative valuation using 22 April 2014 as the valuation date and the Russian market as the benchmark.[386]

345.   The Tribunal is aware that the use of Russia as benchmark means that the Claimants' investment increased in value as a result of the Incorporation. Until the Incorporation, the investment's growth expectations and risks were tied to the economic environment of Ukraine; thereafter, they were linked to economic parameters prevailing in Russia. As the latter were more favorable than the former, the value of assets located in Crimea increased.

346.   One could ask whether this increase represented an inadmissible windfall profit for the Claimants. In the Tribunal's opinion, it does not. The increase is merely a reflection of the fair market value of the asset, as a buyer and seller would assess it at a given location and at a given time. Both experts agreed that the valuation in such a case reflects the outlook of a hypothetical willing seller and a hypothetical willing buyer on the relevant date in light of the information available on that date.[387] As of 22 April 2014, the hypothetical buyer and seller would have considered that the Claimants' Crimean petrol stations and storage facilities would henceforth operate on territory

---

[384]   Transcript 20 August 2018, 104/23-105/3 (testimony of Mr. Sénéchal).

[385]   Transcript 20 August 2018, 21/6-23/15 (testimony of Mr. Sénéchal).

[386]   Letter to the Parties dated 12 September 2018, described at paragraph 87 above.

[387]   Kaczmarek Report, § 94; Sénéchal Report, p. 44 § 43, p. 46 § 48.

controlled by the Russian Federation, with a different outlook than before the Incorporation.[388] As put by Mr. Sénéchal at the hearing, "risk perception of the asset being Russian as compared to Ukrain[ian] changes everything because now you are dealing with a marginal investor willing to take a Russian risk as compared to a Ukrainian risk."[389]

347.  For these reasons, the Tribunal considers that the Russian market is the appropriate benchmark for purposes of establishing the value of the investment.

(c)     Effect of international sanctions

348.  Having decided that Russia is the appropriate benchmark market, the Tribunal has also considered whether international sanctions imposed on Russia following the Incorporation affected the outlook in a manner that would impact the value of the investment.

349.  While certain sanctions were imposed before the valuation date, others only became effective thereafter.[390] As the experts observed, only the reasonable expectations of the hypothetical willing buyer and seller on the date of valuation are relevant.[391] Accordingly, a question may arise as to whether the later sanctions were reasonably foreseeable on 22 April 2014. Ultimately, however, the Tribunal need not answer this question, as there are other reasons why the sanctions must not be taken into account in the present case.

350.  First, the type of business at stake, which resembles a utility, shows little vulnerability to sanctions. Or, in Mr. Sénéchal's words at the hearing on 20 August 2018,

> You are dealing with a commodity which should not be impacted too much by the sanction[s] because of the nature of the products that you sell to a specific market, so it's like a utility. Even if you have sanction[s], people will need

---

[388]  *See* Transcript 20 August 2018, 23/16-24/18, 66/18-69/6 (testimony of Mr. Sénéchal).

[389]  Transcript 20 August 2018, 69/1-6 (testimony of Mr. Sénéchal).

[390]  *Treasury Designates Seven Individuals and One Entity Contributing to the Situation in Ukraine*, U.S. Department of Treasury Website (11 April 2014) (C-66); Adrian Croft and Justyna Pawlak, *EU adds top Putin aide, two Crimea energy firms to sanctions list*, Reuters (12 May 2014) (C-75); *Ukraine-related Sanctions; Publication of Executive Order 13662 Sectoral Sanctions Identifications List*, U.S. Department of Treasury Website (16 July 2014) (C-82).

[391]  Kaczmarek Report, § 94; Sénéchal Report, p. 44 § 43, p. 46 § 48.

electricity here, as we need petroleum, and I do not believe that the impact would be too much related to a sanction for this type of business.[392]

351.  This explanation is consistent with the one given by Mr. Kaczmarek at the Hearing on the Merits:

Whether [Crimea is] flying under the Russian or Ukrainian flag or they're debating it, people are still going to work, they're still driving their cars, food supplies need to be delivered. So, it's more like a utility: You know, people are still going to consume electricity regardless of the flag that the territory is flying under. Same with gasoline. So, from a cash-flow perspective, it is kind of business as usual.[393]

352.  Mr. Sénéchal also testified that, as "Russia is an oil-producing country, […] you can safely assume that, in terms of the supply of oil, you should not see disruption" resulting from international sanctions.[394]

353.  Second, to the extent that sanctions had an impact on the economy in general with a possible consequential effect on the Claimants' business, such effect would already be reflected in the valuation through the incorporation of parameters such as petrol consumption forecasts.

354.  Accordingly, there is no reason to adjust the valuation on the basis of international sanctions against Russia.

(d)  Free cash flow projections

355.  By the end of the hearing of 20 August 2018, the experts agreed on all aspects of the cash flow projections, with the exception of the revenues expected to be generated from the renovation of 19 of the Claimants' Crimean petrol stations. While Mr. Sénéchal initially also questioned the oil prices and fuel sales volumes assumed by Mr. Kaczmarek in light of prevailing macroeconomic conditions, he later clarified that such concern would be fully addressed by an adjustment in respect of the impact of

---

[392]  Transcript 20 August 2018, 70/18-25 (testimony of Mr. Sénéchal).

[393]  Transcript 6 February 2018, 286/1-9 (testimony of Mr. Kaczmarek). *See also* 287/14-16 ("The sanctions don't, in my mind, […] play any role in determining Fair Market Value, again, with hypothetical buyer-hypothetical seller.").

[394]  Transcript 20 August 2018, 70/7-14 (testimony of Mr. Sénéchal).

renovations coupled with an adjustment to the growth factor in the calculation of the terminal value (the latter as discussed at paragraph 389 and following below).[395]

356. The Tribunal has reviewed the cash flow projections presented irrespective of the experts' views. Subject to the impact of any renovation on the petrol stations' revenues, which is discussed below, it reached the conclusion that the projections were reasonable. It is true that, after the Incorporation, the Claimants' supply routes may have been disrupted, as the Claimants used to rely on deliveries by truck and rail from refineries in mainland Ukraine.[396] Yet, that disruption was unlikely to have a lasting effect. Both experts confirmed that, but for the expropriation, the petrol stations could have been expected to procure petrol and diesel from Russia by tanker across the Sea of Azov, the Kerch Strait and the Black Sea.[397]

357. This being so, the Tribunal now turns to the impact of the petrol stations' renovations, the aspect of the cash flow projections on which the experts disagree. As noted above, Mr. Kaczmarek assumed in his DCF model that 19 petrol stations would have been renovated in 2014, resulting in increased revenue as of 2015.[398] Mr. Sénéchal challenged this assumption, opining that there was insufficient evidence to conclude that the renovations (i) would have been implemented, and (ii) if implemented, would have generated the increase in revenue projected by Mr. Kaczmarek.[399] It is true that in his Supplementary Report, Mr. Sénéchal did not restate the first point (see paragraph 368 below). Because it is not entirely clear that Mr. Sénéchal abandoned that point, the Tribunal will review both his criticisms.

358. The two criticisms must be assessed based on the evidence and having regard to the applicable standard, as set out in *Chorzów*, according to which "reparation […] must re-establish the situation which would, <u>in all probability</u>, have existed if that act had not been committed."[400]

---

[395] Transcript 20 August 2018, 63/16-65/14; 104/23-106/21 (testimony of Mr. Sénéchal).

