**UNDER THE 1976 ARBITRATION RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW**

**STABIL LLC; RUBENOR LLC; RUSTEL LLC; NOVEL-ESTATE LLC; PII KIROVOGRAD-NAFTA LLC; CRIMEA-PETROL LLC; PIRSAN LLC (THE "PETROL STATION OWNERS")**

**–AND–**

**TRADE-TRUST LLC AND ELEFTERIA LLC (THE "PETROL STATION LESSEES")**

**–AND–**

**VKF SATEK LLC AND STEMV GROUP LLC (THE "STORAGE FACILITY OWNERS")**

**(Ukraine)**

Claimants

v.

**THE RUSSIAN FEDERATION**

Respondent

---

**NOTICE OF ARBITRATION**

3 JUNE 2015

---

## Table of Contents

Page

I.    Demand for Arbitration ...................................................................................1

II.   The Parties ......................................................................................................1

      A.    Claimants ...............................................................................................1

      B.    Respondent.............................................................................................3

III.  The Agreement to Arbitrate.............................................................................4

      A.    The Conditions Attached to the Russian Federation's Offer in the
            BIT to Arbitrate Disputes Have Been Satisfied .....................................5

            (1)    The dispute is between a Contracting Party to the BIT and
                   investors of the other Contracting Party .......................................6

            (2)    The dispute arose in connection with the Petrol Companies'
                   investments ...................................................................................6

                   (a)    The Petrol Companies made investments within the
                          meaning of Article 1(1) of the BIT .....................................6

                   (b)    The Petrol Companies' investments were "on the territory"
                          of the Russian Federation....................................................8

            (3)    The Petrol Companies notified the Russian Federation in writing of
                   the existence of a dispute in connection with their investments...............12

            (4)    More than six months have elapsed since the Petrol Companies
                   served formal notice on the Russian Federation .........................12

      B.    The Petrol Companies Accept the Russian Federation's Offer in
            the BIT to Arbitrate..............................................................................13

IV.   The Russian Federation's Measures Against the Petrol Companies Violated
      The BIT ..........................................................................................................14

      A.    The Russian Federation's Measures ........................................................14

            (1)    The Russian Federation disrupted the Petrol Companies'
                   operations after the annexation of Crimea .................................14

            (2)    The Russian Federation nationalized the Petrol Companies'
                   investments based on their association with Mr. Kolomoisky and
                   PrivatBank.................................................................................15

i

(a)  The State Council of the Republic of Crimea nationalized the Petrol Companies' properties ...................................................15

(b)  The Government of the Federal City of Sevastopol nationalized the Petrol Companies' properties .............................18

B.  The Breaches of the BIT .......................................................................19

(1)  The Russian Federation Breached Article 2 of the BIT............................19

(2)  The Russian Federation Breached Article 3 of the BIT............................20

(3)  The Russian Federation Breached Article 5 of the BIT............................22

(4)  The Russian Federation Breached Article 6 of the BIT............................22

V.   Relief Sought ....................................................................................................24

VI.  Procedural Matters............................................................................................24

Annex A – Claimants and Registered Addresses

Annex B – Claimants' Properties Expropriated by the State Council of the Republic of Crimea

Annex C – Claimants' Properties Expropriated by the Sevastopol Government

65958773_1

## I.    DEMAND FOR ARBITRATION

1.    This Notice of Arbitration concerns a dispute between the Petrol Station Owners, the Petrol Station Lessees, and the Storage Facility Owners (together, the "Petrol Companies" or "Claimants"), all as defined in paragraph 3 below, and the Government of the Russian Federation ("Russian Federation" or "Respondent"), within the meaning of Article 9 of the Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments (the "Bilateral Investment Treaty" or "BIT").  The BIT was signed on 27 November 1998 and entered into force on 27 January 2000.  A Russian language copy of the BIT (and a certified English translation) is attached hereto as Claimant's Exhibit ("CE") 1-R and a Ukrainian language copy is attached as CE-1-U.[1]

2.    The Petrol Companies submit this Notice of Arbitration in accordance with Article 3 of the 1976 Arbitration Rules of the United Nations Commission on International Trade Law ("UNCITRAL") and demand arbitration of their dispute with the Russian Federation pursuant to Article 9 of the BIT.

## II.    THE PARTIES

### A.    Claimants

3.    The Claimants are eleven companies organized under the laws of Ukraine.  For ease of reference, this Notice of Arbitration groups the Claimants as follows:

- The Petrol Station Owners are:  Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol, LLC, and Pirsan LLC;

---

1.    Article 14 of the BIT provides that it was "Executed in Moscow on November 27, 1998 in two counterparts, each one in the Russian and the Ukrainian languages, both texts having equal force."  A Russian language version of the BIT is available in the following collection of documents:  U.U. Berestnev, *Agreements for Protection and Promotion of Investments:  Collection of Documents* (2002).  A Ukrainian language version of the BIT is available at the Ukrainian Parliament's website:  http://zakon4.rada.gov.ua/laws/show/ru/643_101.

- The Petrol Station Lessees are:  Trade-Trust LLC and Elefteria LLC;

- The Storage Facility Owners are:  VKF Satek LLC and Stemv Group LLC.

Claimants' registered addresses are set forth in Annex A to this Notice of Arbitration. Correspondence addressed to Claimants should be sent to their counsel at the addresses set forth in paragraph 7 below.

4.      Before the Russian Federation targeted Claimants in violation of the BIT (described in Section IV below), the Petrol Station Owners owned 31 petrol stations on the Crimean Peninsula, as well as other real estate properties and land plots.  The Petrol Station Owners leased their stations to the Petrol Station Lessees, which operated the network of Crimean stations.  The Storage Facility Owners owned two facilities on the Crimean Peninsula that supplied reserve fuel to the Petrol Station Owners' and Petrol Station Lessees' petrol stations in the event of market fluctuations or shortages.

5.      The following map illustrates the approximate locations of the Petrol Companies' stations on the Crimean Peninsula.



6.     The ultimate beneficial owners of the Petrol Companies include Mr. Igor

Kolomoisky.  Mr. Kolomoisky is a Ukrainian businessman and the former Governor of the

Dnipropetrovsk Oblast State Administration in Ukraine.  He has publicly opposed the annexation

of Crimea by the Russian Federation and the Russian Federation's organization and support of

illegal armed groups in eastern Ukraine.  Mr. Kolomoisky has also been an outspoken critic of

the policies of the Russian Federation authorities towards Ukraine.

7.     The Petrol Companies are represented by:[2]

> Mr. John M. Townsend
> Mr. James H. Boykin
> Mr. Vitaly Morozov
> Hughes Hubbard & Reed LLP
> 1775 I Street, N.W.
> Washington, DC 20006
> United States of America
> Tel: +1 202 721 4600
> john.townsend@hugheshubbard.com
> james.boykin@hugheshubbard.com
> vitaly.morozov@hugheshubbard.com
>
> Mr. Marc-Olivier Langlois
> Mr. Leon Ioannou
> Hughes Hubbard & Reed LLP
> 8, rue de Presbourg
> 75116 Paris
> France
> Tel: +33 1 44 05 80 00
> marcolivier.langlois@hugheshubbard.com
> leon.ioannou@hugheshubbard.com

**B.     Respondent**

8.     Respondent is the Government of the Russian Federation, a sovereign state and a

Contracting Party to the BIT.  This Notice of Arbitration is being sent to the following

representatives of Respondent:

---

2.     *See* Powers of Attorney for the Petrol Companies (**CE-2**).

His Excellency Vladimir V. Putin
President of the Russian Federation
23 Ilyinka Ulitsa
Moscow 103132
The Russian Federation
8 (800) 200-23-16

His Excellency Dimitry A. Medvedev
Prime Minister of the Russian Federation
Government of the Russian Federation Building
2 Krasnopresnenskaya Naberezhnaya
Moscow 103274
The Russian Federation
8 (800) 200-84-42

His Excellency Anton G. Siluanov
Minister of Finance of the Russian Federation
Ministry of Finance
9 Ilyinka Ulitsa
Moscow 109097
The Russian Federation
(495) 987-91-01

His Excellency Alexander V. Konovalov
Minister of Justice of the Russian Federation
Ministry of Justice
Ulitsa Zhitnaya, Dom 14
GSP-1
Moscow 119049
The Russian Federation
(495) 955-59-99

His Excellency Sergei V. Lavrov
Minister of Foreign Affairs of the Russian Federation
Ministry of Foreign Affairs
Smolenskaya-Sennaya Pl., 32/34
Moscow 119200
The Russian Federation
(499) 244-16-06

## III.    THE AGREEMENT TO ARBITRATE

9.    In Article 9 of the BIT, the Russian Federation made a standing offer to arbitrate

disputes that arise with Ukrainian investors in connection with their investments on the territory

of the Russian Federation:

"1.     Any dispute between either Contracting Party and an investor of the other Contracting Party arising in connection with the investments, including disputes concerning the amount, terms, and payment procedures of the compensation provided for by Article 5 hereof, or the payment transfer procedures provided for by Article 7 hereof, shall be subject to a written notice, accompanied by detailed comments, which the investor shall send to the Contracting Party involved in the dispute. The parties to the dispute shall endeavor to settle the dispute through negotiations if possible.

2.     If the dispute cannot be resolved in this manner within six months after the date of the written notice mentioned in Section 1 of this article, it shall be referred to:

         a)     a competent court or arbitral tribunal of the Contracting Party on whose territory the investments were made;

         b)     the Arbitration Institute of the Stockholm Chamber of Commerce;

         c)     an "ad hoc" arbitration tribunal, in conformity with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).

3.     The arbitral award shall be final and binding upon both parties to the dispute. Each Contracting Party agrees to execute such awards in conformity with its respective laws."

**A.     The Conditions Attached to the Russian Federation's Offer in the BIT to Arbitrate Disputes Have Been Satisfied**

10.     Article 9 of the BIT establishes four conditions that must be satisfied before an investor can initiate arbitration against a Contracting Party:  (1) there must be a dispute between a Contracting Party to the BIT and an investor of the other Contracting Party to the BIT; (2) that dispute must "aris[e] in connection with the investments"; (3) the investor must provide written notice to the Contracting Party of the existence of a dispute so that the investor and the Contracting Party can "endeavor to settle the dispute through negotiations"; and (4) at least six months must have elapsed from the date on which the pertinent Contracting Party was provided with notice of the dispute.  All of Article 9's requirements have been satisfied.

**(1)    The dispute is between a Contracting Party to the BIT and investors of the other Contracting Party**

11.    Ukraine and the Russian Federation are both Contracting Parties to the BIT.

12.    Article 1(2)(b) of the BIT defines "Investor of a Contracting Party" as "any legal entity formed under the laws of the given Contracting Party, on the condition that the said legal entity is legally authorized under the laws of its respective Contracting Party to make investments on the territory of the other Contracting Party."[3]  The Petrol Companies are legal entities incorporated in Ukraine.  Their investments in Crimea were lawful under the laws of Ukraine when they were made.  The Petrol Companies are thus "investors" for the purposes of Article 1(2)(b) of the BIT.

13.    Therefore, the dispute between the Petrol Companies and the Russian Federation is a dispute between investors of a Contracting Party to the BIT (Ukraine) and the other Contracting Party (the Russian Federation).

**(2)    The dispute arose in connection with the Petrol Companies' investments**

14.    The present dispute arose in connection with the Petrol Companies' investments on the territory of the Russian Federation and the Russian Federation's breaches of its obligations owed to the Petrol Companies and their investments under the BIT.  Those breaches are described in Section IV below.

**(a)    The Petrol Companies made investments within the meaning of Article 1(1) of the BIT**

15.    Article 1(1) of the BIT defines "Investments" as follows:

"[A]ll kinds of material and intellectual property contributed by an investor of one Contracting Party on the territory of the other Contracting Party in conformity with the latter's laws, including:

---

3.      BIT, Art. 1(2)(b) (**certified English translation of CE-1-R**).

a)      movable and immovable property, as well as the associated property rights;

b)      cash, as well as securities, commitments, contributions and other forms of participation;

c)      intellectual property rights, including copyrights and related rights, trademarks, rights to inventions, industrial samples, models, engineering processes and know-how; [and]

d)      rights to engage in commercial activity, including rights to the exploration, development and exploitation of natural resources."

16.     Between 2000 and 2010, the Petrol Station Owners acquired title to 31 petrol stations in Crimea through which they sold fuel and other goods directly to the public.  The Petrol Companies owned the land plots on which those stations were built, as well as other real estate.

17.     The Petrol Station Lessees obtained the rights to operate the Petrol Station Owners' stations in 2010 and 2011 through a series of lease agreements with the Petrol Station Owners.

18.     The Petrol Station Lessees obtained all permits and licenses necessary to operate petrol stations in Crimea and they kept these permits and licenses current at all times.

19.     The Petrol Station Lessees entered into contracts with vendors that provided goods and services integral to the operations of the Petrol Station Lessees' stations, including, but not limited to, petroleum and LPG suppliers; shipping companies that transported fuel from those suppliers to the Petrol Station Lessees' Crimean petrol stations; and contractors that provided, among other things, solid waste removal, electric power supply, and telecommunications.

20.     Claimants made investments in equipment in connection with the operations of their Crimean petrol stations.  Further, Claimants modernized, renovated, or made extensive repairs to several of their petrol stations.

21.      The Storage Facility Owners held title to two storage facilities in Crimea.  The Storage Facility Owners entered into lease agreements with another company that operated those two facilities.[4]

22.     The Petrol Companies' property and contract rights and their operations in Crimea, described above, qualify as "investments" under Article 1(1) of the BIT.

**(b)     The Petrol Companies' investments were "on the territory" of the Russian Federation**

23.     Prior to the events described below, Crimea was part of the territory of Ukraine. In 1954, the Supreme Soviet of the Union of Soviet Socialist Republics (the "USSR") adopted an edict approving the transfer of the "Crimean Oblast" from the Russian Soviet Federative Socialist Republic to the Ukrainian Soviet Socialist Republic.[5]  Upon dissolution of the USSR in 1991, the Crimean Peninsula remained a part of the newly independent Ukraine as the Autonomous Republic of Crimea and the City with Special Status Sevastopol.  However, when the Russian Federation occupied the Crimean Peninsula beginning in February 2014, it became part of the Russian Federation's territory for the purposes of Article 1(1) of the BIT, and the Petrol Companies' investments were therefore "on the territory" of the Russian Federation.

24.     The Russian Federation made the Crimean Peninsula part of its territory *de facto* when it established control over the Peninsula through military force.  Beginning in late February

---

4.     The lessee of these facilities is not a party to the present dispute.

5.     Presidium of the Supreme Soviet of the USSR, Edict On the Transfer of the Crimea Region from the RSFSR to the Ukrainian SSR dated 19 Feb. 1954.

