**PCA Case No. 2015-35**

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH THE UNCITRAL ARBITRATION RULES 1976 AND THE AGREEMENT BETWEEN THE GOVERNMENT OF THE RUSSIAN FEDERATION AND THE CABINET OF MINISTERS OF UKRAINE ON THE ENCOURAGEMENT AND MUTUAL PROTECTION OF INVESTMENTS DATED 27 NOVEMBER 1998**

**- between -**

**(i) STABIL LLC (UKRAINE)**
**(ii) RUBENOR LLC (UKRAINE)**
**(iii) RUSTEL LLC (UKRAINE)**
**(iv) NOVEL-ESTATE LLC (UKRAINE)**
**(v) PII KIROVOGRAD-NAFTA LLC (UKRAINE)**
**(vi) CRIMEA-PETROL LLC (UKRAINE)**
**(vii) PIRSAN LLC (UKRAINE)**
**(viii) TRADE-TRUST LLC (UKRAINE)**
**(ix) ELEFTERIA LLC (UKRAINE)**
**(x) VKF SATEK LLC (UKRAINE)**
**(xi) STEMV GROUP LLC (UKRAINE)**

**the Claimants**

**- and -**

**THE RUSSIAN FEDERATION**

**the Respondent**

_____

**AWARD ON JURISDICTION**
_____

**The Arbitral Tribunal:**
Professor Gabrielle Kaufmann-Kohler (Presiding Arbitrator)
Mr. Daniel M. Price
Professor Brigitte Stern

**Secretary of the Tribunal:**
Ms. Eva Kalnina

**Registry:**
The Permanent Court of Arbitration
Ms. Evgeniya Goriatcheva

26 June 2017

TABLE OF CONTENTS

I.      THE PARTIES AND THEIR REPRESENTATIVES .................................................1

II.     OVERVIEW OF THE DISPUTE.................................................................................1

III.    PROCEDURAL HISTORY .........................................................................................3

IV.     STATEMENT OF FACTS.........................................................................................11

        A.    THE CLAIMANTS' INVESTMENTS IN CRIMEA ...............................................11

        B.    THE INCORPORATION OF CRIMEA BY THE RUSSIAN FEDERATION ..............12

        C.    THE FACTS RELATING TO THE CLAIMANTS' INVESTMENTS ........................15

V.      POSITIONS OF THE PARTIES AND UKRAINE AS A NON-DISPUTING PARTY .....19

        A.    SUMMARY OF THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF .......19

              1. Article 5 of the BIT...................................................................19

              2. Article 3 of the BIT...................................................................20

              3. Article 2 of the BIT...................................................................21

              4. The Claimants' Request for Relief .........................................21

        B.    SUMMARY OF THE RUSSIAN FEDERATION'S POSITION .............................21

        C.    SUMMARY OF UKRAINE'S POSITION ...........................................................22

VI.     ANALYSIS.................................................................................................................23

        A.    PRELIMINARY MATTERS .............................................................................23

              1. Law Governing this Arbitration ..............................................23

              2. Subject Matter of this Award ..................................................23

              3. Coordination of Parallel Proceedings ....................................23

              4. Default of the Respondent ......................................................23

              5. Law Governing Jurisdiction.....................................................25

        B.    RELEVANT TREATY PROVISIONS AND JURISDICTIONAL REQUIREMENTS.................26

        C.    TERRITORIAL SCOPE OF APPLICATION OF THE TREATY............................30

              1. The Parties' Positions .............................................................30

                   (a) Russia's presence in Crimea .........................................31

                   (b) Russia's Treaty obligations in light of Article 29 VCLT ...................32

                   (c) No "different intention" rebuts Article 29 VCLT ...............35

                        i.   No different intention exists under the BIT........................35

                        ii.  No different intention is "otherwise established" ...............37

              2. Analysis...................................................................................38

                   (a) Russia's effective control of and assertion of sovereignty over
                       Crimea .....................................................................39

                   (b) The application of the BIT to the Claimants' investments in
                       Crimea in light of the VCLT ..............................................42

                        i.   Ordinary meaning ...........................................................42

ii.   Context  ...........................................................................47

iii.  Object and purpose...........................................................47

iv.  Supplementary means of interpretation.............................50

v.  Good faith ......................................................................51

(c)  **Conclusion** ...........................................................................55

D.  JURISDICTION *RATIONE TEMPORIS* (ARTICLE 12 BIT) ...........................55

1. The Parties' Positions ............................................................56

2. Analysis.....................................................................................58

E.  JURISDICTION *RATIONE PERSONAE* (ARTICLE 1(2) BIT)..........................60

F.  JURISDICTION *RATIONE MATERIAE* (ARTICLE 1(1) BIT)............................64

1. Definition of Investment.........................................................64

2. Legality of Investment.............................................................66

(a)  **The Crimean Integration Law** ...............................................68

(b)  **Federal Law No. 258-FZ and Federal Law No. 124-FZ** ........70

(c)  **Laws of the Republic of Crimea**............................................71

(d)  **The Foreign Investment Law of the Russian Federation** ...................72

3. Conclusion on Legality ...........................................................72

G.  OVERALL CONCLUSION........................................................................72

VII.  COSTS........................................................................................................73

VIII.  OPERATIVE PART.......................................................................................73

## ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| **Belbek** | PCA Case No. 2015-07, *Aeroport Belbek LLC and Mr. Igor Valerievich Kolomoisky v. The Russian Federation* |
| **BIT (or Treaty)** | Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated 27 November 1998 |
| **Bondar Opinion** | Legal opinion by Mr. Glib Bondar, dated 26 August 2016 and submitted with the Claimants' PHB |
| **Claimants (or the Petrol Companies)** | Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC, Trade-Trust LLC, Elefteria LLC, VKF Satek LLC, and Stemv Group LLC |
| **Claimants' Answers** | Claimants' Answers to the Tribunal's Questions, dated 3 June 2016 |
| **Crimea (or Crimean Peninsula, Peninsula)** | the geographical area composed of the administrative units "Autonomous Republic of Crimea" and "City of Special Status Sevastopol", identified in the Ukrainian Constitution |
| **Crimean Integration Law** | Federal Constitutional Law of the Russian Federation No. 6-FKZ "On Accepting the Republic of Crimea into the Russian Federation and Establishing New Constituent Entities in the Russian Federation: the Republic of Crimea and the Federal City of Sevastopol," dated 21 March 2014 |
| **Everest** | PCA Case No. 2015-36, *Everest Estate LLC et al. v. The Russian Federation* |
| **Federal Law No. 124-FZ** | Federal Law of the Russian Federation No. 124-FZ, "On Making Amendments to the Federal Law 'On Putting the First Part of the Civil Code of the Russian Federation into Effect' and Article 1202 of the Third Part of the Civil Code of the Russian Federation," dated 5 May 2014 |
| **FEZ Crimea Law** | Law of Ukraine No. 1636-VII "On Establishing Free Economic Zone Crimea and Special Aspects of Conducting Economic Activity in the Temporarily Occupied Territory of Ukraine," dated 12 August 2014 |
| **Foreign Investment Law** | Federal Law of the Russian Federation No. 160-FZ, "On Foreign Investments in the Russian Federation," dated 9 July 1999, as amended on 19 July 2011 |
| **First Maggs Report** | Expert report by Professor Peter B. Maggs, dated 9 January 2016 and submitted with the Claimants' Statement of Claim |
| **Hearing** | The hearing on jurisdiction that took place in Geneva on 11 July 2016 |
| **ECtHR** | European Court of Human Rights |
| **ICJ** | International Court of Justice |

iv

| | |
|---|---|
| **ILC's 2006 Principles** | United Nations' International Law Commission's *2006 Guiding Principles Applicable to Unilateral Declarations of States Capable of Creating Legal Obligations* |
| **Incorporation** | Incorporation of the Crimean Peninsula to the Russian Federation |
| **Incorporation Treaty** | Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation, dated 18 March 2014 |
| **MFN** | Most favored nation |
| **Notice of Arbitration** | The Claimants' Notice of Arbitration, dated 3 June 2015 |
| **Occupation Law** | Law of Ukraine No. 1207-VII "On Guaranteeing Rights and Freedoms of Citizens and the Legal Regime in the Temporarily Occupied Territory of Ukraine," dated 15 April 2014 |
| **Paramilitary Forces** | Paramilitary forces operating on the Crimean Peninsula whose alleged conduct on 22 April 2014 forms a basis for the dispute |
| **Parties** | The Claimants and the Respondent |
| **PCA** | Permanent Court of Arbitration |
| **PCA Case No. 2015-34** | PCA Case No. 2015-34, *PJSC Ukrnafta v. The Russian Federation* |
| **Petrol Companies (or the Claimants)** | Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC, Trade-Trust LLC, Elefteria LLC, VKF Satek LLC, and Stemv Group LLC |
| **PHB** | The Claimants' post-hearing brief on jurisdiction, dated 26 August 2016 |
| **PILA** | Swiss Federal Act on Private International Law, dated 18 December 1987 |
| **PO1** | Procedural Order No. 1, dated 17 December 2015 |
| **PO2** | Procedural Order No. 2, dated 16 December 2015 |
| **PO3** | Procedural Order No. 3, dated 13 June 2016 |
| **PO4** | Procedural Order No. 4, dated 21 June 2016 |
| **PO5** | Procedural Order No. 5, dated 18 July 2016 |
| **Procedural Timetable** | Procedural timetable established in PO2 |
| **Respondent (or Russia)** | The Russian Federation |
| **Respondent's Letters** | The Respondent's letters dated 12 August and 15 September 2015 |
| **Russia (or Respondent)** | The Russian Federation |
| **Second Maggs Report** | Expert report by Professor Peter B. Maggs, dated 26 August 2016 and submitted with the Claimants' PHB |
| **Soviet Union** | Union of Soviet Socialist Republics |

| | |
|---|---|
| **Statement of Claim** | The Claimants' Statement of Claim, dated 15 January 2016 |
| **Submission of Ukraine** | Submission of Ukraine, dated 6 June 2016 |
| **Treaty (or BIT)** | Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated 27 November 1998 |
| **Transcript** | Transcript of the Hearing on jurisdiction that took place in Geneva on 11 July 2016 |
| **Ukrainian Corporate Register** | Ukrainian Unified State Register of Legal Entities, Individual Entrepreneurs and Civic Organizations |
| **UNCITRAL Rules** | Arbitration Rules of the United Nations Commission on International Trade Law 1976 |
| **USA** | United States of America |
| **VCLT** | Vienna Convention on the Law of Treaties, dated 23 May 1969 |
| **VCST** | Vienna Convention on the Succession of States in respect of Treaties, dated 23 August 1978 |

I.   **THE PARTIES AND THEIR REPRESENTATIVES**

1.   The claimants are Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, Pirsan LLC, Trade-Trust LLC, Elefteria LLC, VKF Satek LLC, and Stemv Group LLC, all companies incorporated and existing under the laws of Ukraine (the "**Claimants**" or the "**Petrol Companies**"). The Claimants are represented in these proceedings by: Messrs. John M. Townsend, James H. Boykin, and Vitaly Morozov of Hughes Hubbard & Reed LLP, 1775 I Street NW, Washington, D.C. 20006, United States of America ("**USA**"); and Messrs. Marc-Olivier Langlois and Leon Ioannou of Hughes Hubbard & Reed LLP, 8 Rue de Presbourg, 75116 Paris, France.

2.   The respondent is the Russian Federation ("**Russia**" or the "**Respondent**," and together with the Claimants, the "**Parties**"). The Respondent has not appointed any agents or representatives in these proceedings.

II.   **OVERVIEW OF THE DISPUTE**

3.   The Claimants seek declaratory and compensatory relief from the Respondent for "a series of measures that disrupted and eventually destroyed Claimants' Crimean operations," culminating in the dispossession and nationalization of the Claimants' network of petrol stations and associated assets in Crimea.[1] According to the Claimants, the Respondent's "interference with and eventual expropriation of the Petrol Companies' properties in Crimea was closely related to" the identity of Mr. Igor Valerievich Kolomoisky, one of the "beneficial owners" of the Claimant companies.[2] The Claimants submit that, as a result of these measures, their investments in Crimea "have been wiped out, without the payment of any compensation."[3]

4.   The Claimants submit that the Respondent has violated the following provisions of the Agreement between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments, dated 27 November 1998 (the "**Treaty**" or "**BIT**"):

- Article 2, which provides that each Contracting Party "guarantees, in

---

[1]   Claimants' Statement of Claim, dated 15 January 2016, § 1.3.

[2]   Claimants' Statement of Claim, dated 15 January 2016, § 1.4.

[3]   Claimants' Notice of Arbitration, dated 3 June 2015, § 59.

accordance with its legislation, the full and unconditional legal protection of investments by investors of the other Contracting Party";[4]

- Article 3, which prohibits the Contracting Parties from undertaking measures "discriminatory in nature that could interfere with the management and disposal" of protected investments and requires each Contracting Party to "ensure in its territory for the investments made by investors of the other Contracting Party, […] treatment no less favorable than that which it accords to its own investors or to investors of any third state"; and

- Article 5, which provides that an investment "shall not be expropriated, nationalized or subject to other measures equivalent in effect to expropriation […], except in cases where such measures are taken in the public interest under due process of law, are not discriminatory and are accompanied by prompt, adequate and effective compensation."

5.   Although invited by the Tribunal to do so, the Respondent did not file a Statement of Defense or otherwise participate in these proceedings. Its only communications in the context of these proceedings were a letter dated 12 August 2015 from the Ministry of Justice of the Russian Federation and a cover letter dated 15 September 2015 from the Ambassador of the Russian Federation to the Kingdom of the Netherlands (the "**Respondent's Letters**"). In its letter dated 12 August 2015, the Ministry of Justice wrote as follows:

We return you herewith the Notices of Arbitration on the arbitration proceedings initiated under Article 9 of the [Treaty] before the Permanent Court of Arbitration by [the Petrol Companies] vs. the Russian Federation […].

It is manifest that such claims cannot be considered under the [Treaty] mentioned above and, therefore, the [Treaty] cannot serve as a basis for composing an arbitral tribunal to settle these claims.

In accordance with paragraph I Article 1 of the [Treaty] the term "investment" means every kind of movable and immovable and intellectual property invested

---

[4]    In general, when quoting the provisions of the Treaty, the Tribunal adopts the language of the Claimants' second translation of the Treaty's Russian original version (CLA-129). Other translations of the Treaty are referred to in this Award as necessary. This said, it does not seem that any decision would turn on the differences between the Claimants' translation in CLA-129 and that of Mr. Vesler, the Tribunal-appointed translator (regarding the latter translation see §§ 30-31 and fn. 168 below).

by an investor of one Contracting Party in the territory of the other Contracting Party in accordance with the legislation of the latter Contracting Party. The property in question which is the matter of the claims is situated in the territory of the Crimea and Sevastopol, *i.e.*, in the territory that was a part of Ukraine but at the present time pursuant to the will of people forms an integral part of the territory of the Russian Federation and cannot be regulated by the [Treaty].

On the basis of the above mentioned the Russian Federation does not recognize the jurisdiction of an international tribunal at the Permanent Court of Arbitration in settlement of the abovementioned claims."

6.   In his cover letter dated 15 September 2015, the Ambassador of the Russian Federation to the Kingdom of the Netherlands stated:

Nothing in the attached letter of the Ministry of Justice of the Russian Federation can be interpreted as consent of the Russian Federation to constitution of an arbitral tribunal, participation in arbitration proceedings, or as procedural actions taken in the framework of the proceedings, mentioned therein, or as waiver by the Russian Federation of the jurisdictional immunities in respect of itself and its property in relation to any judicial or administrative proceedings or procedures, connected directly or indirectly with these claims, including immunity from court jurisdiction and immunity from any measures of constraint that can be connected directly or indirectly with these claims, regardless of the jurisdiction (national or supranational) under which they are initiated.

## III.   PROCEDURAL HISTORY

7.   On 3 June 2015, the Claimants submitted a Notice of Arbitration (the "**Notice of Arbitration**"), invoking Article 9 of the Treaty and the Arbitration Rules of the United Nations Commission on International Trade Law 1976 (the "**UNCITRAL Rules**"). According to the Claimants, the Notice of Arbitration was served on Russia on 15 June 2015. [5] On the same day, Ukrnafta, a Ukrainian entity, represented by the same counsel as the Claimants, also filed a notice of arbitration against Russia under the Treaty (*see* PCA Case No. 2015-34, *PJSC Ukrnafta v. The Russian Federation* ("**PCA Case No. 2015-34**")).

---

[5]   Notice of Arbitration, § 30.

8.    In their Notice of Arbitration, and pursuant to Article 7(1) of the UNCITRAL Rules, the Claimants appointed Mr. Daniel M. Price as the first arbitrator.

9.    The Respondent did not appoint an arbitrator within thirty days of the Claimants' notification of the first arbitrator. Accordingly, on 17 July 2015, the Claimants requested that the Secretary-General of the Permanent Court of Arbitration (the "**PCA**") designate an appointing authority for the appointment of a second arbitrator pursuant to Article 7(2)(b) of the UNCITRAL Rules.

10.   On 6 August 2015, having sought comments from the Respondent but received no reply, the Secretary-General of the PCA designated Mr. Michael Hwang as the Appointing Authority in this matter for all purposes under the UNCITRAL Rules, and communicated this decision to the Parties.

11.   On 18 September 2015, the PCA received the Respondent's Letters. Their content is set out in paragraphs 5 and 6 above.

12.   On 22 September 2015, the PCA wrote to the Parties on Mr. Hwang's behalf, inviting the Claimants' comments on the Respondent's Letters.

13.   By letter dated 25 September 2015, the Claimants stated that the Respondent's Letters showed that it "does not intend to participate in these proceedings." Referring to Articles 7(2) and 28(1) of the UNCITRAL Rules, the Claimants suggested that "nothing stated in the Respondent's [Letters] should prevent the Appointing Authority from proceeding with the appointment of a second arbitrator in this case."

14.   On 28 September 2015, Mr. Hwang appointed Professor Brigitte Stern as the second arbitrator in these proceedings.

15.   The Tribunal was constituted on 7 October 2015, when the co-arbitrators agreed to the appointment of Professor Gabrielle Kaufmann-Kohler as the Presiding Arbitrator pursuant to Article 7(1) of the UNCITRAL Rules. A tribunal composed of the same members was constituted on the same date in PCA Case No. 2015-34. The PCA informed the Parties of Professor Kaufmann-Kohler's appointment in both cases on 13 October 2015.

16.   By letter of 3 November 2015, the Tribunal (i) accepted the Claimants' proposal for the PCA to act as registry in the present proceedings; (ii) invited the Parties to comment on draft terms of appointment and a draft procedural order (which included the PCA's tasks as fund holder and registry); (iii) proposed dates for a first procedural conference;

and (iv) proposed that Ms. Eva Kalnina be appointed as the Secretary of the Tribunal, her tasks being set out in that same letter.

17.  On 6 November 2015, the Claimants agreed to the appointment of Ms. Kalnina as the Secretary of the Tribunal and to the PCA serving as the depository of funds, and welcomed a procedural meeting with the Tribunal. On 16 November 2015, the Claimants submitted additional comments on the draft terms of appointment and procedural order.

18.  On 3 December 2015, the Tribunal held a first procedural teleconference. The Claimants in this matter and the claimant in PCA Case No. 2015-34, as well as Russia, were invited to participate. The claimants in both cases were represented at the teleconference by Messrs. John M. Townsend, James H. Boykin, Vitaly Morozov, Marc-Olivier Langlois and Leon Ioannou of Hughes Hubbard & Reed LLP. The Respondent did not participate in the teleconference.

19.  On 14 December 2015, the Tribunal wrote to His Excellency Mr. Alexander Vasilievich Shulgin, Ambassador of the Russian Federation to the Netherlands, and advised him that, "failing receipt of other instructions […], the Tribunal and the Parties will serve all documents in relation to these proceedings by email on [Mr. Shulgin] as the sole representative of the Russian Federation in [this matter]," with a copy to the e-mail address of the Russian Ministry of Justice.

20.  Subsequent to the teleconference held on 3 December, on 16 and 17 December 2015, the Tribunal issued Procedural Orders Nos. 1 and 2 ("**PO1**" and "**PO2**"), in which it fixed Geneva (Switzerland) as the seat of the arbitration, appointed the PCA as registry, set forth provisions concerning the PCA's remuneration, and established a procedural timetable (the "**Procedural Timetable**"). The Procedural Timetable provided for two distinct scenarios, anticipating that the Russian Federation might or might not participate in the proceedings. In PO1, the Tribunal also indicated that, "[i]n light of the commonalities of fact and law involved […] and of the identical composition of the Tribunal in [this matter and the related PCA Case No. 2015-34]," the Tribunal would "seek to structure both proceedings […] in such a manner as to minimize duplication and avoid unnecessary costs whenever possible." [6] Accordingly, the Tribunal determined that correspondence and hearings would in principle be common

---

[6]  PO1, § 5.2.

to both cases, while written submissions, as well as the Tribunal's awards, would remain separate.

21. On 15 January 2016, the Claimants submitted their Statement of Claim (the "**Statement of Claim**"), which included: (i) exhibits C-1 to C-119; (ii) legal authorities CLA-1 to CLA-128; (iii) the witness statement of Mr. Uriel Laber, dated 6 January 2016, with accompanying exhibits; (iv) the expert report of Professor Peter B. Maggs, dated 8 January 2016 (the "**First Maggs Report**"), with appendices; and (v) the report of Mr. Brent C. Kaczmarek, CFA, dated 15 January 2016, with appendices. The Claimants included among their exhibits English translations of the BIT from both its Ukrainian and Russian original versions.

