UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STABIL LLC**, *et al.*,<br><br>            Petitioners,<br><br>       v.<br><br>**RUSSIAN FEDERATION**,<br><br>            Respondent. | Case No. 1:22-cv-00983 (TNM) |

**MEMORANDUM ORDER**

Petitioners are a group of eleven Ukrainian companies ("the Companies") that owned and operated petrol stations in Crimea. But then the Russian Federation invaded Crimea, declared it part of Russia, and seized their assets. Leveraging the terms of an investment treaty, the Companies obtained an arbitration award of over $34 million against Russia. They asked this Court to confirm the award under an international arbitration treaty. Russia now moves to dismiss, declaring itself immune from suit under the Foreign Sovereign Immunities Act (FSIA) and asserting personal jurisdiction defects. An exception to FSIA immunity applies though, and precedent forecloses Russia's personal jurisdiction arguments. Yet Russia contends that four unrelated appeals could change this outcome, so it requests a stay pending resolution of those cases. The Court is unpersuaded and will thus deny Russia's motions.

**I.**

The Court accepts the factual background laid out by the arbitration tribunal. *See* Decl. of James H. Boykin ("Boykin Decl."), Ex. A ("Final Arb. Award"), ECF No. 2-1. These findings resulted from multiple adversarial hearings where both parties had the opportunity to participate. *See id.* ¶¶ 4, 51, 78, 141.

In 1998, the Russian Federation and Ukraine signed a bilateral investment treaty ("the BIT") "to create and maintain favorable conditions for mutual investments." *See* Boykin Decl., Ex. B (Agreement Between the Government of the Russian Federation and the Cabinet of Ministers of Ukraine on the Encouragement and Mutual Protection of Investments (November 27, 1998)) at 308, ECF No. 2-2. In the BIT, both states agree to safeguard investments made in their territories by investors of the other state. *See id.* at 308–13. Generally, the states pledge equal treatment for foreign and domestic investors; they guarantee that investments will not be expropriated or nationalized in a discriminatory way; and they promise compensation if they do seize assets. *See id.* at 310–11. The BIT also contains a standing offer to arbitrate disputes. *Id.* at 312–13. For Russia, this means arbitrating any disputes Ukrainians have over their investments in Russian territory.

In early 2014, Russia invaded Crimea, a region consisting of the Autonomous Republic of Crimea and the City of Sevastopol. Final Arb. Award ¶¶ 94, 103–04. The next month, the new Russian-backed government in Crimea signed a treaty with the Russian Federation, purporting to incorporate Crimea into Russia. *See id.* ¶¶ 106–07. At the time, the eleven Companies each had investments related to petrol stations in Crimea, including real estate, fuel storage facilities, and other assets like vehicles and buildings. *See id.* ¶¶ 95–98.

Then, Russia began seizing and nationalizing property Crimean. *See id.* ¶¶ 122–32. In April 2014, members of a Russian paramilitary force "seized" and "looted" the Companies' petrol stations and an office. *Id.* ¶¶ 113–19. The paramilitary forces then sold the "remaining inventory of fuel and other products at substantially lower prices than the prices set by" the Companies. *Id.* ¶ 119. As the summer ended, the Russian-backed Council of Ministers of the Republic of Crimea nationalized some of the Companies' properties and "transferr[ed] the 'right

2

of economic management' of [their] stations . . . to a Russian State-owned enterprise." *Id.* ¶ 128 (quoting Order No. 1016-r of the Council of Ministers of the Republic of Crimea (October 7, 2014) (C-92)). Finally, in 2016, the government nationalized the Companies' remaining petrol stations. *See id.* ¶ 132.

In response, the Companies invoked the BIT. They accepted Russia's standing arbitration offer and filed a Notice of Arbitration in June 2015 over the seizure of their investments. *See id.* ¶ 9; *see also* Boykin Decl., Ex. C (Pet'rs' Notice of Arb.), ECF No. 2-3.