[396] Kaczmarek Report, § 43.

[397] Kaczmarek Report, § 43 and Figure 7; Transcript 6 February 2018, 284/17 (testimony of Mr. Kaczmarek); Transcript 20 August 2018, 73/16-74/10 (testimony of Mr. Sénéchal).

[398] Kaczmarek Report, §§ 85, 125-129.

[399] Sénéchal Report, p. 10 §§ 13-14, p. 17 § f, pp. 50-53. *See also* Transcript 20 August 2018, 78/4-16 (testimony of Mr. Sénéchal).

[400] *Chorzów*, p. 47 (CLA-38) (emphasis added).

359.  With respect to the first issue raised by Mr. Sénéchal, *i.e.*, whether the renovations would have been implemented, the question is whether, on 22 April 2014, a hypothetical willing seller and a hypothetical willing buyer would have valued the Claimants' petrol stations on the basis that 19 of these stations would be renovated in 2014. The Tribunal has before it both witness and documentary evidence in this regard.

360.  In his written statement, Mr. Laber, who was responsible for managing all financial and commercial aspects of the Claimants' businesses, testified that the management had approved the renovation of 19 stations to be performed in 2014:

> Several of the new entrants into the Crimean market built new stations or modernized old ones. To stay ahead of the competition, the [Claimants'] management met on several occasions in 2013 and early 2014 to develop and approve plans to renovate 19 of its 31 petrol stations in Crimea over the course of 2014.[401]

361.  At the Hearing on the Merits, Mr. Laber further gave evidence that this type of renovation was part of the normal course of business for the Claimants:

> [W]e did these renovations every year. It was very typical for us to invest in our properties, all over the country, so there was no reason for me not to invest in Crimea.[402]

362.  Mr. Laber's testimony is supported by contemporaneous documents both in respect of Ukrnafta's general practice and the planned Crimean renovations. First, the Claimants have submitted a presentation[403] from late 2013 by Mr. Khabarov, head of Ukrnafta's Crimean regional sales department,[404] which illustrates the planned post-renovation appearance of four of the 19 petrol stations that were to be renovated.[405] This document also shows that certain renovation works, such as the repair of price pylons,

---

[401]  Laber Statement, § 22.

[402]  Transcript 5 February 2018, 122/18-21 (testimony of Mr. Laber).

[403]  Report on the Crimean Branch (NAV-77).

[404]  Artem Prokhorov, *The "new Crimeans" have euthanized the fuel business*, Crimean Events (5 June 2014) (C-77).

[405]  Report on the Crimean Branch (NAV-77). The petrol stations in question are identified as stations 3 (Rubenor), 4 (Stabil), 21 (Stabil) and 26 (Stabil).

the replacement of windows and the painting of transmission poles, had already been carried out at some of the Claimants' petrol stations in Crimea.[406]

363.   As a second piece of contemporaneous evidence, the Claimants have submitted the minutes of a meeting held by way of a conference call by Stabil LLC (and Ukrnafta) managers on 20 January 2014, which records that it was "resolved to approve the list proposed by branch office management of filling stations to be remodeled with the cost for types of work." That list includes the 19 stations identified by Mr. Kaczmarek, and describes the specific works planned for each station. Thus, it was approved during the conference call that the 19 stations would undergo "road surface replacements, improvements," "canopy repair," "façade (operator room) repair," "repair (new layout) inside operator room," "complete replacement of price pylon, advertising," and "design and approval work," while eight of the stations would also undergo "fuel pump replacement, [and] technology replacement," and five would also have their tanks replaced.[407] Additionally, the minutes of the management meeting contain a detailed record of the planned cost of each type of work for each station.[408] Mr. Laber explained at the Hearing on the Merits that such meetings were held by conference call in order to allow him to participate, as by 2013 he no longer lived in Crimea.[409] Indeed, there is evidence on record of other management meetings being held by telephone conference.[410]

364.   Third, the Claimants have shown that in that same period between 2013 and 2015 similar renovations were carried out at petrol stations located in mainland Ukraine, despite the economic and sociopolitical uncertainty prevailing at that time.[411]

365.   On the basis of this evidence, the Tribunal reaches the conclusion that on 22 April 2014 a hypothetical willing buyer and seller would have valued the Claimants' petrol stations on the basis that 19 of these stations would be renovated in 2014. This

---

[406]   Report on the Crimean Branch (NAV-77).

[407]   Minutes of conference call, 20 January 2014 (NAV-87).

[408]   Minutes of conference call, 20 January 2014 (NAV-87).

[409]   Transcript 5 February 2018, 181/24-182/12 (testimony of Mr. Laber).

[410]   Minutes of the Crimean Branch Meeting Approving Renovation Projects, 12 February 2014 (Exhibit 5 to Laber Statement); Crimea Measures Meeting Minutes, 11 December 2013 (Exhibit 1 to Laber Statement).

[411]   "Example of remodeling of filling stations, 2013-2015" (NAV-141).

conclusion is reinforced by Mr. Sénéchal's repeated acknowledgement that companies usually reinvest into their businesses to maintain and grow their operations.[412]

366. Mr. Sénéchal's main criticism in respect of the implementation of the renovation plans was the lack of "third-party evidence", such as "quotations or contracts from suppliers or contractors, submissions for work permits, tentative or final work plans agreed between internal staff and contractors in charge of the renovation, tender preparation to procure renovation services, or internal requests to headquarters for financing authorization."[413]

367. Given the timeline of events, however, the absence of such documentation appears unsurprising and not susceptible of casting doubt on the reliability of the evidence that is in the record. As just noted, the renovation plans were approved on 20 January 2014. By the end of February 2014, Russian military forces had consolidated control over the Crimean Peninsula and, by the end of March 2014, Crimea had been incorporated into the Russian Federation. As explained by Mr. Laber at the Hearing on the Merits, after the Incorporation, the renovation plans were "on hold until we would figure out what was going to happen next there."[414] The Claimants' petrol stations were expropriated shortly thereafter on 22 April 2014. These developments explain why the Claimants did not take steps toward the implementation of the planned renovations and, hence, the absence of third-party evidence from suppliers, contractors, and subcontractors.

368. The lack of third-party evidence does not mean that, but for the expropriation, the Claimants would not have proceeded with the renovations later in 2014. Indeed, Mr. Kaczmarek assumed that the renovations would have taken place in the last four months of that year. The Tribunal considers this to be a reasonable assumption. It also notes that, when the chronology of events was put to him during the hearing of 20 August 2018, Mr. Sénéchal did not insist on his point regarding third-party evidence.[415] Moreover, in his Supplementary Report prepared after the Hearing on the Merits, he no longer suggested that the renovation plans would not have been

---

[412] Sénéchal Report, p. 50 § 54 ("Companies typically reinvest a portion of their cash flow into the business to maintain and grow their operations"). *See also* Supplementary Report, § 17 ("All businesses have to incur CAPEX to maintain fixed assets and create economic value.").

[413] Sénéchal Report, p. 52 § 60. *See also* Sénéchal Report, p.10, § 13; p. 53 § 6; Transcript 20 August 2018, 79/9-19.

[414] Transcript 5 February 2018, 123/9-11 (testimony of Mr. Laber).