2014, the Russian Federation commenced a military operation that swiftly established physical possession and control of Crimea.[6]  By 27 February 2014, the Russian flag was flying over Autonomous Republic of Crimea administrative buildings, including Parliament, all of which were guarded by Russian Federation soldiers.[7]  Access to Crimea, whether by air, sea, or land, was also under Russian Federation control.[8]  Russian Federation control over Crimea extended to blocking telecommunications.[9]

25.     Although Russian Federation officials initially denied that the Russian military was engaged on the Crimean Peninsula, Russian President Vladimir Putin later admitted that the armed forces in Crimea were Russian military personnel.[10]  In a 17 November 2014 interview with the German news service ARD, President Putin said, "Yes, I make no secret of it, it is a fact and we never concealed that our Armed Forces, let us be clear, blocked Ukrainian armed forces stationed in Crimea."[11]  More recently, President Putin admitted in a documentary aired on

---

6.      *See, e.g.,* Paul Lewis, Spencer Ackerman, and Jon Swaine, *US concedes Russia has control of Crimea and seeks to contain Putin*, The Guardian (3 March 2014) ("The US conceded on Sunday that Moscow had '*complete operational control of the Crimean peninsula*' and announced that the secretary of state, John Kerry, will fly to Kiev in an attempt to halt a further Russian advance into Ukraine") (emphasis added) (**CE-3**).

7.      Harriet Salem, Shaun Walker, and Luke Harding, *Crimean parliament seized by unknown pro-Russian gunmen*, The Guardian (27 Feb. 2014) (**CE-4**); David M. Herszenhorn, Mark Landler, and Alison Smale, *With Military Moves Seen in Ukraine, Obama Warns Russia*, The New York Times (28 Feb. 2014) (**CE-5**).

8.      Paul Sonne, *Crimea Checkpoints Raise Secession Fears*, The Wall Street Journal (28 Feb. 2014) (**CE-6**); *Russian navy blocks channel between Crimea, Russia - Ukraine border guards*, Reuters (4 March 2014) (**CE-7**); The New York Times (28 Feb. 2014) (reporting on the seizure of Crimea's main airports) (**CE-5**).

9.      Pavel Polityuk and Jim Finkle, *Ukraine says communications hit, MPs phones blocked*, Reuters (4 March 2014) (**CE-8**).

10.     *Direct Line with Vladimir Putin*, President of Russia Official Website (17 April 2014) (**CE-9, p. 16**); *see also Putin reveals secrets of Russia's Crimea takeover plot*, BBC.com (9 March 2015) (**CE-10**); *Interview to German TV channel ARD*, President of Russia Official Website (17 Nov. 2014) (**CE-11**).

11.     President of Russia Official Website (17 Nov. 2014) (**CE-11**).

Russian TV that he commenced "the work to bring Crimea back into Russia" in February 2014.[12]

President Putin has also declared 27 February – the date on which Russian forces seized the

Autonomous Republic of Crimea Parliament building – to be a national holiday:  "Special

Operations Forces Day."[13]  Any lingering doubts regarding the Russian Federation's deployment

of its troops on the Crimean Peninsula were dispelled by Mr. Boris Nemtsov's report on Russian

military activity in Crimea published posthumously on 12 May 2015.[14]

26.      After establishing *de facto* sovereignty over the Crimean Peninsula, the Russian

Federation asserted *de jure* sovereignty.  On 18 March 2014, the Russian Federation and persons

claiming to act on behalf of the "Republic of Crimea"[15] and the "Federal City of Sevastopol"

signed a so-called "Treaty between the Russian Federation and the Republic of Crimea on the

Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New

Constituent Parts within the Russian Federation" (the "Annexation Treaty").

27.      That same day, President Putin presented the Annexation Treaty to the

Constitutional Court of the Russian Federation for a ruling on its constitutionality.[16]  The

Constitutional Court issued a judgment the next day "recogniz[ing] the international treaty

---

12.      BBC.com (9 March 2015) (noting that President Putin "ordered work on 'returning Crimea' to begin at an all-night meeting on 22 February") (**CE-10**).

13.      Decree No. 103 of the President of the Russian Federation, On the Establishment of "Special Operations Forces Day" dated 26 Feb. 2015 (**CE-12**).

14.      *See Putin.  War:  According to the Materials of Boris Nemtsov* (12 May 2015).  Mr. Nemtsov was an outspoken leader of the opposition in the Russian Federation and the former First Deputy Prime Minister of the Russian Federation.  He was shot and killed outside the Kremlin on 27 February 2015.  The report draws upon Mr. Nemtsov's notes and documents and details the Russian Federation's military intervention in Ukraine.  *See, e.g.,* Andrew E. Kramer, *Kremlin Critic's Posthumous Report Links Russian Soldiers to Ukraine* (12 May 2015) (**CE-13**).

15.      Upon annexation into the Russian Federation, the Autonomous Republic of Crimea was designated the Republic of Crimea.

16.      *Constitutional Court of the Russian Federation to Verify Constitutionality of International Treaty on Acceptance of Republic of Crimea into the Russian Federation*, Constitutional Court Website (18 March 2014).

between the Russian Federation and the Republic of Crimea . . . as consistent with the Russian Federation Constitution."[17]

28.     The State Duma (the lower house of the Russian Parliament) and the Federation Council (the upper house) approved the Annexation Treaty on 20 and 21 March 2014, respectively.[18]  On 20 March 2014, the State Duma also passed legislation implementing the annexation of Crimea.  On 21 March 2014, the Federation Council approved this law.[19]  On 21 March 2014, President Putin signed the implementing legislation at a ceremony in the Kremlin.[20]  Under its terms, the Annexation Treaty has thus been effective under Russian law since 18 March 2014.[21]

29.     The Russian Federation's invasion and annexation of Crimea violated international law.  Nevertheless, from late February 2014, the Russian Federation has been in effective control of Crimea, and from at least the effective date of the Annexation Treaty, the Russian Federation has insisted internally and to the international community that Crimea is part of the Russian Federation.  Regardless of the merits of the Russian Federation's arguments or the legality of its actions, as a matter of international law, the "territory" of the Russian Federation under the BIT is the territory over which the Russian Federation effectively asserts sovereignty.  The Russian Federation's unilateral but effective assertions of *de facto* control and

---

17.     Resolution No. 6-P of the Constitutional Court of the Russian Federation dated 19 March 2014.

18.     Federal Law No. 36-FZ, On Ratification of the Treaty Between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea Into the Russian Federation and the Formation of New Constituent Parts Within the Russian Federation dated 21 March 2014.

19.     Federal Constitutional Law No. 6-FKZ, On Accepting the Republic of Crimea into the Russian Federation and Establishing New Constituent Entities in the Russian Federation:  the Republic of Crimea and the Federal City of Sevastopol (the "Crimea Federalization Law") dated 21 March 2014.

20.     *Ceremony signing the laws on admitting Crimea and Sevastopol to the Russian Federation*, Kremlin Website (21 March 2014).

21.     Annexation Treaty, Art. 10.

its assertions of *de jure* sovereignty make all of the Russian Federation's treaties, including the BIT, applicable to Crimea.  Accordingly, Claimants' investments in Crimea were "on the territory" of the Russian Federation within the meaning of Article 1(1) of the BIT beginning in late February 2014 and by 18 March 2014, at the latest.

### (3)   The Petrol Companies notified the Russian Federation in writing of the existence of a dispute in connection with their investments

30.     In two letters, dated 15 and 31 October 2014, the Petrol Companies, through their counsel, formally notified representatives of the Russian Federation of the present dispute under Article 9(1) of the BIT.[22]  The notice letters informed the Russian Federation of the basis for the dispute, including, without limitation, the primary treaty guarantees that the Russian Federation had violated, and requested consultations to reach a negotiated resolution.  The Russian Federation has not acknowledged receipt of or otherwise responded to those letters.

### (4)   More than six months have elapsed since the Petrol Companies served formal notice on the Russian Federation

31.     More than six months have elapsed since the Petrol Companies formally notified the Russian Federation of a dispute under the BIT.  Upon such notice, Respondent was obliged to "endeavor to settle the dispute through negotiations if possible."[23]  Respondent has not responded to the Petrol Companies' 15 and 31 October 2014 notice letters, much less engaged in negotiations to attempt to resolve the dispute.  The Petrol Companies have therefore initiated arbitration under Article 9(2) of the BIT.

---

22.     Letter from John M. Townsend to Prime Minister Medvedev dated 15 Oct. 2014 (**CE-14**); Letter from John M. Townsend to Prime Minister Medvedev dated 31 Oct. 2014 (**CE-15**).

23.     BIT, Art. 9(1) (**CE-1**).

**B.**   **The Petrol Companies Accept the Russian Federation's Offer in the BIT to Arbitrate**

32.      Pursuant to Article 9(2) of the BIT, the Petrol Companies hereby accept Respondent's offer in the BIT to arbitrate their investment dispute described in this Notice of Arbitration, and consent to submit it to binding arbitration "in conformity with the Arbitration [Rules] of . . . UNCITRAL."

33.      The UNCITRAL Arbitration Rules were first published in 1976 (the "1976 Rules").  A revised version was published in 2010 (the "2010 Rules").  Although the 2010 Rules are presumed to apply to any arbitration agreement concluded after 15 August 2010,[24] "[t]hat presumption does not apply where the arbitration agreement has been concluded by accepting after 15 August 2010 an offer made before that date."[25]

34.      The Russian Federation made its offer to arbitrate when it concluded the BIT on 27 November 1998 – long before the adoption of the 2010 Rules – when only the 1976 Rules were available.[26]  Therefore, the 1976 Rules apply to this arbitration unless the parties agree otherwise.  The Petrol Companies invite Respondent to agree that this arbitration should proceed under the 2010 Rules.

---

24.      UNCITRAL Arbitration Rules, as revised in 2010, Art. 1(2).

25.      *Id.*  The drafting history of the 2010 Rules reveals that, in limiting the presumption related to the applicability of the 2010 Rules to arbitration offers made after 15 August 2010, the drafters specifically contemplated treaty arbitration and intended for the arbitration rules in effect at the time a treaty was signed to govern disputes arising under that treaty.  UNCITRAL, *Report of the Working Group on Arbitration and Conciliation on the work of its forty-eighth session*, 48th session (A/CN.9/646), ¶ 76, dated 4-8 Feb. 2008.

26.      BIT, Art. 14 (**CE-1**).

**IV.     THE RUSSIAN FEDERATION'S MEASURES AGAINST THE PETROL COMPANIES VIOLATED THE BIT**

**A.     The Russian Federation's Measures**

35.     The self-appointed Crimean authorities expropriated the Petrol Companies' investments because of their association with PrivatBank (the largest commercial bank in Ukraine) and Mr. Kolomoisky, who is publicly known to be one of PrivatBank's principal shareholders.

**(1)     The Russian Federation disrupted the Petrol Companies' operations after the annexation of Crimea**

36.     The fuel that the Petrol Companies sold to the Crimean public before the annexation by the Russian Federation originated from suppliers located outside of Crimea. Accordingly, the Petrol Companies arranged for shipping companies to transport that fuel to Crimea by either road or rail.  In or around early April 2014, the Petrol Companies' stations stopped receiving their shipments of fuel from outside Crimea due to the deteriorated security situation on the Crimean Peninsula.

37.     On 22 April 2014, heavily armed members of the "Crimean Self-Defense Forces" (a paramilitary group that acts at the direction of the Russian military and/or Russian Federation authorities and law enforcement agencies) executed a raid on the Petrol Companies' headquarters in Feodosia.[27]  During the raid, the Russian-backed forces seized or destroyed the Petrol Companies' property (including computers, servers, permits and other documents, corporate stamps, and a substantial amount of cash) and harassed their employees.  The seizure of the Petrol Companies' Feodosia headquarters made it impossible for management to communicate with the companies' Crimean stations and thus made it impossible for those stations to operate.

---

27.     The Petrol Companies shared office space in Feodosia with the management of PJSC Ukrnafta (in which Mr. Kolomoisky also has an interest), on behalf of which a separate claim under the BIT is being made.

As a result, the Petrol Companies' management was forced to suspend all of the companies' Crimean operations.

38.      In the days following the Crimean Self-Defense Forces' seizure of the Petrol Companies' Feodosia headquarters, those forces (or persons affiliated with those forces) began to take physical control of the Petrol Companies' stations.

39.      Beginning in late April 2014, persons unaffiliated with the Petrol Companies took control of their Crimean stations and sold their remaining inventory (especially fuel) in Crimea. In June 2014, these same individuals abandoned the Petrol Companies' stations – evidently because the Petrol Companies' remaining inventory had dried up.  To date, none of the revenues derived from the unauthorized sale of the Petrol Companies' fuel and other goods has reached the Petrol Companies.

40.      The Petrol Companies have filed complaints with Crimean and Russian authorities that were established in Crimea at that time concerning the raid on their Feodosia headquarters and the subsequent unauthorized takeover of their petrol stations.  In response, those authorities avoided an objective examination of the Petrol Companies' claims, and therefore denied Claimants' the protection of their legal rights.  Respondent took no actions to remove the individuals engaged in the illegal trade of stolen goods from the Petrol Companies' properties, and failed to otherwise remedy the situation described above.

**(2)      The Russian Federation nationalized the Petrol Companies'
investments based on their association with Mr. Kolomoisky and
PrivatBank**

**(a)      The State Council of the Republic of Crimea nationalized the
Petrol Companies' properties**

41.      By a decree dated 3 September 2014, the so-called State Council of the Republic of Crimea nationalized numerous properties associated with Mr. Kolomoisky.  Previously, in

April 2014, the State Council of the Republic of Crimea had issued a decree that certain properties throughout the Republic of Crimea were to be nationalized (the "Nationalization Decree").[28]  On 3 September 2014, the State Council of the Republic of Crimea issued a further decree amending the Nationalization Decree to include additional properties, including 17 of the Petrol Companies' stations, their Feodosia headquarters, one of their storage facilities, and additional real estate properties belonging to the Petrol Companies, as well as a list of other properties that were perceived to be associated with Mr. Kolomoisky (the "3 September 2014 Amendment").[29]  As a consequence of the 3 September 2014 Amendment, the rights and assets associated with the Petrol Companies' properties in the Republic of Crimea were permanently transferred to the State, without payment of any compensation.

42.     The State Council of the Republic of Crimea made no secret of the motive behind its issuance of the 3 September 2014 Amendment.  Announcing the nationalizations, Mr. Sergei Aksyonov, chairman of the self-proclaimed Council of Ministers of Crimea, declared that "Kolomoisky is one of the oligarchs who initiated and has been financing military operations in the southeast of Ukraine where our compatriots are being killed; therefore it is our moral right and our moral duty to carry out this nationalization."[30]

---

28.     Decree No. 2085-6/14 of the State Council of the Republic of Crimea dated 30 April 2014 (**English translation of CE-16-R-001**).