22. On 8 February 2016, the Tribunal informed the Parties that it "consider[ed] that it may assist the resolution of the jurisdictional issues to have available the *travaux préparatoires*" of Articles 1(1), 1(4), and 12 of the Treaty, and invited the Parties to comment on the prospect of seeking the *travaux* from Russia and/or Ukraine. In a letter dated 12 February 2016, the Claimants undertook to inquire whether copies of such materials were available. On 7 March 2016, they informed the Tribunal that they had been able to locate "at least some of the *travaux* from the Ministry of Economic Development and Trade of Ukraine" and filed electronic copies of these documents as exhibits C-120 to C-126.

23. On 16 March 2016, the Claimants submitted an additional copy of the signed Russian-language original version of the BIT published by the Russian Ministry of Foreign Affairs, together with a "revised English translation" of the same. In their cover letter, the Claimants noted that the new translation "conforms more closely to Russian treaty practice than the translation previously submitted."

24. On 5 April 2016, the Tribunal advised the Parties that it may assist it in this phase on jurisdiction to consult with the other investment tribunals dealing with Crimean cases on the status and nature of the proceedings and on the issues identified in the jurisdictional phase, and invited the Parties to provide their views on such consultation. The Tribunal also invited the Parties to state whether they had any objection to the PCA occasionally publishing information about the progress of this arbitration in a press release.

25. On 18 April 2016, the Claimants expressed their agreement to the PCA's publication of press releases reporting on the procedural progress of this arbitration. The Claimants also agreed to procedural consultations among the different tribunals, but, with regard

to matters of substance, raised concerns as to the result of such consultations in the absence of the Respondent's explicit consent. In light of the Claimants' response and the absence of express consent by the Respondent, on 22 April 2016 the Tribunal informed the Parties that it would not engage in either substantive or procedural consultations with other tribunals.

26.    The Respondent failed to submit a Statement of Defense by 15 April 2016, the deadline fixed by the Tribunal in the Procedural Timetable.

27.    On 22 April 2016, the Tribunal ordered that the proceedings continue notwithstanding the Respondent's failure to communicate its Statement of Defense pursuant to Article 28(1) of the UNCITRAL Rules and informed the Parties that Scenario 2 of the Procedural Timetable would apply.

28.    As foreseen in Scenario 2 of the Procedural Timetable, by letter dated 22 April 2016, the Tribunal posed questions to the Parties with respect to issues of jurisdiction. In the same letter, the Tribunal also (i) invited the Parties to state whether they had any objection to a counsel from the PCA assisting the Tribunal Secretary in her tasks as outlined in the Tribunal's letter of 3 November 2015, and (ii) asked the Parties to provide their comments on a draft press release prepared by the PCA concerning certain procedural steps in the present proceedings. On 1 May 2016, the Claimants confirmed that they had no objection to the PCA providing assistance to the Tribunal Secretary and provided their comments on the press release. The Respondent submitted no comments.

29.    On 2 May 2016, the PCA issued a press release in the present proceedings, which was published on its website.

30.    On 23 May 2016, having sought the Parties' comments on the possible appointment of, and instructions to be given to, a translator, the Tribunal requested Mr. Igor Vesler to produce a new English translation of the BIT from its Russian and Ukrainian original versions.

31.    By letter from the PCA dated 3 June 2016, the Tribunal conveyed copies of the translation of the BIT produced by Mr. Vesler to the Parties and invited their comments by 17 June 2016.

32.    On 3 June 2016, the Claimants submitted their answers to the Tribunal's questions on jurisdiction (the "**Claimants' Answers**"), which included: (i) exhibits C-127 to C-155;

(ii) legal authorities CLA-132 to CLA-195; and (iii) expanded versions of previously submitted legal authorities. The Respondent filed no responses to the Tribunal's questions.

33. On 8 June 2016, the PCA informed the Parties that it had received copies of the following documents from the Embassy of Ukraine in The Hague: (i) a *Note Verbale* from the Embassy of Ukraine to the PCA, dated 7 June 2016; (ii) a letter from the Ministry of Foreign Affairs of Ukraine to the Tribunal, dated 6 June 2016; and (iii) the Submission of Ukraine as Non-Disputing Party to the BIT, dated 6 June 2016 (the "**Submission of Ukraine**"). The PCA informed the Parties that it had forwarded copies of the first two items to the Tribunal and, on behalf of the Tribunal, requested the Parties' comments with respect to whether the Submission of Ukraine should be admitted into the record.

34. Also on 8 June 2016, the Tribunal, the Claimants, and the claimant in PCA Case No. 2015-34 held a teleconference to discuss outstanding issues pertaining to the organization of the hearing on jurisdiction scheduled to take place on 11 July 2016 in Geneva, concurrently in this matter and in PCA Case No. 2015-34 ("**Hearing**"). Although the Respondent was informed of the teleconference and was invited to participate, it did not do so.

35. On 13 June 2016, the Tribunal circulated to the Parties an audio-recording of the teleconference of 8 June 2016 and issued Procedural Order No. 3 ("**PO 3**"), deciding the outstanding issues pertaining to the organization of the Hearing.

36. On 17 June 2016, the Claimants submitted their comments on Mr. Vesler's translation of the BIT. The Respondent did not submit any comments.

37. On 21 June 2016, the Tribunal issued Procedural Order No. 4 ("**PO4**"), in which it admitted the Submission of Ukraine into the record and granted the Parties until 28 June 2016 to submit comments on this Submission. The Claimants provided their comments on that date. The Respondent remained silent.

38. On 22 June 2016, the Claimants sought the Tribunal's permission to introduce into the record the legal authorities referred to in the Submission of Ukraine that were not yet part of the record of the arbitration. The Respondent was invited to comment on the Claimants' request but provided no comments within the time period granted. On 29 June 2016, the Tribunal granted the Claimants' request, noting that the legal authorities in question did not constitute new evidence, but were legal materials to

which the Tribunal might refer in any event and that having them easily available would therefore facilitate the Tribunal's work.

39. On 29 June 2016, counsel for Ukraine sought permission for Ukraine to attend and make oral submissions at the Hearing. Having given the Parties an opportunity to comment on this request, on 1 July 2016 the Tribunal denied the request on the ground that it had available the extensive written Submission of Ukraine as a non-disputing State party to the Treaty.

40. The Hearing was held on 11 July 2016 in Geneva, concurrently in this matter and in PCA Case No. 2015-34. The Respondent was invited to participate, but did not take part in the Hearing. The following individuals were in attendance:

**Tribunal:**
Professor Gabrielle Kaufmann-Kohler (presiding)
Mr. Daniel M. Price
Professor Brigitte Stern

**Secretary of the Tribunal:**
Ms. Eva Kalnina

**PCA Legal Counsel:**
Ms. Evgeniya Goriatcheva

**Claimants:**
Mr. John M. Townsend, Hughes Hubbard and Reed LLP
Mr. James Boykin, Hughes Hubbard and Reed LLP
Mr. Vitaly Morozov, Hughes Hubbard and Reed LLP
Mr. Samuel Cowin, Hughes, Hubbard and Reed LLP
Ms. Victoria Ishchenko, party representative, PJSC Ukrnafta
Mr. Iefor Sierov, party representative, PJSC Ukrnafta

**Court Reporter:**
Ms. Dawn K. Larson

41. On 12 July 2016, the court reporter sent the transcript of the Hearing (the "**Transcript**") to the Parties.

42. On 15 July 2016, the Tribunal sent to the Parties, by courier, a USB flash drive containing the audio recording of the Hearing.

43. On 18 July 2016, the Tribunal issued Procedural Order No. 5 ("**PO5**"), in which it provided a number of post-hearing directions, including questions to be addressed in the Parties' post-hearing briefs due on 26 August 2016. The Parties were permitted to append new legal authorities, as well as expert and documentary evidence, to their post-hearing submissions. The Tribunal also noted in PO5 that there would be no cost

submissions at the present stage and invited the Parties to submit any proposed corrections to the Transcript by 2 August 2016. The Claimants submitted proposed corrections whilst the Respondent remained silent. The finalized Transcript was sent to the Parties on 10 August 2016.

44.   On 4 August 2016, after inviting the Parties' comments on a draft, the PCA issued another press release in the present proceedings.

45.   On 26 August 2016, the Claimants submitted their post-hearing brief (the "**PHB**"), accompanied by documentary evidence, legal authorities, the second expert report of Professor Maggs (the "**Second Maggs Report**") and the opinion of Mr. Glib Bondar (the "**Bondar Opinion**").

46.   On 27 February 2017, the Claimants informed the Tribunal that interim awards addressing jurisdictional issues were issued in PCA Case No. 2015-07, *Aeroport Belbek LLC and Mr. Igor Valerievich Kolomoisky v. The Russian Federation* ("*Belbek*") and PCA Case No. 2015-21, *PJSC CB PrivatBank and Finance Company Finilon LLC v. The Russian Federation*. The Claimants proposed to submit these awards into the record of this arbitration.

47.   The Tribunal sought the comments of the Respondent and, in the absence of any response, informed the Parties on 17 March 2017 that it "would find it useful to have access to the aforementioned awards" and that, if they so wish, the Claimants "may therefore submit these awards into the record."

48.   On the same day (17 March 2017), the Claimants submitted the interim awards into the record of this arbitration.

49.   On 20 March 2017, the Claimants informed the Tribunal that a decision on jurisdiction was issued in PCA Case No. 2015-36, *Everest Estate LLC et al. v. The Russian Federation* ("*Everest*") and proposed to submit this decision into the record of this arbitration. After seeking comments from the Respondent and receiving no response, the Tribunal advised the Parties on 31 March 2017 that the Claimants may submit this decision into the record of the arbitration.

50.   On the same day, the Claimants submitted the decision into the record of this arbitration.

## IV.   STATEMENT OF FACTS

51.   As a preliminary matter, the Tribunal notes that in the present Award it uses the terms "**Crimea**", "**Crimean Peninsula**", and "**Peninsula**" interchangeably to refer to the geographical area composed of the administrative units "Autonomous Republic of Crimea" and "City of Special Status Sevastopol," identified in the Ukrainian Constitution. The Tribunal uses the latter two terms or "Republic of Crimea" and "Federal City of Sevastopol" (which are the terms used under Russian law to refer to the region and city within the Russian Federation) for descriptive purposes only, without expressing any view about the legal status of these two entities.

### A.   THE CLAIMANTS' INVESTMENTS IN CRIMEA

52.   Between 2000 and 2010, the Claimants collectively acquired title to or built 31 petrol stations on the Crimean Peninsula. [7] From 2010 to 2011, two of the Claimants, Trade-Trust LLC and Elefteria LLC, obtained rights to lease and operate the stations and adjoining convenience stores from the owners of the stations: Stabil LLC, Rubenor LLC, Rustel LLC, Novel-Estate LLC, PII Kirovograd-Nafta LLC, Crimea-Petrol LLC, and Pirsan LLC.[8] The remaining companies, VKF Satek LLC and Stemv Group LLC, owned two storage facilities in the cities of Simferopol and Sevastopol, respectively; these were used to store reserve fuel and supply petroleum products (which were largely sourced from outside Crimea[9]) to the petrol stations.[10] The Claimants owned various other assets, including an office building held in Stabil LLC's name, located in the Crimean city of Feodosia.[11] Mr. Kolomoisky, whose connections both to the present Claimants and to the claimant in PCA Case No. 2015-34, PJSC Ukrnafta, are alleged

---

[7]   Statement of Claim, § 2.1, *referring to* Witness Statement of Mr. Uriel Laber, § 10 (CWS-1); Stabil LLC Documents Establishing Ownership of Property (2002-2010) (C-8); Rubenor LLC Documents Establishing Ownership of Property (2007-2008) (C-10); Rustel LLC Documents Establishing Ownership of Property (26 April 2014) (C-73); Novel-Estate LLC Documents Establishing Ownership of Property (2008-2010) (C-11); PII Kirovograd-Nafta LLC Documents Establishing Ownership of Property (2000) (C-5); Crimea-Petrol LLC Extract from Register of Proprietary Rights to Real Estate (25 July 2006) (C-9); Pirsan LLC Extract from Register of Proprietary Rights to Real Estate (21 March 2011) (C-22); VKF Satek LLC Extract from Register of Proprietary Rights to Real Estate (1 August 2013) (C-23); Stemv Group LLC Extract from Register of Proprietary Rights to Real Estate (30 December 2013) (C-24).

[8]   Witness Statement of Mr. Uriel Laber, § 13 (CWS-1).

[9]   Witness Statement of Mr. Uriel Laber, §§ 17-18 (CWS-1).

[10]   Witness Statement of Mr. Uriel Laber, § 14 (CWS-1).

[11]   Witness Statement of Mr. Uriel Laber, § 12 (CWS-1).

to have been the motivating factor for the Respondent's expropriation, is a beneficial owner of the Claimants.[12]

**B.    THE INCORPORATION OF CRIMEA BY THE RUSSIAN FEDERATION**

53.    On 22 February 2014, then-Ukrainian President Viktor Yanukovich departed Ukraine following a series of protests in the country against his administration.[13] Thereafter there have been media accounts which reported that Russian President Vladimir Putin "ordered work on 'returning Crimea'" immediately following President Yanukovich's departure.[14]

54.    The subsequent chain of events, which culminated in what has been referred to by the Claimants as the annexation of the Crimean Peninsula to the Russian Federation, has been extensively documented and features prominently in the Claimants' pleadings. The following account, excerpted from media reports contained in the record, provides an overview of the most relevant events for present purposes which arose in the context of Crimea's incorporation into the Russian Federation (the "**Incorporation**"). The Tribunal underlines that it is using the term "Incorporation" and later "Incorporation Treaty", rather than "annexation" or "Annexation Treaty," in order to be clear that it expresses no view on the legality of the incorporation of Crimea into the Russian Federation, an issue the Tribunal need not resolve in order to decide the questions before it.

55.    On 23 February 2014, the leader of the Crimean "Russian Unity Party", Mr. Sergei Aksyonov, described the formation of "rapid-response groups" and patrols in Simferopol to defend "the interests of the Crimeans and Crimean Russians who live in the autonomous republic."[15] Mr. Alexey Chaly, a Russian national, "emerged as the de facto mayor" of Sevastopol on 25 February 2014.[16]

56.    On 27 February 2014, gunmen "dressed in fatigues" stormed Crimea's regional administrative complex in Simferopol, establishing control over the parliament and

---

[12]   Statement of Claim, §§ 1.4, 3.63.

[13]   *Putin: Russia helped Yanukovych to flee Ukraine*, BBC (24 October 2014) (C-93).

[14]   *Putin reveals secrets of Russia's Crimea takeover plot*, BBC (9 March 2015) (C-101).

[15]   *Aksyonov: Rally of volunteer patrols in Simferopol is a celebration of February 23*, Center for Journalistic Investigations (23 February 2014) (C-26).

[16]   Paul Sonne, *In Crimea, backlash to uprising lifts pro-Russia leader*, Wall Street Journal (25 February 2014) (C-27).

ministerial building of the Autonomous Republic of Crimea, and raised the Russian flag above the building.[17] These forces also surrounded Ukrainian military bases and seized control of the Simferopol and Belbek airports. In a special session, the parliament of the Autonomous Republic of Crimea named Mr. Aksyonov as prime minister.[18]

57. On 28 February 2014, Russian military forces consolidated control over the Peninsula. A Russian Black Sea Fleet missile boat blocked the exit to Balaklava Harbor to Ukrainian State Border Service ships; a Russian armored personnel carrier was observed on the streets of Sevastopol;[19] and Russian military transport planes landed outside Simferopol.[20]

58. According to the Claimants, despite initial denials,[21] President Putin recognized in a television appearance dated 17 April 2014 that Russian armed forces had been involved in the seizure of control in Crimea, stating:

> Russia did not annex Crimea by force. Russia created conditions—with the help of special armed groups and the Armed Forces, I will say it straight—but only for the free expression of the will of the people living in Crimea and Sevastopol. It was the people themselves who made this decision. Russia answered their call and welcomed the decision of Crimea and Sevastopol. This was natural, and it could not have been any other way.[22]

59. On 1 March 2014, President Putin submitted an appeal to the Russian Federation Council, the upper house of Russia's federal legislature, to "use the armed forces of the

---

[17]   Harriet Salem, *Crimean parliament seized by unknown pro-Russian gunmen*, Guardian (27 February 2014) (C-29).

[18]   Alissa de Carbonnel, *How the separatists delivered Crimea to Moscow*, Reuters (12 March 2014) (C-48); Paul Sonne, *Crimea checkpoints raise secession fears*, Wall Street Journal (28 February 2014) (C-33); David M. Herszenhorn, Mark Landler, and Alison Smale, *With military moves seen in Ukraine, Obama warns Russia*, New York Times (28 February 2014) (C-31).

[19]   *In Crimea, a Russian Black Sea Fleet missile boat has blocked the exit [to the sea] for Ukrainian border patrol ships—source*, UNIAN (28 February 2014) (C-32).

[20]   *13 Planes with Russian Paratroopers Arrived in Crimea—Kunitsyn*, UNIAN (28 February 2014) (C-30).

[21]   Bill Chappell and Mark Memmott, *Putin says those aren't Russian forces in Crimea*, National Public Radio (4 March 2014) (C-39) (describing the armed men as "local self-defense forces").

[22]   *Direct Line with Vladimir Putin*, Official Site of the President of Russia (17 April 2014), p. 16 (C-70).

Russian Federation on the territory of Ukraine until the social and political situation in that country is normalized."[23] The request was granted on the same day.[24]

60. A public referendum took place on 16 March 2014 on the Crimean Peninsula.[25] Of the votes cast, 96 percent were reportedly in favor of the Incorporation, although numerous allegations of electoral fraud were received by the Office of the United Nations High Commissioner for Human Rights.[26]

61. On 18 March 2014, the "Republic of Crimea" and the "City of Special Status Sevastopol," the latter of which became known as the "Federal City of Sevastopol" under Russian law, signed the "Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation" (the "**Incorporation Treaty**").[27] The Russian Constitutional Court ruled that the Incorporation Treaty was "consistent with the Russian Federation Constitution" on 19 March 2014,[28] and the Incorporation Treaty was approved by the lower and upper houses of Russia's parliament on 20 and 21 March 2014, respectively.[29] The parliament also approved legislation in furtherance of the Incorporation: the Federal Constitutional Law of the Russian Federation No. 6-FKZ "On Accepting the Republic of Crimea into the Russian Federation and Establishing New Constituent Entities in the Russian Federation: the Republic of Crimea and the Federal City of Sevastopol" (the "**Crimean Integration Law**").[30]

---

[23] *Vladimir Putin submitted appeal to the Federation Council*, Official Site of the President of Russia (1 March 2014) (C-36).

[24] Kathy Lally, Will Englund, and William Booth, *Russian parliament approves use of troops in Ukraine*, Washington Post (1 March 2014) (C-35).

[25] David M. Herszenhorn, *Crimea vote deepens crisis and draws denunciations*, New York Times (6 March 2014) (C-42).

[26] *Report on Human Rights Situation in Ukraine*, Office of the United Nations High Commissioner for Human Rights (15 April 2014), § 22 (C-68).

[27] C-58. Article 2 of the Incorporation Treaty provides: "From the date of acceptance of the Republic of Crimea into the Russian Federation, new constituent parts shall be formed within the Russian Federation: the Republic of Crimea and the federal city of Sevastopol."

[28] Resolution of the Constitutional Court of the Russian Federation No. 6-P (19 March 2014), p. 14 (C-59). *See also* First Maggs Report, § 31 and its exhibit 12.

[29] Federal Law No. 36-FZ "On Ratification of the Treaty between the Russian Federation and the Republic of Crimea on the Acceptance of the Republic of Crimea into the Russian Federation and the Formation of New Constituent Parts within the Russian Federation" (21 March 2014) (C-63). *See also* First Maggs Report, §§ 37-38 and its exhibit 14.

[30] 21 March 2014 (C-62). *See also* First Maggs Report, § 38 and its exhibit 13.

62.   On 21 March 2014, President Putin held a signing ceremony for the Incorporation Treaty,[31] which entered into force with retroactive effect as of 18 March.[32] On 25 and 31 July 2014, the Respondent enacted legislation guaranteeing pre-existing property rights in Crimea.[33]

63.   Ukraine, as stated in its Submission, considers that Crimea remains an "inseparable part of Ukraine" and that the events described above constitute an unlawful occupation.[34]

C.    THE FACTS RELATING TO THE CLAIMANTS' INVESTMENTS

64.   According to the witness statement of Mr. Uriel Laber, an executive in charge of the commercial and financial operations of the Petrol Companies' business, members of Crimean "paramilitary forces" (the "**Paramilitary Forces**") seized the Claimants' Feodosia office on 22 April 2014. Mr. Laber recalls:

> After arriving at my office in Miami, I called [a deputy] in Dnepropetrovsk, Ukraine. He described to me the following events that had transpired earlier in the day in Crimea:
>
> • Mr. Karyagin, a director of Stabil LLC (the company that owned the building in Feodosia from which Ukrnafta operated its Crimean business), was supposed to travel from Crimea to Dnepropetrovsk (in continental Ukraine), but the Paramilitary Forces prevented Mr. Karyagin from leaving Crimea.

---

[31]   *Ceremony signing the laws on admitting Crimea and Sevastopol to the Russian Federation*, Official Site of the President of Russia (21 March 2014) (C-61). *See also* First Maggs Report, § 39 and its exhibit 15.

[32]   Incorporation Treaty, Article 10 (C-58).

[33]   Federal City of Sevastopol Law No. 46-ZS "On the Peculiarities of Regulation of Property and Land Relations on the Territory of the City of Sevastopol" (25 July 2014) (C-84); Law of the Republic of Crimea No. 38-ZRK "On the Peculiarities of Regulation of Property and Land Relations on the Territory of the Republic of Crimea" (31 July 2014) (C-119). *See also* First Maggs Report, §§ 60, 63 and its exhibits 24, 26. Paragraph 2(2) of the Law of the Republic of Crimea No. 38-ZRK provides:

> The right of ownership of land and other objects of real property arising before the entry into force of the Federal Constitutional Law in the Republic of Crimea of individuals and legal entities, including foreign citizens, stateless persons and foreign legal entities, shall be retained.