Arbitration began before a tribunal in Switzerland in 2015. *See* Final Arb. Award ¶¶ 9–21. Russia refused to participate. *See id.* ¶¶ 11–14, 19, 24–26, 35. The tribunal first considered whether it had jurisdiction to hear the dispute and concluded it did. *See id.* ¶¶ 35, 40–41. Russia challenged this jurisdictional finding in the Swiss Federal Supreme Court, but the court sided with the tribunal. *Id.* ¶¶ 44–45; *see also* Boykin Decl., Ex. E (Swiss Federal Supreme Court Judgment on Jurisdiction), ECF No. 2-5. So a hearing on the merits followed—again sans Russia. *See* Final Arb. Award ¶¶ 49, 51.

In the end, the tribunal issued a 126-page decision, finding that Russia breached the BIT. The tribunal awarded the Companies over $34 million in damages. *See id.* ¶ 430. Russia again went to the Swiss high court and filed an application to set aside the award, but without success. *See* Boykin Decl., Ex. F (Swiss Federal Supreme Court Judgment on Award) at 6, ECF No. 2-6. The court dismissed Russia's application in 2019. *Id.* at 12.

Final arbitration award in hand, the Companies petitioned this Court in 2022 to enforce the award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), codified at 9 U.S.C. § 201 *et seq. See* Pet. to Confirm Arb. Award ("Pet.") ¶ 7 (citing New York Convention Art. I(1), 21 U.S.T. 2517, and 330 U.N.T.S.

38), ECF No. 4.  Russia responded with a motion to dismiss for lack of subject matter jurisdiction under the FSIA and lack of personal jurisdiction.  Resp't's Mot. to Dismiss, ECF No. 22.

## II.

Foreign states are generally immune from suit under the FSIA, but there are several exceptions.  *See LLC SPC Stileks v. Rep. of Moldova*, 985 F.3d 871, 877 (D.C. Cir. 2021).  These exceptions are the "sole basis for obtaining [subject matter] jurisdiction over a foreign state." *Argentine Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Courts also have personal jurisdiction over foreign states "where (1) subject matter jurisdiction has been satisfied, and (2) proper service has been effected."  *Schubarth v. Fed. Rep. of Germany*, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018) (citing 28 U.S.C. § 1330(b)).  Russia does not contest service, so personal jurisdiction also turns on the existence of a FSIA exception.[1]  *See id.*

## III.

Russia asserts immunity under the FSIA and disputes the existence of personal jurisdiction as well as its propriety under the Due Process clause.  It fails on all grounds.  The Companies correctly rely on the FSIA's arbitration exception for jurisdiction and binding precedent forecloses Russia's Due Process argument.  In short, the Court has both subject matter jurisdiction and personal jurisdiction over Russia.

---

[1] Russia first alleged improper service but later withdrew that argument.  *See* ECF No. 26.

A.

The arbitration exception is a carveout to the FSIA's general rule of sovereign immunity. It allows courts to hear petitions "to confirm an award made pursuant to" an arbitration agreement if the foreign state formed the agreement "with or for the benefit of a private party." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1100 (D.C. Cir. 2024) (quoting 28 U.S.C. § 1605(a)(6)). Under this exception, the Companies bear the initial burden of production for "three 'jurisdictional facts': (1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement [in the United States]." *Id.* (citing *Chevron Corp. v. Ecuador*, 795 F.3d 200, 204 & n.2 (D.C. Cir. 2015)).

Under current caselaw, the burden then shifts to Russia to "establish the absence of the factual basis" for the Companies' jurisdictional facts "by a preponderance of the evidence." *Id.* (quoting *Chevron Corp.*, 795 F.3d at 204). The Supreme Court is now considering a case that could reverse that presumption. *See Simon v. Rep. of Hungary*, 77 F.4th 1077, 1092 (D.C. Cir. 2023), *cert. granted*, 144 S. Ct. 2680 (2024). At oral argument though, the foreign sovereign conceded it had the burden of persuasion on jurisdiction and acknowledged it had not preserved the issue for appeal. Tr. of Oral Arg. at 10:13–11:2, *Rep. of Hungary v. Simon* (No. 23-867) (U.S. Dec. 3, 2024). That said, even if the Supreme Court reaches the question, *Simon* will not alter the path of this case because the Companies meet their potential burden of persuasion on jurisdiction.

Russia disputes the first and third jurisdictional facts.

1.