[415] Transcript 20 August 2018, 116 & ff.

implemented, but only asserted that the renovations would not have generated the revenues projected by Mr. Kaczmarek.[416]

369. Having concluded that a hypothetical willing buyer and seller would have valued the Claimants' petrol stations on 22 April 2014 on the basis that 19 of these stations would be renovated in 2014, the Tribunal must now consider the revenue that would, in all probability, have been generated by such renovations.

370. Mr. Sénéchal opined that the renovations would not have generated the revenues projected by Mr. Kaczmarek for three main reasons. First, the planned renovations were "mostly typical maintenance operations," which, unlike "strategic investments, which could add valuable cross-selling services and boost revenues, […] were designed to maintain assets in efficient operating condition and to bring incremental improvements, with no reason to expect a major jump of revenues."[417] While, at the hearing, Mr. Sénéchal conceded that it is immaterial whether the renovations are qualified as "maintenance" or "remodeling",[418] he insisted in his Supplementary Report that the planned renovations, as described in the Claimants' documents, were not of a nature to significantly increase revenue.[419] As examples of works that, in contrast to the planned renovations (described at paragraph 363 above), could have significantly increased revenue, Mr. Sénéchal mentioned improvements aimed at "offering diversified services with high value cross-selling opportunities, such as tyre fitting and motor oil change services, car washes, cafes, and shops."[420] Second, Mr. Sénéchal considered that the revenue increases projected by Mr. Kaczmarek were "not suited to exposure to a cyclical downturn and deteriorating macro-economic conditions," as described at paragraphs 303 above and 390-391 below.[421] Third, Mr. Sénéchal explained that, apart from the macroeconomic conditions, the projected revenue increases were unlikely given the type of industry at hand:

---

[416]  Sénéchal Supplementary Report, §§ 16-48.

[417]  Sénéchal Supplementary Report, § 16. *See also* Sénéchal Report, p. 10, § 14, p. 51, § 58, p. 53, § 62.

[418]  Transcript 20 August 2018, 126-128.

[419]  Sénéchal Supplementary Report, §§ 16, 21.

[420]  Sénéchal Report, p. 52, § 59.

[421]  Sénéchal Supplementary Report, § 20. *See also* §§ 16, 22, 26. Transcript 20 August 2018, 128/12-15, 129/1-9 ("[I]f you look at this deterioration of the macroeconomic environment, can the market absorb all these extra revenues that are put into the forecast? That's my point. […] I mean, can the market really absorb all of these new revenues based on all the deteriorating macroeconomic indicators?").

I think it is important to understand the process of economic value creation, and look at the industry and ask the question in what kind of industry – what kind of industry we are dealing with? Here, we're dealing with petroleum station[s], a mature industry, no great innovation, high procurement costs, so it depends on your procurement costs. […]

You are dealing with an industry which is fairly regulated with impact of taxation being important depending on how the Government sees it as well.

So, altogether, not only I do not see the benefits created because of the macroeconomic condition[s], but because of the type of the industry you are dealing with. It gives you more comfort that you would not be dealing in the high-growth potential.

[…]

I have been also looking at the industry. I have been looking at what is the value-creation process for that particular industry. So, for these type of assets, which are not related to macro risks here, I am talking about something else here. I'm talking about are we dealing with a high-growth industry, are we in the Silicon Valley or in a high-growth/high-tech industry where you would really expect an investment leading to high returns, and I think probably, no, probably, no.[422]

371.  As noted by Mr. Sénéchal, Mr. Kaczmarek projected that, depending on the petrol station, post-renovation fuel sales would have amounted to between 135% and 697% of pre-renovation fuel sales for the 16 stations that were operative prior to the Incorporation.[423] Taking Stabil Station No. 30 as an example, Mr. Sénéchal calculated that the projected growth rate in fuel sales of 697%, achieved through a planned capital expenditure of US$ 140,000, would correspond to an annual return on investment of 751%.[424] In addition, for the convenience store sales, Mr. Kaczmarek projected growth rates between 2013 and 2015 in the range of 1,740% and 81,582%.[425] In total, Mr. Sénéchal calculated that, in Mr. Kaczmarek's valuation, the renovations increased

---

[422]  Transcript 20 August 2018, 84/1-21, 85/6-15.

[423]  Sénéchal Supplementary Report, p. 12, Table 1.

[424]  Sénéchal Supplementary Report, § 20.

[425]  Sénéchal Supplementary Report, p. 16, Table 3 and § 28.

the enterprise value of the Claimants' Crimean petrol stations by US$ 19.4 million, from 26.9 million to 46.3 million, *i.e.*, by 72%.[426]

372.   In the Tribunal's view, such very high increase projections call for a careful scrutiny of the basis on which these projections were made, particularly in light of Mr. Sénéchal's opinion that they are unrealistic. Mr. Kaczmarek explained that he based his projections of the impact of renovations on forecasts prepared by the Claimants.[427] While stating that he "did not have any basis to judge what had contemporaneously been forecasted in terms of benefits for the stations at issue," Mr. Kaczmarek explained that he relied on this information because it was consistent with "empirical data" provided by the Claimants. [428] The empirical data in question are found in exhibit NAV-141, which contains historical data collected by the Claimants regarding the increase in petrol sales volumes between 2013 and 2015 at renovated petrol stations in mainland Ukraine.[429] These are the same empirical data that Mr. Sénéchal used in his alternative valuation to calculate the revenue that would have been generated by the renovations of the Claimants' 19 Crimean petrol stations.[430]

373.   Overall, the Tribunal considers that Mr. Kaczmarek and the Claimants have not sufficiently substantiated the basis for their revenue projections generated by the renovations. While the Tribunal understands that the Claimants prepared contemporaneous forecasts for individual stations, it has not been told how or on what basis these forecasts were prepared.

---

[426]   Sénéchal Supplementary Report, § 17.

[427]   Kaczmarek Report, § 127 ("This increase is based on Claimant's expectation of the percentage growth in fuels sales volumes that the renovations would immediately provide."); Transcript 6 February 2018, 288/18-20, 300/1-4 ("[T]his was provided to us obviously by the Claimants. And they had said that they had prepared this. This had been submitted by the Station Operators for plans. So, for each of the stations there was estimates provided as to the amount or volume of fuel that would be sold, how much more after a renovation, so they're not all the same."); Transcript 20 August 2018, 155/16 ("I took that data from the Claimants").

[428]   Transcript 20 August 2018, 147/21-25; 155/14-19.

[429]   Kaczmarek Report, § 127, *referring to* Examples of Gas Station Reconstructions 2013-2015 (NAV-141); Transcript 6 February 2018, 300-301 (testimony of Mr. Kaczmarek) ("[T]his document is what I referred to earlier as the anecdotal evidence of previously renovated stations and the impact it had on volume increases. […] [J]ust to clarify, [exhibit NAV-] 141 was our – we said could we have some data to give us some comfort that this is really going to happen? Does this really happen when you renovate? And they [the Claimants] said yes, here is the data. We said, okay, we looked at it; it looks like what they are forecasting for the […] renovations looks reasonable. It's anecdotal in terms of justifying/verifying that this is actually what has occurred. […] It's factual information that justifies a forecasted assumption.").

[430]   Sénéchal Supplementary Report, §§ 34, 38.