29.     Decree No. 2474-6/14 of the State Council of the Republic of Crimea dated 3 Sept. 2014, *amending* the Nationalization Decree (**English translation of CE-16-R-002-006**); *see also* Decree No. 83-1/14 of the State Council of the Republic of Crimea dated 9 Oct. 2014, *amending* the Nationalization Decree (updating the description of Claimants' property listed in line item number 53) (**English translation of CE-16-R-011**).  Annex B identifies Claimants' petrol stations and other properties that were nationalized by the State Council of the Republic of Crimea.

30.     *Crimea's State Council rules to nationalize [Igor Kolomoisky's] property in Crimea*, ITAR-TASS (3 Sept. 2014) (**CE-17**).

43. After the State Council of the Republic of Crimea issued the 3 September 2014 Amendment, the Crimean authorities ordered the transfer of the rights to the Petrol Companies' properties (discussed in ¶ 41 above) to a state-owned entity.[31]

44. As noted above, Mr. Aksyonov candidly explained that the purpose of the 3 September 2014 Amendment was to nationalize Mr. Kolomoisky's properties. Earlier decisions of the Kievsky District Court in Simferopol foreshadowed the new Crimean authorities' intention to nationalize any property they perceived to be associated with Mr. Kolomoisky or PrivatBank. On 18 August 2014 and 1 September 2014, the Simferopol court granted requests of the Ministry of Internal Affairs of the Republic of Crimea to attach numerous petrol stations belonging to the Petrol Companies (as well as numerous other Crimean properties owned by companies it perceived to be affiliated with Mr. Kolomoisky and PrivatBank). The court did so on the explicit grounds that (1) the petrol stations were connected to PrivatBank and Mr. Kolomoisky, (2) an officer of PrivatBank allegedly committed a crime that endangered funds belonging to PrivatBank's Crimean depositors, and (3) attaching the petrol stations was therefore necessary to

---

31. *See* Order No. 918-r of the Council of Ministers of the Republic of Crimea dated 11 Sept. 2014; Order No. 1016-r of the Council of Ministers of the Republic of Crimea dated 7 Oct. 2014, according to which the Council of Ministers of the Republic of Crimea ultimately ordered the transfer of the petrol stations and other real estate to the state-owned Feodosia Enterprise for Supply of Petroleum (later renamed SUE Crimean Fuel Alliance). On 11 March 2015, the Crimean Council of Ministers issued a decree merging SUE Crimean Fuel Alliance into SUE Chernomorneftegaz. *See* Order No. 182-r of the Council of Ministers of the Republic of Crimea dated 11 March 2015. Notably, Feodosia Enterprise for Supply of Petroleum and SUE Chernomorneftegaz were subject to both European Union and United States sanctions following the annexation. *See Ukraine-related Sanctions; Publication of Executive Order 13662 Sectoral Sanctions Identification List*, U.S. Department of Treasury Website (16 July 2014); Adrian Croft and Justyna Pawlak, *EU adds top Putin aide, two Crimea energy firms to sanctions list*, Reuters (12 May 2014); *Treasury Designates Seven Individuals and One Entity Contributing to the Situation in Ukraine*, U.S. Department of Treasury Website (11 April 2014). Upon information and belief, SUE Chernomorneftegaz is controlled by the Beim family, which now owns approximately one-third of the petrol stations on the Crimean Peninsula. *See Petrol flows in the family*, Kommersant Newspaper (12 March 2015). At present, the Petrol Companies' former stations that were the subject of the 3 September 2014 Amendment are operating under the GOST brand. *See id.*

protect the bank's Crimean depositors.[32]  The Simferopol court claimed that the Petrol Companies were "directly involved in the business of [PrivatBank]" and "may be financially liable for the acts of officers of [PrivatBank], in the business of which they are involved."[33] However, the Petrol Companies are distinct legal entities that have no legal responsibility for the allegedly criminal conduct of PrivatBank's officers or PrivatBank's obligations to its depositors. Tellingly, the Simferopol court's decisions noted that "PrivatBank . . . is part of the Privat financial group which, like PrivatBank . . . , is owned by Igor Valeryevich Kolomoisky . . . ."[34]

**(b)      The Government of the Federal City of Sevastopol nationalized the Petrol Companies' properties**

45.      The Government of the Federal City of Sevastopol (the "Sevastopol Government") nationalized the Petrol Companies' stations and sole storage facility located in Sevastopol, and eventually transferred the rights to those properties to a state-owned entity.  On 17 March 2014, the Chairman of City Council of Sevastopol issued a resolution providing that "[a]ll institutions, enterprises and other organizations established by or with the participation of Ukraine in the City of Sevastopol shall become institutions, enterprises and other organizations established by the City of Sevastopol," and that "State property of Ukraine located in the City of Sevastopol as of the day this resolution is passed shall become the property of the City of Sevastopol."[35]  On 24 April 2014, the Interim Governor of Sevastopol signed a law declaring

---

32.      Decision of the Simferopol Kievsky District Court, Case No. 3/6-291/2014 dated 18 Aug. 2014 (**CE-18**); Decision of the Simferopol Kievsky District Court, Case No. 3/6-319/2014 dated 1 Sept. 2014 (**CE-19**).

33.      *E.g.,* Decision of the Simferopol Kievsky District Court, Case No. 3/6-319/2014 dated 1 Sept. 2014 (**CE-19**).

34.      *Id.*

35.      *See* City Council of Sevastopol Resolution No. 7156, On the Status of City-Hero Sevastopol dated 17 March 2014 (**CE-20**).

that "all the land within the boundaries of the federal city of Sevastopol, except for land privately held as of March 17, 2014, is state property of the federal city of Sevastopol."[36]

46.     Although the terms of the 17 March 2014 resolution and the 24 April 2014 law applied only to entities owned by the Government of Ukraine, the Sevastopol Government implemented the resolution and the law so as to apply to the petrol stations and the storage facility owned by the Petrol Companies, notwithstanding the fact that none of those properties were owned by the Government of Ukraine.  On 11 November 2014, the Sevastopol Government issued an order assigning the ownership rights to 13 petrol stations located in Sevastopol and belonging to the Petrol Companies, as well as one of their storage facilities, to the state-owned SUE City Petrol Station Complex.[37]

### B.     The Breaches of the BIT

### (1)     The Russian Federation Breached Article 2 of the BIT

47.     Article 2(1) of the BIT provides that the Russian Federation "shall encourage the investors of [Ukraine] to make investments on its territory and shall allow such investments in conformity with its respective laws."  Article 2(2) further provides that the Russian Federation "shall guarantee, in conformity with its own laws, the complete and unconditional legal protection of investments by [Ukrainian investors]."

48.     The Russian Federation failed to provide the Petrol Companies' investments the "complete and unconditional" protection of its domestic laws (which, among other things, ensured that investors were permitted to maintain their property rights in Crimea after Crimea

---

36.     *See* City of Sevastopol Law No. 3-3C, On former state property of Ukraine and establishing the procedure for inventory, management and disposal of City of Sevastopol Property dated 24 April 2014 (**CE-21**).

37.     Order No. 401 of the Sevastopol Government, On the assignment of property under right of economic management to SUE City Petrol Station Complex dated 11 Nov. 2014 (**CE-22**).  Annex C identifies the 13 stations belonging to the Petrol Companies that were the subject of the 11 November 2014 order of the Sevastopol Government.

became a part of the Russian Federation) when it:  (1) looted and seized the Petrol Companies'
Feodosia headquarters; (2) prevented the Petrol Station Lessees from operating their petrol
stations; and (3) allowed  individuals unaffiliated with the Petrol Companies to operate (and
profit from) those stations without the Petrol Companies' authorization.  The Russian Federation
further failed to provide the Petrol Companies' investments complete and unconditional legal
protection when the State Council of the Republic of Crimea and the Sevastopol Government
together nationalized all of the Petrol Companies' operative petrol stations and their storage
facilities, as well as their Feodosia headquarters and additional properties belonging to the Petrol
Companies, without the payment of compensation.

### (2)      The Russian Federation Breached Article 3 of the BIT

49.      Article 3 of the BIT requires the Russian Federation to ensure that the treatment
on its territory of investments of Ukrainian investors, as well as the activities involved in making
those investments, "shall be no less favorable than the treatment given to its own investors or
investors of any third state, precluding the use of discriminatory measures that could interfere
with the management and disposal of those investments."

50.      The Russian Federation violated this obligation.  Russian and other investors in
Crimea were permitted to continue operating their businesses after the annexation.  In fact,
Russian and other businesses were granted subsidies and exemptions from taxes to ease Crimea's
economic integration into the Russian Federation.  The Petrol Companies, on the other hand,
were impeded from operating their network of Crimean petrol stations.  Respondent has given no
objective or reasoned basis for its series of targeted measures against the Petrol Companies,
relying instead on their associations with Mr. Kolomoisky and PrivatBank.

51.      In addition, Article 3 of the BIT entitles the Petrol Companies to any more
favorable protections contained in investment treaties between the Russian Federation and third

states.  The Russian Federation has provided a number of additional protections to investors from certain other nations that are made applicable to the Petrol Companies' investments by virtue of Article 3 of the BIT.  The Russian Federation has breached these obligations, including, for example:

- A requirement in the Canada-USSR BIT that "[i]nvestments or returns of investors . . . shall at all times be accorded fair and equitable treatment in accordance with principles of international law";[38]

- A requirement in the Canada-USSR BIT that "[i]nvestments or returns of investors . . . shall enjoy full protection and security within the territory";[39] and

- An obligation in the Japan-Russian Federation BIT not to "impair by unreasonable or discriminatory measures the business activities in connection with the investments of investors."[40]

52.    The measures taken by the Russian Federation against the Petrol Companies and their Crimean investments (as described in ¶¶ 35-46 above) breached these guarantees.  In addition to the above-referenced provisions contained in investment treaties between the Russian Federation and third states, the Petrol Companies reserve the right to rely on any more favorable treatment of investments accorded by the Russian Federation to its own investors or to investors of any third state.

---

38.    Agreement between the Government of Canada and the Government of the Union of Soviet Socialist Republics for the Promotion and Reciprocal Protection of Investments, Art. 3(1), 20 Nov. 1989 (the "Canada-USSR BIT"); *see also* treaties with Denmark, Egypt, Ethiopia, Greece, Hungary, India, Japan, Kuwait, Lithuania, Norway, South Korea, Sweden, Turkey, and United Kingdom.

39.    Canada-USSR BIT, Art. 3(1); *see also* treaties with Denmark, Ethiopia, Greece, Hungary, India, Japan, Lithuania, Norway, South Korea, Sweden, Turkey, and United Kingdom.

40.    Agreement Between the Government of the Russian Federation and the Government of Japan Concerning the Promotion and Protection of Investments, Art. 3(3), 13 Nov. 1998; *see also* treaties with Denmark, Egypt, Greece, Kuwait, Lithuania, Sweden, Turkey, and United Kingdom.

### (3)    The Russian Federation Breached Article 5 of the BIT

53.    Article 5 of the BIT provides that an investment "shall not be subject to expropriation, nationalization or other measures equivalent in effect to expropriation . . . except in cases where such measures are taken in the public interest according to the procedures established by law, are not of a discriminatory nature and are accompanied by prompt, adequate and effective compensation."

54.    The Respondent's actions breached Article 5 of the BIT.  The nationalizations of all of the Petrol Companies' operable stations, their headquarters, their storage facilities, and other properties belonging to them by both the State Council of the Republic of Crimea and the Sevastopol Government resulted in the total deprivation of the value of the Petrol Companies' investments in Crimea.  The nationalizations were not required by any public interest, nor did they follow any legal process.  To the contrary, the Crimean authorities' actions were part of their broader efforts to target investments associated with Mr. Kolomoisky and PrivatBank.

55.    The Respondent has not offered "prompt, adequate, and effective compensation" for its unlawful nationalizations of the Petrol Companies' Crimean stations,  headquarters, storage facilities, and other properties.  Indeed, Respondent has provided the Petrol Companies no compensation whatsoever.

### (4)    The Russian Federation Breached Article 6 of the BIT

56.    Article 6 of the BIT defines Respondent's obligations to Ukrainian investors in the event that their "investments suffer damage on the territory . . . as a result of war, civil unrest or other similar events."  Specifically, Article 6 requires the Russian Federation to treat Ukrainian investors no less favorably than "investors of any third state in relation to any measures which it takes in connection with such damage."  At least one arbitral panel has concluded that a treaty provision similar to Article 6 of the BIT provides "a floor treatment for

the investor in the context of the measures adopted in respect of the losses suffered" and "ensures that any measures directed at offsetting or minimizing losses will be applied in a non-discriminatory manner."[41]

57.     The Respondent has entered into multiple BITs with other countries that contain a broader and more favorable guarantee than the BIT with Ukraine that, in the case of war, civil unrest, or similar circumstances, the Russian Federation shall treat foreign investors no less favorably than investors from any third state *and* no less favorably than investors of the Russian Federation.[42]  The Petrol Companies are entitled by Article 3 of the BIT to rely on the more favorable provisions contained in those treaties.  Accordingly, the Russian Federation was required to treat Ukrainian investors no less favorably than Russian investors.

58.     Following its assertion of sovereignty over the Crimean Peninsula, the Russian Federation took measures to address the resulting economic turmoil and uncertainty.  Specifically, the Russian Federation enacted laws that ensured that investors from the Russian Federation and from other states were permitted to maintain their investments on the Crimean Peninsula after Crimea became a part of the Russian Federation.  The Russian Federation, however, deprived the Petrol Companies (as well as other companies associated with Mr. Kolomoisky and PrivatBank) of this opportunity.  Rather than being allowed to transition into the Russian economy, the Petrol Companies were excluded from it.

---

41.     *CMS Gas Transmission v. Argentina*, ICSID No. ARB/01/8, Award, ¶ 375 (12 May 2005).

42.     The Russian Federation has several treaties in force which promise that measures in response to war, civil unrest, or similar conditions will be no less favorable than those meted out to Russian nationals, as well as third state investors.  These include treaties with Greece, Hungary, India, Japan, Kuwait, Lithuania, Norway, South Korea, and Sweden.

## V.    RELIEF SOUGHT

59.    As a result of the Russian Federation's measures in breach of the BIT, the Petrol Companies' investments in Crimea have been wiped out, without the payment of any compensation.  In this arbitration, the Petrol Companies request that the Tribunal grant relief, including an award of compensation to be proven in the arbitration, which is sufficient to "wipe out all the consequences of the illegal act[s] and reestablish the situation which would, in all probability, have existed if [those] act[s] had not been committed."[43]

60.    The Petrol Companies will also seek an award from the Tribunal of interest and all costs and legal fees incurred by the Petrol Companies in connection with this arbitration in accordance with Article 38 of the UNCITRAL Rules.