The Russian laws applicable to the Claimants' alleged investments following the Incorporation are discussed in further detail in Section VI.F.2 below.

[34]   Submission of Ukraine, § 2.

- By 10:00 a.m. (Ukraine time), we could no longer reach the office in Feodosia by telephone. At 10:30 a.m., an employee in the Feodosia office managed to reach Mr. Topchiy and told him that the office had been seized by approximately 20 gunmen. Before she could provide any additional details, the phone line went dead.

- At about 2:30 p.m. (Ukraine time), Mr. Topchiy received another call from the Feodosia office. The caller said that he had only 15 seconds to talk, and that the Feodosia office had been seized. The connection was then cut. Fearing for our employees' safety, Mr. Topchiy repeatedly tried to call them throughout the day, but he could not get through.[35]

65.  According to Mr. Laber, the armed men who took control of the Feodosia office confiscated mobile phones and "abducted" two employees of PJSC Ukrnafta.[36] The office employees later reported that the office had been "looted" of computers, permits and licenses, commercial documentation, and the equivalent of USD 800,000 in cash.[37]

66.  According to the Claimants, the Paramilitary Forces were "directed by the Russian-installed Crimean authorities" and received "direct support" from the Respondent's military,[38] including in respect of the seizure of the Claimants' Feodosia office.[39] They assert that the Paramilitary Forces (i) were installed by the Russian Federation; (ii) were afforded the imprimatur of authority through a series of decrees issued by the Republic of Crimea and the Federal City of Sevastopol; and (iii) acted "on the instruction of, or under the direction or control of," the Russian military, a State organ.[40] Furthermore, the Russian military is alleged to have trained, directed, and fought alongside the Paramilitary Forces,[41] and has been acknowledged by President Putin.[42]

---

[35]  Witness Statement of Mr. Uriel Laber, § 28 (CWS-1).

[36]  Witness Statement of Mr. Uriel Laber, § 29 (CWS-1).

[37]  Witness Statement of Mr. Uriel Laber, § 30 (CWS-1).

[38]  Statement of Claim, §§ 2.24, 3.51.

[39]  Statement of Claim, §§ 2.29-2.32, 3.51.

[40]  Statement of Claim, § 3.56.

[41]  Statement of Claim, § 3.56, *referring to Locals join Crimean defense forces, allied with Russia*, National Public Radio (8 March 2014) (C-45); Andrew Foxall, *To see Ukraine's future, recall Crimea*, New York Times (24 March 2015) (C-105).

[42]  Statement of Claim, § 3.56, *referring to Direct Line with Vladimir Putin*, President of Russia Official Website (17 April 2014), p. 8 (C-70).

67.   On 30 April 2014, the State Council of the Republic of Crimea, which had been established after the Incorporation and which the Claimants contend is a Russian State organ,[43] issued "a decree nationalizing certain properties" throughout the Peninsula.[44] That decree was amended on 3 September 2014 to include: (i) Stabil LLC's office in Feodosia; (ii) the Claimants' petrol stations located in the Republic of Crimea, excluding the stations within the Federal City of Sevastopol, a separately administered entity under Russian law; (iii) the Claimants' storage facility in Simferopol; and (iv) other properties and real estate connected with, or believed to be connected with, Mr. Kolomoisky.[45] In announcing these amendments, Mr. Aksyonov, chairman of the new Council of Ministers of the Republic of Crimea, declared that "Kolomoisky is one of the oligarchs who initiated and has been financing military operations in the southeast of Ukraine where our compatriots are being killed; therefore it is our moral right and our moral duty to carry out this nationalization."[46]

68.   On 18 June 2014, the Investigative Committee of the Russian Federation, the principal federal investigative organ in Russia, opened a criminal investigation into Mr. Kolomoisky. [47] The Basmanny District Court in Moscow authorized Mr. Kolomoisky's arrest *in absentia* on 2 July 2014.[48]

69.   On 18 August and 1 September 2014, the Kievskiy District Court in Simferopol granted two requests that had been submitted by the Ministry of Internal Affairs of the Republic of Crimea to attach properties owned by companies believed by the court to be affiliated with Mr. Kolomoisky, including several petrol stations owned by the Claimants.[49] On 24 September 2014, a spokesperson for the Russian Investigative

---

[43]   Statement of Claim, § 3.54.

[44]   Decree of the State Council of the Republic of Crimea No. 2085-6/14 dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-001).

[45]   Decree of the State Council of the Republic of Crimea No. 2085-6/14 dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-002-006).

[46]   *Crimea's State Council rules to nationalize [Igor Kolomoisky's] property in Crimea*, ITAR-TASS (3 September 2014) (C-87).

[47]   *Russia opens criminal case against top Ukrainian officials Avakov and Kolomoisky*, RAPSI (18 June 2014) (C-79).

[48]   *Moscow court sanctions arrest of Ukraine tycoon Governor Kolomoisky*, Moscow Times (2 July 2014) (C-81).

[49]   Decision of the Simferopol Kievsky District Court, Case No. 3/6-291/2014 (18 August 2014) (C-85); Decision of the Simferopol Kievsky District Court, Case No. 3/6-319/2014 (1 September 2014) (C-86).

Committee, Mr. Vladimir Markin, confirmed that "all of Mr. Kolomoisky's assets in Russia" would be seized.[50]

70.   On 7 October 2014, the Council of Ministers of the Republic of Crimea passed Order No. 1016-r, transferring the "right of economic management" of the Claimants' stations to a Russian State-owned enterprise, Feodosia Enterprise for Supply of Petroleum,[51] which was later renamed to SUE Crimean Fuel Alliance. On 11 November 2014, the Federal City of Sevastopol issued an order nationalizing the Claimants' Sevastopol-based petrol stations, assigning ownership rights to that station to a Russian State-owned entity called SUE City Petrol Station Complex.[52]

71.   On 11 March 2015, the Council of Ministers of the Republic of Crimea issued a decree merging SUE Crimean Fuel Alliance with SUE Chernomorneftegaz, another Russian State-owned entity.[53] At the time of the Claimants' Statement of Claim, the 31 petrol stations formerly owned or leased by the Claimants were operated by this company, under the "GOST" brand.[54]

72.   The Claimants assert that the measures described above were taken as a result of their affiliation with Mr. Kolomoisky, a beneficial owner of the Petrol Companies and several related enterprises, as well as a former Governor of Ukraine's Dnepropetrovsk region and an opponent of the annexation.[55] In their view, Mr. Kolomoisky's assets have been "the target of a campaign by Russian and Russian-controlled authorities in

---

[50]   *Crimean authorities nationalize Kolomoisky's tourist resorts*, RAPSI News (24 September 2014) (C-90).

[51]   Order No. 1016-r of the Council of Ministers of the Republic of Crimea (7 October 2014) (C-92); s*ee also* Order No. 918-r of the Council of Ministers of the Republic of Crimea (11 September 2014) (C-88).

[52]   Order No. 401 of the Sevastopol Government "On the assignment of property under right of economic management to SUE City Petrol Station Complex" (11 November 2014) (C-94).

[53]   Order No. 182-r of the Council of Ministers of the Republic of Crimea (11 March 2015) (C-102). According to the Statement of Claim, SUE Chernomorneftegaz "is the property of the Republic of Crimea" (p. 26, fn. 122). *See also* Charter of the State Unitary Enterprise of the Republic of Crimea "Chernomorneftegaz," entered into the Ukrainian Unified State Register of Legal Entities, Individual Entrepreneurs and Civic Organizations on 29 November 2014 (C-98).

[54]   *Chernomorneftegaz Real Time Overview of Fuel Supplies at GOST Gasoline Stations*, SUE Chernomorneftegaz website (15 December 2015) (C-116); *Kolomoisky's chain of petrol stations in Crimea will be offered for sale no earlier than next year*, Novosti Kryma (13 October 2015) (C-114). *See also* Statement of Claim, § 2.41 (table tracing the ownership and control of each of the petrol stations).

[55]   Statement of Claim, § 1.4.

Crimea that resulted in the taking of all properties in Crimea known or perceived to be associated with him."[56]

## V.    POSITIONS OF THE PARTIES AND UKRAINE AS A NON-DISPUTING PARTY

### A.    SUMMARY OF THE CLAIMANTS' POSITION AND REQUEST FOR RELIEF

73.    As noted above, the Claimants consider that the Respondent has breached the following provisions of the Treaty: (i) Article 5, relating to expropriation; (ii) Article 3, prohibiting "measures discriminatory in nature that could interfere with the management and disposal" of protected investments, and incorporating a most favored nation ("**MFN**") clause; and (iii) Article 2, which provides that each Contracting Party "guarantees, in accordance with its legislation, the full and unconditional legal protection of investments by investors of the other Contracting Party."

#### 1.    Article 5 of the BIT

74.    The Claimants argue that, as of April 2014, Crimea's Paramilitary Forces "seized and looted" the Feodosia office building and began to operate the Claimants' petrol stations,[57] measures which they consider to be attributable to the Respondent as outlined in paragraph 66 above. The Claimants additionally note that, on 3 September 2014, the State Council of the Republic of Crimea formally nationalized the Claimants' petrol stations located in the Republic of Crimea and, on 11 November 2014, in the Federal City of Sevastopol.[58] In the Claimants' view, these measures qualify as a nationalization within the meaning of Article 5.

75.    The Claimants submit that the nationalization was unlawful and did not satisfy any of the conditions set forth in Article 5 of the Treaty.[59]

---

[56]    Statement of Claim, § 1.4.

[57]    Statement of Claim, § 3.59.

[58]    Statement of Claim, § 3.59, *referring to* Decree No. 2085-6/14 of the State Council of the Republic of Crimea dated 30 April 2014 and amendments thereto dated 3 September 2014 to 27 February 2015 (English translation of C-74-R-002-006); Order No. 401 of the Sevastopol Government, "On the assignment of property under right of economic management to SUE City Petrol Station Complex" (11 November 2014) (C-94).

[59]    Statement of Claim, § 3.60.

### 2.    Article 3 of the BIT

76.    In addition to their pleadings with regard to Article 5, the Claimants submit that the Respondent has also violated Article 3 of the Treaty. Article 3(1) requires Contracting Parties to refrain from "measures discriminatory in nature that could interfere with the management and disposal" of protected investors' investments. The article also includes an MFN clause that requires host States to provide protected investors treatment that is "no less favorable than the treatment given to its own investors or investors of any third state."

77.    First, the Claimants assert a claim under a theory of discriminatory treatment flowing from the first clause of Article 3(1).[60] Relying on *AES Summit Generation Ltd. v. Hungary*, the Claimants suggest that discrimination is shown where a State "benefit[s] or harm[s] someone more in comparison with the generality."[61] In the Claimants' view, the Respondent "left no doubt" that its actions discriminated against the Claimants and were motivated by "political animus towards Mr. Kolomoisky."[62] They submit that such conduct is devoid of an "objective or reasoned basis."[63]

78.    Second, the Claimants invoke the MFN clause in Article 3.[64] In this connection, the Claimants refer to Article 3(1) of the bilateral investment treaty between Canada and the Union of Soviet Socialist Republics (the "**Soviet Union**"), which provides for fair and equitable treatment and full protection and security.[65] The Claimants consider the Treaty to incorporate, and the Respondent to have violated, guarantees of fair and equitable treatment and full protection and security.[66]

---

[60]    Statement of Claim, § 3.70.

[61]    Statement of Claim, § 3.72, *referring to AES Summit Generation Ltd. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, § 10.3.53 (23 September 2010) (CLA-27). *See also Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Liability, § 210 (27 December 2010) (CLA-79).

[62]    Statement of Claim, § 3.72.

[63]    Statement of Claim, § 3.72.

[64]    Statement of Claim, §§ 3.73-3.75, *referring to* Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (2ⁿᵈ ed. 2012), p. 211 (CLA-94); *MTD Equity Sdn. Bhd. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, §§ 100, 107, 190, 197 (25 May 2004) (CLA-63); *see also White Indus. Australia Ltd. v. Republic of India*, UNCITRAL, Final Award, §§ 11.2.1-11.2.9 (30 November 2011) (discussing and rejecting India's claim that importing substantive treaty provisions through the MFN clause would "fundamentally subvert the carefully negotiated balance of the [bilateral investment treaty]") (CLA-83).

[65]    Statement of Claim, §§ 3.77, 3.89.

[66]    Statement of Claim, § 3.70.

### 3.    Article 2 of the BIT

79.    The Claimants also claim a breach of Article 2 of the Treaty, which requires the Respondent to guarantee "the full and unconditional legal protection of investments by investors of the other Contracting Party." According to the Claimants, the Russian Federation failed to grant such protection when it "targeted" the Claimants based on their connection with Mr. Kolomoisky, "ultimately destroying" their investments through physical seizure and nationalization.[67]

### 4.    The Claimants' Request for Relief

80.    The Claimants request the Tribunal to issue an award:

(a) Ordering the Russian Federation to pay compensation for the injury to the Petrol Companies; the Petrol Companies calculate that value as USD 47,406,455;

(b) Ordering the Russian Federation to pay interest on the above amount at a reasonable commercial rate compounded from 22 April 2014 until full payment has been made;

(c) Ordering the Russian Federation to pay the Petrol Companies' costs in these arbitration proceedings in an amount to be specified later, together with interest thereon, including all attorneys' fees and expert witness fees, and as between the parties, alone to bear the responsibility for compensating the Arbitral Tribunal, the Appointing Authority, and the Permanent Court of Arbitration; and

(d) Ordering any other relief that the Tribunal may deem appropriate.[68]

### B.    SUMMARY OF THE RUSSIAN FEDERATION'S POSITION

81.    The Respondent has not participated in these proceedings so far. Nevertheless, the Tribunal understands the Respondent's Letters, quoted in full in paragraphs 5 and 6 above, to constitute an objection to jurisdiction and, *a fortiori*, an objection to the Claimants' requested relief. Specifically, the Russian Federation objected that the Treaty "cannot serve as a basis for composing an arbitral tribunal to settle these

---

[67]    Statement of Claim, § 3.96.

[68]    Statement of Claim, § 4.1.

claims." By reference to the definition of investment in Article 1(1) of the Treaty, it also submitted that the assets in dispute are "situated in the territory of the Crimea and Sevastopol, *i.e.*, in the territory that was a part of Ukraine but at the present time […] forms an integral part of the territory of the Russian Federation and cannot be regulated by the Treaty."

## C.   SUMMARY OF UKRAINE'S POSITION

82.   As stated in the procedural history above, in PO4 the Tribunal admitted the Submission of Ukraine as a non-disputing party to the BIT. It did so on the basis of the general procedural powers vested in it by Article 182(1) of the Swiss Federal Private International Law Act (the "**PILA**")[69] and by analogy with ICSID Arbitration Rule 37(2) and Articles 4 and 5 of the UNCITRAL Transparency Rules, all of which recognize such inherent powers of arbitral tribunals in investor-State disputes. In the exercise of its procedural powers, the Tribunal found that Ukraine's application to file a non-disputing party submission met the criteria of Article 5(1) of the UNCITRAL Transparency Rules for issues of interpretation of the BIT and the criteria of Articles 5(2) and 4(3) of such Rules as well as ICSID Arbitration Rule 37(2) in respect of other matters, all these provisions being applied by analogy.

83.   In its Submission, Ukraine makes the following four main arguments in support of its position that the Treaty should apply to and protect Ukrainian investments in Crimea. First, according to Ukraine, the term "territory" as used in Article 1(4) of the Treaty applies to territories occupied by, and under the effective control and jurisdiction of, the relevant Contracting Party.[70] Second, the Treaty's application to Ukrainian investments in Crimea is supported by international practice concerning situations of illegal occupation.[71] Third, in light of the objective of the Treaty, there can be no doubt that it applies to investments in Crimea initiated before the Russian occupation.[72] Finally, the requirement of consistency in international law (*allegans contraria non audiendus est*) precludes the Russian Federation from denying the Treaty's application to Ukrainian investments and investors in Crimea.[73]

---

[69]   Swiss Federal Act on Private International Law, dated 18 December 1987.

[70]   Submission of Ukraine, §§ 6-27.

[71]   Submission of Ukraine, §§ 28-29.

[72]   Submission of Ukraine, §§ 30-33.

[73]   Submission of Ukraine, §§ 34-41.

## VI.   ANALYSIS

### A.   PRELIMINARY MATTERS

84.   Prior to considering the merits of the Parties' positions, the Tribunal will address the law governing this arbitration (1); the subject matter of this Award (2); the coordination of parallel proceedings (3); the default of the Respondent (4); and the law applicable to the jurisdiction of the Tribunal, in which context it will also address the relevance of previous decisions or awards (5).

### 1.   Law Governing this Arbitration

85.   This investment arbitration is seated in Geneva, Switzerland, and is thus governed by Chapter 12 of the PILA.[74] It is also governed by any procedural rules found in the BIT and by the 1976 UNCITRAL Rules.

### 2.   Subject Matter of this Award

86.   The present proceedings were bifurcated between jurisdiction and merits in accordance with the Procedural Timetable (Scenario 2) in PO2. Thus, this Award deals with the jurisdiction of the Tribunal over the dispute submitted to it.

### 3.   Coordination of Parallel Proceedings

87.   In accordance with Article 5 of PO1, the present proceedings were conducted in parallel with PCA Case No. 2015-35, *Stabil LLC et al. (Ukraine) v. The Russian Federation*. In light of the commonalities of fact and law and of the identical composition of the tribunals in the two cases, the Tribunal sought to structure the arbitral proceedings in such a manner as to minimize duplication and avoid unnecessary costs whenever possible. In particular, a joint Hearing was held and the Tribunal allowed a single PHB to be filed for both matters. However, the Tribunal deals with the cases in separate awards.

### 4.   Default of the Respondent

88.   Although it has been advised of all procedural steps in this arbitration and invited to participate in each of them, the Respondent has not taken part in the proceedings

---

[74]   PO1, Articles 9.1, 11.1.

aside from submitting the Respondent's Letters. After the Respondent failed to submit a Statement of Defense, the Tribunal ordered the proceedings to continue in accordance with Article 28(1) of the UNCITRAL Rules.[75]

89.   Under the UNCITRAL Rules and the *lex arbitri*, an arbitration must proceed even if the Respondent defaults. This said, unlike in court litigation in many jurisdictions, there is no "default judgment" in arbitration. In other words, in spite of the default, a tribunal cannot dispense with satisfying itself that the claims before it are well founded in fact and in law. This rule applies to jurisdiction as well as to the merits.

90.   In this context, the Claimants have argued that by electing not to participate in these proceedings, the Respondent has waived any objections other than those raised in its Letters. With reference to scholarly writings,[76] the Claimants submit that Article 21 of the UNCITRAL Rules[77] "by its wording suggests that the tribunal's far-reaching power to rule on jurisdictional objections is limited to 'objections' to jurisdiction—that is, only if raised by a party and not as a result of the tribunal's own initiative." The Claimants appreciate the Tribunal's duty "to find the appropriate balance between assuring that the non-participating party is treated fairly, […] and not over-compensating for that party's absence in a way that is unfair to the party that is participating."[78] Nonetheless, the Tribunal should bear in mind, say the Claimants, that the protection it gives to the non-participating respondent "erodes the protection" of the claimant under the applicable rules, with the result that "the greater the protection to the respondent the more progressive is the shift in the balance in its favour."[79]

---

[75]   Pursuant to Article 28(1) of the UNCITRAL Rules, "[i]f, within the period of time fixed by the arbitral tribunal, the respondent has failed to communicate his statement of defence without showing sufficient cause for such failure, the arbitral tribunal shall order that the proceedings continue."

[76]   Claimants' Answers, p. 1, *referring to* Richard Kreindler, *Illegality in the Formation and Performance of Contracts*, in INTERNATIONAL COMMERCIAL ARBITRATION: IMPORTANT CONTEMPORARY QUESTIONS, p. 235 (Albert Jan van den Berg, ed., 2003) (CLA-182).

[77]   In accordance with Article 21 of the UNCITRAL Rules, "[t]he arbitral tribunal shall have the power to rule on objections that it has no jurisdiction, including any objections with respect to the existence or validity of the arbitration clause or of the separate arbitration agreement."

[78]   Claimants' Answers, p. 1.

[79]   Claimants' Answers, p. 1, *referring to* Gerald Fitzmaurice, *The Problem of the Non-Appearing Defendant Government*, Brit. Y.B. Int'l L., p. 95 (1980) (reproducing Professor O'Connell's observations in *Aegean Sea Continental Shelf (Greece v. Turkey)*, Oral Arguments on Jurisdiction—Minutes of the Public Sittings held at the Peace Palace, The Hague, President Jiménez de Aréchaga presiding, CR 1978, pp. 318-319 (9 to 17 October and 19 December 1978) (CLA-179)).

91.   The Tribunal has taken note of the Claimants' submission and considers that the Parties have been treated in accordance with their fundamental procedural rights. This being so, it underlines that it has a duty to ascertain its jurisdiction *ex officio* whenever jurisdiction is sought to be established on the basis of an international treaty. This rule appears even more justified when the respondent does not participate.

### 5.   Law Governing Jurisdiction

92.   The Tribunal's jurisdiction is governed by the BIT, interpreted in application of Articles 31 to 33 of the Vienna Convention on the Law of Treaties (the "**VCLT**"),[80] to which both Russia and Ukraine are parties since 1986,[81] and which also reflect customary international law. In addition, the Tribunal may also look to other rules of international law which may apply as between the Contracting Parties. Finally, national law may further be relevant to the jurisdictional requirements depending on the issues involved, particularly if the BIT contains a reference to national law[82] or uses a term that can only be understood by reference to national law.[83]

93.   When applying the governing law, be it international or national, the Tribunal is not bound by the arguments and sources invoked by the Parties. Under the maxim *iura novit curia*—or, better, *iura novit arbiter*—the Tribunal is required to apply the law of its own motion, provided it seeks the Parties' views if it intends to base its decision on a legal theory that was not addressed and that the Parties could not reasonably anticipate.[84]

---

[80]   1155 UNTS 331 (1969) (CLA-24).