Begin with the existence of an arbitration agreement. The Companies have "made a prima facie showing that there was an arbitration agreement by producing the BIT and the notice

5

of arbitration." *Chevron*, 795 F.3d at 205; *see* Boykin Decl., Exs. B and C.  In rebuttal, Russia insists the Companies never made any investments in Russian territory because they invested in Crimea when it was still part of Ukraine.  *See* Resp't's Reply at 6, ECF No. 27.  So, Russia reasons, its standing offer to arbitrate did not extend to the Companies, and Russia's de facto control of Crimea does not convert the Companies into covered investors under the BIT.  *See id.* at 7.  In other words, Russia does not dispute that the BIT "establish[es] that [Russia has] agreed to arbitrate certain disputes" with Ukrainian investors but says the BIT "does not prove that it agreed to arbitrate this *particular* dispute" with these specific investors.  *Stileks*, 985 F.3d at 878.

Russia misses the mark.  "For jurisdictional purposes, the FSIA's arbitration exception requires that the arbitral tribunal 'purported to make an award pursuant to the [BIT], not that it in fact did so.'"  *NextEra Energy*, 112 F.4th at 1104 (quoting *Stileks*, 985 F.3d at 878).  Here, the tribunal concluded that the BIT gave it jurisdiction and it premised the Companies' award on Russia's alleged breach of the BIT.  *See* Final Arb. Award ¶¶ 35, 40–41, 430.  The Swiss Federal Supreme Court affirmed the tribunal on both fronts.  *See* Boykin Decl., Exs. E and F.  Russia offers nothing to undermine the existence of these facts.

Instead, Russia warns that "the very structure of the BIT" is rendered "unworkable" because Ukraine and the international community refuse to recognize Russia's claim on the Crimean Peninsula.  Resp't's Reply at 8.  According to Russia, the BIT "can only function" in "mutually recognized territories," so its standing arbitration offer "cannot apply to disputed territory, such as Crimea."  Resp't's Mot. to Dismiss at 20.  As a result, Russia steadfastly insists there is no threshold arbitration agreement.  Resp't's Reply at 12–13.

This rather cynical argument is too clever by half.  Russia "must attack the *existence or validity* of the arbitration agreement" "to make the issue jurisdictional."  *NextEra Energy*, 112

F.4th at 1101 (emphasis added).  But Russia disputes only the *scope*, not the validity, of its standing offer to arbitrate.  No matter how Russia tries to repackage this argument, it still cashes out as a quarrel over arbitrability, not jurisdiction.  Russia's focus on the BIT's geographic contours "conflates the jurisdictional standard of the FSIA with the standard for review under the New York Convention."  *Chevron Corp.*, 795 F.3d at 205.  While arbitrability may be germane to a merits defense under the New York Convention, it "does not affect the Court's jurisdiction" under the FSIA.  *Tethyan Copper Co. Pty Ltd. v. Islamic Republic of Pakistan*, 590 F. Supp. 3d 262, 274 (D.D.C. 2022) (citing *Stileks*, 985 F.3d at 878).

So for purposes of the arbitration exception, Russia has not rebutted the Companies' factual support for the existence of an arbitration agreement.  *See NextEra Energy*, 112 F.4th at 1100.  More, the Companies affirmatively satisfy the burden—should it belong to them after *Simon*—of showing that "the arbitral tribunal purported to make an award pursuant to" an arbitration agreement.  *NextEra Energy*, 112 F.4th at 1104 (cleaned up).

**2.**

Next, the Companies must identify a treaty governing award enforcement.  The Companies point to the New York Convention—an international treaty to which the United States and Russia are both signatories.  *See* Pet. ¶ 54 (citing 751 U.N.T.S. 398 and 374 U.N.T.S. 386).  The New York Convention allows for "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought."  *Process & Indus. Devs. Ltd. v. Fed. Rep. of Nigeria*, 27 F.4th 771, 774 (D.C. Cir. 2022) (quoting New York Convention Art. I(1)).  But the United States included a "commercial reservation" when signing this treaty.  *See Zhongshan Fucheng Indus. Inv. Co. v. Fed. Rep. of Nigeria*, 112 F.4th 1054, 1059 (D.C. Cir. 2024).  The reservation cabins the treaty's

applicability to "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial." 9 U.S.C. § 202; *see also Zhongshan*, 112 F.4th at 1059. The Companies invoke the BIT as the source of the commercial relationship, so Russia must show either that there was no legal relationship under the BIT or that any relationship was not commercial. Russia says the parties lack "any legal relationship," much less a commercial one, because the BIT is an agreement solely between two sovereigns. Resp't's Mot. to Dismiss at 25–26.