374. At the same time, the Tribunal notes that both quantum experts consider it appropriate to look at the empirical data set out in exhibit NAV-141 regarding renovations that have actually been implemented in Ukraine in 2013-2015. To be precise, Mr. Kaczmarek uses these data "in terms of justifying/verifying"[431] the Claimants' own projections, while Mr. Sénéchal arrives at his projections by averaging the Claimants' projections with the data from exhibit NAV-141.[432] While Mr. Sénéchal explains that he does not rely solely on the data from exhibit NAV-141 because this exhibit describes renovations at petrol stations belonging to Ukrnafta, rather than the Claimants,[433] the Tribunal notes that the testimony of Mr. Laber suggests that these were indeed the Claimants' petrol stations.[434] In any event, both experts consider that the petrol stations referred to in exhibit NAV-141 are sufficiently similar to the Claimants' Crimean stations to treat that exhibit as reliable empirical evidence. The Tribunal also notes that the types of works described in exhibit NAV-141 (*e.g.*, "operator's room, canopy, design, façade, pylon") are similar to the works that were planned for the Claimants' Crimean stations. Accordingly, even if the petrol stations referred to in NAV-141 did not belong to the Claimants, their renovation scheme constitutes a good proxy for the renovation plans of the Claimants' Crimean stations.

375. In light of these considerations, the Tribunal regards the objective data collected in exhibit NAV-141 as more reliable than the Claimants' subjective assessment of the impact of renovations. It will thus use these objective data.

376. As noted by both experts, exhibit NAV-141 shows an average growth rate in fuel sales at renovated petrol stations of 167%.[435] Accordingly, the Tribunal will assume that, at the 16 operative petrol stations that the Claimants planned to renovate in Crimea, post-renovation fuel sales would have amounted to 167% of pre-renovation sales, and will modify Mr. Kaczmarek's estimate of cash flows accordingly.

377. For the three petrol stations that were inoperative prior to the Incorporation, the Tribunal will use the Claimants' projections, which were adopted by both experts. For those stations, exhibit NAV-141 does not provide any useful empirical evidence, as it

---

[431] Transcript 6 February 2018, 300-301 (testimony of Mr. Kaczmarek).

[432] Sénéchal Supplementary Report, § 34.

[433] *See* Sénéchal Supplementary Report, §§ 23, 34 and p. 12, Note to Table 1.

[434] Laber Statement, § 23, where Mr. Laber describes exhibit NAV-141 as "a market analysis we conducted in early 2015 of other petrol stations <u>we</u> renovated in Ukraine" (emphasis added).

[435] Kaczmarek Report, § 127; Sénéchal Supplementary Report, § 23.

does not address the impact of renovations on inoperative stations. Moreover, the Claimants' projected post-renovation fuel revenues for these three petrol stations appear to be reasonable when compared to the revenues projected by the Tribunal for the Claimants' other Crimean petrol stations, amounting to somewhat less than the other stations' individual revenues for 2015 (the year when the inoperative stations would have become active) and to revenues roughly similar to those of the other stations starting from 2016.[436]

378. In the absence of hard data regarding the impact of renovations on the convenience store sales,[437] the Tribunal will assume that such sales would have increased in the same proportion as fuel sales, with a growth rate of 167%, and not by the rate of 216% proposed by Mr. Sénéchal or the much higher rates claimed by the Claimants (see paragraph 371 above).

(e)   Discount rate

379. Mr. Kaczmarek's methodology to calculate the cost of capital (equity and debt) from 2014 to 2018 and, therefore, the rate to be applied to discount the value of free cash flows to the valuation date, is described at paragraphs 283-289 above. It includes the use of the WACC to determine the cost of capital and of the CAPM to compute the cost of equity. Overall, the Tribunal finds this methodology appropriate and so does Mr. Sénéchal. The Tribunal has, however, given particular consideration to some aspects of the cost of capital calculation.

380. Mr. Kaczmarek assessed the capital structure for the Claimants' investment and the beta variable in the CAPM formula (which reflects the volatility of the investment as compared to the market as a whole) by looking at other companies that he deemed comparable to the Claimants' Crimean business. In respect of the capital structure, he relied on comparables to use an optimal structure rather than the actual structure of the Claimants' business.[438] In the case of the beta, Mr. Kaczmarek explained that the beta of the Claimants, which are not publicly traded companies, could not be observed

---

[436]   *See* Sénéchal Second Supplementary Report, Adjusted financial model.

[437]   The Tribunal notes that exhibit NAV-141 contains data on the convenience store sales of only five of the twelve renovated stations (projecting revenues in the range of UAH 48,000-UAH 100,000 per year post-renovation). For the remainder of the stations, it is unclear whether there were no convenience store sales or whether the data is simply unavailable. The Tribunal considers this information insufficient to draw any conclusions.

[438]   Kaczmarek Report, § 201.

directly.[439] Accordingly, instead of looking at the Claimants, Mr. Kaczmarek averaged the capital structures and betas of two comparable companies, Galnaftogaz and Petrol Ljubljana, on the one hand, and of the automotive retail industry index in Europe, on the other hand.[440]

381. In his initial report, Mr. Sénéchal approved of Mr. Kaczmarek's use of comparables to determine the capital structure and the beta. He noted, however, that the approach could be improved by taking a larger sample of comparable companies and using a different industry index, such as, for example, an index for the oil distribution business in emerging markets.[441] At the hearing of 20 August 2018, Mr. Sénéchal did not restate these criticisms and agreed that no adjustments were needed to Mr. Kaczmarek's valuation. [442] He acknowledged that another industry index might not be more appropriate, as no index refers exclusively to companies in the retail petrol sales sector.[443] He was also comforted by the fact that the parameters derived from the two comparables and the industry index were similar.[444] Finally, Mr. Sénéchal emphasized that the capital structure proposed by Mr. Kaczmarek (a debt/equity ratio of 88%, implying 53% equity and 47% debt) was reasonable.[445]

382. Based on the descriptions of Galnaftogaz and Petrol Ljubljana provided by Messrs. Kaczmarek[446] and Sénéchal,[447] the Tribunal ascertained that the operations of these companies were sufficiently close to the Claimants' Crimean business to be comparable. The Tribunal's conclusion is reinforced by Mr. Sénéchal's assessment that Mr. Kaczmarek's approach to comparables is sound.

383. Furthermore, the Tribunal has given particular consideration to the appropriate country risk. In its view, there is no doubt that a country risk must be included in the cost of equity. In line with the conclusion reached above according to which the Russian

---

[439]   Kaczmarek Report, § 184.

[440]   Kaczmarek Report, § 201.

[441]   Sénéchal Report, p. 11 § 16, pp. 58-59 §§ 72-73, 75; Transcript 20 August 2018, 50/17-51/2 (testimony of Mr. Sénéchal).

[442]   Transcript 20 August 2018, 49-53 (testimony of Mr. Sénéchal).

[443]   Transcript 20 August 2018, 51/3-15 (testimony of Mr. Sénéchal).

[444]   Transcript 20 August 2018, 52/22-53/5 (testimony of Mr. Sénéchal).

[445]   Transcript 20 August 2018, 52/22-53/5 (testimony of Mr. Sénéchal); Sénéchal Report, p. 59 § 75.

[446]   Kaczmarek Report, §§ 212-213.