## VI.    PROCEDURAL MATTERS

61.    In accordance with Article 3(3)(g) of the UNCITRAL Rules, the Petrol Companies propose that the Tribunal consist of three members.  The Petrol Companies further propose that they and Respondent each name an arbitrator, and that the two named arbitrators shall select the third, who will act as chair.  If the two party-appointed arbitrators are unable to agree on a third arbitrator, the Petrol Companies invite Respondent to discuss whether the parties to this arbitration might reach agreement upon the designation of an appointing authority to name the third arbitrator.  The Petrol Companies propose that the Secretary General of the Permanent Court of Arbitration in The Hague, The Netherlands should, in that event, act as the appointing authority.

62.    Article 3(4)(b) of the UNCITRAL Rules provides that a notice of arbitration may include "[t]he notification of the appointment of an arbitrator referred to in Article 7."  The

---

43.    *Case concerning the Factory at Chorzów,* Judgment No. 13, ¶ 125, 13 Sept. 1928, PCIJ Ser. A, No. 17, at p. 47.

Petrol Companies hereby designate Daniel M. Price as their appointed arbitrator.  Mr. Price's contact information is as follows:

> Daniel M. Price
> Daniel M. Price PLLC
> 1401 I Street, N.W., Suite 1120
> Washington, DC 20005
> United States of America
> Tel: +1 202 903 0619
> dmprice@danielmpricepllc.com

63.     Pursuant to Article 17 of the UNCITRAL Rules, the Petrol Companies request that the language of arbitration be English.

64.     The Petrol Companies invite Respondent to discuss where the arbitration should take place.  The Petrol Companies propose The Hague, The Netherlands.

65.     The Petrol Companies invite Respondent to agree that the Secretariat of the Permanent Court of Arbitration be asked to act as Registry to provide administrative support to this arbitration.

3 June 2015

**HUGHES HUBBARD & REED LLP**

John M. Townsend
James H. Boykin
Vitaly Morozov
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC  20006
United States of America

Marc-Olivier Langlois
Leon Ioannou
Hughes Hubbard & Reed LLP
8, rue de Presbourg
75116 Paris
France

# Annex A

# (Claimants and Registered Addresses)

| Name of Claimant | | Registered Address |
|---|---|---|
| Stabil LLC | | 49000 Dnepropetrovsk<br>ul. Karla Libnekhta 11<br>Ukraine |
| Rubenor LLC | | 49600 Dnepropetrovsk<br>ul. Mironova 30<br>Office 70<br>Ukraine |
| Rustel LLC | | 03113 Kiev<br>Pr. Pobedy, 62-B<br>Ukraine |
| Novel-Estate LLC | | 49083 Dnepropetrovsk<br>Pr. Imeni Gazety "Pravda" 29<br>Ukraine |
| PII Kirovograd-Nafta LLC | | 25006 Kirovograd<br>ul. Lenina 13<br>Ukraine |
| Crimea-Petrol LLC | | 49083 Dnepropetrovsk<br>Pr. Imeni Gazety "Pravda" 29<br>Ukraine |
| Pirsan LLC | | 49022 Dnepropetrovsk<br>ul. Okeanskaya 11<br>Ukraine |
| Trade-Trust LLC | | 49033 Dnepropetrovsk<br>ul. Akademika Yangelya 30<br>Ukraine |
| Elefteria LLC | | 49051 Dnepropetrovsk<br>ul. Bogdana Khmelnitskogo 14<br>Ukraine |
| VKF Satek LLC | | 49000 Dnepropetrovsk<br>ul. Karla Libknekhta 11<br>Ukraine |
| Stemv Group LLC | | 58000 Chernovtsy<br>ul. Toreza Morisa 76<br>Ukraine |

A-1

# Annex B

# (Claimants' Properties Expropriated by the State Council of the Republic of Crimea Pursuant to the 30 April 2014 Decree and 3 September 2014 Amendment Thereto (CE-16))

| No. | Property Address | Owner | Lessee | Line Item No. in 3 September 2014 Amendment (CE-16) |
|---|---|---|---|---|
| 1 | 2-A Simferopolskoye Highway, Blizhnyee Village, Feodosia | Rubenor LLC | | 54 |
| 2 | 23 Kerchenskoye Highway, Feodosia | | | 47 |
| 3 | 25 Simferopolskoye Highway, Feodosia | | | 68 |
| 4 | 2-A Montazhnikov Lane, Simferopol | | | 51 |
| 5 | 105 Pobedy Prospect, Simferopol | | | 52 |
| 6 | 4 Yalta-Yevpatoria Bypass Road, Simferopol | | | 49 |
| 7 | 5 Yalta-Yevpatoria Bypass Road, Simferopol | | Trade-Trust LLC | 50 |
| 8 | 2-A Yaltinskaya Street, Lozovoye Village, Simferopolsky District | Stabil LLC | | 64 |
| 9 | 26 Zarechnaya Street, Novopavlovka Village, Bakhchisaraysky District | | | 61 |
| 10 | Simferopol-Kharkov Road (42 km), Amurskoye Village, Oktyabrskoye Township, Krasnogvardeisky District | | | 69 |
| 11 | 2 Yuzhnoberezhnoye Highway, Vinogradnoye Township, Yalta | | | 48 |
| 12 | 1-A Lineinaya Street, Oktyabrskoye Village, Krasnogvardeisky District | | *Inoperative* | 86 |
| 13 | 84 Krymskaya Street, Space 2, Feodosia | | | 55 |
| 14 | 20 Donskaya Street, Apt. 53, Simferopol | | | 65 |
| 15 | Simferopol-Nikolayevka Road (22 km+400 (left)), Pozharsky Village Council, Simferopolsky District | Rustel LLC | | 110 |
| 16 | 1 Obyezdnaya Street, Sadovod Garden Association, Molodezhnensky Village Council, Simferopolsky District | | | 111 |
| 17 | Kherson-Krasnoperekopsk-Simferopol Road (252 km+700 (right)), Mirnoye Village, Simferopolsky District | Novel-Estate LLC | Elefteria LLC | 58 |
| 18 | Moscow-Simferopol Road (1392 km+400 m), Mirnensky Village Council, Simferopolsky District | Crimea-Petrol LLC | | 63 |

| No. | Property Address | Owner | Lessee | Line Item No. in 3 September 2014 Amendment (CE-16) |
|---|---|---|---|---|
| 19 | 4 Smozhevskaya Street, Kerch | Crimea-Petrol LLC | | 53 |
| 20 | 95 Frunze Street, Sofiyevka Village, Simferopolsky District | Pirsan LLC | Elefteria LLC | 83 |
| 21 | 53 Danilov Street, Simferopol | VKF Satek LLC | | 66 |

B-2

# Annex C

# (Claimants' Properties Expropriated by the Sevastopol Government Pursuant to Order No. 401 (CE-22))

| No. | Property Address | Owner | Lessee |
|---|---|---|---|
| 1 | 5-A Fiolentovskoye Highway, Sevastopol | Rustel LLC | Elefteria LLC |
| 2 | 23 Kamyshovoye Highway, Sevastopol | | |
| 3 | 10 Industrialnaya Street, Sevastopol | | |
| 4 | 12 Balaklavskoye Highway, Sevastopol | | |
| 5 | 6 Khrustaleva Street, Sevastopol | | |
| 6 | 28 Sapungorskaya Street, Sevastopol | | |
| 7 | 59 Bogdanova Street, Sevastopol | | |
| 8 | 85-A Tyukova Street, Sevastopol | Novel-Estate LLC | |
| 9 | 2 Neftyanaya Street, Sevastopol (Petrol Station) | | |
| 10 | 15 Goroskoye Highway, Sevastopol | | |
| 11 | 146 Gorpishenko Street, Sevastopol | PII Kirovograd-Nafta LLC | |
| 12 | 12 Monastyrskoye Highway, Sevastopol | | |
| 13 | 117 Chelyuskintsev Street, Sevastopol | | *Inoperative* |
| 14 | 2 Neftyanaya Street, Sevastopol (Storage Facility) | Stemv Group LLC | |

C-1

Unofficial Russian Translation
(English version is operative)


Неофициальный русский перевод
(Действующий документ – английская версия)

*Неофициальный перевод на русский язык*
*Courtesy translation into Russian*

# В СООТВЕТСТВИИ С АРБИТРАЖНЫМ РЕГЛАМЕНТОМ 1976 ГОДА КОМИССИИ ОРГАНИЗАЦИИ ОБЪЕДИНЕННЫХ НАЦИЙ ПО ПРАВУ МЕЖДУНАРОДНОЙ ТОРГОВЛИ

**ООО «Стабил»; ООО «Рубенор»; ООО «Рустель»; ООО «Новел Истейт»; ПИИ ООО «Кировоград-Нафта»; ООО «Крым-Петрол»; ООО «Пирсан» («Собственники автозаправочных станций»)**

**-и-**

**ООО «Трейд-Траст» и ООО «Элефтерия» («Арендаторы автозаправочных станций»)**

**-и-**

**ООО «ВКФ "Сатек"» и ООО «Стемв Груп» («Собственники сооружений для хранения»)**

**(Украина)**

Истцы

против

## РОССИЙСКОЙ ФЕДЕРАЦИИ

Ответчик

---

## УВЕДОМЛЕНИЕ ОБ АРБИТРАЖЕ

3 июня 2015 г.

---

## **Содержание**

Стр.

I.    ТРЕБОВАНИЕ О ПЕРЕДАЧЕ СПОРА НА АРБИТРАЖНОЕ
      РАЗБИРАТЕЛЬСТВО ..................................................................2

II.   СТОРОНЫ ...................................................................................2

      A.    Истцы ..............................................................................2

      B.    Ответчик .........................................................................5

III.  АРБИТРАЖНОЕ СОГЛАШЕНИЕ ...........................................6

      A.    УСЛОВИЯ ПРЕДОСТАВЛЕНИЯ ПРЕДЛОЖЕНИЯ РОССИЙСКОЙ
            ФЕДЕРАЦИИ В РАМКАХ ДИД О РАЗРЕШЕНИИ СПОРОВ ПУТЕМ
            АРБИТРАЖА ВЫПОЛНЕНЫ ...........................................................7

            (1)    Рассматриваемый спор является спором между
                   «Договаривающейся Стороной» ДИД и «инвесторами другой
                   Договаривающейся Стороны» .................................................7

            (2)    Спор возникает в связи с инвестициями Автозаправочных
                   компаний ..........................................................................8

                   (a)    Автозаправочные компании произвели инвестиции в
                          смысле пункта 1) статьи 1 ДИД .....................................8

                   (b)    Инвестиции Автозаправочных компаний осуществлены
                          «на территории» Российской Федерации ..........................10

            (3)    Автозаправочные компании в письменной форме уведомили
                   Российскую Федерацию о существовании спора, возникшего в
                   связи с их инвестициями ....................................................15

            (4)    С момента направления Автозаправочными станциями
                   Российской Федерации официального уведомления прошло
                   более шести месяцев ..........................................................15

      B.    АВТОЗАПРАВОЧНЫЕ КОМПАНИИ ПРИНИМАЮТ ПРЕДЛОЖЕНИЕ
            РОССИЙСКОЙ ФЕДЕРАЦИИ В РАМКАХ ДИД ОБ АРБИТРАЖЕ ..................16

IV.   ДЕЙСТВИЯ, ПРЕДПРИНЯТЫЕ РОССИЙСКОЙ ФЕДЕРАЦИЕЙ ПРОТИВ
      АВТОЗАПРАВОЧНЫХ КОМПАНИЙ, ЯВЛЯЮТСЯ НАРУШЕНИЕМ ДИД .........17

      A.    ДЕЙСТВИЯ, ПРЕДПРИНЯТЫЕ РОССИЙСКОЙ ФЕДЕРАЦИЕЙ .....................17

(1)     После аннексии Крыма Российская Федерация прервала деятельность Автозаправочных компаний...........................................17

(2)     Российская Федерация национализировала инвестиции Автозаправочных компаний, поскольку они были связаны с г-ном Коломойским и «ПриватБанком»...................................................19

        (a)     Государственный совет Республики Крым национализировал объекты собственности Автозаправочных компаний в Республике Крым....................19

        (b)     Правительство города федерального значения Севастополя национализировало станции Автозаправочных компаний .......................................23

B.     Нарушения ДИД ........................................................................24

(1)     Российская Федерация нарушила положения статьи 2 ДИД .............24

(2)     Российская Федерация нарушила положения статьи 3 ДИД .............25

(3)     Российская Федерация нарушила положения статьи 5 ДИД .............27

(4)     Российская Федерация нарушила положения статьи 6 ДИД .............28

V.     ИСПРАШИВАЕМОЕ УДОВЛЕТВОРЕНИЕ.....................................................30

VI.     ПРОЦЕССУАЛЬНЫЕ ВОПРОСЫ ....................................................................30

Дополнение «А» - Истцы и юридические адреса

Дополнение «В» - Объекты собственности, экспроприированные Государственным советом Республики Крым

Дополнение «С» - Объекты собственности, экспроприированные Правительством города Севастополь

## I.     ТРЕБОВАНИЕ О ПЕРЕДАЧЕ СПОРА НА АРБИТРАЖНОЕ РАЗБИРАТЕЛЬСТВО

1.     Данное Уведомление об арбитраже касается спора между Собственниками автозаправочных станций, Арендаторами автозаправочных станций и Собственниками сооружений для хранения (далее совместно именуемыми «Автозаправочные компании»

или «Истцы»), все как определённые в п. 3 ниже,  и Правительством Российской Федерации (далее, Российская Федерация» или «Ответчик»), в соответствии со ст. 9 Соглашения между Правительством Российской Федерации и Кабинетом Министров Украины о поощрении и взаимной защите инвестиций (далее «Двусторонний Инвестиционный Договор» или «ДИД»). ДИД был подписан 27 ноября 1998 года и вступил в силу 27 января 2000 года. Копия ДИД на русском языке (и заверенный перевод на английский язык) приведены в **приложении Истца («CE») 1-R**, а копия ДИД на украинском языке приведена в **приложении CE-1-U.**[1]

2.        Автозаправочные компании подают настоящее Уведомление об арбитраже в соответствии со статьей 3 Арбитражного регламента Комиссии Организации Объединенных Наций по праву международной торговли 1976 г. (ЮНСИТРАЛ) и требуют передачи спора с Российской Федерацией на арбитраж в соответствии со статьей 9 ДИД.