[81]   The VCLT entered into force on 27 January 1980. The Ukrainian Soviet Socialist Republic acceded to the VCLT on 14 May 1986, while the Soviet Union acceded to it on 29 April 1986 (Multilateral Treaties Deposited with the General Secretary, United Nations Treaty Collection Website, Chapter XXIII (23 May 1969) (CLA-113)). Ukraine is the legal successor of the Ukrainian Soviet Socialist Republic and Russia assumed the treaty obligations of the Soviet Union upon its dissolution.

[82]   *See, inter alia, Quiborax S.A., Non Metallic Minerals S.A. and Allan Fosk Kaplún v. Plurinational State of Bolivia*, ICSID Case No. ARB/06/2, Decision on Jurisdiction, § 47 (27 September 2012).

[83]   This determination of applicable law is in line with Article 178 PILA. As to its form, there is no question that the arbitration agreement is in writing under Article 178(1). As to the law governing substantive validity, the determination just made accords with the first two options of Article 178(2) PILA, being specified that the Contracting States consent to jurisdiction and applicable law when concluding the treaty and the investor when starting an arbitration under it.

[84]   Swiss Supreme Court decisions 4P.114/2001 of 19 December 2001, §§ 3a, 20 *ASA Bulletin* (2002), pp. 493, 511 and 4A_214/2013 of 5 August 2013, § 4. *See also, inter alia, Vestey Group Ltd v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/06/4, Award, § 118 (15 April 2016);

94.   The Tribunal also notes that the Claimants as well as Ukraine have referred to a large number of arbitral awards and decisions dealing with international investment law and other areas of international law. The Tribunal considers that, while it is not bound by previous decisions, in its judgment it must give due consideration to earlier decisions of international tribunals. Specifically, it believes that, absent contrary grounds, it should in principle adhere to rules established on comparable facts in a series of consistent cases.[85]

95.   In this context, the Tribunal further observes that, as can be seen from the procedural history above, it had the opportunity to review the decisions on jurisdiction issued in PCA Case No. 2015-07, *Aeroport Belbek LLC and Mr. Igor Valerievich Kolomoisky v. The Russian Federation*, PCA Case No. 2015-21, *PJSC CB PrivatBank and Finance Company Finilon LLC v. The Russian Federation*, and PCA Case No. 2015-36, *Everest Estate LLC et al. v. The Russian Federation*. These decisions, rendered under the BIT at issue here, dealt at least in part with legal issues analogous or identical to the ones before this Tribunal. While the Tribunal has formed its opinion independently and exclusively on the basis of the record before it, it notes the convergence of the outcomes reached by the different tribunals.

## B.   RELEVANT TREATY PROVISIONS AND JURISDICTIONAL REQUIREMENTS

96.   Turning next to the specific treaties applicable in the present case, in particular the BIT and the VCLT, the Tribunal notes that the following BIT provisions may be relevant to the present dispute:

- Article 1 of the BIT reads, in relevant part, as follows:

  1. The term "investments" means any kind of tangible and intangible assets [which are] invested by an investor of one Contracting Party in the territory of the other Contracting Party in accordance with its legislation, including:

    a) movable and immovable property, as well as any other related property rights;

    b) monetary funds, as well as securities, commitments, stock and other forms of participation;

---

*Daimler Financial Services A.G. v. Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment, § 295 (7 January 2015).

[85]   Arbitrator Stern does not analyze the arbitrator's role in the same manner, as she considers it her duty to decide each case on its own merits, independently of any apparent jurisprudential trend.

c) intellectual property rights, including copyrights and related rights, trademarks, rights to inventions, industrial designs, models, as well as technical processes and know-how;

d) rights to engage in commercial activity, including rights to the exploration, development and exploitation of natural resources.

Any alteration of the type of investments in which the assets are invested shall not affect their nature as investments, provided that such alteration is not contrary to legislation of a Contracting Party in the territory of which the investments were made.

2. The term "investor of a Contracting Party" means:

a) any natural person having the citizenship of the state of that Contracting Party and who is competent in accordance with its legislation to make investments in the territory of the other Contracting Party;

b) any legal entity constituted in accordance with the legislation in force in the territory of that Contracting Party, provided that the said legal entity is competent in accordance with legislation of that Contracting Party, to make investments in the territory of the other Contracting Party.

[…]

4. The term "territory" means the territory of the Russian Federation or the territory of Ukraine as well as their respective exclusive economic zone and the continental shelf, defined in accordance with international law.

5. The term "legislation of the Contracting Party" means legislation of the Russian Federation or Ukraine, respectively.

- Article 9 of the BIT states, in relevant part, as follows:

1. Any dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments, including disputes concerning the amount, terms, and payment procedures of the compensation provided for by Article 5 hereof, or the payment transfer procedures provided for by Article 7 hereof, shall be subject to a written notice, accompanied by detailed comments, which the investor shall send to the Contracting Party involved in the dispute. The parties to the dispute shall endeavor to settle the dispute through negotiations if possible.

2. If the dispute cannot be resolved in this manner within six months after the date of the written notice mentioned in paragraph 1 of this article, it shall be referred to:

[…]

c) an "ad hoc" arbitration tribunal, in accordance with the Arbitration Regulations of the United Nations Commission for International Trade Law (UNCITRAL).

- Further, Article 12 of the BIT has the following content:

  This Agreement shall apply to all investments made by investors of one Contracting Party in the territory of the other Contracting Party, on or after January 1, 1992.

97.   Furthermore, it is recalled that Article 31 of the VCLT provides the following rules on treaty interpretation:

(1)   A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

(2)   The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:

  a.   Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;

  b.   Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty.

(3)   There shall be taken into account, together with the context:

  a.   Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;

  b.   Any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;

  c.   Any relevant rules of international law applicable in the relations between the parties.

(4)   A special meaning shall be given to a term if it is established that the parties so intended.

- Article 32 of the VCLT adds the following:

  Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31:

  (a)   Leaves the meaning ambiguous or obscure; or

  (b)   Leads to a result which is manifestly absurd or unreasonable.

- Furthermore, Article 29 of the VCLT, entitled "Territorial Scope of Treaties", provides as follows:

  Unless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory.

- Article 26 of the VCLT, entitled "*Pacta Sunt Servanda*", states that:

> Every treaty in force is binding upon the parties to it and must be performed by them in good faith.

98.   On the basis of the BIT provisions set out above, the following requirements must be met for the Tribunal to have jurisdiction: the dispute must fall within the territorial (C) and the temporal (D) scope of application of the Treaty; the Claimants must qualify as "investors" under the Treaty (E); and they must have made an "investment" in the territory of the Respondent State in accordance with the host State's legislation (F).

99.   One issue pervades practically all the themes just listed. It arises because State control over Crimea changed between the time when the investments were made and the time when they were allegedly taken (or otherwise affected by State measures). The Treaty, like all investment treaties, is conceived for investments by nationals of one State that own or control investments in another State. The present situation is different. At the time of the investment, the assets at stake were located in the territory and were under the control of the investor's home State. Through the Incorporation, control over Crimea, the location of the investment, changed, with the result that what had been an investment in Ukraine became an investment in Crimea.

100.   This specific feature of the dispute, while linked to the timing of the investment, essentially raises the issue of the territorial scope of application of the BIT and the definition of "territory" under the BIT. However, it is recurrent in various aspects of the analysis, such as in the context of the definition of "investment" in Article 1(1) of the BIT, which refers to "assets […] invested by an investor of one Contracting Party <u>in the territory</u> of the other Contracting Party."[86] Similarly, Article 12 of the BIT, which defines the Treaty's temporal scope of application, also speaks of "investments […] made by investors […] <u>in the territory</u> of the other Contracting Party."[87]

101.   In essence, the question is whether investments made by Ukrainian nationals in Ukraine came under the protection of the Russia-Ukraine BIT because the territory of Ukraine where the investments were made came under the control of Russia. In other words, does the Treaty bind Russia in respect of investments made in Crimea prior to the Incorporation? If the answer is affirmative, the Tribunal will then review the other jurisdictional requirements separately taking into account its previous conclusion and,

---

[86]   Emphasis added.

[87]   Emphasis added.

in particular, the relevant point in time to assess the jurisdictional requirements. A negative answer, by contrast, will put an end to the enquiry.

102.   In view of the recurrent relevance of this question in the assessment of the various jurisdictional requirements, the Tribunal will address it at the outset of its analysis. Before turning to it, the Tribunal, however, notes that it is satisfied that there is a dispute between the Claimants and Russia, that the Claimants have given an appropriate notice of such dispute,[88] and that the requirements of Article 9(2) BIT are met.[89]

## C.   TERRITORIAL SCOPE OF APPLICATION OF THE TREATY

### 1.   The Parties' Positions

103.   In the Claimants' view, a treaty extends to "all territories which are 'controlled and administered' by the parties" to that treaty.[90] Noting that the status of Russia's annexation of Crimea is heavily disputed under international law,[91] the Claimants submit that the Tribunal "does not need to resolve the controversy between Russia and the international community" with regard to the legality of the annexation in order to adjudicate the present dispute.[92] Specifically, they submit as follows:

> The Petrol Companies are not asking the Tribunal to find that the Russian Federation's invasion and Annexation of Crimea were legal or to recognize the Crimean referendum as legitimate. Nor are the Petrol Companies asking the Tribunal to find the opposite and hold that the Russian Federation's invasion and Annexation of Crimea were illegal.

---

[88]   Statement of Claim, § 3.50; Letter from John M. Townsend to Prime Minister Dmitri Medvedev,15 October 2014 (exhibit C-14 to Notice of Arbitration); Letter from John M. Townsend to Prime Minister Dmitri Medvedev, 31 October 2014 (exhibit C-15 to Notice of Arbitration).

[89]   Notice of Arbitration, § 31; Statement of Claim, § 3.50.

[90]   Claimants' Answers, § 4.2.4, *referring to* Karl Doehring, *The Scope of the Territorial Application of Treaties: Comments on Art. 25 of the ILC's 1966 Draft Articles on the Law of Treaties*, 27 Heidelberg J. Int'l L., pp. 483, 488-489 (1967) (CLA-93). Ukraine has also relied on the writings of Professor Doehring, then-Director of the Max Planck Institute, who observed, shortly before the VCLT was concluded, that under Article 29, application of a treaty to a State's "territory" could include "occupied zones" held by that State. Professor Doehring went on to note that where a State purports to annex such territory, application of the treaty does "not imply the recognition of [the] annexation." According to Ukraine, contemporary authorities confirm this point (Submission of Ukraine, § 9).

[91]   Statement of Claim, §§ 3.10-3.11.

[92]   Statement of Claim, § 3.12.

Rather, the Petrol Companies are asking the Tribunal simply to find that, as a result of the Russian Federation's establishment of *de facto* control over Crimea and its assertion of sovereign authority there, Ukrainian investors with investments on the territory of the Crimean Peninsula are entitled to invoke the protections of the BIT and to arbitrate their claims for compensation for injuries they have sustained due to the Russian Federation's unlawful interference with their investments.[93]

104.   Accordingly, the Claimants suggest that the Tribunal merely needs to find that Ukrainian investors are "entitled" to invoke the BIT as a result of Russian factual control and assertion of sovereignty over Crimea. In this connection, the Claimants submit that: Russia has established *de facto* control in and asserted sovereignty over Crimea (a); under Article 29 of the VCLT, Russia's Treaty obligations apply to all areas in which it exercises control and has asserted sovereignty (b); and no "different intention" rebuts Article 29 of the VCLT (c).

### (a)   Russia's presence in Crimea

105.   The Claimants submit that the *de facto* control of the Respondent over Crimea "continues uninterrupted" since 27 February 2014.[94] The Claimants add:

Crimea became part of the "territory" of the Russian Federation within the meaning of Article 1.4 [of] the BIT, and the Russian Federation began to incur obligations to Ukrainian investments in Crimea, on 27 February 2014, when the Russian Federation forcibly took possession of Crimea and assumed the function of a State to the exclusion of the Ukrainian authorities, as part of a planned and premeditated effort to permanently make Crimea Russian territory.

In the weeks that followed, the Russian Federation purported to legitimize its control and authority over Crimea though the integration of Crimea into its federal system of government. Specifically, on 18 March 2014, the Russian Federation signed the Annexation Treaty. […] Thus, Russian law has, since 18 March 2014, served as the vehicle through which the Russian Federation purported to assert *de jure* sovereignty over Crimea.[95]

---

[93]   Statement of Claim, §§ 3.12-3.13.

[94]   Claimants' Answers, § 2.3.5.

[95]   Claimants' Answers, §§ 2.4.2-2.4.3.

106.   Thus, Russia "took steps [...] to assert *de jure* sovereignty" over Crimea pursuant to Russian law; this was accomplished by dividing the Peninsula into two new juridical units, or "federal subjects," *i.e.*, the Federal City of Sevastopol and the Republic of Crimea.[96] In this regard, the Claimants note that Article 9 of the Incorporation Treaty[97] provides that the "laws and other statutes and regulations of the Russian Federation shall apply on the territories" of the two new federal subjects, effective from the date of the Republic of Crimea's acceptance into the Russian Federation and the formation of its new constituent parts.[98] The fact that Russian legislation itself explicitly provides that the territorial scope of Russian law extends to Crimea, they submit, is indicative of Russia's intent to become bound by its international obligations in respect of Crimea as well. The Claimants also note the conclusion of their Russian law expert, Professor Maggs, who explains that the Russian Constitution incorporates the Respondent's treaties into the domestic legal system.[99]

### (b)   Russia's Treaty obligations in light of Article 29 VCLT

107.   The Claimants submit that the Respondent's Treaty obligations extend to all territory over which it asserts sovereignty and jurisdiction. In this respect, they rely principally on Article 29 of the VCLT, which provides that, "[u]nless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory."[100]

108.   For the Claimants, the reference in Article 29 to the "entire territory" includes "all territory over which a State asserts sovereignty or exercises jurisdiction."[101] The Claimants further observe that the VCLT, unlike the Vienna Convention on the Succession of States in respect of Treaties (the "**VCST**")[102], is not limited in its application to situations in "conformity with international law."[103] The Claimants do not consider the VCST to be a relevant or helpful basis of reference in this dispute because its application is limited by Article 6 to "succession of States occurring in conformity

---

[96]   Statement of Claim, § 3.15; Claimants' Answers, §§ 2.3.5, 2.4.3.

[97]   The Claimants refer to the Incorporation Treaty as the "Annexation Treaty".

[98]   Statement of Claim, § 3.15; Claimants' Answers, § 2.4.3.

[99]   Statement of Claim, § 3.16, *referring to* First Maggs Report, § 32 (CER-1).

[100]   VCLT, Article 29 (CLA-24).

[101]   Statement of Claim, § 3.18. *See also* Claimants' Answers, § 4.4.3.

[102]   1946 UNTS 3 (1978) (CLA-145).

[103]   Claimants' Answers, § 4.2.2.

with international law."[104] As opposed to the VCST, Article 29 VCLT may be applied "without having to accept" (or otherwise adjudicate) the lawfulness of the annexation.[105]

109. In this context, the Claimants have referred to the *travaux* of the VCLT and its commentary in support of the argument that a State's treaty obligations apply to its entire territory, including any new territory over which a State asserts sovereignty and exercises jurisdiction, whether it does so legally or illegally.[106] They also submit that their position in the context of the VCLT is supported by State practice,[107] even with regard to extending treaty obligations of an annexing State to territory acquired forcibly.[108] Such State practice is alleged to include the annexations of (i) Hawaii by the USA in 1898; (ii) Austria by Germany in 1938; and (iii) the Baltic States by the Soviet Union in 1940.[109] With regard to contemporary State practice, the Claimants further cite the practice of the USA, which, they suggest, deems treaties to extend "to all territories which are 'controlled and administered' by the parties."[110]

110. The Claimants also assert that international law "continues to apply treaties of an occupying power" to unlawfully occupied territory, even after the introduction of the United Nations Charter and its prohibition on the use of force.[111] They cite, for instance, the advisory opinion of the International Court of Justice (the "**ICJ**"), declaring that the prohibition on invoking or applying treaties concluded by South Africa on behalf of Namibia, a territory deemed illegally occupied by the international community, could not apply to "certain general conventions such as those of a humanitarian character."[112]

---

[104] Claimants' Answers, § 4.2.1.

[105] Statement of Claim, § 3.23.

[106] Statement of Claim, § 3.17, fn. 174, 175.

[107] Statement of Claim, § 3.24.

[108] Statement of Claim, § 3.26.

[109] Statement of Claim, § 3.26.

[110] Statement of Claim, § 3.24, *referring to* Karl Doehring, *The Scope of the Territorial Application of Treaties: Comments on Art. 25 of the ILC's 1966 Draft Articles on the Law of Treaties*, 27 Heidelberg J. Int'l L., pp. 483, 488-489 (1967) (CLA-93).

[111] Statement of Claim, § 3.27.

[112] Statement of Claim, § 3.28, *referring to Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276*, Advisory Opinion, I.C.J. Reports 1971, p. 16, § 42 (21 June 1971) (CLA-60). *See also* Claimants' Answers, § 4.2.4, *referring to Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, I.C.J. Reports 2004, p. 136, § 112 (9 July 2004) (CLA-61) (deeming Israel's obligations to uphold "essentially territorial" rights anchored in the International Covenant on Economic, Social, and Cultural Rights to extend to occupied Palestinian territory by virtue of Israel's control and exercise of territorial jurisdiction).

111. Ukraine has also underlined that the ICJ made clear in the *Wall Advisory Opinion* that "essentially territorial" treaties may apply "both to territories over which a State party has sovereignty and to those areas over which that State exercises territorial jurisdiction." It is therefore widely understood that a State exercises "territorial jurisdiction as the occupying power" over the territory which it effectively controls.[113]

112. It is the Claimants' additional submission that the jurisprudence of the European Court of Human Rights (the "**ECtHR**") provides similar support for their proposition. The ECtHR held that "certain legal arrangements and transactions" remained in effect despite the Turkish occupation of Northern Cyprus.[114] The Claimants draw particular attention to the ECtHR's concern that "any other finding", namely one in which States would be exempted from treaty obligations with respect to unlawfully occupied territory, "would result in a regrettable vacuum in the system of human rights protection."[115] In the Claimants' submission, the policy underlying the ECtHR's jurisprudence militates in favor of the application of bilateral investment treaties to occupied territories, since these treaties "protect[] the rights of individuals and other third parties—investors— against State conduct that violates international law."[116]

113. The Claimants further argue that they "immediately became foreign investors in the Russian Federation upon the unlawful imposition of Russian authority and jurisdiction over Crimea and Claimants' investments, and the Russian Federation's conduct quickly demonstrated their need for treaty protection."[117]

---

[113] Submission of Ukraine, § 8, *referring to Legal Consequences of the Construction of a Wall in the Occupied Palestinian Territory*, Advisory Opinion, I.C.J. Reports 2004, p. 136, § 112 (9 July 2004) (CLA-61) and *Al-Skeini v. United Kingdom*, ECtHR App. No. 55721/07, Judgment, § 142 (7 July 2011) (CLA-205).

[114] Statement of Claim, § 3.29, *referring to Case of Cyprus v. Turkey*, ECtHR App. No. 25781/94, Judgment, § 90 (10 May 2001) (CLA-40) (*referring to Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276*, Advisory Opinion, I.C.J. Reports 1971, p. 16, § 42 (21 June 1971) (CLA-60)).

[115] Statement of Claim, § 3.29, *referring to Case of Cyprus v. Turkey*, ECtHR App. No. 25781/94, Judgment, § 78 (10 May 2001) (CLA-40).

[116] Statement of Claim, § 3.31.

[117] Claimants' Answers, § 4.5.3.

114.   The Claimants conclude that the Tribunal should apply Article 29 of the VCLT in order to "hold the Russian Federation to its obligations to Ukrainian investors in Crimea under the BIT."[118]

### (c)   No "different intention" rebuts Article 29 VCLT

115.   While they acknowledge that Article 29 of the VCLT does not apply to cases where "a different intention appears from the treaty or is otherwise established," the Claimants argue that no such intention is established in this case. [119]

#### i.   No different intention exists under the BIT

116.   The Claimants submit that an intention contrary to Article 29 does not appear in the Treaty's use of the term "territory". Relying on Article 31 of the VCLT,[120] the Claimants consider that a reading of the BIT, "in good faith in accordance with the ordinary meaning" of its text, the Treaty's context, and its object and purpose, "reveals no intention" to deviate from Article 29.

117.   The Claimants also submit that the Treaty provides for its "expansive application".[121] Article 1(4), for example, defines "territory" as "the territory of the Russian Federation or the territory of Ukraine as well as their respective exclusive economic zone and the continental shelf, defined in accordance with international law." According to the Claimants, the correct interpretation of Article 1(4) of the Treaty is that "in accordance with international law" modifies only the continental shelf and exclusive economic zone of each Contracting Party; it does not modify or concern the Treaty's definition of "territory" such as to potentially exclude the Claimants' investment owing to the change of control over Crimea.[122]

118.   The Claimants also suggest that a distinction between a broad definition of "territory", on the one hand, and more specific constraints placed on the continental shelf and exclusive economic zone, on the other, is present in the Russian Constitution itself,

---

118   Statement of Claim, § 3.32.

119   Statement of Claim, § 3.35.

120   Statement of Claim, § 3.36, *referring to* VCLT, Article 31 (CLA-24).

121   Statement of Claim, § 3.37.

122   Claimants' Answers, §§ 2.1.1-2.1.2.

where Article 67 addresses the two categories in separate subparagraphs.[123] Since Russian law is the "mechanism by which the Russian Federation has purported to assert *de jure* sovereignty" over Crimea, the Claimants assert that Russian law is a relevant factor in construing the words of Article 1(4) of the BIT.[124]

119.   Even if the phrase "in accordance with international law" did refer to terrestrial territory, the Claimants contend that the effect would be to expressly incorporate into the definition of Article 1(4) the rule of customary international law found in Article 29 of the VCLT.[125]

120.   The Claimants insist that the Respondent's approach in other bilateral investment treaties is instructive.[126] According to the Claimants, the Respondent has previously agreed to the inclusion of provisions limiting the territorial scope of its bilateral investment treaties.[127] In the absence of similar provisions in the current BIT, the "ordinary meaning" of the term "territory" should prevail, with the effect that the BIT should be read to cover "the entire territory" over which the Respondent asserts sovereignty.[128]

121.   In the Claimants' view, international jurisprudence supports the proposition that, absent such contrary intent, "generic" terms (such as "territory") are best approached with an interpretive flexibility permitting adjustment in the face of changes in circumstances.[129] The Claimants rely on ICJ jurisprudence in the *Aegean Sea Continental Shelf* case,[130] *Gabčíkovo-Nagymaros*,[131] and *Costa Rica v. Nicaragua*[132] as having interpreted terms

---

[123]   Claimants' Answers, § 2.1.10.