A legal relationship under the New York Convention exists when parties enter an agreement that: "(1) explicitly contemplates which parties it will obligate; (2) determines the extent of the obligations; and (3) provides the legal framework to govern the arrangement." *Zhongshan*, 112 F.4th at 1062 (cleaned up). And "contract law has long permitted parties to contract for the benefit of a third party," so when an agreement between sovereigns is "intended to confer specified benefits upon investors," the agreement operates "as if it were a contract between the sovereign and the investor corporation seeking to confirm an arbitral award." *Id.* at 1062–63 (quoting *Chevron Corp.*, 795 F.3d at 207). Indeed, courts have "repeatedly enforced under the New York Convention arbitral awards arising from foreign states' sovereign acts that breach obligations owed to a third-party investor under an investment treaty." *Id.* at 1074.

The BIT expressly obligates its two signatories, Russia and Ukraine. *See* Boykin Decl., Ex. B at 308. It details the extent of the states' obligations, including requirements for how each state must treat foreign investors and investments. *See id.* at 309–11. And the dispute resolution provisions contain reciprocal standing offers to arbitrate with third-party investors. *See id.* at 312. Thus, because "the agreement define[s] a relationship between the parties," and includes

"reciprocal obligations and responsibilities, . . . the relationship [i]s legal in nature." *Diag Hum. v. Czech Republic-Ministry of Health*, 824 F.3d 131, 135 (D.C. Cir. 2016).

Consider next whether the relationship is commercial. The commercial reservation has a "broad compass." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015). Its scope is like that of "the more familiar term 'affecting commerce'—[a term] of art that ordinarily signal[s] the broadest permissible exercise of Congress' Commerce Clause power." *Id.* (quoting *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003)). In other words, the commercial reservation "reaches anything with a *connection* to commerce." *Zhongshan*, 112 F.4th at 1064 (emphasis added).

Russia seized a "chain of 31 petrol stations" that the Companies "owned, operated, and supplied." Final Arb. Award ¶ 95. Owning, operating, and supplying petrol stations "has an obvious connection to commerce." *Diag Hum.*, 824 F.3d at 136. Recall, for instance, that Russian paramilitary forces seized the Companies' facilities and sold the remaining petrol for "substantially lower prices." Final Arb. Award ¶ 119. And the Crimean government issued an order transferring the "right of economic management" for the petrol stations away from the Companies. *Id.* ¶ 128. Connections to commerce permeate these facts. Any "argument to the contrary will not sell." *Gov't of Belize*, 794 F.3d at 105.

Russia maintains that government seizure of private property is a sovereign act excluded from the commercial sphere. *See* Resp't's Reply at 16. But it relies on inapt cases discussing the contours of the FSIA's commercial activity exception. *See, e.g.*, *id.* (citing *Ivanenko v. Yanukovich*, 995 F.3d 232, 239 (D.C. Cir. 2021)). The Companies do not rely on the commercial activity exception for jurisdiction, and that exception's commercial nexus requirement is more

9

stringent than the standard courts apply under the New York Convention. *See Gov't of Belize*, 794 F.3d at 104–05.

In sum, the BIT "creates a legal relationship between the parties that is commercial in nature, and [the] arbitral award arising from that relationship satisfies the commercial reservation." *Zhongshan*, 112 F.4th at 1065. Russia has not rebutted the Companies' showing that the New York Convention is "a treaty potentially governing award enforcement." *NextEra Energy*, 112 F.4th at 1100. More, the Companies' facts establish that the New York Convention *does*, in fact, apply to their arbitration award.

* * *

The Companies have satisfied their burden of production—and persuasion, if required—under the FSIA's arbitration exception. They have: (1) produced an arbitration agreement between themselves and Russia; (2) furnished an award rendered under that agreement; and (3) identified a treaty governing enforcement of the award. Russia has not rebutted the Companies' jurisdictional facts. The Court thus has subject matter jurisdiction under the arbitration exception.[2] And because the Court has subject matter jurisdiction and Russia does not dispute service, the Court also has personal jurisdiction over Russia.

B.