[447]   Sénéchal Report, p. 56, Table 8.

market is the relevant benchmark, the Tribunal will take into account the country risk prevailing in the Russian Federation.

384. As noted above, Mr. Kaczmarek opined that the primary risk factors to be considered in a "valuation analysis in the context of an arbitral proceedings such as this are currency risk, macroeconomic risks, and social risks," while "the level of legal risk, regulatory risk, and political risk […] should be excluded because these risks are controlled by the state (and arguably protected against under the BIT)."[448] On this basis, he proposed a country risk of 2%.[449] In contrast, Mr. Sénéchal was of the opinion that the country risk must factor in regulatory and political risks, adding that it may in any event not be possible to isolate the effect of such risks from currency, economic, and social risks.[450] In practice, Mr. Sénéchal derived the country risk from the CDS spread between March 2013 and March 2014, arriving at a country risk of 1.8%.[451]

385. Although they seemed to disagree on the inclusion of some risk components in the country risk for present purposes, it remains that both experts essentially agreed on a country risk in the range of 2%. Even though Mr. Sénéchal was in favor of incorporating more risk factors, he came up with a percentage slightly lower than the one put forward by Mr. Kaczmarek, and regarded a percentage of 2% as correctly reflecting Russian country risk. Overall, both quantum experts thus concurred that 2% would be an appropriate country risk for Russia.[452] On this basis, the Tribunal accepts 2% as the country risk.

386. In light of the above, the Tribunal finds that Mr. Kaczmarek's calculation of the discount rate is reasonable. It notes that Mr. Sénéchal opined likewise.

---

[448]   Kaczmarek Report, § 194. *See also* §§ 192-199.

[449]   Kaczmarek Report, § 199.

[450]   Sénéchal Report, p. 72 § 99.

[451]   Sénéchal Report, p. 74 §§ 102-103.

[452]   Kaczmarek Report, § 199; Transcript 20 August 2018, 53/25, 100/4-5, 106/5-9 (testimony of Mr. Sénéchal).

(f)    Terminal value

387.  To capture the value of all future cash flows expected to arise from the Claimants' investment after 2018, based on a constant growth model, Mr. Kaczmarek calculated a terminal value for the investment, applying the following formula:

Terminal Value = [FCFE_t * (1 + g)] / (r - g)

Where:

$FCFE_t$ = Free Cash Flow to equity in year t

g = Terminal Growth Rate

r = Cost of Capital[453]

388.  Mr. Kaczmarek proposed a terminal growth rate of 3.02%, equal to the sum of expected U.S. inflation in 2018 (1.98%) and 50% of the estimated growth in Russian petrol consumption in the same year (2.09% divided by two, which equals 1.04%).[454]

389.  Mr. Sénéchal confirmed that "[t]he approach and formula Mr. Kaczmarek used correctly reflect terminal value,"[455] but was of the view that Mr. Kaczmarek's terminal growth rate was overstated and failed to account for deteriorating macroeconomic conditions in the pre-Incorporation period and economic uncertainty and volatility post-Incorporation.[456]

390.  Mr. Sénéchal described the deteriorating macroeconomic conditions in Russia as follows:

Growth in Russia slowed from 5.1% in 2011 to 3.4% in 2012 and 1.8% in 2013. This is less than half the growth rate in the decade up to the 2009 crisis, which averaged 7% GDP growth per year (Figure 4). In 2012, policymakers and analysts warned about the downside risk in the economy. For instance, the World Bank Group highlighted the negative impacts of the structural crisis that started in 2012, showing economic activity in Russia had lost momentum, with growth in

---

[453]  Kaczmarek Report, p. 75, Figure 41.

[454]  Kaczmarek Report, § 204.

[455]  Sénéchal Report, p. 80 § 113.

[456]  Sénéchal Supplementary Report, §§ 40-44.

> 2013 seen falling from the previous year due to sagging global confidence, flat oil prices, high inflation, and sluggish domestic demand.
>
> From end 2013 to early 2014, Russia's economy was in a de facto recession with investment dropping rapidly, consumer demand slackening and real incomes falling.[457]

391. The Tribunal's expert further opined that "[p]olitical conditions in late 2013 and early 2014 contributed to a worsening economy and had a huge influence on the perception of market risk."[458] He then summarized his concerns as follows:

> Many economic uncertainties existed in the region then, including falling GDP in Russia and Ukraine, a protracted economic downturn in Ukraine and a structural crisis in Russia. Therefore, it is important to recognize that the terminal value has risk and that the businesses may never actually achieve the expected performance due to economic vulnerabilities and regional economic volatility. One should recall that the growth rate in the terminal value formula serves as a proxy for the expected future growth rate; the understanding that the businesses may not actually achieve the representative steady state in 2018 requires some adjustment.[459]

392. Thus, in his first report, Mr. Sénéchal proposed a growth rate based solely on the U.S. inflation rate of 1.98%.[460] In his Supplementary Report, he proposed a growth rate of 2.62%, corresponding to the sum of expected U.S. inflation from 2014 to 2018 (1.76%) and 50% of the estimated growth in Russian petrol consumption for the same period (1.73% divided by two, which equals 0.86%).[461]

393. Having examined the expert evidence, the Tribunal considers that it would be inappropriate to adopt a growth rate based solely on U.S. inflation, as this would essentially mean no expectation of growth for the Claimants' business after 2018. At the same time, the Tribunal is sensitive to Mr. Sénéchal's arguments regarding the

---

[457]   Sénéchal Report, p. 26 §§ 16-17. *See also* Sénéchal Report, p. 83 § 119.

[458]   Sénéchal Report, p. 42 § 40.

[459]   Sénéchal Supplementary Report, § 41. *See also* Sénéchal Report, pp. 7-8 §§ 3-5; Transcript 20 August 2018, 28/19-23, 47/2-13 (testimony of Mr. Sénéchal).

[459]   Sénéchal Report, p. 26 § 16, p. 29 § 21, p. 31 § 23.

[460]   Sénéchal Report, p. 13, § 23, p. 18, § h, p. 80, § 115.

[461]   Sénéchal Supplementary Report, §§ 40-44.

deteriorating macroeconomic conditions pre-Incorporation and the economic and sociopolitical uncertainties of 2014. The Tribunal notes that 2014 was a period of turmoil in the Crimean Peninsula, and in the relations between Ukraine and Russia generally. A hypothetical willing buyer and seller would no doubt have borne these uncertainties in mind when valuing an asset located in the Crimean Peninsula on 22 April 2014. In effect, Mr. Kaczmarek also recognized these uncertainties when, in calculating the terminal growth rate, he halved the estimated Russian petrol consumption for 2018. The remaining question is therefore whether Mr. Kaczmarek's growth rate sufficiently took into account these uncertainties or whether the further adjustment proposed by Mr. Sénéchal is required.

394. The difference between the experts is that Mr. Kaczmarek used the U.S. inflation rate and the Russian petrol consumption for the year 2018 (as forecast in 2014), when Mr. Sénéchal used the average of such parameters over the period 2014-2018. The Tribunal considers that taking variables over a period of time rather than for a specific year is more likely to result in a realistic prediction of growth, as it avoids attaching disproportionate weight to one year that may not be representative because of special circumstances. Moreover, in line with both experts' assessment, it appears reasonable to use only 50% of the forecast petroleum consumption growth in order to account for the uncertainties described above.