## II.        СТОРОНЫ

### A.        **Истцы**

3.        Истцами являются одиннадцать компаний, организованных в соответствии с законодательством Украины. Для облегчения ссылок, это Уведомление об Арбитраже классифицирует Истцов следующим образом:

---

1    В статье 14 ДИД говорится, что он «Совершен в Москве 27 ноября 1998 года в двух подлинных экземплярах, каждый на русском и украинском языках, причем оба текста имеют одинаковую силу». Текст ДИД на русском языке доступен в следующем сборнике документов: Ю. Ю. БЕРЕСТЕНЕВ, *Соглашения о защите и поощрении капиталовложений: Сборник документов (2002)*. Текст ДИД на украинском языке доступен на вебсайте Парламента Украины по адресу: http://zakon4.rada.gov.ua/laws/show/ru/643_101.

- Собственники автозаправочных станций: ООО «Стабил», ООО «Рубенор», ООО «Рустель», ООО «Новел Истейт», ПИИ ООО «Кировоград-Нафта», ООО «Крым-Петрол», и ООО «Пирсан»;

- Арендаторы автозаправочных станций: ООО «Трейд-Траст» и ООО «Элефтерия»;

- Собственники сооружений для хранения: ООО «ВКФ Сатек» и ООО «Стемв Груп».

4.      До причинения Российской Федерацией ущерба Истцам в нарушение положений ДИД (описанного в разделе IV ниже), Собственники автозаправочных станций владели на праве собственности 31 автозаправочной станцией на Крымском полуострове, а также прочими объектами недвижимости и земельными участками. Собственники автозаправочных станций сдавали свои станции в аренду Арендаторам автозаправочных станций, которые осуществляли эксплуатацию сети автозаправочных станций в Крыму. Собственники сооружений для хранения владели двумя сооружениями на Крымском полуострове, в которых хранились запасы топлива, откуда оно поставлялось на автозаправочные станции Собственников автозаправочных станций и Арендаторов автозаправочных станций в случае конъюнктурных колебаний или нехватки топлива.

5.      На следующей карте показано примерное местоположение станций Автозаправочных компаний на Крымском полуострове.



6.      Одним из конечных бенефициарных собственников Автозаправочных компаний является Игорь Коломойский. Г-н Коломойский является украинским бизнесменом и бывшим Председателем Днепропетровской областной государственной администрации Украины. Он открыто выступает против аннексии Крыма Российской Федерацией, организации и поддержки Российской Федерацией незаконных вооруженных формирований на востоке Украины. Г-н Коломойский также является оппонентом политики руководства Российской Федерации в отношении Украины.

7.      Представителями Автозаправочных компаний являются следующие лица[2]:

---

2   См. Доверенности от Автозаправочных компаний (**CE-2**).

5

Джон М. Таунсенд (John M. Townsend)
Джеймс Х. Бойкин (James H. Boykin)
Виталий Морозов
«Хьюз Хаббард энд Рид Эл-эл-пи» (Hughes Hubbard & Reed LLP)
1775 I Street, N.W.
Washington, DC 20006
United States of America
Тел. +1 202 721 4600
john.townsend@hugheshubbard.com
james.boykin@hugheshubbard.com
vitaly.morozov@hugheshubbard.com

Марк-Оливье Ланглуа (Marc-Olivier Langlois)
Леон Иоанну (Leon Ioannou)
«Хьюз Хаббард энд Рид Эл-эл-пи» (Hughes Hubbard & Reed LLP)
8, rue de Presbourg,
75116 Paris, France
Тел. +33 1 44 05 80 00
marcolivier.langlois@hugheshubbard.com
leon.ioannou@hugheshubbard.com

B.     **Ответчик**

8.     Ответчиком является Правительство Российской Федерации, суверенного

государства и Договаривающейся Стороны ДИД. Настоящее Уведомление об арбитраже

направляется следующим представителям ответчика:

Его превосходительству Владимиру Владимировичу Путину
Президенту Российской Федерации
Российская Федерация
Москва 103132
ул. Ильинка, д. 23
8 (800) 200-23-16

Его превосходительству Дмитрию Анатольевичу Медведеву
Председателю Правительства Российской Федерации
Российская Федерация
Москва 103274
Краснопресненская набережная, 2
Дом Правительства Российской Федерации
8 (800) 200-84-42

Его превосходительству Антону Германовичу Силуанову
Министру финансов Российской Федерации

Российская Федерация
Москва 109097
ул. Ильинка, д. 9
Министерство финансов Российской Федерации
(495) 987-91-01

Его превосходительству Александру Владимировичу Коновалову
Министру юстиции Российской Федерации
Российская Федерация
Москва 119049
ГСП-1
ул. Житная, д. 14
Министерство юстиции Российской Федерации
(495) 955-59-99

Его превосходительству Сергею Викторовичу Лаврову
Министру иностранных дел Российской Федерации
Российская Федерация
Москва 119200
Смоленская-Сенная пл., д. 32/34
Министерство иностранных дел Российской Федерации
(499) 244-16-06

## III.   АРБИТРАЖНОЕ СОГЛАШЕНИЕ

9.     В статье 9 ДИД Российская Федерация сделала открытое предложение

решать споры, возникающие с украинскими инвесторами в связи с их инвестициями на

территории Российской Федерации, путем арбитражного разбирательства:

> «1. Любой спор между одной из Договаривающихся Сторон и инвестором
> другой Договаривающейся Стороны, возникающий в связи с инвестициями,
> включая споры, касающиеся размера, условий или порядка выплаты
> компенсации, предусмотренной в статье 5 настоящего Соглашения, или
> порядка осуществления перевода платежей, предусмотренного в статье 7
> настоящего Соглашения, будет предметом письменного уведомления,
> сопровождаемого подробными комментариями, которые инвестор направит
> Договаривающейся Стороне, участвующей в споре. Стороны в споре будут
> стремиться урегулировать такой спор по возможности путем переговоров.
>
> 2. Если таким образом спор не будет разрешен в течение шести месяцев с
> даты письменного уведомления, упомянутого в пункте 1 настоящей статьи,
> он будет передан на рассмотрение в:

а) компетентный суд или арбитраж Договаривающейся Стороны, на территории которой осуществлены инвестиции;

б) Арбитражный институт Стокгольмской торговой палаты;

в) арбитражный суд «ad hoc» в соответствии с Арбитражным регламентом Комиссии Организации Объединенных Наций по праву международной торговли (ЮНСИТРАЛ).

3. Арбитражное решение будет окончательным и обязательным для обеих сторон в споре. Каждая из Договаривающихся Сторон обязуется привести такое решение в исполнение в соответствии со своим законодательством».

A. **УСЛОВИЯ ПРЕДОСТАВЛЕНИЯ ПРЕДЛОЖЕНИЯ РОССИЙСКОЙ ФЕДЕРАЦИИ В РАМКАХ ДИД О РАЗРЕШЕНИИ СПОРОВ ПУТЕМ АРБИТРАЖА ВЫПОЛНЕНЫ**

10. В статье 9 ДИД определены четыре условия, которые должны быть выполнены, прежде чем инвестор сможет возбудить арбитражное разбирательство против Договаривающейся стороны: (1) наличие спора между Договаривающейся Стороной ДИД и инвестором другой Договаривающейся Стороны ДИД; (2) спор должен возникать «в связи с инвестициями»; (3) инвестор должен предоставить Договаривающейся Стороне письменное уведомление о существовании спора, чтобы инвестор и Договаривающаяся сторона «стремились урегулировать этот спор путем переговоров»; и (4) с момента предоставления соответствующей Договаривающейся Стороне уведомления о возникновении спора должно пройти не менее шести месяцев. Все требования статьи 9 удовлетворены.

**(1)     Рассматриваемый спор является спором между «Договаривающейся Стороной» ДИД и «инвесторами другой Договаривающейся Стороны»**

11. И Украина, и Российская Федерация являются Договаривающимися Сторонами ДИД.

12. В подпункте б) пункта 2 статьи 1 ДИД понятие «инвестор Договаривающейся Стороны» определено как «любое юридическое лицо, созданное в

соответствии с действующим на территории этой Договаривающейся Стороны законодательством, при условии, что юридическое лицо правомочно в соответствии с законодательством своей Договаривающейся Стороны осуществлять инвестиции на территории другой Договаривающейся Стороны».[3] Автозаправочные компании являются юридическими лицами, зарегистрированными в Украине. В соответствии с законодательством Украины, их инвестиции в Крыму были законными в момент их осуществления. Таким образом, Автозаправочные компании являются «инвесторами» в смысле подпункта б) пункта 2 статьи 1 ДИД.

13.     Таким образом, спор между Автозаправочными компаниями и Российской Федерацией – это спор между инвесторами одной Договаривающейся Стороны ДИД (Украина) и другой Договаривающейся Стороной ДИД (Российская Федерация).

**(2) Спор возникает в связи с инвестициями Автозаправочных компаний**

14.     Рассматриваемый спор возник в связи с инвестициями Автозаправочных компаний на территории Российской Федерации и нарушениями Российской Федерацией своих обязательств в рамках ДИД по отношению к Автозаправочным компаниям и их инвестициям по ДИД. Эти нарушения описаны в разделе IV ниже.

**(a) Автозаправочные компании произвели инвестиции в смысле пункта 1) статьи 1 ДИД**

15.     В п. 1 ст. 1 ДИД термину «Инвестиции» дано следующее определение:

«Все виды имущественных и интеллектуальных ценностей, которые вкладываются инвестором одной Договаривающейся Стороны на территории другой Договаривающейся Стороны в соответствии с ее законодательством, и в частности:

а) движимое и недвижимое имущество, а также связанные с ним имущественные права;

---

3     ДИД, ст. 1 п. 2 (б) (**заверенный перевод на английский язык прил. CE-1-R**).

б) денежные средства, а также ценные бумаги, обязательства, взносы и другие формы участия;

в) права интеллектуальной собственности, включая авторские и смежные права, товарные знаки, права на изобретения, промышленные образцы, модели, а также технологические процессы и «ноу-хау»;

г) права на осуществление хозяйственной деятельности, включая права на разведку, разработку и эксплуатацию природных ресурсов».

16.     В период с 2000 по 2010 годы Собственники автозаправочных станций приобрели право собственности на 31 автозаправочную станцию на Крымском полуострове, через которые они осуществляли прямую продажу топлива и других товаров населению. Автозаправочные компании владели участками земли, на которых эти станции были построены, а также другими объектами недвижимой собственности.

17.     Арендаторы автозаправочных станций приобрели права на эксплуатацию станций, принадлежащих Собственникам автозаправочных станций в 2010 и 2011 годах посредством заключения нескольких договоров аренды с Собственниками автозаправочных станций.

18.     Арендаторы автозаправочных станций получили все разрешения и лицензии, необходимые для эксплуатации автозаправочных станций в Крыму и всегда следили за своевременным продлением сроков действия этих разрешений и лицензий.

19. Арендаторы автозаправочных станций заключили договоры с поставщиками товаров и услуг, необходимых для эксплуатации станций Арендаторов автозаправочных станций, в том числе, помимо прочего, с поставщиками бензина и СУГ, транспортными компаниями, которые осуществляли перевозку  топлива от этих поставщиков до автозаправочных станций Арендаторов автозаправочных станций в Крыму, а также с

подрядчиками, предоставляющими, помимо прочего, услуги по вывозу твердых отходов, электроснабжению и телекоммуникациям.

20.     Истцы произвели инвестиции в оборудование в связи с деятельностью своих автозаправочных станций в Крыму. Более того, Истцы произвели модернизацию, реконструкцию и капитальный ремонт нескольких из своих автозаправочных станций.

21.     Собственники сооружений для хранения владели на праве собственности двумя сооружениями для хранения в Крыму. Собственники сооружений для хранения заключили договоры аренды с другой компанией, которая осуществляла эксплуатацию этих двух сооружений.[4]

22.     Имущественные и договорные права и деятельность Автозаправочных компаний в Крыму, описанные выше, соответствуют определению «инвестиций» в статье 1.1 ДИД.

### (b) Инвестиции Автозаправочных компаний осуществлены «на территории» Российской Федерации

23.     До описанных ниже событий Крым являлся частью территории Украины. В 1954 году Президиум Верховного Совета Союза Советских Социалистических Республик (далее «СССР») издал Указ о передаче Крымской области из состава Российской Советской Федеративной Социалистической Республики в состав Украинской Советской Социалистической Республики.[5] После распада СССР в 1991 году, Крымский полуостров остался в составе независимой Украины в качестве Автономной Республики Крым и города с особым статусом Севастополя. Но, когда, начиная с февраля 2014 года,

---

4     Арендатор сооружений не является стороной настоящего спора.

5     См. Президиум Верховного Совета СССР, Указ о передаче Крымской области из состава РСФСР в состав Украинской ССР от 19 февраля 1954 г.

Российская Федерация оккупировала  Крымский  полуостров, он стал частью территории Российской Федерации с точки зрения статьи 1.1 ДИД, и поэтому инвестиции Автозаправочных компаний осуществлялись «на территории» Российской Федерации.

24.     Российская Федерация *de facto* включила Крымский полуостров в свою территорию, установив контроль над полуостровом при помощи военной силы. С конца февраля 2014 года Российская Федерация начала военную операцию, в результате которой был быстро установлен физический контроль над Крымом.[6] К 27 февраля 2014 года российский флаг уже был установлен над административными зданиями Автономной Республики Крым, включая здание парламента, все из которых охранялись солдатами Российской Федерации.[7] Воздушные, морские и наземные сообщения с Крымом также

---

[6]   *См, например, Пол Люис* (Paul Lewis), Спенсер Акерман (Spencer Ackerman) и Джон Свейн (Jon Swaine), «*США признает факт российского контроля над Крымом и стремится сдержать Путина» ("US concedes Russia has control of Crimea and seeks to contain Putin")*, The Guardian, от 3 марта 2014 г. («США признали в воскресенье, что Москва установила полный операционный контроль над Крымским полуостровом и объявили, что госсекретарь Джон Керри отправится в Киев, чтобы предотвратить дальнейшее продвижение России на Украину» ("The US conceded on Sunday that Moscow had '*complete operational control of the Crimean peninsula*' and announced that the secretary of state, John Kerry, will fly to Kiev in an attempt to halt a further Russian advance into Ukraine") (**CE-3**).

[7]   Харриет Салем (Harriet Salem), Шон Уокер (Shaun Walker) и Люк Хардинг (Luke Harding), *«Крымский парламент захвачен неизвестными пророссийскими боевиками»* (*Crimean parliament seized by unknown pro-Russian gunmen*) , The Guardian, от 27 февраля 2014 г. (**CE-4**); Дэвид М. Хершенхорн (David M. Herszenhorn), Марк Ландлер (Mark Landler) и Алисон Смэйл (Alison Smale), *«Обама предупреждает России по поводу военных действий на Украине»* (*With Military Moves Seen in Ukraine, Obama Warns Russia*, New York Times, от 28 февраля 2014 г. (**CE-5**).