[124]   Claimants' Answers, §§ 2.4.1-2.4.3.

[125]   Claimants' Answers, §§ 2.2.2-2.2.3.

[126]   Statement of Claim, § 3.38.

[127]   Statement of Claim, § 3.38, *referring* to Agreement between the Government of the Russian Federation and the Government of the People's Republic of China on the Promotion and Reciprocal Protection of Investments, Protocol (9 November 2006) (CLA-10); Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Union of Soviet Socialist Republics for the Promotion and Reciprocal Protection of Investments, Article 1(e)(i) (6 April 1989) (CLA-16).

[128]   Statement of Claim, § 3.38.

[129]   Statement of Claim, § 3.39.

[130]   *Aegean Sea Continental Shelf*, Judgment, I.C.J. Reports 1978, p. 3, §§ 76-77 (19 December 1978) (CLA-26).

[131]   *Case Concerning the Gabčíkovo-Nagymaros Project*, Judgment, I.C.J. Reports 1997, p. 7, § 140 (25 September 1997) (CLA-39).

such as "territorial status", "the protection of the environment", and "commerce" by similarly taking into account the terms' contemporary meaning.[133] The Claimants argue that the present Treaty already endorses such an evolutionary approach in Article 1(4), which construes the continental shelf "as defined in conformity with international law," thus embracing, implicitly or by extension, the above approach.[134]

122.   Finally, the Claimants consider an expansive interpretation of "territory" to be consistent with the BIT's object and purpose, noting especially the Treaty's aspiration, in its preamble, to the "expansion of economic cooperation between the Contracting Parties" and its purpose to "create and maintain favorable conditions" for investment between Russia and Ukraine.[135] In the Claimants' view, excluding investments in Crimea from the Treaty's scope "would not serve this purpose."[136]

ii.   No different intention is "otherwise established"

123.   Having argued that the Treaty contains no intention to deviate from the rule set forth in Article 29 of the VCLT, the Claimants next submit that no extrinsic element indicates the existence of such an intention.

124.   The Claimants note, first, that Article 15 of the Russian Constitution provides that treaties form an integral part of Russian law.[137] Article 17 of the Russian Constitution also refers to "generally recognized principles and norms of international law."[138] In the Claimants' view, Russia therefore "recognizes the validity" of its international obligations, including with respect to the territory of the Republic of Crimea and the Federal City of Sevastopol.[139]

---

[132]   *Dispute Regarding Navigational and Related Rights*, Judgment, I.C.J. Reports 2009, p. 213, §§ 70-71 (13 July 2009) (CLA-45).

[133]   Statement of Claim, § 3.39.

[134]   Statement of Claim, § 3.39.

[135]   Statement of Claim, § 3.40, *referring to* BIT, preamble.

[136]   Statement of Claim, § 3.40.

[137]   Statement of Claim, § 3.42, *referring to* Constitution of the Russian Federation, Article 15, as reprinted in Peter B. Maggs, Olga Schwartz, and William Burnham, *Constitution*, in LAW AND LEGAL SYSTEM OF THE RUSSIAN FEDERATION, pp. 875, 879 (6th ed. 2015) (C-84).

[138]   Constitution of the Russian Federation, Article 17, as reprinted in Peter B. Maggs, Olga Schwartz, and William Burnham, *Constitution*, in LAW AND LEGAL SYSTEM OF THE RUSSIAN FEDERATION, pp. 875, 879 (6th ed. 2015) (C-84).

[139]   Statement of Claim, § 3.42.

125.  In addition, the Claimants submit that the Respondent's statements demonstrate the understanding that Crimea comprises part of its territory.[140] This understanding, they argue, is reflected in numerous statements of Russian officials [141] and in the Respondent's Letters. [142] In the Claimants' submission, the Respondent must "act consistently" with those assertions, in compliance with its obligation of good faith under international law.[143] Similarly, theories of estoppel could also be relied upon to "confirm" the Respondent's previous assertions.[144]

126.  Finally, the Claimants note that the Respondent has not attempted to argue that illegality in its conduct may justify excluding the application of the Treaty to Crimea.[145] In any event, the Claimants stress that it is well established that a State may not rely on its own illegal acts to defeat jurisdiction.[146]

2.     Analysis

127.  The Claimants have emphasized that the exercise of jurisdiction under the BIT does not require the Tribunal "to resolve the controversy between Russia and the international community over the legality of the Russian Federation's Annexation of Crimea." [147] The Claimants do not ask the Tribunal to find that "the Russian Federation's invasion and Annexation of Crimea were legal or to recognize the Crimean referendum as legitimate"; nor do they ask it "to find the opposite."[148]

128.  The Tribunal has noted the Claimants' observations. It deems its mission limited to assessing whether it has jurisdiction under the BIT. Therefore, in the analysis that

---

[140]  Claimants' Answers, § 4.6.10.

[141]  Statement of Claim, § 3.43.

[142]  Claimants' Answers, § 4.6.7, *referring to* Respondent's Letters.

[143]  Statement of Claim, § 3.43, *referring to* Anthony Aust, HANDBOOK OF INTERNATIONAL LAW, p. 8 (2nd ed. 2010) (CLA-87); I.C. MacGibbon, *Estoppel in International Law*, 7 Int'l Comp. L.Q., pp. 468, 468 (1958) (CLA-108).

[144]  Claimants' Answers, §§ 4.6.1-4.6.18 (referring to estoppel and several other permutations of the principle of good faith, such as *allegans contraria non est audiendus* and *non concedit contra factum proprium*).

[145]  Claimants' Answers, § 4.3.1.

[146]  Claimants' Answers, §§ 4.3.2-4.3.3, *referring to Case Concerning the Factory at Chorzow*, PCIJ Ser. A No. 9, Decision on Jurisdiction, pp. 12, 31 (26 July 1927) (CLA-148); *Irene Roberts Case (USA v. Venezuela)*, American-Venezuelan Commission, 9 R.I.A.A., pp. 204, 207 (1903) (CLA-157).

[147]  Statement of Claim, § 3.12.

[148]  Statement of Claim, § 3.12.

follows, it expresses no view on the legality of Crimea's incorporation into Russia or on the legitimacy of the sovereignty claims over this territory.[149]

129.   Before embarking on the interpretation and application of the BIT, it may be worthwhile to stress the obvious: the Treaty is in force. Neither Contracting Party has sought to terminate, suspend, or amend the Treaty; nor have they taken any steps to terminate its application with respect to investments in Crimea.[150]

130.   The Tribunal will begin its analysis by recalling some facts (Section VI.C.2(a)). It will then interpret the BIT in light of the VCLT, namely, in accordance with the ordinary meaning of terms placed in their context and taking account of the BIT's object and purpose, viewed in good faith (Section VI.C.2(b)).

(a)   Russia's effective control of and assertion of sovereignty over Crimea

131.   The facts pertaining to the events that took place in Crimea in 2014 have been described in detail above (§§ 53 ff.). Among them, the following events are particularly relevant to the Tribunal's analysis:

i.   By the end of February 2014, the Russian military forces had consolidated control over Crimea.

ii.   On 1 March 2014, Russia formally authorized the "use [of] the armed forces of the Russian Federation" in Crimea.

iii.   On 18 March 2014, Russia and the Republic of Crimea concluded the Incorporation Treaty, which formally admitted Crimea into the Russian Federation and subjected it to Russia's laws ("[t]he Republic of Crimea shall be considered accepted into the Russian Federation from the date of signing of this treaty"[151]). The Russian Constitutional Court and the upper and lower houses of Russia's

---

[149]   The Tribunal observes that the *Belbek* tribunal took a similar view and noted that "this Interim Award does not reach any view on the legality or illegality under international law of the incorporation of the Crimean Peninsula by the Russian Federation or on the sovereignty claims of Ukraine and the Russian Federation in respect of the Crimean Peninsula. None of the findings contained in this Interim Award are intended to take any position on such matters" (Interim Award, § 158  (24 February 2017) (CLA-269)).

[150]   Russia's assertion in its letter of 12 August 2015 that the "property in question […] cannot be regulated by the [Treaty]" has no impact on this conclusion, particularly considering that Russia has taken no action to denounce or terminate the Treaty's general application with respect to Crimea.

[151]   Incorporation Treaty, Article 9(1) (C-58).

parliament approved the Incorporation Treaty. Shortly thereafter, the Crimean Integration Law was adopted, providing for the creation of new courts and various new administrative bodies for Crimea.[152] Such courts were required to adjudicate cases under Russian procedural law.[153]

iv. On 19 March 2014, the Permanent Representative of the Russian Federation to the United Nations submitted President Putin's 18 March 2014 speech—in which he maintained that "Crimea has always been an inseparable part of Russia"—as "an official document of the General Assembly […] and of the Security Council."[154]

v. On 21 March 2014, President Putin held a signing ceremony for the Incorporation Treaty,[155] which entered into force with retroactive effect as of 18 March 2014.[156]

vi. The Russian authorities also adopted a constitution for Crimea, which entered into force on 12 April 2014 and which *inter alia* calls for the application of "international treaties of the Russian Federation" to Crimea.[157]

vii. In its domestic legislation, Russia has repeatedly treated Crimea as an integral part of its territory.[158] It has reiterated such claims to the public at large[159] and in

---

[152] Crimean Integration Law, Articles 7-9 (C-62).

[153] Crimean Integration Law, Article 9(7) (C-62).

[154] Letter from the Permanent Representative of the Russian Federation to the United Nations addressed to the Secretary-General, U.N. doc A/68/803-S/2014/202 (19 March 2014) (C-140).

[155] *Ceremony signing the laws on admitting Crimea and Sevastopol to the Russian Federation*, Official Site of the President of Russia (21 March 2014) (C-61).

[156] Incorporation Treaty, Article 10 (C-58).

[157] Article 39(3) of the Constitution of the Republic of Crimea (2014) provides as follows: "Everyone shall have the right to appeal, according to international treaties of the Russian Federation, to international bodies for the protection of human rights and freedoms, if all the existing internal state means of legal protection have been exhausted." *See also* Submission of Ukraine, § 34.

[158] *See, e.g.,* Constitution of the Russian Federation, Article 65, as amended by the Crimean Integration Law (C-62), which describes Crimea and Sevastopol as subjects of the Russian Federation.

[159] *See, e.g.,* a letter by the Permanent Representative of the Russian Federation to the United Nations circulating Russia's reservation to the 2014 Annual Report of the International Atomic Energy Agency, noting that the report asserted that Crimea and Sevastopol were part of Ukraine in the applicable period and stating: "This assertion is false […] [and] the Russian Federation cannot agree to any parts of the Annual Report […] which contradict objective reality" (Letter from the Permanent Representative of the Russian Federation to the United Nations Addressed to the Secretary-General, U.N. Doc A/70/555 (5 November 2015) (C-150)).

these proceedings, stating explicitly that Crimea "forms an integral part of the territory of the Russian Federation."[160]

132. In light of these facts, there can be no doubt that the Russian Federation has established effective control over Crimea, by taking physical control coupled with legal steps. It is equally clear that the Respondent considers Crimea as part of its sovereign territory; it treats it as such in its national law and claims sovereignty vis-à-vis the international community.

133. In its non-disputing party submission, Ukraine acknowledges that the Russian Federation has established control over Crimea, while challenging the legality of Russia's conduct:

> Ukraine considers that the Russian Federation, although it has not lawfully assumed any rights pertaining to sovereignty in Crimea, has by its conduct assumed international obligations in its administration of Crimea, particularly with respect to treaties benefiting individual rights or other innocent third parties.[161]

> […]

> Properly interpreted, the Treaty requires the Russian Federation to afford investment protection to Ukrainian investors in Crimea, a territory over which Russia exercises jurisdiction and effective control.[162]

134. In fact, Ukraine has enacted long term legislation and thus accepts as a matter of fact that the control is not merely temporary: "as reflected in Ukrainian legislation, Crimea is presently occupied by, and under the effective control and jurisdiction of, the Russian Federation."[163] Thus, even if it disputes Russia's claims of sovereignty over Crimea, Ukraine recognizes the factual situation and Russia's *de facto* control of Crimea.

---

[160]  Letter from the Ministry of Justice of the Russian Federation to the PCA dated 12 August 2015 (C-112), reproduced at § 5 above.

[161]  Submission of Ukraine, § 45, *referring to Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) notwithstanding Security Council Resolution 276*, Advisory Opinion, I.C.J. Reports 1971, p. 16, § 125 (21 June 1971) (CLA-60).

[162]  Submission of Ukraine, § 3.

[163]  Submission of Ukraine, § 2. *See also* Claimants' Answers, § 4.2.5, fn. 108.

**(b)    The application of the BIT to the Claimants' investments in Crimea in light of the VCLT**

135.    In accordance with Article 31 VCLT, a treaty must be interpreted in good faith, according to the ordinary meaning of its terms, read in their context and in light of the BIT's object and purpose and with due regard to any other relevant rules of international law applicable in the relations between the Contracting Parties.

136.    Furthermore, pursuant to Article 32 VCLT, if through the application of Article 31 VCLT the meaning of a provision or a term of a treaty were to remain unclear or lead to a manifestly unreasonable result, the *travaux préparatoires* and the negotiating history may also be used as supplementary means of interpretation.

137.    As noted above, both Russia and Ukraine are parties to the VCLT. Moreover, the treaty interpretation standards set forth in Articles 31 and 32 VCLT are also generally accepted as reflecting customary international law.[164] The Tribunal will thus apply these standards and interpret the Treaty in accordance with the ordinary meaning of terms (i) placed in their context (ii) taking account of the Treaty's object and purpose (iii), interpreted in good faith (iv).

i.    Ordinary meaning

138.    Article 31(1) VCLT provides that a treaty should be interpreted "in accordance with the ordinary meaning to be given to the terms of the treaty." Indeed, the starting point of treaty interpretation is the text of the Treaty[165] and it is "reasonable to assume […] that the ordinary meaning is most likely to reflect what the parties intended."[166]

139.    According to the Claimants, "the ordinary meaning of the term 'territory' in the Russia-Ukraine BIT should be the entire territory over which the Russian Federation

---

[164]    VIENNA CONVENTION ON THE LAW OF TREATIES: A COMMENTARY (Oliver Dörr and Kirsten Schmalenbach eds., 2012), p. 523, noting that the ICJ has consistently "applied the rules of interpretation laid down in the Convention as codified custom to virtually every treaty that came before it." *See also*, among many other investment awards, *Mondev International Ltd. v. USA*, ICSID Case No. ARB(AF)/99/2, Award, § 43 (11 October 2002), noting that "the applicable rules of interpretation of treaties […] set out in Articles 31-33 of the [VCLT] […] can be taken to reflect the position under customary international law" (footnotes omitted).

[165]    As the ICJ stated in *Libya v. Chad*, "[i]interpretation must be based above all upon the text of the treaty" (*Territorial Dispute (Libyan Arab Jamahiriya/Chad)*, Judgment, I.C.J. Reports 1994, p. 6, § 41 (3 February 1994)).

[166]    Anthony Aust, MODERN TREATY LAW AND PRACTICE (2nd ed. 2014), p. 209.

asserts sovereignty or exercises jurisdiction, including Crimea."[167] In assessing the validity of the Claimants' position, the Tribunal has in particular considered the following arguments and circumstances, not without noting beforehand that both languages of the BIT are equally authoritative under Article 31(1) VCLT.[168]

140. First, several English, Ukrainian, and Russian legal dictionaries commonly define "territory" with reference to all areas under a State's jurisdiction and control, without reference to sovereignty.[169] In a similar vein, Judge Crawford has also observed that the terms "territory[, ...] sovereignty and jurisdiction" are "not employed very consistently," and that situations arise where "territorial administration [is] separated from state sovereignty."[170]

141. Second, the meaning referring to jurisdiction and control is not contradicted by Article 1(4) of the BIT, which reads: "The term 'territory' means the territory of the Russian Federation or the territory of Ukraine as well as their respective exclusive economic zone and the continental shelf, defined in accordance with international law." Indeed, from a natural and grammatical reading of Article 1(4), it seems clear that the term "in accordance with international law" refers to the exclusive economic zone and the continental shelf, and not to the term "territory". As the Claimants correctly point out, other Russian bilateral investment treaties confirm that the phrase "in accordance

---

[167] Statement of Claim, § 3.38.

[168] The Treaty provides that it was "[e]xecuted in Moscow in November 27, 1998 in two counterparts, each one in the Russian and the Ukrainian languages, both texts having equal force." In accordance with Article 33 VCLT, "[w]hen a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, unless the treaty provides or the parties agree that, in case of divergence, a particular text shall prevail." In this context, the Tribunal also notes that it retained the services of a professional translator to determine whether there were any significant differences between the two authoritative language versions of the Treaty (see § 30 above and the 1st Harmonization Chart dated 25 May 2016 provided by the translator, Mr. Vesler). On this basis, the Tribunal identified no differences in the Ukrainian and Russian versions of the Treaty that would have any impact on the Tribunal's findings.

[169] Statement of Claim, § 3.39; Submission of Ukraine, § 7, *referring to, inter alia*, Ukrainian, Russian, and English legal dictionaries (*see, e.g.,* Black's Law Dictionary (2014), which defines territory as "a geographical area included within a particular government's jurisdiction; the portion of the earth's surface that is in a state's exclusive possession and control").

[170] Submission of Ukraine, § 8, *referring to* James Crawford, BROWNLIE'S PRINCIPLES OF PUBLIC INTERNATIONAL LAW, pp. 206-208 (8th ed. 2012) (CLA-204). The Claimants have also referred to Professor Brownlie's view that "courts are very ready to equate 'territory' with the actual and effective exercise of jurisdiction even when it is clear that the state exercising jurisdiction has not been the beneficiary of any lawful and definitive act of disposition" (Statement of Claim, § 3.25, *referring to* Ian Brownlie, PRINCIPLES OF PUBLIC INTERNATIONAL LAW (7th ed. 2008), p. 112 (CLA-88)).

with international law" is concerned with maritime concepts, because it only appears in treaties with States that have maritime borders.[171]

142.   Third, there is simply no indication in Article 1(4) or in any other provision of the Treaty that the ordinary meaning of the term "territory" should be interpreted restrictively in order to include only areas over which a State has lawful title "in accordance with international law,"[172] which would require the Tribunal to decide the issue of the legality of the incorporation of Crimea into the Russian Federation. Unlike the maritime concepts (*i.e.*, exclusive economic zones and continental shelves), which are often defined with a greater degree of specificity under multilateral conventions such as the United Nations Convention on the Law of the Sea,[173] there is nothing in the BIT that would imply an intention to strictly limit the Contracting Parties' territorial boundaries.[174] As noted by UNCTAD:

> The geographical scope of application of a BIT depends on the definition of the term "territory." The purpose of defining this term is not to delimit the territory of the Contracting Parties; that is an aspect normally dealt with in national constitutions. Rather, the rationale derives from the objective of investment protection, in particular to provide that investments located in maritime areas beyond the boundaries of the territorial waters are deemed to be within the parties' territory for the purposes of the agreement.[175]

---

[171]   Claimants' Answers, § 2.1.9, in response to the Tribunal's question to the Parties as to whether "the term 'in accordance with international law' in Article 1.4 of the BIT refer[s] to both the Contracting Parties' (i) territory and (ii) the exclusive economic zone and the continental shelf or only to (ii)?" (*see* the Tribunal's questions to the Parties of 22 April 2016, § 2.1).

[172]   The Tribunal also notes that the *Belbek* tribunal came to a similar conclusion: "As for the phrase 'in accordance with international law' in Article 1(4), the Tribunal considers that it only concerns the definition of the two States' exclusive economic zones and continental shelf, not the definition of 'territory' as a whole. This reading is consistent with the ordinary meaning of this provision and is supported by the investment treaty practice of the Russian Federation" (Interim Award, § 199 (24 February 2017) (CLA-269) (footnotes omitted)). The *Everest* tribunal, on the other hand, did not consider the construction of the phrase "in accordance with international law" in Article 1(4) relevant for purposes of ascertaining its jurisdiction "given declarations of both State parties to the BIT after the annexation of Crimea," and the fact that there was "no indication in the Russian Federation's conduct that it has the intention to exclude Crimea from the application of the BIT" (Decision on Jurisdiction, § 147 (20 March 2017) (CLA-269)).

[173]   1833 UNTS 3, (1982) (CLA–23); *see also* Statement of Claim, § 3.37, fn. 231.

[174]   Claimants' Answers, §§ 2.1.7-2.1.8.

[175]   UNCTAD, BILATERAL INVESTMENT TREATIES 1995-2006: TRENDS IN INVESTMENT RULEMAKING, p. 17 (2007) (CLA-191).

143.    Fourth, the Tribunal notes that, whenever they deemed it necessary, the Contracting Parties explicitly limited the territorial scope of application of other bilateral investment treaties.[176] In fact, a number of bilateral investment treaties concluded by Ukraine specifically define "territory" with reference to "sovereignty".[177] No such limitations are contained in the Ukraine-Russia Treaty.