Next, Russia protests that personal jurisdiction violates the Due Process clause because this case has no connection with the United States. Resp't's Reply at 19. But the Due Process clause offers Russia no shelter because foreign states are not "persons" entitled to Fifth Amendment protections. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 96

---

[2] Accordingly, the Court need not reach the Companies' separate argument that Russia waived sovereign immunity. *See* Pet'rs' Opp'n to Mot. to Dismiss at 22–23, ECF No. 23.

10

(D.C. Cir. 2002). Though Russia maintains that *Price* was wrongly decided, *see* Resp't's Mot. to Dismiss at 41–42, this Court is "obligated to follow controlling circuit precedent until either [the D.C. Circuit], sitting en banc, or the Supreme Court, overrule[s] it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997). And under controlling circuit precedent, Russia cannot hide behind the Due Process clause. *See Price*, 294 F.3d at 96.

Russia has made its bed and now must lie in it. After all, "[c]ountries that do not wish to arbitrate or to be subject to enforcement proceedings in foreign courts do not have to extend to commercial investors a standing offer to arbitrate like [Russia] did." *Zhongshan*, 112 F.4th at 1065.

## C.

In a final gambit, Russia seeks to stay proceedings pending the outcome of appeals in four separate cases. *See* Resp't's Mot. to Stay, ECF No. 32. The Court declines Russia's invitation.

It is a "rare" case in which a litigant will "be compelled to stand aside" pending the resolution of independent proceedings. *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). In assessing such requests, the Court balances hardship to the parties and benefits to judicial efficiency. *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732–33 (D.C. Cir. 2012).

Begin with hardship. Russia contends the FSIA shields it from the "burdens of litigation," so continued engagement with this case is itself a hardship. Resp't's Mot. to Stay at 11 (cleaned up). But the arbitration exception strips Russia of immunity. And "being required to defend a suit, without more, does not constitute a clear case of hardship." *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1112 (9th Cir. 2005) (cleaned up). In contrast, the Companies' fully adjudicated award has been languishing for half a decade despite their best efforts to collect.

11

"[O]bvious harm arises from [the Companies'] wait . . . for compensation. [Further] delay hurts the economic interests of not only the compan[ies] but also of [their] shareholders and employees." *Tethyan*, 590 F. Supp. 3d at 271. More, the Court is unconvinced that the outstanding cases Russia points to are truly the silver bullets it suggests. Recall that at least one, *Simon,* is unlikely to have any impact on this litigation.

As for judicial efficiency, the Court is mindful that confirmation petitions are meant to be "summary" proceedings, not multi-year slugfests. *Argentine Republic v. Nat'l Grid PLC*, 637 F.3d 365, 369 (D.C. Cir. 2011). The Companies filed for confirmation over two-and-a-half years ago and there is more briefing still to come on the merits. Stalling resolution of the Court's jurisdiction does not promote judicial efficiency. *Accord Tethyan*, 590 F. Supp. 3d at 270 ("[J]udicial economy also favors swift adjudication.").

Though a stay is unwarranted, so too is immediate confirmation of the award. The Companies ask the Court to move beyond jurisdiction and reach the merits without further briefing. *See* Pet'rs' Opp'n to Mot. to Stay at 16, ECF No. 34. But foreign sovereigns are entitled to a threshold immunity determination before raising merits-based defenses. *See Process & Indus. Devs. Ltd. v. Fed. Rep. of Nigeria*, 962 F.3d 576, 585–86 (D.C. Cir. 2020). The Companies previously conceded as much by asking the Court to wait until "it reaches the merits of the Petition" to consider Russia's "premature" arbitrability arguments. Pet'rs' Opp'n to Mot. to Dismiss at 14–15, ECF No. 23. Though Russia could have waived bifurcation had it simultaneously briefed merits and jurisdictional defenses, *see Process & Indus. Devs.,* 962 F.3d at 585–86, it did not, *see* Resp't's Mot. to Dismiss at 14 & n.9. So the Petition is not yet ripe for decision.

**IV.**

For these reasons, the Court **ORDERS** that Respondent's Motion to Dismiss and Respondent's Motion to Stay are **DENIED**.

**SO ORDERED.**


Dated: December 12, 2024                                          _____
                                                                                    TREVOR N. McFADDEN
                                                                                    United States District Judge