395. Accordingly, the Tribunal adopts Mr. Sénéchal's proposed growth rate of 2.62%, equal to the sum of expected U.S. inflation from 2014 to 2018 (1.76%) and 50% of the estimated growth in Russian petrol consumption for the same period (1.73% divided by two, which equals 0.86%). [462] The Tribunal notes that this growth rate is more consistent than Mr. Kaczmarek's proposal with the historical evolution of the Claimants' revenues in Crimea from 2008 to 2013, which did not show constant growth, but rather ups and downs with an overall positive trend. [463] In all other respects, the Tribunal accepts Mr. Kaczmarek's calculation of the terminal value, with which Mr. Sénéchal took no issue.

---

[462] Sénéchal Supplementary Report, §§ 40-44.

[463] Kaczmarek Report, p. 30, Figure 17. *See also* Transcript 20 August 2018, 55/20-25 (testimony of Mr. Sénéchal) ("And if I look at the past fluctuation, historical fluctuation, historical volatility, there is not a strong case of why that growth rate should be linear as well. If you use the growth rate, if you look at the past now, you can imagine that it also fluctuates and that you have also volatility.").

iii.    Comparable publicly traded company (CPTC) approach

396.  The Tribunal recalls that it has already accepted the implementation of the CPTC approach in the context of the calculation of the CAPM and especially of the capital structure and beta based on the two selected comparables, *i.e.*, Galnaftogaz and Petrol Ljubljana. For the reasons stated above, the Tribunal accepts his CPTC analysis. Its conclusion is confirmed by the fact that Mr. Sénéchal found no fault in the use of the CPTC by the Claimants' expert and that he also approved the allocation of 15% of the total valuation to the CPTC approach.

iv.    Stabil LLC's residential apartment

397.  In addition to the enterprise value of their 31 petrol stations and two storage facilities, the Claimants request compensation for the loss of Stabil LLC's residential apartment located at 20 Marka Donskogo Street in Simferopol, which, as noted at paragraph 229 above, was expropriated through the 3 September 2014 amendment to the Nationalization Decree.

398.  Mr. Kaczmarek valued the apartment by considering the listing prices in December 2015[464] of two other apartments located on the same street in Simferopol. From these listing prices, he derived an estimated price per square meter (US$ 963), which he applied to the surface area of Stabil LLC's apartment (37.7 m$^2$), arriving at a value of US$ 36,318.[465]

399.  The Tribunal considers that, in principle, the use of comparable properties constitutes an appropriate methodology for the valuation of residential real estate.[466] At the same time, Mr. Kaczmarek's implementation of this approach in the present case suffers from certain weaknesses.

400.  One such weakness is the minimal information provided about Stabil LLC's apartment, which makes it difficult to assess whether the chosen comparators are appropriate. In his report, Mr. Kaczmarek mentions only the apartment's address and its surface area,

---

[464]   While these listings post-date the valuation date of 3 September 2014, the Tribunal observes that the prices of real estate in Simferopol decreased between the valuation date and December 2015 (NAV-148), such that the use of listings from December 2015 does not lead to an overstatement of the value of Stabil LLC's apartment.

[465]   Kaczmarek Report, § 206.

[466]   *See, e.g., Everest*, Award on the Merits, § 265 (2 May 2018) (CLA-278), where the tribunal accepted this methodology for the valuation of residential properties in Crimea.

and selects the comparable properties apparently on the sole basis that they are located on the same street and are "similarly-sized". [467] Stabil LLC's apartment is described in the sale and purchase agreement as consisting of "three habitable rooms, indicated on the plan by Nos. 4, 5 and 8, with a total area of 37.7 m$^2$, entrance hall No. 1, closet No. 2, kitchen No. 3, bathroom No. 6, water closet No. 7, recessed balcony, and protruding balcony." [468] No information is provided, however, on the condition of Stabil LLC's apartment and of the comparable properties selected, although such information would shed light on the value of the apartment and the appropriateness of the comparators. Additionally, the number of available comparators is relatively low. In light of the uncertainties arising from these circumstances, the Tribunal considers it appropriate to reduce Mr. Kaczmarek's estimated value for Stabil LLC's apartment by 15%.

401.   Another weakness is that Mr. Kaczmarek uses listing rather than actual sales prices for the comparable properties. While information regarding actual prices may not be available with the result that list prices are the best available data, it remains that list prices are typically higher than sales prices. In the *Everest* case, where Mr. Kaczmarek acted for the claimants and valued several real estate properties in Crimea, he acknowledged this fact and "decreas[ed] the resulting list price for Claimants' real estate properties by 10 percent to account for the typical difference between list prices (*i.e.*, the seller's asking price) and sales prices (*i.e.*, the final price agreed to by a buyer and seller)."[469] The *Everest* tribunal accepted this approach and this Tribunal considers that it would be similarly appropriate in the present case. Mr. Kaczmarek's estimated value for Stabil LLC's apartment will therefore be reduced by a further 10% (which is equivalent to reducing the list prices of the comparable properties by 10%).

402.   For completeness, the Tribunal notes that, in December 2002, the apartment was bought by Stabil LLC for UAH 51,230.00.[470] However, that transaction took place too long ago to provide a reliable indicator of value.

---

[467]   Kaczmarek Report, § 218.

[468]   Apartment Sale and Purchase Agreement (25 December 2002) (NAV-143).

[469]   *Everest*, Award on the Merits, § 117, quoting Mr. Kaczmarek's expert report in that case. The approach proposed by Mr. Kaczmarek was accepted by the *Everest* tribunal (§ 274).

[470]   Apartment Sale and Purchase Agreement (25 December 2002), § 3 (NAV-143).

403. Thus, in summary, the Tribunal reduces the value estimated by Mr. Kaczmarek by 25% and awards Stabil LLC compensation for the loss of its apartment in the amount of US$ 27,238.

v.   Conclusion

404. As stated at paragraphs 376-378 and 395 above, the Tribunal has decided to adjust the Claimants' valuation by (i) recalculating the impact of the planned renovations on the projected cash flows for 2014-2018; and (ii) using a different growth rate in the calculation of the terminal value.

405. As calculated by Mr. Sénéchal, the effect of these adjustments is as follows (all amounts in US$):

| | | |
|---|---|---|
| **DCF approach** | Enterprise value per Kaczmarek Report | 46,340,006 |
| | Renovation plans adjustment | (10,899,940) |
| | Growth rate adjustment | (2,520,195) |
| | Adjusted enterprise value | 32,919,871 |
| **CPTC approach** | Enterprise value per Kaczmarek Report | 53,207,543 |
| | Adjusted enterprise value[471] | 43,868,564 |
| **Weighted DCF and CPTC approaches (85% and 15% respectively)** | Enterprise value per Kaczmarek Report | 47,370,137 |
| | Adjusted enterprise value | 34,562,175 |

406. As the Claimants have asked for an award allocating the total enterprise value of their 31 Crimean petrol stations and two storage facilities among them, the Tribunal,

---

[471] The changes to Mr. Kaczmarek's DCF analysis have an impact on the Claimants' average EBITDA for 2014-2018, which requires a corresponding adjustment in the CPTC model. *See* Sénéchal Supplementary Report, § 47.