находились под контролем Российской Федерации.[8] Контроль Российской Федерации над Крымом также включал телекоммуникационную блокаду.[9]

25.     Хотя официальные лица Российской Федерации сначала отрицали причастность российских военных к событиям на Крымском полуострове, президент России Владимир Путин позже признал, что вооруженные люди в Крыму были российскими военными.[10] Семнадцатого  ноября 2014 года в интервью немецкой службе новостей ARD президент Путин сказал: «Да, я не скрываю, конечно, это факт, мы никогда его не скрывали, наши Вооруженные Силы, прямо скажем, блокировали вооруженные силы Украины, расквартированные в Крыму».[11] В документальном фильме, недавно показанном по российскому телевидению, президент Путин признал, что «работа по возвращению Крыма в Россию» началась в  феврале 2014 года[12] Президент Путин также объявил 27 февраля (день, когда российские силы захватили здание парламента Автономной Республики Крым) государственным праздником — «Днем Сил специальных

---

8   Пол Сонн (Paul Sonne), *«Установление контрольно-пропускных пунктов в Крыму вызвало опасения отделения полуострова»* (*Crimea Checkpoints Raise Secession Fears*), The Wall Street Journal, от 28 февраля 2014 г. (**CE-6**); *«Российский флот заблокировал канал между Крымом и Россией, сообщают украинские пограничники» (Russian navy blocks channel between Crimea, Russia - Ukraine border guards)*, агентство «Рейтер», от 4 марта 2014 г. (**CE-7**); The New York Times, от 28 февраля 2014 г. (о захвате крупнейших аэропортов Крыма) (**CE-5**).

9   Павел Политюк (Pavel Polityuk) и Джим Финкль (Jim Finkle), *«Украина сообщает о блокаде коммуникаций. Телефоны депутатов парламента заблокированы» (Ukraine says communications hit, MPs phones blocked)*, агентство «Рейтер», от 4 марта 2014 г. (**CE-8**).

10   *Прямая линия с Владимиром Путиным* Официальный сайт президента России, от 17 апреля 2014 г. (**CE-9, c. 16**); см. также «Путин раскрыл секрет плана по захвату Крыма Россией» (Putin reveals secrets of Russia's Crimea takeover plot), BBC.com, от 9 марта 2015 г. (**CE-10**); *Интервью Владимира Путина немецкому телеканалу ARD* Официальный сайт президента России, от 17 ноября 2014 г. (**CE-11**).

11   Официальный сайт Президента России, от 17 ноября 2014 г. (**CE-11**).

12   BBC.com, от 9 марта 2015 г. (было отмечено, что президент Путин «приказал приступить к работе по „возвращению Крыма" на совещании, продолжавшемся всю ночь 22 февраля») (**CE-10**).

операций».[13]  Если и оставались какие-то сомнения в том, что Российская Федерация дислоцировала свои войска на Крымском полуострове, они были развеяны докладом Бориса Немцова о деятельности российских военных в Крыму, опубликованном посмертно 12 мая 2015 года.[14]

26.    После того, как суверенитет Российской Федерации  над Крымским полуостровом был установлен *de facto*, Российская Федерация утвердила суверенитет и *de jure*. Восемнадцатого  марта 2014 года Российской Федерацией и лицами, заявляющими, что они действуют от имени «Республики Крым»[15] и «города федерального значения Севастополя», был подписан так называемый  «Договор между Российской Федерацией и Республикой Крым о принятии Республики Крым в состав Российской Федерации и образовании в составе Российской Федерации новых субъектов» (далее «Договор об аннексии»).

27.    В тот же день президент Путин представил Договор об аннексии на рассмотрение Конституционного Суда Российской Федерации с запросом о проверке его конституционности.[16] Конституционный суд на следующий день вынес решение

---

13  Указ Президента Российской Федерации № 103 от 26 февраля 2015 г. «Об установлении Дня Сил специальных операций» (**СЕ-12**).

14  *См. Путин. Война*: Согласно Материалов Бориса Немцова (12 мая 2015 года). Г-н Немцов являлся откровенным лидером оппозиции в Российской Федерации и бывшим первым заместителем премьер-министра Российской Федерации. Он был застрелен недалеко от Кремля 27 февраля 2015 года. Доклад написан на основании записей и документов г-на Немцова и детально описывает военное вторжение Российской Федерации на территорию Украины. *См. пример* Andrew E. Kramer, Kremlin's Critic's Posthumous Report Links Russian Soldiers to Ukraine (12 мая 2015 года) (**СЕ-13**).

15  После аннексии Автономной Республики Крым к Российской Федерации она получила название «Республика Крым».

16  «Конституционный Суд РФ проверит международный договор о принятии в Российскую Федерацию Республики Крым на соответствие Конституции РФ». Вебсайт Конституционного Суда, от 18 марта 2014 г.

«признать …международный договор между Российской Федерацией и Республикой

Крым… соответствующим Конституции Российской Федерации».[17]

28.     Государственная Дума (нижняя палата российского парламента) и Совет

Федерации (верхняя палата) одобрили Договор об аннексии 20 и 21 марта 2014 года

соответственно.[18] Двадцатого марта 2014 года Государственная Дума также приняла закон

о присоединении Крыма. Двадцать первого марта 2014 года Совет Федерации одобрил

этот закон.[19] Двадцать первого марта 2014 года на церемонии в Кремле президент Путин

подписал этот закон.[20] Согласно этому закону, Договор об аннексии вступил в силу в

рамках российского права с 18 марта 2014 года.[21]

29.     Вторжение Российской Федерации в Крым и его аннексия являются

нарушением международного права. Тем не менее, с конца февраля 2014 года Российская

Федерация осуществляет фактический контроль над Крымом и, как минимум с даты

вступления в силу Договора об аннексии, настаивает, как внутри страны, так и перед

международным сообществом, что Крым является частью Российской Федерации.

Независимо от оснований для аргументов Российской Федерации или законности ее

действий, с точки зрения международного права «территорией» Российской Федерации в

---

17   Постановление Конституционного Суда Российской Федерации от 19 марта 2014 г. № 6-П.

18   Федеральный закон от 21 марта 2014 г. № 36-ФЗ «О ратификации Договора между Российской
      Федерацией и Республикой Крым о принятии в Российскую Федерацию Республики Крым и
      образовании в составе Российской Федерации новых субъектов».

19   Федеральный конституционный закон от 21 марта 2014 г. № 6-ФКЗ «О принятии в Российскую
      Федерацию Республики Крым и образовании в составе Российской Федерации новых субъектов –
      Республики Крым и города федерального значения Севастополя» (далее «Закон о процедуре вхождения
      Крыма в состав России»).

20   *«Церемония подписания законов о принятии Крыма и Севастополя в состав Российской Федерации».*
      Вебсайт Кремля, от 21 марта 2014 г.

21   Договор об аннексии, ст. 10.

соответствии с ДИД является территория, на которую распространяется фактический суверенитет Российской Федерации. Одностороннее, но действительное установление Российской Федерацией контроля *de facto* и суверенитета *de jure* означает, что все договоры Российской Федерации, участницей которых она является, включая ДИД, распространяются и на Крымский полуостров. Соответственно, инвестиции Истцов в Крыму осуществлялись «на территории» Российской Федерации в смысле пункта 1 статьи 1 ДИД, начиная с конца февраля 2014 года и, самое позднее, к 18 марта 2014 года.

**(3) Автозаправочные компании в письменной форме уведомили Российскую Федерацию о существовании спора, возникшего в связи с их инвестициями**

30.     В двух письмах, датированных 15 и 31 октября 2014 года, Автозаправочные компании, действуя через своих адвокатов, официально уведомили представителей Российской Федерации о данном споре согласно п. 1 статьи 9 ДИД.[22] В письменных уведомлениях Российской Федерации сообщалось об основаниях возникновения спора, в том числе, среди прочего, о нарушении Российской Федерацией основных договорных гарантий, и предлагалось провести консультации, чтобы урегулировать спор путем переговоров. Российская Федерация не подтвердила получение этих писем и никак на них не отреагировала.

**(4) С момента направления Автозаправочными станциями Российской Федерации официального уведомления прошло более шести месяцев**

31.     С того момента, когда Автозаправочные станции направили в адрес Российской Федерации официальные уведомления о существовании спора в рамках ДИД,

---

22  Письмо Джона М. Таунсенда Председателю Правительства Д.А. Медведеву от 15 октября 2014 г. (**CE-14**). Письмо Джона М. Таунсенда Председателю Правительства Д.А. Медведеву от 31 октября 2014 г. (**CE-15**).

прошло более шести месяцев. После получения уведомлений Ответчик должен был «стремиться урегулировать такой спор по возможности путем переговоров».[23] Ответчик не ответил на уведомительные письма Автозаправочных компаний от 15 и 31 октября 2014 года, не говоря о переговорах с целью урегулирования возникшего спора. Поэтому Автозаправочные компании возбудили арбитражное разбирательство в рамках п. 2 статьи 9 ДИД.

### B.   АВТОЗАПРАВОЧНЫЕ КОМПАНИИ ПРИНИМАЮТ ПРЕДЛОЖЕНИЕ РОССИЙСКОЙ ФЕДЕРАЦИИ В РАМКАХ ДИД ОБ АРБИТРАЖЕ

32.    Согласно п. 2 ст. 9 ДИД, Автозаправочные компании настоящим принимают предложение Ответчика в рамках ДИД об арбитраже их спора, описанного в настоящем Уведомлении об арбитраже, и дают согласие на передачу этого спора на разбирательство в арбитражный орган, решение которого будет обязательным для сторон, «в соответствии с Арбитражным регламентом . . . ЮНСИТРАЛ.»

33.    Арбитражный регламент ЮНСИТРАЛ был впервые опубликован в 1976 году (далее «Регламент ЮНСИТРАЛ»). Его пересмотренный вариант (далее именуемый «Регламент 2010 года») был опубликован в 2010 году. Хотя считается, что Регламент 2010 года применяется ко всем арбитражным соглашениям, заключенным после 15 августа 2010 года,[24] «[э]то предположение не применяется, если арбитражное соглашение заключено посредством принятия после 15 августа 2010 года предложения, сделанного до этой даты».[25]

---

23   ДИД, п. 1 ст. 9 (**CE-1**).

24   П. 2 ст. 1 Арбитражного регламента ЮНСИТРАЛ, пересмотренного в 2010 г.

25   *Там же*. История создания Регламента 2010 года говорит о том, что, ограничивая сферу действия Регламента 2010 года предложениями об арбитраже, сделанными после 15 августа 2010 г., его авторы имели в виду именно арбитраж по международным договорам и определили, что споры, возникающие в

34.    Предложение об арбитраже было сделано Российской Федерацией в момент заключения ДИД 27 ноября 1998 года, задолго до принятия Пересмотренного регламента 2010 года, когда существовал только Арбитражный регламент 1976 года.[26] Таким образом, если стороны не договорятся об ином, на данный арбитраж будет распространяться Регламент 1976 года. Автозаправочные компании, однако, предлагают Ответчику договориться о том, что данный арбитраж должен проходить в соответствии с Регламентом 2010 года.

## IV.    ДЕЙСТВИЯ, ПРЕДПРИНЯТЫЕ РОССИЙСКОЙ ФЕДЕРАЦИЕЙ ПРОТИВ АВТОЗАПРАВОЧНЫХ КОМПАНИЙ, ЯВЛЯЮТСЯ НАРУШЕНИЕМ ДИД

### A.    ДЕЙСТВИЯ, ПРЕДПРИНЯТЫЕ РОССИЙСКОЙ ФЕДЕРАЦИЕЙ

35.    Самопровозглашенные Крымские власти экспроприировали инвестиции Автозаправочных компаний в Крыму по причине их связи с «ПриватБанком» (крупнейшим коммерческим банком в Украине) и г-ном Коломойским, который широко известен как один из основных акционеров «ПриватБанка».

### (1)    После аннексии Крыма Российская Федерация прервала деятельность Автозаправочных компаний

36.    До аннексии Крыма Российской Федерацией топливо, которое Автозаправочные компании продавали крымскому населению, поступало от поставщиков, расположенных за пределами Крыма. Соответственно, Автозаправочные компании задействовали транспортные компании для перевозки топлива в Крым автомобильным

---

рамках того или иного международного договора, должны рассматриваться в соответствии с арбитражным регламентом, действующим на тот момент, когда был подписан соответствующий договор. ЮНСИТРАЛ, Доклад Рабочей группы по арбитражу и согласительной процедуре о работе своей сорок восьмой сессии. 48-я сессия. (A/ CN 9/646), п. 76 от 4-8 февраля 2008 г.

26    ДИД, ст. 14 (**CE-1**).

или железнодорожным транспортом. Приблизительно в начале апреля 2014 года поставки топлива на станции Автозаправочных компаний от поставщиков за пределами Крыма прекратились в связи с ухудшением обстановки в области безопасности на Крымском полуострове.

37.     Двадцать второго апреля 2014 года вооруженные «Силы самообороны Крыма» (военизированная группировка, действующая по указанию Вооруженных сил РФ и (или) властей и правоохранительных органов Российской Федерации) совершили нападение на  главное управление Автозаправочных компаний в Феодосии.[27] В ходе нападения поддерживаемые Россией формирования захватили или уничтожили имущество Автозаправочных компаний (включая компьютеры, серверы, разрешения и прочие документы, корпоративные печати и значительные денежные суммы), а также применили насилие в отношении их работников. В результате захвата главного управления Автозаправочных компаний в Феодосии прекратилась связь между руководством компаний и их крымскими станциями, что сделало невозможным эксплуатацию этих станций. Вследствие этого руководство Автозаправочных компаний было вынуждено приостановить всю деятельность компаний в Крыму.

38.     В течение нескольких дней после захвата Силами самообороны Крыма главного управления Автозаправочных компаний в Феодосии эти силы (или связанные с ними лица) начали устанавливать физический контроль над станциями Автозаправочных компаний.

---

[27] Автозаправочные компании делили офисные помещения в Феодосии с руководством АО «Укрнафта» (в которой г-н Коломойский также имеет долю собственности), от имени которой предъявлен отдельный иск в рамках ДИД.

39.     Начиная с конца апреля 2014 года лица, не связанные с Автозаправочными компаниями, установили контроль над станциями Автозаправочных компаний в Крыму и продали их оставшиеся запасы (в особенности топлива) в Крыму. В июне 2014 года эти лица покинули станции Автозаправочных компаний – по всей видимости, потому, что остававшийся на них бензин закончился. На сегодняшний день Автозаправочные компании так и не получили выручку от незаконной продажи топлива и других своих товаров.

40.     Автозаправочные компании подали жалобы в крымские и российские органы власти, созданные в то время в Крыму, касательно нападения на их главное управление в Феодосии и последующего несанкционированного захвата их автозаправочных станций. В ответ эти органы власти уклонились от объективного расследования жалоб Автозаправочных компаний и, следовательно, отказали Истцам в защите их законных прав. Ответчик не предпринял никаких действий по удалению лиц, задействованных в незаконной продаже украденных товаров с территории объектов Автозаправочных компаний, и никаким образом не исправил ситуацию, описанную выше.