144.    Finally, the Tribunal notes that it had invited the Parties' views on the relevance, if any, of Russian law in construing the meaning of "territory" in Article 1(4) of the BIT.[178] The Claimants replied that "Russian law is relevant […] to the extent that [it] is the mechanism by which the Russian Federation has purported to assert *de jure* sovereignty over Crimea."[179] As the Tribunal has already noted, it cannot be seriously disputed that, having incorporated Crimea into its territory by various legal and constitutional measures, Russia considers that its "territory" encompasses Crimea, which the Tribunal finds relevant for the purposes of its present analysis.[180]

145.    Importantly, Ukraine has also acknowledged that:

> [w]ithin the meaning of the Treaty, "territory of the Russian Federation" presently includes Crimea because it is occupied and administered by the Russian Federation, despite Russia's lack of a valid claim to sovereignty. This

---

[176]   For example, Russia's bilateral investment treaty with the United Kingdom excludes the United Kingdom's self-governing, overseas dependent territories (Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the Union of Soviet Socialist Republics for the Promotion and Reciprocal Protection of Investments, Article 1(e)(i) (6 April 1989) (CLA-16)). Similarly, the Protocol accompanying Russia's bilateral investment treaty with China expressly excludes that treaty's application to the Macao Special Administrative Region (Agreement between the Government of the Russian Federation and the Government of the People's Republic of China on the Promotion and Reciprocal Protection of Investments, Protocol (9 November 2006) (CLA-10)). *See also* Statement of Claim, § 3.38.

[177]   Ukraine's Submission, § 14, referring to other bilateral investment treaties concluded by Ukraine and Russia which explicitly define "territory" of a party as "the territory under its sovereignty" (*see*, *inter alia*, Agreement between the Government of Ukraine and the Government of the Republic of Lithuania on the Encouragement and Mutual Protection of Investments, Article 1(4) (8 February 1994) (CLA-220)).

[178]   *See* the Tribunal's questions to the Parties of 22 April 2016, § 2.4: "What is the relevance, if any, of Russian law in construing the meaning of territory in Article 1.4 of the BIT? To what extent, if any, is Russian law relevant in determining whether the Respondent has asserted *de facto* and/or *de jure* sovereignty over Crimea under international law?"

[179]   Claimants' Answers, § 2.4.1, *referring to* UNCTAD, Bilateral Investment Treaties 1995-2006: Trends in Investment Rulemaking, p. 17 (2007) (CLA-191).

[180]   Michael Waibel, *Investment Arbitration: Jurisdiction and Admissibility*, University of Cambridge Faculty of Law Research Paper No. 9/2014 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2391789), p. 40 (2014) (CLA-192), arguing that "[p]resumably, tribunals would give great weight to the host State's own definition of its national territory." *See also* the Claimants' arguments as summarized at § 118 above.

interpretation of the Treaty follows from the ordinary meaning of the word "territory," interpreted in the context of the Treaty's other provisions, in good faith, and in light of the Treaty's object and purpose.[181]

146.  On this basis, the Tribunal concludes that the ordinary meaning of the term "territory" includes areas over which the Contracting Parties exercise jurisdiction and *de facto* control, even if they hold no lawful title under international law. For completeness, the Tribunal notes that its conclusion finds further support in the open-ended manner in which the term "territory" has been interpreted in Article 29 VCLT, which establishes the widely-accepted rule that a treaty applies to the State's "entire territory", unless the Contracting Parties have expressed a "different intention" with regard to the Treaty's territorial scope.[182]

147.  Indeed, a number of authorities have expressed support for a broad definition of the term "entire territory" in Article 29 VCLT, not limited to lawful territory under international law. It has been observed that the application of a treaty to a State's "territory" could include "occupied zones" held by that State[183] and that "recognition under international law of the State and its territory is not required."[184]

148.  Most recently, the *Belbek* tribunal also held that the term "territory" in Article 29 VCLT should be interpreted broadly,[185] whilst the *Everest* tribunal confirmed that the "term 'territory' as defined in the BIT and read in light of Article 29 of the VCLT covers the entire territory of each State party," adding that it is "unable to identify a different intention in the BIT."[186]

---

[181]  Submission of Ukraine, § 6.

[182]  Verbatim Article 29 VCLT provides that, "[u]nless a different intention appears from the treaty or is otherwise established, a treaty is binding upon each party in respect of its entire territory."

[183]  *See, inter alia*, Karl Doehring, *The Scope of the Territorial Application of Treaties: Comments on Art. 25 of the ILC's 1966 Draft Articles on the Law of Treaties*, 27 Heidelberg J. Int'l L., pp. 483, 488-489 (1967) (CLA-93).

[184]  Marc Villiger, COMMENTARY ON THE 1969 VIENNA CONVENTION ON THE LAW OF TREATIES, p. 392 (2009) (CLA-128).

[185]  *Belbek*, Interim Award, § 200 (24 February 2017) (CLA-269), finding that "the term 'territory' in the Treaty is used in accordance with the meaning of that term in Article 29 of the VCLT, and that the latter term has a wider meaning capable of encompassing territory for which a State has assumed the responsibility for international relations."

[186]  *Everest*, Decision on Jurisdiction, § 146 (20 March 2017) (CLA-269).

ii.    Context

149. In accordance with Article 31(2) VCLT, the context of a treaty includes its text and preamble. The text of the treaty must be considered "as a whole" by *inter alia* comparing "the use of the same term elsewhere in the treaty."[187]

150. Many provisions of the BIT include references to the term "territory", which is itself defined in Article 1(4) of the BIT. To the extent that the term "territory" as used elsewhere in the BIT may provide further context, the Tribunal notes that nothing in the context supports the view that this term should only cover territory over which a Contracting Party maintains internationally recognized title. Instead, the use of the term "territory" in the other articles is linked to the State's ability to legislate in a particular area[188] and generally reflects a practical focus on effective control over territory.[189] As discussed above, Russia is currently the only State with the effective ability to legislate in Crimea and it has, in fact, made extensive use of this prerogative.

151. Conversely, when the Contracting Parties intended to prescribe a definition of the term as it is understood under general international law, they did so explicitly, such as when requiring that the exclusive economic zone and the continental shelf be "defined in accordance with international law" (Article 1(4) of the BIT).

152. Accordingly, the Tribunal finds that the context supports the ordinary meaning of the term "territory" identified above. This understanding is also supported by the preamble of the Treaty, to which the Tribunal now turns.

iii.    Object and purpose

153. In accordance with Article 31(1) VCLT, a treaty must also be interpreted in light of its object and purpose. It is habitually acknowledged that one of the main objectives of investment treaties is to "enhanc[e] the legal framework under which foreign investment

---

[187]  VIENNA CONVENTION ON THE LAW OF TREATIES: A COMMENTARY, p. 544 (Oliver Dörr and Kirsten Schmalenbach eds., 2012) (expanded CLA-95). *See also* Submission of Ukraine, § 16, fn. 32.

[188]  *See, e.g.*, Article 1(1): "The term 'investments' means any kind of tangible and intangible assets […] invested by an investor […] in the territory of the other Contracting Party in accordance with its legislation […]"; Article 2: "Each Contracting Party will […] admit such investments in accordance with its legislation"; *see also* the dispute resolution clause in Article 9, which lists domestic courts among the possible dispute settlement *fora* available to a qualifying investor: "[…] 2. If the dispute cannot be resolved […] it shall be referred to: a) a competent court or arbitration court of the Contracting Party in the territory of which the investments were made."

[189]  Submission of Ukraine, § 17.

operates."[190] More specifically, the object and purpose of an investment treaty is often determined by looking at its preamble.[191] Here, the preamble of the BIT refers to the Contracting Parties' commitment "to develop the basic provisions of the Agreement on Cooperation in the Sphere of Investment Activity of December 24, 1993." This agreement, which was concluded between Russia, Ukraine, and other CIS countries, pursued cooperation "in the development and implementation of investment policy" and protection of foreign investment.[192] These objectives can thus be considered to reflect those of the BIT.

154. Furthermore, the preamble of the Treaty expressly states that the Contracting Parties "intend[…] to create and maintain favourable conditions for mutual investments" and "desir[e] to create favourable conditions for the expansion of economic cooperation between the Contracting Parties."[193] The Tribunal therefore finds that, like in many investment treaties, there is an intent to both enhance economic cooperation and safeguard investments by maintaining favourable conditions.

155. This observation resonates with the findings of the tribunal in *Sanum*, where the question arose whether the extension of the bilateral investment treaty between China and Laos to Macao at the moment of recovery of sovereignty by China was compatible with the Treaty's object and purpose. The *Sanum* tribunal concluded that that treaty's

> purpose is twofold: to protect the investor and develop economic cooperation. The Tribunal does not find—and no element has been provided by the Respondent to that effect—that the extension of the PRC/Laos BIT could be contrary to such a dual purpose. In fact, the larger scope the Treaty has, the better fulfilled the purposes of the Treaty are in this case: more investors—who would not otherwise be protected—are internationally protected, and the economic cooperation benefits a larger territory that would otherwise not receive such benefit.

---

[190]  Susan D. Franck, *Foreign Direct Investment, Investment Treaty Arbitration and the Rule of Law*, 19 Global Bus. & Development L.J., pp. 337, 341 (2007) (CLA-180).

[191]  Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW, p. 29 (2nd ed. 2012) (expanded CLA-94).

[192]  Agreement on Cooperation in the Sphere of Investment Activity, Article 1 (24 December 1993), http://naviny.org/1993/12/24/by74954.htm (available in Russian only).

[193]  Claimants' Answers, § 1.2.9.

[…] In other words, the Tribunal is satisfied that the extension of the PRC/Laos Treaty to the Macao SAR is not incompatible with its object and purpose, which again is to "encourage, protect and create favorable conditions for investment by investors of one Contracting State in the territory of the other Contracting State […] and for the purpose of the development of economic cooperation between both States […]."[194]

156. The *Sanum* tribunal thus concluded that extending a State's obligations under a bilateral investment treaty to its new territory is "fundamentally compatible with [that treaty's] object and purpose, the more so that there is no other possibly competing [bilateral investment treaty]."[195]

157. In claiming that the object and purpose of the Treaty is to expand rather than limit its scope of application, the Claimants have argued that leaving investments "without any protection" under international law would "reduce, rather than create and maintain" the conditions which the Treaty aspires to nurture.[196] They added that there is "certainly nothing about the object and purpose of the BIT that would require it to be interpreted to favor aggressor States by shielding them from their obligations."[197]

158. In the Tribunal's view, the object and purpose of the Treaty does not support a restrictive interpretation which would exclude investments that ended up being located on a Contracting State's territory as the result of that State's territorial expansion. It is undisputed that the Treaty applied to foreign investments in Crimea before the Incorporation. As a result of the Incorporation, foreign investments by Russian investors became domestic investments and domestic investments by Ukrainian investors became foreign investments. That the latter became entitled to Treaty protection as a consequence appears in conformity with the Treaty's object to protect investments. It would indeed go against the object and purpose of the Treaty to leave without protection foreign investments on a territory over which a State exercises exclusive control and claims sovereignty, particularly in circumstances where that State

---

[194] *Sanum Investments Limited v. Lao People's Democratic Republic*, UNCITRAL, PCA Case No. 2013-13, Award on Jurisdiction, §§ 240, 241 (13 December 2013) (CLA-72).

[195] *Sanum Investments Limited v. Lao People's Democratic Republic*, UNCITRAL, PCA Case No. 2013-13, Award on Jurisdiction, § 242 (13 December 2013) (CLA-72).

[196] Statement of Claim, § 3.40.

[197] Claimants' Answers, § 1.2.10.

is not only the main beneficiary-State of these investments but also the only State in a position to protect foreign investments.[198]

159.   Finally, the Tribunal's finding derived from the object and purpose of the Treaty is buttressed by reference to Article 12. Under that provision, which is entitled "Application of the Agreement", the Treaty protects investments and investors irrespective of when and how they became subject to Treaty protection, as discussed in more detail below (*c.f.* Sections VI.D and VI.E).

iv.   Supplementary means of interpretation

160.   Pursuant to Article 32 VCLT, resort may be had to supplementary means of interpretation, including the *travaux préparatoires*, in order to (i) confirm the meaning resulting from the application of Article 31 VCLT, or (ii) determine the meaning when the interpretation according to Article 31 VCLT "leaves the meaning ambiguous or obscure" or "leads to a result which is manifestly absurd or unreasonable."

161.   In the present case, the supplementary means of interpretation, including the *travaux préparatoires* of the Treaty,[199] may be used to confirm the meaning of "territory" as established above, which is neither ambiguous nor obscure, nor brings to a result that is absurd or unreasonable, let alone manifestly so.

162.   For that purpose, the Tribunal first notes that, while it has only had the benefit of the input of one Contracting Party, it finds nothing in the *travaux préparatoires* submitted by the Claimants that would require or justify restricting the definition of the term "territory" in the BIT to territory over which a Contracting Party lawfully asserts sovereignty in accordance with international law. In this context, the Tribunal has also noted the argument that Ukraine deferred in Article 1(4) to the Russian Federation's preference for a broad, non-restrictive definition of "territory".[200]

163.   Second, the Tribunal observes that any other interpretation of the term "territory" under Article 31 VCLT would indeed lead to a manifestly unreasonable result, which the Tribunal must avoid under Article 32 VCLT. The Tribunal thus concurs with the view expressed by the *Everest* tribunal, which held that "it would lead to an unreasonable

---

[198]   Claimants' Answers, § 4.5.3.

[199]   For completeness, the Tribunal notes that it had asked the Parties to submit the *travaux préparatoires* of Articles 1(1), 1(4), and 12, which the Claimants did on 7 March 2016.

[200]   Submission of Ukraine, § 14.

result as a matter of interpretation of the BIT, if investments made in Crimea and interrupted by the nationalization by Russia and/or its subjects were considered made outside the Russian Federation. In fact, the nationalization presupposes that the investments were on Russian territory."[201]

     v.    Good faith

164.  Article 31(1) VCLT opens with the requirement for a treaty to be interpreted in good faith.

165.  The principle of good faith is an "essential principle of law in the international legal order,"[202] as well as a universally recognized cornerstone of treaty interpretation, which is recalled in the preamble of the VCLT.[203] Its importance is also highlighted in Article 26 VCLT ("*Pacta sunt servanda*"), which provides that "[e]very treaty in force is binding upon the parties to it and must be performed by them in good faith." As noted above, neither Party has sought to take any steps towards the suspension or termination of the Treaty, which therefore remains binding upon the Parties and must be performed in good faith.

166.  The principle of good faith is the source of several other international legal principles, such as "the rule *pacta sunt servanda* and other legal rules distinctively and directly related to honesty, fairness and reasonableness."[204] Good faith also encompasses the principle of consistency[205] and the Latin maxim of *allegans contraria non audiendus est* (colloquially translated as "one cannot blow hot and cold"), which has often been applied by international courts and tribunals.[206]

---

[201]  *Everest*, Decision on Jurisdiction, § 162 (20 March 2017) (CLA-269).

[202]  Bin Cheng, General Principles of Law as Applied by International Courts and Tribunals, p. 105 (1st reprinted ed. 2006) (CLA-172).

[203]  The preamble of the VCLT provides as follows: "The States Parties to the present Convention, […] [n]oting that the principles of free consent and of good faith and the *pacta sunt servanda* rule are universally recognized."

[204]  John F. O'Connor, Good Faith in International Law (1991), p. 124.

[205]  Andreas Kulick, *About the Order of Cart and Horse, Among Other Things: Estoppel in the Jurisprudence of International Investment Arbitration Tribunals*, 27 Eur. J. Int'l L., pp. 107, 108 (2016) (CLA-183).

[206]  As noted by Judge Alfaro in *Temple of Preah Vihear*: "Inconsistency between claims or allegations put forward by a state, and its previous conduct in connection therewith, is not admissible […]" (*Case Concerning the Temple of Preah Vihear*, Judgment, Separate Opinion of Vice President Alfaro, I.C.J. Reports 1962, p. 39, § 40 (15 June 1962) (CLA-149)). *See also* Submission of Ukraine, § 39, *referring to* D.W. Bowett, *Estoppel Before International Tribunals*

167. A number of investment tribunals have similarly acknowledged the importance of good faith in a variety of contexts.[207] For example, tribunals have found that the principle of consistency stems from "the more generally conceived requirement of good faith"[208] and have disallowed inconsistent behavior by States vis-à-vis foreign investors,[209] accentuating the principle that "[a] State that has taken a particular position may be under an obligation to act consistently with it on another occasion."[210]

168. In the Claimants' view, applied to the present case, "[g]ood faith bars the Russian Federation from claiming Crimea as part of its territory before the international community and yet simultaneously denying that it has obligations to Ukrainian investors there."[211]

---

*and its Relation to Acquiescence*, 33 Brit. Y.B. Int'l L., pp. 176, 187 (1957) (CLA-171). For further references, *see* fn. 207 below.

[207] *See, inter alia, Inceysa v. El Salvador*, holding that good faith "is a supreme principle, which governs legal relations in all of their aspects and content" (*Inceysa Vallisoletana S.L. v. Republic of El Salvador*, ICSID Case No. ARB/03/26, Award, §§ 230, 235-239 (2 August 2006)). *See also Phoenix v. The Czech Republic*, stating that "[t]he principle of good faith has long been recognized in public international law, as it is also in all national legal systems. This principle requires parties 'to deal honestly and fairly with each other, to represent their motives and purposes truthfully, and to refrain from taking unfair advantage'" (*Phoenix Action Ltd v. The Czech Republic*, ICSID Case No. ARB/06/5, Award, § 107 (15 April 2009), citing Anthony D'Amato, "Good Faith", ENCYCLOPEDIA OF PUBLIC INTERNATIONAL LAW, vol. 7, p. 107 (Rudolf Bernhardt, ed. 1984)). The tribunal in *Europe Cement v. Turkey* also found that it is "well accepted in investment arbitrations that the principle of good faith is a principle of international law applicable to the interpretation and application of obligations under international investment agreements" (*Europe Cement Investment & Trade S.A. v. Republic of Turkey*, ICSID Case No. ARB(AF)/07/2, Award, §§ 171-174 (13 August 2009)).

[208] *Waguih Eli George Siag v. Egypt*, ICSID Case No. ARB/05/15, Award, § 483 (1 June 2009).

[209] *Desert Line Projects LLC v. Republic of Yemen*, ICSID Case No. ARB/05/17, Award, § 92 (2 June 2008) (CLA-152), holding that Yemen's consistent representation that the claimant's investment was made in accordance with its laws prevented it from later asserting that the tribunal lacked jurisdiction based on the unlawful nature of the investment. The tribunal also noted that "[it] would offend the most elementary notions of good faith […] to imagine that [the Head of State] offered his assurances and acceptance with his fingers crossed, as it were, making a reservation to the effect 'that we welcome you, but will not extend to you the benefits of our BIT with your country'" (§ 119). In the same vein, the tribunal in *Rumeli v. Kazakhstan* held that "it is also well established in international law that a State may not take away accrued rights of a foreign investor by domestic legislation abrogating the law granting these rights. This is an application of the principles of good faith, estoppel and *venire factum proprium*" (*Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, § 335 (29 July 2008)).

[210] Anthony Aust, HANDBOOK OF INTERNATIONAL LAW, p. 8 (2nd ed. 2010) (CLA-87).

[211] Claimants' Answers, § 4.6.12.

169.   Ukraine has expressed a similar view:

> The Russian Federation has repeatedly claimed that Crimea forms an integral part of the territory of the Russian Federation. Yet it simultaneously maintains that its actions in Crimea "cannot be regulated by the [Treaty]." A restrictive interpretation of the term "territory" in the Treaty that would allow Russia to profit from this inconsistency is fundamentally inconsistent with the principle of good faith interpretation. To condone this position would reward Russia for violating international law. Paradoxically, the Russian Federation would be permitted a freer hand vis-à-vis Ukrainian investors in territory it illegally occupies than within its legitimate sovereign territory. No good faith interpretation could allow this result.[212]

170.   The Tribunal agrees with the Claimants' position insofar as the principle of good faith calls for the opposability of the Treaty to Russia with respect to foreign investment presently located in Crimea. Indeed, Russia cannot at the same time claim that Crimea forms part of its territory and deny the application of a Treaty that it has concluded to protect investments made on its territory, without incurring an inconsistency contrary to good faith and the principle of consistency.

171.   In reaching this conclusion, the Tribunal has in particular considered Russia's publicly stated views with respect to Crimea, as discussed above (§ 131). In this context, the Tribunal recalls the United Nations' International Law Commission's *2006 Guiding Principles Applicable to Unilateral Declarations of States Capable of Creating Legal Obligations* (the "**ILC's 2006 Principles**"),[213] in accordance with which:

> Declarations publicly made and manifesting the will to be bound may have the effect of creating legal obligations. When the conditions for this are met, the binding character of such declarations is based on good faith; States concerned may then take them into consideration and rely on them; such States are entitled to require that such obligations be respected.[214]

---

[212]   Submission of Ukraine, §§ 20-21 (footnotes omitted).

[213]   *Guiding Principles Applicable to Unilateral Declarations of States Capable of Creating Legal Obligation, with Commentaries Thereto* [2006] 2 Y.B. Int'l L. Comm'n, pp. 161, 161, 162, Guiding Principles 1, 10, U.N. Doc. A/CN.4/SER.A/2006/Add.I (Part 2). *See also* Submission of Ukraine, p. 14, fn. 67.

[214]   ILC's 2006 Principles, Principle 1.