applying the methodology used by Mr. Kaczmarek, hereby grants the individual Claimants compensation for the expropriation of their 31 Crimean petrol stations and two storage facilities by the Russian Federation as follows:

| Claimant | Type | No. of Stations/ Facilities | Amount of Compensation (in US$) |
|----------|------|-----------------------------|---------------------------------|
| Stabil LLC | Station Owner | 11 | 2,964,057 |
| Rubenor LLC | Station Owner | 2 | 534,105 |
| Rustel LLC | Station Owner | 9 | 2,403,473 |
| Novel-Estate LLC | Station Owner | 4 | 1,068,210 |
| Crimea-Petrol LLC | Station Owner | 1 | 267,053 |
| PII Kirovograd-Nafta LLC | Station Owner | 3 | 801,158 |
| Pirsan LLC | Station Owner | 1 | 267,053 |
| Trade Trust LLC | Lessee | 13 | 10,280,111 |
| Elefteria LLC | Lessee | 18 | 14,234,000 |
| VKF Satek LLC | Storage Facility Owner | 1 | 871,478 |
| Stemv Group LLC | Storage Facility Owner | 1 | 871,478 |

407. The Tribunal also awards Stabil LLC compensation for the expropriation of its apartment in Simferopol in the amount of US$ 27,238.

### (e)   Interest

#### i.   The Claimant's position

408. The Claimants ask the Tribunal to award it compound interest on any amount granted in this Award from 22 April 2014 until full payment is made.[472]

409. According to the Claimants, the rate of interest fixed in Article 5(2) of the BIT only applies in cases of lawful expropriation and is, therefore, inapplicable here.[473] The

---

[472]   Statement of Claim, § 4.1.

Claimants thus ask the Tribunal to consider three commercial interest rates:[474] (i) the U.S. prime rate plus 2%;[475] (ii) the 12-month London Interbank Offered Rate (LIBOR) plus 4%;[476] and (iii) the yield on the Russian Federation's U.S. dollar denominated bonds, which represents the cost of raising money for the Russian government.[477] According to Mr. Kaczmarek, the latter rate is reasonable since the Claimants are now an unwilling lender to the Russian Federation.[478]

   ii. Analysis

410. Article 5(2) of the Treaty provides for the payment of interest "accruable from the date of expropriation until the date of payment, at the interest rate for three-month deposits in US dollars on the London Interbank Market (LIBOR) plus 1%."

411. It is true that the standard of compensation set forth in Article 5(2) of the Treaty applies only in the event of lawful expropriation. This is equally true of the interest rate specified in that provision. At the same time, the Tribunal considers that this provision is indicative of the Contracting Parties' view that LIBOR constitutes an appropriate basis for the calculation of late interest. Moreover, the Tribunal sees no reason why late interest which compensates for the fact that funds payable to a creditor were not available to him during a certain period of time, should be set differently in case of a lawful act of expropriation as opposed to an unlawful one. Finally, the Tribunal considers that compound interest is a better reflection of the standard of full reparation than simple interest. Had the Claimants received compensation for their investment on the date of expropriation, they would have been in a position to earn interest, which would have been compounded over time.[479]

---

[473] Statement of Claim, § 3.115.

[474] Statement of Claim, § 3.115.

[475] Kaczmarek Report, § 229.

[476] Kaczmarek Report, § 230.

[477] Kaczmarek Report, § 231.

[478] Kaczmarek Report, § 231.

[479] *See Quasar de Valores SICAV S.A. v. Russian Federation*, SCC Case No. 24/2007, Award, § 226 (20 July 2012) (CLA-68) ("[…] the proper measure of compensation under general principles of international law should put [the Claimants] into the position they would have been in if there had been compliance with the BIT, that is to say compensation would have been paid to the Claimants upon the expropriation of Yukos and they would have been in a position to earn interest thereon […] as a matter of realism this includes the compounding of interest."); *Vivendi v. Argentine Republic* (*Vivendi II*), ICSID Case No. ARB/97/3, Award, §§ 9.2.4, 9.2.5, 9.2.6 (20 August 2007) (CLA-80), *referring to Compañía del Desarrollo de Santa Elena, S.A. v. The*

412. In view of these considerations and all relevant circumstances of the case, the Tribunal awards the Claimants interest on the compensation granted in this Award from 22 April 2014 until the date of payment at LIBOR for three month deposits in U.S. dollars plus 1%, compounded annually.

## VII.   COSTS

### A.   THE CLAIMANTS' POSITION

413. The Claimants submit that the Respondent should bear all the costs and legal fees incurred by them in connection with this arbitration, including: (i) arbitration costs (comprised of the Claimants' deposits for the fees and expenses of the Tribunal, the PCA, and the appointing authority); (ii) legal fees; (iii) expert witness fees and expenses; (iv) other expenses (*e.g.*, translation, travel, shipping, and printing expenses); and (v) interest thereon.[480] The Claimants further ask the Tribunal to allocate any awarded costs equally among them (*i.e.*, to allocate 9,091% of costs to each Claimant).

### B.   RELEVANT PROVISIONS

414. Article 38 of the UNCITRAL Rules, defining the "costs of arbitration", states as follows:

> The arbitral tribunal shall fix the costs of arbitration in its award. The term "costs" includes only:

---

*Republic of Costa Rica,* ICSID Case No. ARB/96/1, Award, 17 February 2000, § 104 ("[T]he award of compound interest is no longer the exception to the rule […] The tribunal [in *Santa Elena*] had noted that where the owner of property has lost the value of his asset but not been timely  compensated, the amount of compensation that is later awarded '[…] should reflect, at least in part, the additional sum that his money would have earned, had it, and the income generated by it, been reinvested each year at generally prevailing rates of interest.' Reflecting this rationale, a number of international tribunals have recently expressed the  view that compound interest should  be available as a matter of course if economic reality requires such an award to place the claimant in the position it would have been had it never been injured (i.e. the wrongful act had not taken place.)"); *Siemens A.G. v. Argentine Republic, Republic of Egypt*, ICSID Case No. ARB/98/4, Award, §§ 129-130 (8 December 2000) (CLA-74). *See also* John Gotanda, *A Study of Interest*, Villanova Public Law and Legal Theory Working Paper Series (2007), pp. 23-31 (CLA-99) ("the trend in investment disputes has been for tribunals to award interest at market rates and on a compound basis […] the approach taken by these investment arbitration tribunals better compensates claimants for the loss of the use of money; interest awarded at market rates    and on a compound basis more accurately reflects what the claimant would have been able to earn on the sums owed if they had been paid in a timely manner.").

[480]   Application for Costs, § 17; Statement of Claim, § 4.1(c).

(a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 39;

(b) The travel and other expenses incurred by the arbitrators;

(c) The costs of expert advice and of other assistance required by the arbitral tribunal;

(d) The travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;

(e) The costs for legal representation and assistance of the successful party if such costs were claimed during the arbitral proceedings, and only to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;

(f) Any fees and expenses of the appointing authority as well as the expenses of the Secretary-General of the Permanent Court of Arbitration at The Hague.

415. Article 40 of the UNCITRAL Rules provides, in respect of the allocation of costs:

1. Except as provided in paragraph 2, the costs of arbitration shall in principle be borne by the unsuccessful party. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that appointment is reasonable, taking into account the circumstances of the case.