**(2)     Российская Федерация национализировала инвестиции Автозаправочных компаний, поскольку они были связаны с г-ном Коломойским и «ПриватБанком»**

**(a)     Государственный совет Республики Крым национализировал объекты собственности Автозаправочных компаний в Республике Крым**

41.     Постановлением от 3 сентября 2014 года так называемый Государственный совет Республики Крым национализировал многочисленные объекты, связанные с г-ном Коломойским. Ранее, в апреле 2014 года, Государственный совет Республики Крым вынес постановление о национализации некоторых объектов на территории Республики Крым

(«Постановление о национализации»).[28] Третьего сентября 2014 года Государственный

совет Республики Крым вынес еще одно постановление, содержащее дополнения к

Постановлению о национализации и включающее дополнительные объекты

собственности, в том числе 17 станций Автозаправочных компаний их главное управление

в Феодосии, одно из сооружений для хранения, и другие объекты недвижимости,

(«Дополнение к Постановлению от 3 сентября 2014 года»).[29] На основании Дополнения к

Постановлению от 3 сентября 2014 года права и активы, связанные с объектами

собственности Автозаправочных компаний в Республике Крым, были окончательно

переданы государству без уплаты какой-либо компенсации.

42.     Государственный совет Республики Крым не скрывал мотивов принятия

Дополнения к Постановлению от 3 сентября 2014 года. Выступая с объявлением об актах

национализации, Сергей Аксенов, председатель самопровозглашенного Совета министров

Республики Крым, заявил, что г-н «Коломойский является в том числе инициатором и

финансистом мероприятий, которые проходят сегодня на юго-востоке Украины, где

убивают наших сограждан, поэтому наше моральное право и наш моральный долг—

провести такую национализацию».[30]

---

28  Постановление № 2085-6/14 Государственного совета Республики Крым от 30 апреля 2014 г. (**перевод с английского языка CE-16-R-001**).

29  Постановление № 2474-6/14 Государственного совета Республики Крыма от 3 сентября 2014 г., дополняющее Постановление о национализации (**перевод с английского языка CE-16-R-002-006);** *см. также* Постановление № 83-1/14 Государственного Совета Республики Крым от 9 октября 2014 года, дополняющее Постановление о национализации (изменяющее описание объектов собственности Истцов в списке под номером 53) (**перевод с английского языка CE-16-R-011**) . В Приложении «B» указаны автозаправочные станции Истцов и другие объекты собственности, которые были национализированы Государственным Советом Республики Крым.

30  «Государственный совет Крыма принял решение о национализации имущества Коломойского», ИТАР-ТАСС, от 3 сентября 2014 г. (**CE-17**).

43.     После принятия Государственным советом Республики Крым Дополнения к Постановлению от 3 сентября 2014 года крымские власти издали распоряжение о передаче прав на объекты собственности Автозаправочных компаний (как оговаривалось выше в п. 41) государственному предприятию.[31]

44.     Как было указано выше, г-н Аксенов открыто разъяснил, что целью Дополнения к Постановлению от 3 сентября 2014 года была национализация имущества г-на Коломойского. Принятые ранее решения Киевского районного суда г. Симферополя предвосхитили намерение новых властей Крыма национализировать любое имущество, которое они считали связанным с г-ном Коломойским или «ПриватБанком». Восемнадцатого августа 2014 года и 1 сентября 2014 года симферопольский суд удовлетворил ходатайства Министерства внутренних дел Республики Крым о наложении ареста на несколько автозаправочных станций, принадлежащих Автозаправочным

---

31  *См.* Распоряжение № 918-р Совета министров Республики Крым от 11 сентября 2014 г. и Распоряжение № 1016-р Совета министров Республики Крым от 7 октября 2014 г., на основании которых Совет министров Республики Крым окончательно распорядился о передаче автозаправочных станций и различных объектов недвижимости государственному предприятию «Феодосийское предприятие по обеспечению нефтепродуктами» (позднее переименованному в ГУП «Крымский нефтяной альянс»). Одиннадцатого марта 2015 года Совет министров Республики Крым издал постановление о преобразовании ГУП «Крымский нефтяной альянс» в ГУП «Черноморнефтегаз». *См.* Распоряжение № 182-р Совета министров Республики Крым от 11 марта 2015 года. Примечательно, что после аннексии Крыма Европейский Совет и Соединенные Штаты наложили санкции на «Феодосийское предприятие по обеспечению нефтепродуктами» и на ГУП «Черноморнефтегаз». *См.* Санкции, связанные с Украиной (*Ukraine-related Sanctions*); Публикация Указа Президента США 13662 «Идентификационный список юридических и физических лиц, в отношении которых введены секторальные санкции» (*Sectoral Sanctions Identifications List*), Сайт Министерства финансов США, от 16 июля 2014 г.; Адриан Крофт (Adrian Croft) и Джастина Павлак (Justyna Pawlak), *«ЕС внес высокопоставленного помощника Путина и две крымские топливно-энергетические фирмы в санкционный список»* (*EU adds top Putin aide, two Crimea energy firms to sanctions list*), агентство «Рейтер», от 12 мая 2014 г.; *«Министерство финансов обозначило семь физических лиц и одно предприятие, связанные с ухудшением ситуации в Украине»* (*Treasury Designates Seven Individuals and One Entity Contributing to the Situation in Ukraine*), Сайт Министерства финансов США, от 11 апреля 2014 г.. Существуют основания полагать, что ГУП «Черноморнефтегаз» контролируется семьей Бейма, которая уже владеет посредством третью автозаправочных станций на Крымском полуострове. *См.* «*Крымский бензин слился в родные руки*», газета «Коммерсантъ», от 12 марта 2015 г. В настоящее время бывшие станции Автозаправочных компаний, в отношении которых было принято Дополнение к Постановлению от 3 сентября 2014 г., работают под брендом ГОСТ, *см. там же.*

компаниям (а также на многочисленные объекты недвижимости в Крыму, принадлежащие компаниям, которые считались связанными с г-ном Коломойским и «ПриватБанком»). Суд вынес свое решение на основании того, что (1) автозаправочные станции были связаны с «ПриватБанком» и г-ном Коломойским, (2) должностное лицо «ПриватБанка» якобы совершило преступление, поставившее под угрозу активы, принадлежащие крымским вкладчикам «ПриватБанка», и (3) наложение ареста на автозаправочные станции было необходимо для защиты крымских вкладчиков банка.[32] Симферопольский суд заявил, что Автозаправочные компании — «лица, непосредственно связанные с деятельностью [«ПриватБанка»]» и «могут нести материальную ответственность за действия должностных лиц [«ПриватБанка»], к деятельности которого они причастны».[33] Однако Автозаправочные компании являются самостоятельными юридическими лицами, которые не несут какой-либо юридической ответственности в связи с мнимыми уголовными действиями должностных лица «ПриватБанка» или по обязательствам «ПриватБанка» перед своими вкладчиками. Примечательно то, что в решениях симферопольского суда отмечается, что «„Приватбанк" входит в финансовую группу „Приват", принадлежащую, как и сам „Приватбанк", Коломойскому Игорю Валерьевичу …».[34]

---

32   Решение Киевского районного суда г. Симферополя, дело №  3/6-291/2014 от 18 августа 2014 г.  (**CE-18**).Решение Киевского районного суда г. Симферополя, дело № 3/6-319/2014 от 1 сентября 2014 г. (**CE-19**).

33   Пример. Решение Киевского районного суда г. Симферополя, дело № 3/6-319/2014 от 1 сентября 2014 г. (**CE-19**).

34   *Там же.*

**(b)   Правительство города федерального значения Севастополя национализировало объекты Автозаправочных компаний**

45.      Правительство города федерального значения Севастополя («Правительство Севастополя») национализировало станции Автозаправочных компаний и единственное сооружение для хранения, расположенные на территории Севастополя, и впоследствии передало права на эти объекты собственности государственному предприятию. Семнадцатого марта 2014 года Председатель Севастопольского городского совета издал распоряжение о том, что «[в]се учреждения, предприятия и иные организации, учрежденные при участии Украины на территории города Севастополя, становятся учреждениями, предприятиями и иными организациями, учрежденными городом Севастополем», и что «[г]осударственная собственность Украины, находящаяся на день принятия настоящего  постановления на территории города Севастополя, является собственностью города Севастополя».[35] Двадцать четвертого апреля 2014 года временный губернатор Севастополя подписал закон, устанавливающий, что «все земли в пределах территориальных границ города федерального значения Севастополя, за исключением земель, находящихся в частной собственности по состоянию на 17 марта 2014 года, являются государственной собственностью города федерального значения Севастополя».[36]

46.      Хотя положения постановления от 17 марта 2014 года и закона от 24 апреля 2014 года относились только к предприятиям, принадлежащим правительству Украины,

---

35  *См.* Постановление Севастопольского городского Совета № 7156 «О статусе города-героя Севастополя» от 17 марта 2014 г. (**CE-20**).

36  См. Закон города Севастополя от 24 апреля 2014 г. № 3-ЗС «О бывшей государственной собственности Украины и определении порядка инвентаризации, управления и распоряжения собственностью города Севастополя» (**CE-21**).

Правительство Севастополя  претворило в жизнь постановление и закон таким образом, что они стали относиться к автозаправочным станциям и сооружениям для хранения Автозаправочных компаний, несмотря на то, что ни один из этих объектов собственности не принадлежал правительству Украины. Одиннадцатого ноября 2014 года Севастопольское правительство вынесло постановление, на основании которого права собственности на 13 автозаправочных станций, а также одно из сооружений для хранения, находящихся в Севастополе и принадлежащих Автозаправочным компаниям, были переданы государственному предприятию ГУП «Городской автозаправочный комплекс».[37]

    B.    **НАРУШЕНИЯ ДИД**

    **(1)    Российская Федерация нарушила положения статьи 2 ДИД**

47.    В пункте 1 статьи 2 ДИД сказано, что Российская Федерация «будет поощрять инвесторов [Украины] в осуществлении инвестиций на своей территории и допускает такие инвестиции в соответствии со своим законодательством». Далее, в пункте 2 статьи 2 ДИД, сказано, что Российская Федерация «гарантирует в соответствии со своим законодательством полную и безусловную правовую защиту инвестициям [украинских инвесторов]».

48.    Российская Федерация не обеспечила инвестициям Автозаправочных компаний «полной и безусловной» защиты, предусмотренной ее внутренним законодательством, (которое, помимо прочего, гарантировало, что инвесторам будет разрешено сохранить свои имущественные права в Крыму после его присоединения к

---

37  Постановление № 401 Правительства Севастополя «О передаче имущества на праве хозяйственного ведения унитарному государственному предприятию города Севастополь „Городской автозаправочный комплекс"» от 11 ноября 2014 г. (**СЕ-22**). В Приложении «С» указаны 13 станций, принадлежащих Автозаправочным компаниям, на которые распространялось действие Постановления Правительства Севастополя от 11 ноября 2014 г.

Российской Федерации), когда она: (1) разграбила и захватила главное управление Автозаправочных компаний в Феодосии; (2) сделала невозможным для Арендаторов автозаправочных станций эксплуатацию их автозаправочных станций; и (3) позволила лицам, не связанным с Автозаправочными компаниями, осуществлять эксплуатацию этих станций (и получать от них прибыль) без разрешения Автозаправочных компаний. Российская Федерация далее не обеспечила инвестициям Автозаправочных станций полной и безоговорочной юридической защиты, когда Государственный совет Республики Крым и Правительство Севастополя совместно национализировали все действующие станции и сооружения для хранения Автозаправочных компаний,а также их главный офис в Феодосии и другие объекты собственности, принадлежащие Автозаправочным компаниям, без выплаты компенсаций.

### (2) Российская Федерация нарушила положения статьи 3 ДИД

49.     В соответствии со статьей 3 ДИД Российская Федерация обязана обеспечивать на своей территории инвестициям, осуществленным украинскими инвесторами, и видам деятельности в связи с такими инвестициями режим «не менее благоприятный, чем режим, который предоставляется собственным инвесторам или инвесторам любого третьего государства, исключающий применение мер дискриминационного характера, которые могли бы препятствовать управлению и распоряжению инвестициями».

50.     Российская Федерация нарушила это обязательство. Российским и другим инвесторам после аннексии было разрешено продолжать хозяйственную деятельность в Крыму. Более того, российские и другие хозяйствующие субъекты получили субсидии и налоговые льготы, направленные на облегчение экономической интеграции Крыма в

Российскую Федерацию. Автозаправочным компаниям, напротив, мешали осуществлять эксплуатацию принадлежащей им сети автозаправочных станций в Крыму. Ответчик не предоставил объективных или мотивированных обоснований принятия ряда мер, направленных против Автозаправочных компаний, руководствуясь вместо этого лишь их связью с г-ном Коломойским и «ПриватБанком».

51.     Более того, согласно статье 3 ДИД Автозаправочные компании имеют право и на более благоприятные гарантии защиты, содержащиеся в инвестиционных договорах между Российской Федерацией и любым третьим государством. Российская Федерация предоставила целый ряд дополнительных гарантий инвесторам из некоторых других государств, которые в силу статьи 3 ДИД распространяются и на инвестиции Автозаправочных компаний. Российская Федерация нарушила эти обязательства, включая, например:

- Положение ДИД между Канадой и СССР, в соответствии с которым «капиталовложениям или доходам инвесторов … всегда предоставляется справедливый и равноправный режим в соответствии с принципами международного права»;[38]

- Положение ДИД между Канадой и СССР, в соответствии с которым «[к]апиталовложениям или доходам инвесторов … обеспечиваются полная защита и безопасность на территории»;[39] и

---

38  П. 1 ст. 3 Соглашения между Правительством Канады и Правительством СССР о поощрении и взаимной защите капиталовложений от 20 ноября 1989 г. («ДИД между Канадой и СССР»); *см. также* соглашения с Данией, Египтом, Эфиопией, Грецией, Венгрией, Индией, Японией, Кувейтом, Литвой, Норвегией, Южной Кореей, Швецией, Турцией и Великобританией.

39  П. 1 ст. 3 Соглашения между Правительством СССР и Правительством КанадыДИД между Канадой и СССР о поощрении и взаимной защите капиталовложений; *см. также* соглашения с Данией, Эфиопией, Грецией, Венгрией, Индией, Японией,  Литвой, Норвегией, Южной Кореей, Швецией, Турцией и Великобританией.