172. The ILC's 2006 Principles further specify that such a declaration "binds the State internationally only if it is made by an authority vested with the power to do so"[215] and provided that it is "stated in clear and specific terms."[216] In the present case, Russia, via its Head of State and other officials, has clearly manifested its will to consider Crimea as part of its territory, whilst taking no action to terminate or suspend the Treaty. As noted by the ICJ in the *Nuclear Tests* case:

> One of the basic principles governing the creation and performance of legal obligations, whatever their source, is the principle of good faith. Trust and confidence are inherent in international co-operation, in particular in an age when this co-operation in many fields is becoming increasingly essential. Just as the very rule of *pacta sunt servanda* in the law of treaties is based on good faith, so also is the binding character of an international obligation assumed by unilateral declaration.[217]

173. The tribunal in *Joy Mining* also made clear that unilateral declarations by States are not without consequence: "formal declarations by States and its officials constitute unilateral acts giving rise to obligations on which third parties may rely to exercise their rights."[218]

174. Consequently, a good faith interpretation of the Treaty mandates that Russia's declaration that Crimea is part of its territory cannot remain without legal consequence to Russia's Treaty obligations vis-à-vis Ukrainian investors in Crimea. A similar conclusion was also reached by the *Belbek* tribunal:

> [...] a conclusion that the Treaty no longer applies to conduct occurring in the Crimean Peninsula would be to denude the Treaty of effect and relieve the Contracting Parties of their obligation to perform the Treaty in good faith, contrary to the cardinal principle of *pacta sunt servanda*. It would be to create a legal void,

---

[215]  ILC's 2006 Principles, Principle 4.

[216]  ILC's 2006 Principles, Principle 7.

[217]  *Nuclear Tests (New Zealand v. France)*, Judgment, I.C.J. Reports 1974, p. 457, § 49 (20 December 1974) (CLA-160), where the ICJ found that a series of statements made by French officials expressing France's intent to conduct only below ground nuclear testing created binding legal obligations to that effect based on the principle of good faith.

[218]  *Joy Mining Machinery v. Arab Republic of Egypt*, ICSID Case No. ARB/03/11, Award on Jurisdiction, §§ 96-98 (6 August 2004) (CLA-158).

a bubble, in the application of the Treaty in respect of the Crimean Peninsula that was never contemplated and should not be countenanced.[219]

### (c)   Conclusion

175.   In sum, and particularly with due regard to the Respondent's statement in these proceedings and elsewhere that Crimea now "forms an integral part of the territory of the Russian Federation,"[220] the Tribunal construes the term "territory" for purposes of the Treaty to include territory over which a State exercises *de facto* control and jurisdiction. Any other interpretation would, to borrow the words of the Russian Federation, "contradict objective reality".[221] The Tribunal thus finds that the Treaty became opposable to Russia with respect to Ukrainian investments in Crimea upon Russia's incorporation of Crimea in its territory no later than 21 March 2014 when Russia ratified the Incorporation Treaty and passed the Crimean Integration Law which formally incorporated Crimea as a subject of the Russian Federation in accordance with its Constitution.[222]

176.   Thus, the Tribunal concludes that the territorial scope of the Treaty encompasses Crimea and Russia's jurisdictional objection must be denied.

### D.   JURISDICTION *RATIONE TEMPORIS* (ARTICLE 12 BIT)

177.   In the Tribunal's understanding, Article 12 of the BIT sets forth the scope of application of the Treaty in time and thus deals with the *ratione temporis* jurisdiction of the Tribunal: the Treaty applies to investments made in the territory of the other Contracting State after 1 January 1992. Article 1(1) by contrast defines investments and thereby deals primarily with the Tribunal's *ratione materiae* jurisdiction. This said, doing so, Article 1(1) refers to investment made in the territory of the other Contracting State like Article 12, linking the territorial with the temporal requirement. The Claimants have not strictly distinguished these two aspects, which is reflected in the following summary of their positions. The Tribunal has considered the interplay between Article

---

[219]   *Belbek*, Interim Award, § 265 (24 February 2017) (CLA-269).

[220]   Letter from the Ministry of Justice of the Russian Federation to the PCA dated 12 August 2015 (C-112), reproduced at § 5 above.

[221]   Letter from the Permanent Representative of the Russian Federation to the United Nations Addressed to the Secretary-General, U.N. Doc A/70/555 (5 November 2015) (C-150); *see also* fn. 159 above.

[222]   Article 65 of the Constitution of the Russian Federation, as amended by Crimean Integration Law (C-62).

1(1) and Article 12 in the analysis below, but finds that its focus should remain on the temporal notion in Article 12 of the BIT.

### 1.  The Parties' Positions

178.  The Claimants acknowledge that the Respondent's Letters "appear to assert a form of objection to jurisdiction *ratione temporis* that the Tribunal lacks jurisdiction because the Claimants made their investments in Crimea before it became Russian territory," but submit that this objection is not well founded.[223]

179.  The Claimants agree that Crimea was part of Ukraine at the time when they made their investments. However, they submit that Russia assumed all State obligations "in the territory" of Crimea when it "assumed the function of a State to the exclusion of the Ukrainian authorities" on 27 February 2014.[224] The Claimants maintain that their investments "became entitled to the protections of the BIT" at the moment when its operations were "forcibly transferred into the territory of the Russian Federation."[225]

180.  In the Claimants' submission, Article 12 of the Treaty reinforces this position. That article provides that the Treaty "shall apply to all investments made by investors of one Contracting Party in the territory of the other Contracting Party, on or after January 1, 1992." Since the instrument itself was executed on 27 November 1998 and did not enter into force until 27 January 2000, Article 12 contemplates the coverage of investments pre-dating the Treaty's entry into force.[226] The only temporal restriction found in Article 12 is that of 1 January 1992, which is the cut-off date for qualifying investments.[227]

181.  The Claimants further submit that the application of the rules of the VCLT also leads to the conclusion that Article 12 "imposes no further requirements beyond the requirement found in its text," namely that an investment be "in the territory of the other Contracting Party" on or after 1 January 1992.[228] They conclude that there is "no basis" in the

---

[223]  Claimants' Answers, § 1.1.4.

[224]  Claimants' Answers, §§ 2.3.5-2.3.6, 2.4.2. *See also* Statement of Claim, § 3.14.

[225]  Claimants' Answers, § 1.1.4.

[226]  Statement of Claim, § 3.46.

[227]  Claimants' Answers, §§ 1.3.2-1.3.3.

[228]  Claimants' Answers, § 1.1.1.

Treaty text to "exclude from protection pre-existing investments on newly acquired territory."[229]

182.    Finally, and in any event, the Claimants assert that the text of the BIT is consistent with a "default rule" in international law that allows for "retroactive application" of bilateral investment treaties to pre-existing investments.[230] They explain their argument in the following terms:

> There is no reason to distinguish Claimants' investments here. Just as future investments of Ukrainian investors in Crimea would be protected investments under the BIT now that the Russian Federation has asserted sovereignty and assumed jurisdiction over Crimea, Ukrainian investments made in Crimea prior to the Russian Annexation […] are equally entitled to the protections of the BIT.[231]

183.    For the Claimants, this position is confirmed by the broad protection afforded to property rights in other legal instruments, including the Universal Declaration of Human Rights, multilateral treaties, regional human rights conventions to which the Respondent is party, and customary international law.[232] Consequently, the Claimants oppose the objection set forth in the Respondent's Letters in the following terms:

> The fact that Crimea was not "in the territory of the other Contracting Party" when Claimants initially invested in Crimea is irrelevant. Although the BIT did not apply to Claimants' investments when they initially were made in Crimea, because Crimea was then part of Ukraine, those investments became protected under the BIT when the Russian Federation caused them to be located in the territory of the Russian Federation by invading, exercising jurisdiction, and asserting sovereignty over Crimea.[233]

---

[229]    Statement of Claim, § 3.46.

[230]    Statement of Claim, §§ 3.47-3.48, *referring to* Zachary Douglas, INTERNATIONAL LAW OF INVESTMENT CLAIMS, p. 340, Rule 41 (2009) (CLA-96); Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW, p. 41 (2d ed. 2012) (expanded CLA-94).

[231]    Claimants' Answers, § 1.1.7.

[232]    Claimants' Answers, § 1.2.11. With regard to the Claimants' arguments on customary international law, see also Claimants' Answers, § 2.3.4: "In general, where one State exercises authority or control over the sovereign territory of another, typically as a result of a military occupation, the occupying State is liable for its conduct (or the conduct of those persons under its control) in the occupied territory."

[233]    Claimants' Answers, § 1.1.2.

184.  In its Submission, Ukraine has expressed a similar view:

> The clear intent of Article 12 was to maximize the temporal application of the Treaty, specifically to cover investments that were not protected by the Treaty at the time they were initiated. Like most bilateral investment treaties of its era, the Treaty was written to protect pre-existing investments (covering the period from 1992, shortly after the dissolution of the USSR, to 1998, when the Treaty was concluded).
>
> […]
>
> A Russian investor who initiated an investment in Kyiv in 1993 had no expectation that the investment would be protected by the Treaty, but nonetheless received that protection as soon as the Treaty began to apply in 1998. Similarly, a Ukrainian investor who initiated an investment in Crimea in 2013 had no expectation that the investment would be protected by the Treaty, but nonetheless received that protection as soon as the Treaty began to apply in 2014. Any interpretation that discriminates against a class of Ukrainian investors, and excludes them from protection despite the exposure of their investments to Russian authority, would conflict with the investment protection and rule of law aims of the Treaty.[234]

## 2.    Analysis

185.  The Treaty was signed on 27 November 1998. In Article 12, it provides that "[t]his Agreement shall apply to all investments made by investors of one Contracting Party in the territory of the other Contracting Party, on or after January 1, 1992." As is well known, 1 January 1992 is the date of the dissolution of the Soviet Union. Hence, the purpose of Article 12 is to protect investments made after the dissolution of the Soviet Union, irrespective of whether the BIT was in effect or not at the time the investment was made.

186.  The default rule, to which the Claimants draw attention, provides that a protected investment can have been made before or after the investment treaty's entry into force, unless the treaty contains a provision providing otherwise.[235] Article 12 is such a

---

[234]  Submission of Ukraine, §§ 32-33 (footnotes omitted).

[235]  *E.g.* Zachary Douglas, INTERNATIONAL LAW OF INVESTMENT CLAIMS, p. 340, Rule 41 (2009) (CLA-96).

provision. While it confirms the default rule according to which the Treaty covers pre-existing investments, it limits the period prior to the entry into force of the Treaty.

187.   Thus, the key aspect of Article 12 is the date of 1 January 1992. By choosing this date, the Contracting Parties expressly agreed that investments made when no protection existed because the BIT was not in force and possibly not even contemplated, could later benefit from Treaty protection if they were affected by a measure taken after the Treaty had entered into force. In other words, Article 12 of the BIT expressly foresees the application of the BIT to investments made prior to its entry into force.

188.   Considering that all of the Claimants' investments were made after 1 January 1992, the Tribunal is satisfied that the temporal condition set forth in Article 12 of the BIT is met.

189.   In this context, the Tribunal further notes that, to the extent that Russia's letter dated 12 August 2015[236] can be read as an objection to the Tribunal's jurisdiction *ratione temporis* and/or *ratione materiae* based on the fact that the Claimants initially invested in Crimea before its incorporation into Russia, the Tribunal finds that a reading of Article 12 in combination with Articles 1(1) and 1(4) of the Treaty imposes no requirement that the investment be made in the territory of the other Contracting Party *ab initio*.

190.   This conclusion concords with the interpretation of Article 12 of the Treaty under Article 31 VCLT. As to the ordinary meaning of the words, the Tribunal finds that Article 12 must be interpreted by reference to Article 1(1) of the Treaty, which defines "investment", and to Article 1(4), which defines "territory".[237] As to the latter, suffice it to recall the conclusion reached by the Tribunal[238] that Russia's "territory" for the purposes of the BIT includes Crimea and that Russia assumed obligations over Ukrainian investment in Crimea upon incorporating Crimea in this territory.

---

[236]   In its letter of 12 August 2015 (C-112), the Respondent noted as follows:

> In accordance with paragraph 1 Article 1 of the [Treaty] the term "investment" means every kind of movable and immovable and intellectual property invested by an investor of one Contracting Party in the territory of the other Contracting Party in accordance with the legislation of the latter Contracting Party. The property in question which is the matter of the claims is situated in the territory of the Crimea and Sevastopol, i.e. in the territory that was a part of Ukraine but at the present time pursuant to the will of people forms an integral part of the territory of the Russian Federation and cannot be regulated by the [Treaty].

[237]   Claimants' Answers, § 1.2.2.

[238]   *See* § 175 above.

191. As to the definition of the term "investment" in Article 1(1), the Tribunal is of the view that it sets forth a geographical as opposed to a temporal limitation on the "making" of an investment. This becomes clear if one considers other requirements contained in Article 1(1) of the definition of "investment", such as the requirement to comply with the legislation of the host State. For this requirement to be meaningful, the host State in question must be capable of exercising jurisdiction and control over the area where the given assets are located. In the present case, Russia exercises sole jurisdiction and control over Crimea and consequently, as demonstrated further below,[239] the legality of the investment must be assessed under the Russian legislation, which became applicable to the investments upon Russia's incorporation of Crimea into its territory.

192. The Tribunal thus concludes that there is nothing in the language of Articles 12 or 1 excluding the Claimants from the protection of the Treaty on temporal grounds.[240] Moreover, such exclusion would also contradict the Treaty's object and purpose: Articles 2 and 5 of the BIT, as well as the preamble referring to the creation of "favorable conditions for mutual investments" and the "expansion of economic cooperation" lead to the conclusion that any restrictive interpretation denying protection would defeat the objectives of both Article 12 and the BIT in general.[241]

193. In conclusion, the Tribunal finds that there is no basis to read into the Treaty a denial of protection for pre-existing investments in the event of a change of territorial boundaries.

E.   **JURISDICTION *RATIONE PERSONAE* (ARTICLE 1(2) BIT)**

194. Article 1(2)(b) defines an "investor" in relevant part as follows:

> b) any legal entity constituted in accordance with the legislation in force in the territory of that Contracting Party, provided that the said legal entity is competent in accordance with legislation of that Contracting Party, to make investments in the territory of the other Contracting Party.

---

[239]   *See* §§ 214 ff. below.

[240]   Claimants' Answers, § 1.2.5.

[241]   As noted by the *Everest* tribunal, the textual analysis of the BIT does not support a finding that "(i) the character of the 'investor', (ii) the transaction comprised of the assets, and (iii) the 'territory' need to converge at the same time, namely when the investment is made." Rather, "the non-simultaneity of the requirements of Article 1(1) is more responsive to the purposes and objects of the BIT provided these requirements converge before the alleged breach of the BIT occurs" (Decision on Jurisdiction, §§ 151, 153 (20 March 2017) (CLA-269)).

195. In order to meet the requirements set forth in Article 1(2)(b), the Claimants need to demonstrate that they are legal entities constituted in accordance with Ukrainian legislation and that they are "competent" to make investments in accordance with Ukrainian legislation. Thus, the relevant law for the purposes of determining the Claimants' status as "investors" is undoubtedly Ukrainian law.[242]

196. The Claimants assert that they are legal entities incorporated in Ukraine, whose investments in Crimea were lawful under the laws of Ukraine at the time when they were made. Accordingly, in the Claimants' view, they are investors for the purposes of Article 1(2)(b) of the BIT.[243]

197. The record shows that the Claimants are corporations organized under the laws of Ukraine. The Claimants have submitted constituent documents for each of the claimant companies establishing their existence and presence in accordance with the Ukrainian company register, the Ukrainian Unified State Register of Legal Entities, Individual Entrepreneurs and Civic Organizations (the "**Ukrainian Corporate Register**"), which is available on the website of the Ministry of Justice of Ukraine.[244] The Tribunal finds this documentary evidence sufficient to ascertain that the Claimants are indeed legal entities "constituted in accordance with the legislation in force in the territory of [Ukraine]" for the purposes of Article 1(2)(b) of the BIT.[245]

198. The Claimants' expert, Mr. Bondar, also confirmed that the Claimants are registered in the Ukrainian Corporate Register and that they have been duly constituted in

---

[242] This is also the Claimants' position: "The BIT requires that investors be competent under the law of the State of incorporation (BIT, Art. 1(2)), in this case Ukrainian law" (PHB, p. 11, fn. 55).

[243] Notice of Arbitration, § 12; Transcript, 19/25-20/8.

[244] Statement of Claim, § 3.5; Ukrainian Unified State Register of Legal Entities, Individual Entrepreneurs and Civic Organizations, Ministry of Justice of Ukraine Website (C-117).

[245] While the Tribunal has deemed the documentation provided by the Claimants to be sufficient for the present purposes, it notes that, as confirmed by the Claimants at the Hearing in response to a question from the Tribunal, as of 22 April 2014 the Claimants had no access to their offices and any of the petrol stations. Considering that most company records were kept in those offices, the Claimants are presently only in possession of very limited documentation (Transcript, 17/3-17). This is also confirmed by Mr. Laber, who explains that the documentation of the Claimants' day-to-day business activities—including permits and licenses—was stored in their Feodosia office, and thus has been inaccessible since the seizure of these offices in April 2014 (Witness Statement of Mr. Uriel Laber, § 33 (CWS-1). In any event, the Tribunal has no reason to doubt the fact that the Claimants were legal entities incorporated in accordance with Ukrainian law at all relevant times.

accordance with Ukrainian legislation from the moment of their registration to the present.[246]

199.  Furthermore, Article 1(2)(b) requires the investor to be "competent" in accordance with the legislation of its home State to make investments in the territory of the host State. Two questions thus arise: first, what is to be understood by "competence" in this context and, second, at what time should such "competence" be assessed.

200.  As to the first question, with the assistance of a legal translator whom it appointed to provide an independent translation of the original Russian and Ukrainian versions of the BIT,[247] the Tribunal has established that "competent" in this context means "having legal capacity" under the home State's law. In the ordinary understanding of this term, legal capacity refers to a natural or judicial person's power to enter into contracts or other legal relationships and to sue and be sued. The term does not imply the necessity of any specific authorization.[248] On this basis, the Tribunal is satisfied that the Claimants had the necessary "competence" and/or the legal capacity to invest under Ukrainian law.

201.  The Tribunal now turns to the second question dealing with the time when competence must be assessed. For the Claimants, they were "competent" under Ukrainian law to make investments in Crimea when they made their investments. Another approach in light of the specificity of the situation would be to enquire whether the Claimants were competent in accordance with Ukrainian law to make investments in Crimea at the time of the Incorporation, *i.e.*, when the investment came under the protection of the BIT.

202.  Be this as it may, the question can remain open. Indeed, the Tribunal is satisfied that the Claimants were competent, in accordance with Ukrainian law, to invest in Crimea both at the time of making the original investment as well as at the time of the

---

[246]   Bondar Opinion, §§ 15-19.

[247]   *See, e.g.*, the 1st Harmonization Chart dated 25 May 2016 provided by the translator, Mr. Vesler. *See also* fn. 168 above.

[248]   The Tribunal notes that the initial BIT translation provided by the Claimants (CLA-1) used the term "legally authorized" as opposed to "competent". Having examined other Russian bilateral investment treaties, the Claimants concluded that the term "competent" more adequately reflected the meaning of this provision. The independent translator appointed by the Tribunal also found the term "competent" more appropriate on the grounds that it does not imply a specific authorization. According to the translator: "'Legally authorized' strongly implies specific 'permitting' action on the part of the State's authorities, which is not the case in the majority of all cases. More appropriate legal terms for this would include 'competent' or 'having/enjoying the legal capacity to [do something],' the latter being a little too verbose to my liking" (Translator's Chart dated 25 May 2016).

Incorporation. There is no indication in the record that Ukrainian law would have barred legally competent corporations from investing at either time. In particular, the Tribunal accepts Mr. Bondar's evidence that the legislation enacted by Ukraine following the Incorporation, *i.e.*, the Law of Ukraine No. 1207-VII "On Guaranteeing Rights and Freedoms of Citizens and the Legal Regime in the Temporarily Occupied Territory of Ukraine" (the "**Occupation Law**")[249] and the Law of Ukraine No. 1636-VII "On Establishing Free Economic Zone Crimea and Special Aspects of Conducting Economic Activity in the Temporarily Occupied Territory of Ukraine" (the "**FEZ Crimea Law**"),[250] allowed Ukrainian investors to maintain their existing investments in Crimea and guaranteed their protection.[251]

203. In this context, at the Hearing the Tribunal invited the Claimants to comment on the legal capacity of a Ukrainian entity to invest in Crimea in light of the sanctions currently in place against Russia. The Claimants clarified that "in Crimea, there are restrictions on the transfer of funds, but […] no restriction on the ownership of property [and] no impediment under Ukrainian law to continuing to own property you owned already."[252] In any event, the current sanctions were imposed after the Incorporation and, hence, could have no bearing on the Claimants' competence at the earlier moments in time just determined to be relevant.

204. The Tribunal's conclusion on the Claimants' competence is shared by the *Belbek* tribunal which held that "competence" in Article 1(2) of the Treaty is to be understood as "a requirement of capacity to enter into certain legal relations" and that, particularly in light of the expert evidence on Ukrainian law, there can be no doubt that the *Belbek* claimants had such capacity "at all times from the making of their investment to the commencement of this arbitration."[253]

---

[249]  15 April 2014 (C-67).

[250]  12 August 2014 (C-168).

[251]  Bondar Opinion, §§ 78-84.

[252]  Transcript, 44-45.

[253]  *Belbek*, Interim Award, § 215 (24 February 2017) (CLA-269). For completeness, the Tribunal adds that it shares the *Belbek* tribunal's conclusion regarding the impact of Resolution No. 699 of the National Bank of Ukraine of 3 November 2014, namely that, to the extent that this Resolution may at all be relevant, it only prohibits monetary transfers to Crimea after the Resolution came into force (*Belbek*, Interim Award, §§ 217-219 (24 February 2017) (CLA-269)). As already noted above, the Tribunal has accepted the Claimants' explanation that their investments are not impacted by any restriction on the transfer of funds in Crimea (c.f. § 203).