2. With respect to the costs of legal representation and assistance referred to in article 39, paragraph (e), the arbitral tribunal, taking into account the circumstances of the case, shall be free to determine which party shall bear such costs or may apportion such costs between the parties if it determines that apportionment is reasonable.

## C.   COSTS OF THE TRIBUNAL, THE APPOINTING AUTHORITY AND THE PCA

416. In accordance with Article 41 of the UNCITRAL Rules, a tribunal may request the parties to make deposits in equal shares as advances for the costs of arbitration. In the event that a party has not paid its share of a deposit within 30 days of a request,

the tribunal "shall so inform the parties in order that one or another of them may make the required payment."

417. In these proceedings, the Tribunal requested deposits from the Parties on six occasions, in a total amount of EUR 352,500 from each Party. The Claimants paid their share of the requested deposits in full. Since the Respondent did not pay any of its shares of the requested deposits, the Tribunal requested the Claimants to make substitute payments for the Respondent's shares, which they did, in an amount of EUR 352,500. Accordingly, the Claimants deposited with the PCA a total of EUR 705,000.

418. The fees and expenses in these proceedings of Mr. Daniel M. Price, the arbitrator appointed on behalf of the Claimants, amount respectively to EUR 90,180 and EUR 14,934.59.

419. The fees and expenses in these proceedings of Professor Brigitte Stern, the arbitrator appointed by the appointing authority on behalf of the Respondent, amount respectively to EUR 120,900 and EUR 7,696.81.

420. The fees and expenses in these proceedings of Professor Gabrielle Kaufmann-Kohler, the Presiding Arbitrator, amount respectively to EUR 176,430 and EUR 6,995.90.

421. Pursuant to PO1, Ms. Eva Kalnina was appointed as Secretary to the Tribunal and the PCA was designated to serve as registry in these proceedings. By letter of 22 April 2016, the Tribunal indicated that the PCA would assist the Secretary in her tasks.[481] Ms. Kalnina's fees and expenses amount respectively to EUR 71,295 and EUR 3,780. The PCA's fees and expenses amount respectively to EUR 86,977.25 and EUR 2,455.70.

422. The Tribunal also appointed an expert on quantum, Mr. Thierry Sénéchal. His fees and expenses amount respectively to EUR 63,125 and EUR 176.

423. Other arbitration costs, including the costs of hearing facilities, court reporters, translation and interpretation, IT equipment, bank transactions, and all other expenses relating to the proceedings, amount to EUR 40,388.76.

---

[481] *See* §§17, 21, 26 above.

424. Based on the above figures, the costs of the Tribunal, comprising the items covered in Article 38(a) to (c) of the UNCITRAL Rules, total EUR 685,335.01. After payment of these costs from the deposit, an unexpended balance of EUR 19,664.99 remains. This balance will be reimbursed by the PCA to the Claimants in accordance with Article 41(5) of the UNCITRAL Rules.

425. Additionally, the Claimants have paid EUR 750 to the PCA for the designation of an appointing authority and EUR 1,000 to the appointing authority for the appointment of an arbitrator. Thus, the costs under Article 38(f) of the UNCITRAL Rules total EUR 1,750.

### D.   COSTS OF LEGAL REPRESENTATION AND ASSISTANCE

426. In respect of their costs of legal representation and assistance, the Claimants seek US$ 5,333,120.96, comprising legal fees (US$ 4,404,266.09), expert witnesses' fees and expenses (US$ 598,503.37), and other expenses incurred in presenting the case (US$ 330,351.50).[482]

427. The Tribunal notes that these costs fall within the definition of costs in Article 38(d) and (e) of the UNCITRAL Rules and have been duly justified with evidence submitted with the Claimants' Application for Costs. The Tribunal considers that the amount of such costs is reasonable.

### E.   ALLOCATION OF COSTS

428. Article 40 of the UNCITRAL Rules provides that the unsuccessful party shall "in principle" bear all the costs of arbitration, while the arbitral tribunal has discretion to apportion such costs between the parties if it determines that apportionment is reasonable taking into account the circumstances of the case. With regard to the costs of legal representation and assistance, the UNCITRAL Rules contain no presumption for awarding them to the successful party but rather provide that in apportioning these costs, the arbitral tribunal should consider "the circumstances of the case." The circumstances to be taken into account may include, *inter alia*, an overall view of the case, the novelty of the case, and the parties' respective degree of success.

429. In the present proceedings, the Claimants have prevailed on jurisdiction and liability, and been partially successful with their damages claim. Hence, in the exercise of its

---

[482]   Application for Costs, §§ 9-16.

discretion under Article 40 of the UNCITRAL Rules in matters of allocation of costs, the Tribunal finds it fair and appropriate that the Respondent shall bear the costs of the arbitration, as well as the costs of legal representation and assistance of the Claimants, in a proportion that reflects the Claimants' win on jurisdiction and liability as well as it partial win on quantum. Under the circumstances, it sets this percentage at 75%. Accordingly, the Respondent shall pay the Claimants 75% of all costs, amounting to EUR 515,313.76 [483] and US$ 3,999,840.72. [484] These costs shall be allocated equally among the Claimants (*i.e.*, 9,091% of costs to each Claimant).

## VIII.  OPERATIVE PART

430.  For the reasons set forth above, the Tribunal decides as follows:

(i)  Declares that the Respondent has breached Article 5 of the Treaty in respect of the Claimants' investment;

(ii)  Orders the Respondent to pay forthwith compensation to the Claimants for the expropriation of their petrol stations and storage facilities, in the following amounts, in each case plus interest from 22 April 2014 until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually:

a.  to Stabil LLC: US$ 2,964,057;

b.  to Rubenor LLC: US$ 534,105;

c.  to Rustel LLC: US$ 2,403,473;

d.  to Novel-Estate LLC: US$ 1,068,210;

e.  to PII Kirovograd-Nafta LLC: US$ 801,158;

f.  to Crimea-Petrol LLC: US$ 267,053;

g.  to Pirsan LLC: US$ 267,053;

h.  to Trade-Trust LLC: US$ 10,280,111;

i.  to Elefteria LLC: US$ 14,234,000;

j.  to VKF Satek LLC: US$ 871,478;

---

[483] (EUR 685,335.01 + EUR 1,750)*0.75

[484] US$ 5,333,120.96*0.75

k.  to Stemv Group LLC: US$ 871,478;

(iii)   Orders the Respondent to pay forthwith compensation to Claimant Stabil LLC for the expropriation of its residential apartment, in the amount of US$ 27,238, plus interest from 3 September 2014 until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually;

(iv)   Fixes the costs of arbitration at EUR 687,085.01;

(v)   Decides that the Respondent shall bear 75% of the costs of arbitration fixed in the preceding paragraph and of the Claimants' costs of legal representation and assistance, and thus orders the Respondent to pay EUR 46,846.71 and US$ 363,621.88 to each Claimant, plus interest from the date of this Award until payment in full, at LIBOR for three month deposits in U.S. dollars, plus 1%, compounded annually;

(i)   Dismisses all other claims.

Seat of arbitration: Geneva

Date: 12 April 2019

_____
Mr. Daniel M. Price
Arbitrator

_____
Professor Brigitte Stern
Arbitrator

_____
Professor Gabrielle Kaufmann-Kohler
Presiding Arbitrator