- Требование ДИД между Российской Федерацией и Японией не применять «необоснованных или дискриминационных мер в отношении деловой деятельности в связи с капиталовложениями инвесторов».[40]

52.      Своими действиями, направленными против Автозаправочных компаний и их крымских инвестиций (как описано в п.п. 35-46 выше), Российская Федерация нарушила эти обязательства. В дополнение к вышеуказанным положениям, предусмотренным соглашениями между Российской Федерацией и третьими государствами, Автозаправочные компании оставляют за собой право полагаться на любые более благоприятные условия осуществления инвестиций, обеспечиваемые Российской Федерацией своим собственным инвесторам или инвесторам любого третьего государства.

### (3) Российская Федерация нарушила положения статьи 5 ДИД

53.      В статье 5 ДИД говорится, что инвестиции «не будут экспроприированы, национализированы или подвергнуты мерам, равным по последствиям экспроприации … за исключением случаев, когда такие меры принимаются в общественных интересах в установленном законодательством порядке, не являются дискриминационными и сопровождаются выплатой быстрой, адекватной и эффективной компенсации».

54.      Своими действиями Ответчик нарушил положения статьи 5 ДИД. Национализация всех действующих станций Автозаправочных компаний, главного управления, сооружений для хранения и других им принадлежащих объектов собственности, Государственным советом Республики Крым и Правительством Севастополя привела к полному обесцениванию инвестиций Автозаправочных компаний

---

40  П. 3 ст. 3 Соглашения между Правительством Российской Федерации и Правительством Японии о поощрении и защите капиталовложений от 13 ноября 1998 г.; *см. также* соглашения с Данией, Египтом, Грецией, Кувейтом, Литвой, Швецией, Турцией и Великобританией.

в Крыму. Национализация не была обусловлена общественными интересами и была осуществлена без соблюдения юридического процесса. Напротив, действия крымских властей являлись частью более широких мер, направленных против инвестиций, связанных с г-ном Коломойским и «ПриватБанком».

55.     Ответчик не предложил заплатить «быструю, адекватную и эффективную компенсацию» за свою незаконную национализацию станций, главного управления, сооружений для хранения и других объектов собственности. На самом деле, Ответчик не предоставил Автозаправочным компаниям никакой компенсации вообще.

### (4) Российская Федерация нарушила положения статьи 6 ДИД

56.     В статье 6 ДИД определяется ответственность Ответчика перед украинскими инвесторами, «инвестициям которых нанесен ущерб на территории . . . вследствие войны, гражданских беспорядков или иных подобных обстоятельств». А именно, в соответствии с положениями статьи 6 Российская Федерация обязана оказывать украинским инвесторам не менее благоприятный режим, чем тот, который предоставляется «инвесторам любого третьего государства в отношении любых мер, которые принимаются ею в связи с таким ущербом». По крайней мере один арбитражный суд заключил, что в положении международного договора, подобном статье 6 ДИД, оговаривается «базовый режим для инвестора в контексте мер, принятых в отношении нанесенного ему ущерба» и «гарантируется, что любые меры, направленные на компенсацию или минимизацию ущерба будут применяться на недискриминационной основе».[41]

---

41  Решение по делу *«Си-эм-эс гэс трансмишен» (CMS Gas Transmission) против Аргентины*, Международный центр по урегулированию инвестиционных споров, № дела ARB/01/8, абзац 375, от 12 мая 2005 г.

57.     Ответчик заключил с целым рядом других стран двусторонние инвестиционные соглашения, которые содержат более обширные и более благоприятные гарантии, чем те, что предусмотрены в ДИД с Украиной, и поэтому в случае войны, гражданских беспорядков или иных подобных обстоятельств, Российская Федерация должна предоставить иностранным инвестициям режим не менее благоприятный, чем режим, предоставленный инвесторами любого третьего государства, и не менее благоприятным, чем режим предоставленный российским инвесторам.[42] В силу статьи 3 Автозаправочные компании вправе рассчитывать на более благоприятные условия, предусмотренные этими соглашениями. Таким образом, Российская Федерация обязана была относиться к украинским инвесторам не менее благоприятно, чем к российским инвесторам.

58.     После установления своего суверенитета над Крымским полуостровом Российская Федерация приняла ряд мер в связи с экономическим хаосом и неопределенностью. В частности, Российская Федерация ввела в действие законы, по которым инвесторам из Российской Федерации и других государств было разрешено сохранить свои инвестиции на территории Крымского полуострова после того, как Крым вошел в состав Российской Федерации. Однако Российская Федерация лишила Автозаправочные компании (а также другие компании, связанные с г-ном Коломойским и «ПриватБанком») такой возможности. Вместо того, чтобы получить возможность интеграции в российскую экономику, Автозаправочные компании были ее лишены.

---

42  Российская Федерация располагает целым рядом действующих международных соглашений, в которых говорится, что меры, принимаемые в случае войны, гражданских беспорядков или других аналогичных обстоятельств, не будут менее благоприятными, чем меры, принимаемые в отношении граждан России и инвесторов третьих государств. К ним относятся соглашения с Грецией, Венгрией, Индией, Японией, Кувейтом, Литвой, Норвегией, Южной Кореей и Швецией.

### V.   ИСПРАШИВАЕМОЕ УДОВЛЕТВОРЕНИЕ

59.   В результате действий Российской Федерации, осуществленных в нарушение ДИД, инвестиции Автозаправочных компаний в Крыму были уничтожены без выплаты какой-либо компенсации. В этом арбитражном уведомлении Автозаправочные компании просят у Суда удовлетворения, включая присуждение компенсации, обоснования которой будут представлены в ходе арбитражного разбирательства, и которая будет являться достаточной для «устранения всех последствий противоправного(-ых) деяния(-й) и восстановления того порядка, который, по всей вероятности, существовал бы, если бы такое(-ие) деяние(-я) не было(-и) совершено(-ы)».[43]

60.   Автозаправочные компании также требуют у Суда выплаты процентов и всех расходов и арбитражных издержек, понесенных ими в связи с этим арбитражным разбирательством, в соответствии со статьей 38 Регламента ЮНСИТРАЛ.

### VI.   ПРОЦЕССУАЛЬНЫЕ ВОПРОСЫ

61.   Согласно подпункту g пункта 3 статьи 3 Регламента ЮНСИТРАЛ, Автозаправочные компании предлагают арбитражный суд в составе трех членов. Автозаправочные компании также предлагают, чтобы она и Ответчик назначили по одному арбитру, и чтобы назначенные таким образом два арбитра избрали третьего арбитра, который будет выступать в качестве председателя арбитражного суда. Если два арбитра, назначенные сторонами, не придут к соглашению о выборе третьего арбитра, Автозаправочные компании предлагают Ответчику обсудить, смогут ли стороны арбитражного соглашения достичь договоренности после назначения компетентного органа для назначения третьего арбитра. Автозаправочные компании предлагают

---

43   *Решение по делу о заводе в Чорзове № 13 (Case concerning the Factory at Chorzów No. 13)*, п. 125, 13 сентября 1928 г. Постоянная палата международного правосудия. Серия А, №. 17, с. 47.

назначить в качестве компетентного органа для назначения третьего арбитра Генерального секретаря Постоянной палаты третейского суда в Гааге.

62.      Подпункт b пункта 4 статьи 3 Регламента ЮНСИТРАЛ гласит, что уведомление об арбитраже может включать «уведомление о назначении арбитра, предусмотренное в статье 7». Настоящим Автозаправочные компании назначают своим арбитром Дэниела М. Прайса. Контактные данные господина Прайса приведены ниже.

> Daniel M. Price
> Daniel M. Price PLLC
> 1401 I Street, N.W., Suite 1120
> Washington, DC 20005
> United States of America
> Tel: +1 202 903 0619
> dmprice@danielmpricepllc.com

63.      В соответствии со статьей 17 Регламента ЮНСИТРАЛ Автозаправочные компании выбирают языком арбитражного разбирательства английский язык.

64.      Автозаправочные компании предлагают Ответчику обсудить место проведения арбитражного разбирательства. Автозаправочные компании предлагают выбрать Гаагу, Нидерланды.

65.      Автозаправочные компании предлагают, чтобы Ответчик дал согласие на то, чтобы секретариату Постоянной палаты третейского суда был дан запрос на оказание административной поддержки этому арбитражному разбирательству.

3 июня 2015 г.

**«ХЬЮЗ ХАББАРД ЭНД РИД ЭЛ-ЭЛ-ПИ»**
**(HUGHES HUBBARD & REED LLP)**

*(Подпись в оригинале)*
_____
Джон М. Таунсенд (John M. Townsend)
Джеймс Х. Бойкин (James H. Boykin)
Виталий Морозов
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC 20006
United States of America

Марк-Оливье Ланглуа (Marc-Olivier Langlois)
Леон Иоанну (Leon Ioannou)
Hughes Hubbard & Reed LLP8, rue de Presbourg,
75116 Paris
France
United Kingdom

# Дополнение «А»

## (Истцы и Юридические Адреса)

| Наименование Истца | Юридический адрес |
|---|---|
| ООО «Стабил» | 49000, Украина, г. Днепропетровск, ул. Карла Либкнехта, д. 11 |
| ООО «Рубенор» | 49600, Украина, г. Днепропетровск ул. Миронова д. 30, офис 70 |
| ООО «Рустель» | 03113, Украина, г. Киев пр. Победы, д. 62-Б |
| ООО «Новел-Истейт» | 49083, Украина, г. Днепропетровск пр. Имени газеты «Правда», д. 29 |
| ПИИ ООО «Кировоград-Нафта» | 25006, Украина, г. Кировоград ул. Ленина, д. 13 |
| ООО «Крым-Петрол» | 49083, Украина, г. Днепропетровск пр. Имени газеты «Правда», д. 29 |
| ООО «Пирсан» | 49022, Украина, г. Днепропетровск ул. Океанская, д. 11 |
| ООО «Трейд-Транс» | 49033, Украина, г. Днепропетровск ул. Академика Янгеля, д. 30 |
| ООО «Элефтерия» | 49051, Украина, г. Днепропетровск ул. Богдана Хмельницкого, д. 14 |
| ООО «ВКФ Сатек» | 49000, Украина, г. Днепропетровск, ул. Карла Либкнехта, д. 11 |
| ООО «Стемв Груп» | 58000, Украина, г. Черновцы ул. Тореза Мориса, д. 76 |

# Дополнение «В»

(Объекты собственности Истцов, экспроприированные Государственным советом Республики Крым согласно Постановлению от 30 апреля 2014 года и Дополнению к Постановлению от 3 сентября 2014 года (CE-16))

| № | Обьекты собственности | Собственник | Арендатор | Дополнение к Постановлению от 3 сентября 2014 года (СЕ-16) |
|---|---|---|---|---|
| 1 | г. Феодосия, с. Ближнее, Симферопольское шоссе, д. 2А | ООО «Рубенор» | ООО «Трейд-Траст» | 54 |
| 2 | г. Феодосия, Керченское шоссе, д. 23 | | | 47 |
| 3 | г. Феодосия, Симферопольское шоссе, д. 25 | ООО «Стабил» | | 68 |
| 4 | г. Симферополь, пер. Монтажников, 2А | | | 51 |
| 5 | г. Симферополь, пр. Победы, д. 105 | | | 52 |
| 6 | г. Симферополь, объездная дорога Ялта-Евпатория, д. 4 | | | 49 |
| 7 | г. Симферополь, объездная дорога Ялта-Евпатория, д. 5 | | | 50 |
| 8 | г. Симферополь, с. Лозовое, ул. Ялтинская, д. 2А | | | 64 |
| 9 | Бахчисарайский район, д. Новопавловка, ул. Заречная, д. 26 | | | 61 |
| 10 | Красногвардейский район, пгт Октябрьское, с. Амурское, дорога Симферополь-Харьков (42 км) | | | 69 |
| 11 | г. Ялта, пгт Виноградное, Южнобережное шоссе, д. 2 | | | 48 |
| 12 | Красногвардейский район, пгт Октябрьское, ул. Линейная, д. 1а | | недействующая | 86 |
| 13 | г. Феодосия, ул. Крымская, д. 84, помещение 2 | | | 55 |
| 14 | г. Симферополь, ул. Донская, д. 20, кв. 53 | | | 65 |
| 15 | Симферопольский район, Пожарский сельский совет, дорога Симферополь-Николаевка (22 км+400 м (слева)) | ООО «Рустель» | ООО «Элефтерия» | 110 |

| № | Обьекты собственности | Собственник | Арендатор | Дополнение к Постановлению от 3 сентября 2014 года (СЕ-16) |
|---|---|---|---|---|
| 16 | Симферопольский район, Молодежненский сельсовет, СТ «Садовод», ул. Объездная, д. 1 | | | 111 |
| 17 | Симферопольский район, с. Мирное, дорога Херсон-Красноперекопск-Симферополь (252 км+700 м (справа)) | ООО «Новел Истейт» | | 58 |
| 18 | Симферопольский район, Мирненский сельсовет, дорога Москва-Симферополь (1392 км+400 м) | ООО «Крым-Петрол» | | 63 |
| 19 | г. Керчь, ул. Сможевская, д. 4 | | | 53 |
| 20 | Симферопольский район, с. Софиевка, ул. Фрунзе, д. 95 | ООО «Пирсан» | ООО «Элефтерия» | 83 |
| 21 | г. Симферополь, ул. Данилова, д. 53 | ООО «ВКФ Сатек» | | 66 |

# Дополнение «С»

## (Объекты собственности Истцов, экспроприированные Правительством Севастополя согласно Распоряжения № 401 (СЕ-22))

| № | Объекты собственности | Владелец | Арендатор |
|---|---|---|---|
| 1 | г. Севастополь, Фиолентовское шоссе, д. 5А | ООО «Рустель» | ООО «Элефтерия» |
| 2 | г. Севастополь, Камышовое шоссе, д. 23 | | |
| 3 | г. Севастополь, ул. Индустриальная, д. 10 | | |
| 4 | г. Севастополь, Балаклавское шоссе, д. 12 | | |
| 5 | г. Севастополь, ул. Хрусталева, д. 6 | | |
| 6 | г. Севастополь, ул. Сапунгорская, д. 28 | | |
| 7 | г. Севастополь, ул. Богданова, д. 59 | | |
| 8 | г. Севастополь, ул. Тюкова, д. 85А | ООО «Новел Истейт» | |
| 9 | г. Севастополь, ул. Нефтяная, д. 2А | | |
| 10 | г. Севастополь, Городское шоссе, д. 15 | ПИИ ООО «Кировоград-Нафта» | |
| 11 | г. Севастополь, ул. Горпищенко, д. 146 | | |
| 12 | г. Севастополь, Монастырское шоссе, д. 12 | | |
| 13 | г. Севастополь, ул. Челюскинцев, д. 117 (недействующая) | | Недействующая |
| 14 | г. Севастополь, ул. Нефтяная, д. 2 (помещение хранилища) | ООО «Стемв Груп» | |