205. In a similar vein, the *Everest* tribunal also held that Ukrainian law did not "restrict the competence of Ukrainian entities or individuals to make or maintain investments in Crimea" and emphasized that "Article 11(1) of the Occupation Law guarantees the protection of investments made by individuals or legal entities in Crimea."[254]

206. In light of the foregoing analysis, the Tribunal reaches the conclusion that the Claimants qualify as "investors" in accordance with Article 1(2)(b) of the BIT.

F.    JURISDICTION *RATIONE MATERIAE* (ARTICLE 1(1) BIT)

    1.    **Definition of Investment**

207. Article 1(1) of the Treaty (cited in full at § 96 above) defines "investments" as "any kind of tangible and intangible assets [which are] invested by an investor of one Contracting Party in the territory of the other Contracting Party in accordance with its legislation," including, *inter alia*, "movable and immovable property, as well as any other related property rights."

208. The Claimants submit that their investment on the Crimean Peninsula, which consists of "movable and immovable property, cash, and rights to engage in the commercial activity of selling petrol," qualifies as an investment under Article 1(1) of the BIT.[255] At the Hearing, the Claimants further specified that the immovable property consisted of "actual title to real estate and leaseholds in real estate and property rights in both," while the movable property consisted of "tanks, pumps, cash registers, computer equipment[,] land [and] buildings."[256] Their investment also included "the supply mechanism necessary to store and deliver the petrol and related convenience stores, real estate holdings, commercial operations [and] machinery."[257] The Claimants added that their investment consisted of "thriving profitable chains of petrol stations," which were fully operational, had plans for expansion, and were "moneymaking enterprises".[258]

---

[254]  *Everest*, Decision on Jurisdiction, § 140 (20 March 2017) (CLA-269).

[255]  Statement of Claim, § 3.9.

[256]  Transcript, 14.

[257]  Transcript, 11.

[258]  Transcript, 14.

209. It is also the Claimants' submission that it is sufficient for them to establish that their investment corresponds to one of the categories of assets listed in Article 1(1), which they undoubtedly do.

210. The Tribunal must first construe the meaning of the word "investment" in Article 1(1). At the Hearing, the Tribunal asked the Claimants whether, in their view, there was an inherent notion of "investment" embedded into Article 1(1) of the BIT.[259] Indeed, a number of recent investor-State awards have considered that the term "investment" has an inherent meaning, which an alleged investment must meet in addition to falling within one of the categories of assets generally used in bilateral investment treaties. Importantly, these awards have applied this so-called inherent or objective definition irrespective of the application of the ICSID Convention.[260]

211. In response to the Tribunal's question, the Claimants noted that the wide majority of cases containing this type of analysis were decided under the ICSID Convention and that *Romak*, a non-ICSID case, was wrong on the inherent meaning of "investment".[261] In their view, the "intellectual foundations of that argument lie mostly in the construction of Article 25 of the ICSID Convention and how to construe 'investment.'"[262]

212. In the Tribunal's view, elucidating the meaning of the term "invested" in Article 1(1) is part of the interpretation of that provision and thus there can be no question of adding an inexistent element into the Treaty. Thus, in light of the wording of this BIT, which expressly requires that assets be "invested", the Tribunal can dispense with

---

[259] Transcript, 66-67.

[260] For example, in *GEA v. Ukraine*, the tribunal found as follows: "[I]t is not so much the term 'investment' in the ICSID Convention than the term 'investment' *per se* that is often considered as having an objective meaning in itself, whether it is mentioned in the ICSID Convention or in a BIT" (*GEA Group Aktiengesellschaft v. Ukraine*, ICSID Case No. ARB/08/16, Award, § 141 (31 March 2011)). Similarly, the tribunal in *Romak v. Uzbekistan* also held in favour of an objective meaning of the term investment: "The term 'investment' has a meaning in itself that cannot be ignored when considering the list contained in Article 1(2) of the BIT. […] The Arbitral Tribunal therefore considers that the term 'investments' under the BIT has an inherent meaning (irrespective of whether the investor resorts to ICSID or UNCITRAL arbitral proceedings) entailing a contribution that extends over a certain period of time and that involves some risk [...]. By their nature, asset types enumerated in the BIT's non-exhaustive list may exhibit these hallmarks. But if an asset does not correspond to the inherent definition of 'investment', the fact that it falls within one of the categories listed in Article 1 does not transform it into an 'investment'" (*Romak S.A. v. The Republic of Uzbekistan*, PCA Case No. AA280, Award, § 207 (9 November 2009)). Lastly, mention of an objective definition of investment existing equally under the ICSID Convention and bilateral investment treaties is also found in *Abaclat and Others (formerly, Giovanna Beccara and Others) v. The Argentine Republic*, ICSID Case No. ARB/07/5, Decision on Jurisdiction and Admissibility, § 371 (4 August 2011).

[261] Transcript, 67-69.

[262] Transcript, 68/3-5.

determining whether the Treaty incorporates an objective definition of investment beyond the asset list contained in Article 1(1).

213. In the present case, there can be no serious doubt that the resources committed by the Claimants fully correspond to the meaning of "investment" set forth in Article 1(1) of the BIT.[263]

### 2.    Legality of Investment

214. Article 1(1) of the BIT requires that any investment be made "in the territory of the other Contracting Party in accordance with its legislation." [264] Previous investor-State decisions have held that this condition—referred to as the "legality requirement"—limits the scope of protected investments to those that are established lawfully under the host State's laws and regulations at the time the investments were made.[265]

215. As to the general meaning and scope of the legality requirement, the Claimants have argued that only a breach of a fundamental legal norm would result in the violation of this requirement. The Claimants refer to previous investor-State awards[266] in support of their argument that "[d]eficiencies in meeting registration rules and similar bureaucratic infractions typically do not disqualify investments from treaty protection." [267] The Claimants also argue that Russia may not raise its illegal actions as a defense to jurisdiction. As the annexation of Crimea violated international law, the imposition of Russian law upon the Claimants and their investments is therefore also a violation of international law. Consequently, Russia cannot impose its unlawful actions (*i.e.*, the

---

[263]  The Tribunal was also convinced by the Claimants' explanations provided at the Hearing as to how their investment fully meets all four requirements arguably imposed by the so-called *Salini* test, *i.e.*, allocation of resources, duration, risk, and contribution to the host State's development (Transcript, 67-70).

[264]  Emphasis added.

[265]  *See*, *inter alia*, *Metal-Tech Ltd. v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, §§ 185-193 (4 October 2013) (CLA-264); *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines [II]*, ICSID Case No. ARB/11/12, Award, § 331 (10 December 2014); *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, § 420 (28 July 2015) (CLA-260); *Vladislav Kim and others v. Republic of Uzbekistan*, ICSID Case No. ARB/13/6, Decision on Jurisdiction, § 410 (8 March 2017).

[266]  *Inter alia*, the Claimants refer to *Rumeli Telekom v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, § 319 (29 July 2008) (CLA-71); *Tokios Tokeles v. Ukraine*, ICSID Case No. ARB/02/18, Award, § 97 (26 July 2007) (CLA-78); *Consorzio Groupement L.E.S.I.-DIPENTA v. People's Democratic Republic of Algeria*, ICSID Case No. ARB/03/08, Award pt. II, § 24 (10 January 2005) (CLA-263) (PHB, § 2.14).

[267]  PHB, § 2.14.

imposition of its domestic laws in Crimea) to excuse itself of its obligations under the BIT.[268]

216. In the present case, it first needs to be determined whether the "host State" for the purposes of the legality requirement in Article 1(1) is Russia or Ukraine. Put differently, should the Claimants' compliance with the "host State's" legislation be assessed at the time when the investment was initially made in Crimea before Incorporation or rather upon Crimea's Incorporation to Russia when the investments became subject to Russian control?[269]

217. The Claimants have argued that the BIT requires that "investments be in accordance with the law of the place of investments (BIT, Art. 1(1))," and that the relevant law for the present purposes is Russian law.[270] They further argue, with reference to *Metal-Tech*,[271] that "the relevant point in time under the BIT for analyzing whether an investment was made in conformity with local law is the moment of the investment's inception."[272] In their view, the fact that an investment may subsequently violate local laws cannot strip a tribunal of jurisdiction provided that the investment was legal when created.[273] They submit that their investments conformed with Russian law from the moment it became applicable to them, and remained in compliance with it until the moment they were unlawfully taken away from them.[274]

218. For the Tribunal, the legality of the investment must be established at the time when the investment came under the protection of the Treaty, which occurred on 21 March

---

[268] PHB, § 2.16; Claimants' Answers, §§ 4.3.1-4.3.6. The Claimants also refer to Article 27 of the VCLT providing that "[a] party may not invoke the provisions of its internal law as justifications for its failure to perform a treaty."

[269] The Tribunal notes that the third hypothetical, namely, whether the investments complied with Russian law at the time they were made (in Crimea/Ukraine) is irrelevant. This question is analogous to the one addressed in the context of "competence" or legal capacity; *see* §§ 201-202 above.

[270] PHB, p. 11, fn. 55 and § 2.15 (emphasis removed).

[271] *Metal-Tech Ltd. v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award, § 193 (4 October 2013) (CLA-264), finding that Article 1(1) of the bilateral investment treaty before that tribunal "refers to the time when the investment was made."

[272] PHB, § 2.15.

[273] PHB, § 2.15 *referring to Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, § 420 (28 July 2015) (CLA-260); *Gustav F W Hamester GmbH v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, § 127 (18 June 2010) (CLA-56).

[274] PHB, § 2.15, *referring to Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Award, § 420 (28 July 2015) (CLA-260); *Gustav F W Hamester GmbH v. Republic of Ghana*, ICSID Case No. ARB/07/24, Award, § 127 (18 June 2010) (CLA-56).

2014.[275] Hence, the legal regime applicable to the investment before the Incorporation is of no relevance for the present purposes.

219.    The Claimants further submit that, following the annexation, their investments were subject to two domestic legal regimes. From the perspective of Ukraine, Ukrainian law continued to apply, while Russia asserted that its law applied to Crimea.[276] The Claimants go on to explain, with reference to the legal opinions of Professor Maggs and Mr. Bondar, that their investments complied with both regimes.

220.    In connection with the Ukrainian legal regime, the Claimants explain that Ukraine took a pragmatic approach and sought to protect existing legal rights by allowing Ukrainian investors to maintain their investments and property rights in Crimea following the annexation.[277] In particular, and as already noted above, Mr. Bondar has convincingly explained that the legislation enacted by the Ukrainian parliament following the Incorporation, *i.e.*, the Occupation Law and the FEZ Crimea Law, allowed Ukrainian investors to maintain their existing investments in Crimea and guaranteed their protection.[278]

221.    The Tribunal further notes that while the FEZ Crimea Law prohibited "transactions with entities owned or controlled by the Russian Federation in relation to property located in the Occupied Territory,"[279] it seems obvious that the Claimants were no longer in possession of their investments—which were allegedly nationalized pursuant to decrees passed by the Crimean authorities in September and November 2014[280]— before any occasion for any transactions with Russian entities could have arisen.

(a)    **The Crimean Integration Law**

222.    As to the Russian legislation applicable to the Claimants' investments post-Incorporation, the Tribunal notes that the primary legal instrument through which the Russian Federation integrated Crimea into the Russian legal structure was the Crimean Integration Law, a federal constitutional law. This law established a transition

---

[275]    *See* § 175 above.

[276]    PHB, §§ 1.1-1.2.

[277]    PHB, §§ 1.3 ff.

[278]    Bondar Opinion, §§ 78-84.

[279]    Bondar Opinion, § 84.

[280]    *See* Statement of Claim, §§ 2.37-2.42.

period until 1 January 2015 during which "issues shall be resolved regarding the integration of the new constituent entities of the Russian Federation into the economic, financial, credit and legal systems of the Russian Federation and into the system of state agencies of the Russian Federation."[281] The Crimean Integration Law provided for the continued operation of business entities under their existing corporate forms during the transition period.[282]

223.  The Crimean Integration Law also provided in its Article 12 that legal documents establishing ownership rights, rights of use, and business licenses issued by Ukrainian authorities to persons and legal entities in Crimea prior to the Incorporation would be recognized and that no further confirmation by the Russian authorities of such rights would be necessary.[283] Importantly, Article 12 applied beyond the expiration of the transition period and explicitly stated that there would be "no limitation on the period of validity of such documents."[284] To conclude, it does not seem to the Tribunal that the Crimean Integration Law required the Claimants to take any action to secure or confirm their property rights or licenses, as long as they complied with Ukrainian law upon Incorporation,[285] which they did.[286]

---

[281]  Crimean Integration Law, Article 6 (C-62).

[282]  Crimean Integration Law, Article 10 (C-62). Russian legislation thus did not apply to legal entities that had invested in Crimea prior to the Incorporation. Similarly, taxes were levied in accordance with Ukrainian tax laws during the transition period (Letter from the Republic of Crimea Tax Service to Ukrnafta dated 27 May 2014 (C-152)).

[283]  Article 12 of the Crimean Integration Law (C-62) provided as follows:

> Documents issued by state and other official agencies of Ukraine [and] state and other official agencies of the Autonomous Republic of Crimea, […] shall remain valid in the Republic of Crimea […], including documents confirming civil status, education, title, right of use, right to receive pensions, benefits, compensation and other forms of social payments, right to obtain medical care, and permit documents (licenses, except licenses to perform banking transactions and licenses (permits) for the operation of non-credit financial organizations). There is no limitation on the period of validity of such documents and no confirmation by state agencies of the Russian Federation [or] state agencies of the Republic of Crimea […] is required, unless otherwise required by the documents in question or the nature of the relationship."

The Tribunal notes in passing that the specific provisions regarding licenses to perform banking transactions (Articles 17 and 18 of the Crimean Integration Law) are irrelevant for the present purposes as they did not apply to the Claimants or their investments in Crimea.

[284]  Crimean Integration Law, Article 12 (C-62); see also Second Maggs Report, § 8.

[285]  Second Maggs Report, §§ 61-62.

[286]  See §§ 200-202 above.

224. Furthermore, the Crimean Integration Law contemplated and, in some instances,[287] also provided the legal basis for the enactment of further laws, both federal and regional.

### (b)   Federal Law No. 258-FZ and Federal Law No. 124-FZ

225. Federal Law No. 258-FZ[288] provided that contracts, including leases[289] such as those of the Claimants, that were entered into in the territory of Crimea prior to the Incorporation would remain in force. In response to a question from the Tribunal at the Hearing[290] as to whether the Claimants' licenses were affected by any exceptions to Article 21(2) of Federal Law No. 258-FZ,[291] the Claimants explained that none of the transactions pursuant to which they acquired property rights constituted a "unilateral transaction" under Russian law and, hence, Article 21(2) did not apply to their investments in Crimea. The Tribunal is satisfied with the Claimants' explanation.

226. For completeness, the Tribunal notes that another Russian law part of the post-Incorporation legal framework was Federal Law No. 124-FZ "On Making Amendments to the Federal Law 'On Putting the First Part of the Civil Code of the Russian Federation into Effect' and Article 1202 of the Third Part of the Civil Code of the Russian Federation'" ("**Federal Law No. 124-FZ**"),[292] which essentially established a simplified procedure for the transition of Ukrainian companies with their corporate seat

---

[287] *See*, *e.g.*, Article 12.1 of the Crimean Integration Law (amendment of 21 July 2014) (C-62), which delegated to the newly-formed Republic of Crimea and Federal City of Sevastopol the power to enact "legislation affecting property rights" in Crimea (discussed in Second Maggs Report, §§ 43-44).

[288] Federal Law No. 258-FZ, "On the Making of Amendments to Article 222 of the first part of the Civil Code of the Russian Federation and to the Federal Law on Putting the First Part of the Civil Code of the Russian Federation into Effect," 13 July 2015, Article 21(1) (C-148).

[289] As explained by Professor Maggs, leases are considered contracts under Russian law (First Maggs Report, § 65; Second Maggs Report, § 25).

[290] Transcript, 82/10-13.

[291] Article 21(2) provides as follows:

With respect to relations that have arisen from unilateral transactions on the territory of the Republic of Crimea […] before the date of acceptance of the Republic of Crimea into the Russian Federation and the formation in the composition of the Russian Federation of the new subjects—the Republic of Crimea and the City of Federal Significance Sevastopol, the civil legislation of the Russian Federation shall be applied to rights and duties arising from the date of acceptance of the Republic of Crimea into the Russian Federation and the formation in the composition of the Russian Federation of the new subjects—the Republic of Crimea and the City of Federal Significance Sevastopol.

[292] 5 May 2014 (C-167); also introduced and discussed during the Hearing (Transcript, 35-36, 79, 85-86).

in Crimea prior to the expiration of the transition period on 1 January 2015 (as per Article 6 of the Crimean Integration Law).[293] Five of the Claimants, whose executive bodies were seated in Crimea or Sevastopol before Incorporation, could have arguably profited from this simplified procedure.

227.    However, while arguably some of the Claimants were eligible for this simplified procedure, they were no longer in possession of their property upon the expiration of the transition period and thus were not affected by the procedure.

228.    In any event, Federal Law No. 124-FZ does not appear to contain sanctions in case of a company's failure to re-register as a Russian company upon expiration of the transition period and did not affect the company's existing property rights in Crimea. Rather, the only result appears to be that such company could no longer do business in Crimea, which, considering the circumstances of the present case, is of no practical or legal consequence.

### (c)    Laws of the Republic of Crimea

229.    In light of the authority granted to them by the Crimean Integration Law (Article 6), the Republic of Crimea and the Federal City of Sevastopol also enacted legislation concerning the registration of property rights. In response to the Tribunal's question during the Hearing[294] concerning the effect of paragraph 3(11) of the Republic of Crimea Law No. 38-ZRK[295] on the Claimants' investments, the Claimants answered with reference to Professor Maggs that Article 3(11) does not apply to the Claimants for two reasons. First, because it has no effect on private property and, second, because none of the Claimants is a Ukrainian State or municipally owned enterprise.[296]

---

[293]    Second Maggs Report, § 67.

[294]    Transcript, 79/10-80/4.

[295]    Law of the Republic of Crimea No. 38-ZRK, "On the Peculiarities of Regulation of Property and Land Relations on the Territory of the Republic of Crimea," 31 July 2014, Article 2(2) (C-119). An identical law was passed by the Federal City of Sevastopol (C-84).

Paragraph 3(11) of the Crimea Law No. 38-ZRK provides as follows:

The right of economic management of property, the right of operational management of property located in the Republic of Crimea arising before the entry into force of the Federal Constitutional Law shall be deemed consistent with the right of economic management and the right of operational management of such land as provided for under the legislation of the Russian Federation. The rule established in this paragraph shall not apply with respect to foreign legal entities.

[296]    PHB, § 1.28; Second Maggs Report, §§ 93-95.

### (d)   The Foreign Investment Law of the Russian Federation

230. Finally, apart from the compliance of the Claimants' investments' with the specific post-Incorporation laws, the Tribunal has also asked whether they complied with the definition of "foreign investment" under the Russian pre-existing Federal Law No. 160-FZ "On Foreign Investments in the Russian Federation" (the "**Foreign Investment Law**").[297]

231. For this assessment, the Tribunal has carefully scrutinized the authorities in the record, including *inter alia* Professor Maggs' detailed analysis of the Foreign Investment Law.[298] Specifically, it notes that the Claimants' investments qualified as such under the Foreign Investment Law because they complied with all the requirements imposed by Article 2 of this Law. In brief, the Claimants' assets were (i) "in the form of objects under the civil law," which (ii) included "money" and "other property", and (iii) were "held by the foreign investor." In addition, their trading was not "prohibited or limited in the Russian Federation" and they were not affected by any of the Law's restrictions "required for the purposes of protecting the constitutional system, morals, health, rights and lawful interests of others, national defense and state security."[299]

### 3.   Conclusion on Legality

232. The Tribunal thus concludes that the Claimants' investment meets the requirement set forth in Article 1(1) of the BIT for the investment to be made in accordance with the host State's legislation. For completeness, the Tribunal also notes that the *Everest* tribunal reached the same conclusion.[300]

### G.   OVERALL CONCLUSION

233. On the basis of the foregoing analysis, the Tribunal concludes that is has jurisdiction over the present dispute. In particular, it is satisfied that the dispute falls within the territorial and temporal scope of application of the Treaty and that the Claimants qualify

---

[297]   Federal Law No. 160-FZ, "On Foreign Investments in the Russian Federation," 9 July 1999, as amended on 19 July 2011, Article 2 (C-158).

[298]   PHB, §§ 1.29-1.37; Second Maggs Report, §§ 98 ff.

[299]   Foreign Investment Law, Articles 2 and 4(2).

[300]   *Everest*, Decision on Jurisdiction, § 167 (20 March 2017) (CLA-269), adding that "the Russian authorities did not justify the measures that are the subject of this arbitration by reference to any non-conformity of Claimants' properties with Russian or Ukrainian laws." The Tribunal concurs with this observation.

as "investors" under the Treaty, having made an "investment" in the territory of Russia in accordance with its legislation.

## VII.   COSTS

234.   In PO5, which dealt with various post-hearing matters, the Tribunal decided that "[t]here shall be no cost submissions at the present stage, it being understood that the Parties shall provide cost submissions if the Tribunal subsequently so requests." The decision on the costs and fees of the jurisdictional phase is thus reserved for a later stage of the proceedings.

## VIII.  OPERATIVE PART

235.   For the reasons set forth above, the Tribunal decides as follows:

(i)    The Tribunal has jurisdiction over the dispute submitted to it in this arbitration;

(ii)   The Tribunal will take the necessary steps for the continuation of the proceedings toward the liability phase;

(iii)  The Tribunal reserves the decision on the costs of the jurisdictional phase for a later stage of the proceedings.

**Seat of the arbitration**: Geneva

**Date**: 26 June 2017

_____

Mr. Daniel Price

Arbitrator

_____

Prof. Brigitte Stern

Arbitrator

_____

Prof. Gabrielle Kaufmann-Kohler

Presiding Arbitrator