**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STABIL LLC**, *et al.*,<br><br>Petitioners,<br><br>v.<br><br>**RUSSIAN FEDERATION**,<br><br>Respondent. | Case No. 1:22-cv-00983 (TNM) |

**MEMORANDUM OPINION**

A decade ago, Russia violently invaded and annexed Crimea. It seized and nationalized private assets there. Among those properties were holdings belonging to eleven Ukrainian companies ("the Companies") that owned and operated petrol stations in Crimea. But that is not the end of the story. Under an investment treaty between Ukraine and Russia, the Companies obtained an arbitral award of over $34 million from a Swiss tribunal. They now petition the Court to enforce that award against Russia. Having previously denied Russia's motion to dismiss, *see Stabil LLC v. Russian Federation*, 2024 WL 5093202 (D.D.C. Dec. 12, 2024), *aff'd*, 167 F.4th 506 (D.C. Cir. 2026), the Court considers the petition on the merits. Russia fails to carry its significant burden to establish a valid defense. And public policy emphatically favors confirmation of foreign arbitral awards. Thus, the Court will grant the petition.

**I.**

As in its Order denying Russia's Motion to Dismiss, the Court adopts the arbitral tribunal's unchallenged factual findings. *See Zhongshan Fucheng Indus. Inv. Co. LTD v. Fed. Rep. of Nigeria*, 112 F.4th 1054, 1059 n.1 (D.C. Cir. 2024) (citing *United Paperworkers Int'l*

*Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 38 (1987)). These findings resulted from multiple adversarial hearings where both parties had the opportunity to participate. *See* 1st Boykin Decl., Ex. A ("Final Arb. Award") ¶¶ 4, 51, 141, ECF No. 2-1.

Russia and Ukraine signed a bilaterial investment treaty in 1998 "to create and maintain favorable conditions for mutual investments." *See* 2d Boykin Decl., Ex. B (Agreement Between Russia and Ukraine on the Encouragement and Mutual Protection of Investments ("BIT")), Preamble, ECF No. 24-2. Both countries agreed to safeguard investments made in their territories by investors from the other state. *See, e.g.*, *id.* art. 2. The countries pledged that they would treat each other's investors as favorably as their own, would not expropriate or nationalize investments in a discriminatory way, and would compensate investors for seized assets. *See id.* arts. 3, 5–6. The BIT also contains a standing offer to arbitrate disputes over investments by citizens of one country in the territory of the other. *See id.* art. 9.

In early 2014, Russia invaded Ukrainian Crimea, a region consisting of the Autonomous Republic of Crimea and the City of Sevastopol. Final Arb. Award ¶¶ 94, 103–04. The following month, the new Russian-backed government in Crimea signed a treaty with the Russian Federation purportedly incorporating Crimea into Russia. *See id.* ¶¶ 106–07. At the time, the Companies each had investments related to petrol stations in Crimea, including real estate, fuel storage facilities, and other assets like vehicles and buildings. *See id.* ¶¶ 95–98. The oldest of these investments were made in 2000. *Id.* ¶ 96.

Russia quickly began seizing and nationalizing property in Crimea. *See id.* ¶¶ 122–32. In April 2014, members of a Russian paramilitary force "seized" and "looted" the Companies' petrol stations and an office. *Id.* ¶¶ 113–19. The paramilitary forces then sold the "remaining inventory of fuel and other products at substantially lower prices than the prices set by" the

Companies. *Id.* ¶ 119. At the end of the summer, the Russian-backed Crimean Council of Ministers nationalized some of the Companies' properties and "transferr[ed] the 'right of economic management' of [their] stations . . . to a Russian State-owned enterprise." *Id.* ¶ 128 (cleaned up). Finally, in 2016, the government nationalized the Companies' remaining petrol stations. *See id.* ¶ 132.

In response, the Companies invoked the BIT. They accepted Russia's standing arbitration offer and filed a Notice of Arbitration in June 2015 over Russia's seizure of their investments. *See id.* ¶ 9; *see also* 1st Boykin Decl., Ex. C ("Notice of Arb."), ECF No. 2-3. Arbitration took place before a Swiss arbitral tribunal and began in 2015. *See* Final Arb. Award ¶¶ 9–21. Russia refused to participate. *See id.* ¶¶ 11–14, 19, 24–26, 35. The tribunal first considered whether it had jurisdiction to hear the dispute and concluded it did. *See id.* ¶¶ 35, 40–41. Russia challenged this jurisdictional finding in the Swiss Federal Supreme Court. *See id.* ¶¶ 44–45; *see also* BGer [Federal Supreme Court] Oct. 16, 2018, 4A_398/2017 (Switz.). An arbitral hearing on the merits followed, and Russia again did not participate. *See* Final Arb. Award ¶¶ 49, 51.

The tribunal ultimately issued a 126-page decision finding that Russia breached the BIT. It awarded the Companies over $34 million in damages. *See id.* ¶ 430. Russia returned to the Swiss high court and filed an application to set aside the award—without success. *See* BGer [Federal Supreme Court] Dec. 12, 2019, 4A_246/2019 (Switz.). The court dismissed Russia's application in 2019. *Id.* ¶ 5.

In 2022, the Companies petitioned this Court to enforce the award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), codified at 9 U.S.C. § 201 *et seq.* *See* Pet. to Confirm Arb. Award ("Pet.") ¶ 7, ECF No. 4. Russia moved to dismiss for lack of subject matter jurisdiction under the Foreign Sovereign

Immunities Act ("FSIA") and lack of personal jurisdiction. *See* Mot. to Dismiss Pet. to Enforce Arb. Award, ECF No. 22. The Court rejected Russia's jurisdictional arguments and denied its motion in 2024. *See Stabil LLC*, 2024 WL 5093202, at *7. Russia appealed, and the D.C. Circuit affirmed. *See Stabil LLC v. Russian Federation*, 167 F.4th 506, 528 (D.C. Cir. 2026).

Russia responded to the Petition, *see* Resp., ECF No. 45, and the Companies' their reply, *see* Reply, ECF No. 46. Russia then sought leave to file a supplemental brief on the merits. Mot. for Leave, ECF No. 51; Merits Suppl. Br., ECF No. 51-1. The Companies filed an opposition. Opp'n to Mot. for Leave, ECF No. 53. The Court held oral argument on the petition.

Next, at the Companies' request, *see* Pet. at 28 n.10,[1] the Court ordered supplemental briefing on the proper interest rate to be applied to the arbitral award should it grant the Petition, *see* October 2, 2026, Minute Order; Pet'rs' Suppl. Br. on Interest Rate, ECF No. 57; Resp't's Suppl. Br. on Interest Rate, ECF No. 58. The Petition and Russia's motion for leave to file a supplemental brief are ripe for this Court's decision.[2]

## II.

"The New York Convention is a multilateral treaty that, with exceptions, obligates participating countries to honor international commercial arbitration agreements and to recognize and enforce arbitral awards rendered pursuant to such agreements." *Enron Nigeria Power Holding, Ltd. v. Fed. Rep. of Nigeria*, 844 F.3d 281, 283 (D.C. Cir. 2016). It applies to awards

---

[1] All page numbers cited herein refer to the ECF page number.

[2] The Court has federal question jurisdiction over this case. Actions to enforce foreign arbitral awards pursuant to the New York Convention are "deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. The Court also has subject matter jurisdiction because the Companies bring a "claim for relief" against Russia for which it is "not entitled to immunity." *See* 28 U.S.C. § 1330(a).

"made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." *Process & Indus. Devs. Ltd. v. Fed. Rep. of Nigeria*, 27 F.4th 771, 774 (D.C. Cir. 2022) (quoting New York Convention, art. I(1)). Under the New York Convention, "the state in which, or under the law of which, the award is made" has "primary jurisdiction" over the award and is "free to set aside or modify an award in accordance with its domestic arbitral law." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007) (cleaned up). Other states have secondary jurisdiction over the award and lack subject matter jurisdiction to vacate, set aside, or modify those awards. *See id.* And "when an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *Id.* (cleaned up); *see* 9 U.S.C. § 207.

There is an "emphatic federal policy in favor of arbitral dispute resolution." *TermoRio*, 487 F.3d at 933 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). "[T]hat federal policy applies with special force in the field of international commerce." *Id.* (cleaned up). Thus, district courts have "little discretion in refusing or deferring enforcement of foreign arbitral awards," *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (cleaned up), and confirmation proceedings should be "summary in nature," *Argentine Republic v. Nat'l Grid Plc*, 637 F.3d 365, 369 (D.C. Cir. 2011). The party opposing confirmation bears the burden of showing that one of the limited grounds for refusal applies. *See* New York Convention, art. V; *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 (D.C. Cir. 2017).

**III.**

Russia argues that three of Article V's narrow grounds for non-enforcement bar confirmation in this case. First, it claims that the arbitral award cannot be enforced because no

arbitral agreement in fact exists. Resp. at 20–29; *see* New York Convention, art. V(2)(a). But this argument was already rejected at the motion-to-dismiss stage of this litigation, and it fares no better now. Second, Russia alternatively argues that the subject matter of the award falls outside the scope of the parties' agreement to arbitrate. Resp. at 29–40; *see* New York Convention, art. V(1)(c). The Companies refute this claim three times over. Third, Russia contends that enforcing the award would violate U.S. public policy. Resp. at 40–48; *see* New York Convention, art. V(2)(b). Yet Russia fails to connect its asserted public-policy interest to the arbitral award in this case. The Court will enforce the award.

**A.**

Consider Russia's first argument—that no arbitration agreement exists. Without "an agreement to arbitrate, there is no authority to require a party to submit to arbitration." *Nat'l R.R. Passenger Corp. v. Bos. & Me. Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988). This rule follows from the fundamental principle that arbitral proceedings derive their legitimacy from the consent of the parties. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010). Courts must therefore decide de novo whether an agreement to arbitrate exists. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (cleaned up).

Courts have applied this principle in confirmation proceedings governed by the New York Convention. Some have held that Article V does not "preclude" this deeply rooted defense. *China Minmetals Materials Imp. & Exp. Co. v. Chi Mei Corp.*, 334 F.3d 274, 286 (3d Cir. 2003). Others ground it in the Convention's text, reasoning that "in the absence of an arbitration agreement that binds the parties, the dispute 'is not capable of settlement by arbitration under' United States law, and the award is unenforceable." *Al-Qarqani v. Chevron Corp.*, 8 F.4th 1018, 1024 (9th Cir. 2021) (indirectly quoting New York Convention, art. V(2)(a)); *see Baker Hughes*

*Servs. Int'l, LLC v. Joshi Techs. Int'l, Inc.*, 73 F.4th 1139, 1146–47 (10th Cir. 2023). Russia also invokes Article V(1)(a) of the Convention. Resp. at 23 n.5 (citing *OJSC Ukrnafta v. Carpatsky Petro. Corp.*, 957 F.3d 487 (5th Cir. 2020)). Whatever its provenance, this argument stumbles on the merits here.

Russia argues that no arbitration agreement exists because the Companies fall outside the BIT's standing offer to arbitrate and therefore could not have accepted it. Resp. at 21. The Court considers Russia's textual arguments about the BIT when it addresses Russia's alternative theory that this dispute falls outside the scope of an existing arbitral agreement. But Russia's threshold contention that no such agreement exists at all has already failed.

This Court and the D.C. Circuit rejected this argument when denying Russia's motion to dismiss. Affirming this Court's holding that it has subject matter jurisdiction under the FSIA's arbitration exception, the D.C. Circuit rejected Russia's argument that "it never intended to agree to arbitrate for the benefit of particular investors—Ukrainian investors operating in Crimea." *Stabil LLC*, 167 F.4th at 519. As it explained, this theory "confuses who ultimately prevails under the [BIT] with whether an agreement to arbitrate exists at all." *Id.* The D.C. Circuit had "rejected this maneuver before, and repeatedly." *Id.*; *see id.* 519–21 (collecting cases). That is because "[q]uestions about territorial reach and treaty coverage go to the scope of the agreement—to arbitrability—not to the existence of consent." *Id.* at 520; *see also Chevron Corp. v. Ecuador*, 795 F.3d 200, 205–06 (D.C. Cir. 2015) (explaining that, under *BG Grp., PLC v. Rep. of Argentina*, 572 U.S. 25 (2014), a bilateral investment treaty and notice of arbitration can function as an agreement between signatory countries and potential investors).

Russia cannot rehash at the merits stage its already rejected theory that no agreement to arbitrate exists. A valid arbitration agreement exists between the Companies and Russia. Properly understood, Russia objects to the scope of the BIT.

**B.**

Turn now to that objection about the BIT's scope. Russia repackages its same analysis of the BIT's text and argues this dispute is beyond the BIT's reach. Resp. at 29. A court may refuse to enforce an arbitral award where "[t]he award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." New York Convention, art. V(1)(c).

As a default, courts decide de novo whether an issue falls within the scope of an arbitration agreement. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). But the parties fiercely contest the application of this general rule to the present case. First, the Companies argue that the prior judgments of the Swiss Federal Supreme Court have preclusive effect on the scope of the arbitration agreement. Second, they argue that the Court should defer to the arbitral tribunal's own decision about the scope of the agreement. Finally, even if the Court resolves the issue de novo, the Companies argue that this dispute falls within the scope of the controlling Ukrainian and Russian-language texts of the BIT. The Court agrees with all three arguments and analyzes them in the alternative.

**1.**

The Companies first argue that the Swiss high court's prior decisions that this dispute falls within the BIT's scope have preclusive effect on this Court.[3] The D.C. Circuit has yet to decide whether foreign judgments can ever have preclusive effect in proceedings to confirm foreign arbitral awards under the New York Convention. The Court holds that they can. And here, the Swiss high court's decision that this dispute falls within the scope of the BIT has issue-preclusive effect.

Start with the preclusive effect of foreign judgments. In *Hilton v. Guyot*, the Supreme Court held that U.S. courts can recognize foreign judgments as a matter of international comity. 159 U.S. 113, 163–67 (1895). "Since *Hilton*, the federal courts have extended comity to foreign judgments that comport with the standard expounded by the Court." *Hulley Enters. Ltd. v. Russian Federation*, 149 F.4th 682, 692 (D.C. Cir. 2025). In *Hulley*, the D.C. Circuit remanded to the district court to determine whether issue preclusion applies to jurisdictional questions under the FSIA, and if so, whether it extends to foreign judgments in that context. *See id.* at 691. If the answer to both questions is yes, then the district court should "apply the *Hilton* factors" and "also consider how the *Hilton* factors intersect with the ordinary standard for assessing collateral estoppel." *Id.* at 692; *see also Deutsche Telekom, A.G. v. Rep. of India*, 155 F.4th 694, 697, 703 (D.C. Cir. 2025) (acknowledging that *Hilton* "might extend to foreign judgments

---

[3] The Companies' terminology is not always consistent. *Compare* Reply at 15–16 (analyzing "issue preclusion"), *with id.* at 9–10 (discussing "res judicata"). That said, although res judicata can refer specifically to claim preclusion, it can also refer to issue preclusion. *See Brownback v. King*, 592 U.S. 209, 215 n.3 (2021). And the Companies confirmed at oral argument that they argue that the Swiss judgments have issue-preclusive effect. Hr'g Tr. 7:7–15. The Court is thus satisfied that their argument pertains to issue preclusion.

confirming arbitral awards" under the New York Convention but declining to decide the issue because the parties did not substantially brief it on appeal).

Satisfied with the parties' briefing here, the Court holds that foreign judgments can have issue-preclusive effect in proceedings to confirm foreign arbitral awards.[4] *Hulley* cautioned that sensitive matters of "foreign relations and international law" may counsel against extending preclusion. 149 F.4th at 692. But *Hulley* made this observation about "determinations of foreign sovereign immunity." *Id.* An immunity determination requires a federal court to decide whether it can subject a foreign state to its jurisdiction at all. This threshold decision would seem to be of particular significance to international relations, and countries' laws on foreign sovereign immunity could conceivably implicate vastly different policy considerations. But once a court has crossed the Rubicon and rejected a foreign sovereign's claim to immunity, the stakes of granting issue-preclusive effect to a prior foreign judgment are lessened.

More, *Hilton* teaches that, provided a foreign court adhered to certain basic principles of fairness, "the merits of [a] case should not, in an action brought in this country upon the judgment, be tried afresh, as on a new trial or an appeal, upon the mere assertion of the party that the judgment was erroneous in law or in fact." 159 U.S. at 203. Russia points to no principle in

---

[4] Russia argues that the Companies have forfeited their preclusion argument by not raising it in their Petition and alluding to it only in their Response to Russia's Motion to Dismiss, ECF No. 23. Resp. at 35 (citing *Entergy Ark., LLC v. FERC*, 134 F.4th 576, 580–81 (D.C. Cir. 2025)). Russia forgets that it bears the burden to establish a defense to confirmation, *see Belize Bank*, 852 F.3d at 1111, and that the Companies' preclusion argument is merely a response to one such defense. More, the parties each devote five pages of thoughtful briefing to whether the Swiss high court's judgments have preclusive effect. *See* Resp. at 35–40; Reply at 9–13. The issue is thus appropriately developed, and the Court will decide it now. *Cf. Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 919 (D.C. Cir. 2018) (explaining that it is appropriate for a court of appeals to consider a fully briefed legal argument raised for the first time on appeal).

*Hilton* or its progeny that prevents extending its rule to issue preclusion in enforcement proceedings under the New York Convention.

More still, preclusion is particularly appropriate to confirmation proceedings given the "emphatic" public policy in favor of international arbitration. *TermoRio*, 487 F.3d at 933 (cleaned up); *see Aenergy, S.A. v. Rep. of Angola*, 123 F.4th 1351, 1356 (D.C. Cir. 2024) (explaining that issue preclusion "protect[s] against the expense and vexation attending multiple lawsuits, conserv[es] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent verdicts" (cleaned up)). The enforcement of arbitral awards would only become more protracted by requiring petitioners to re-litigate issues already decided by foreign courts. Issue preclusion thus applies.

Russia disagrees. It relies on two decisions in the same out-of-circuit case, but they are not relevant here. Resp. at 36. The first decision was precedential, *see VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322 (2d Cir. 2013), but the second decision was not, *see VRG Linhas Aereas S/A v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 605 F. App'x 59 (2d Cir. 2015). Neither, of course, is binding on this Court. Russia cites the nonprecedential decision for the proposition that a federal court "may not 'directly enforce or give preclusive effect to the judgments' of foreign courts at the seat of the arbitration . . . in deciding whether the parties agreed to arbitrate." Resp. at 36 (quoting *VRG Linhas*, 605 F. App'x at 60–61). Viewed in context, this sentence is the thinnest of reeds. The Second Circuit did not explain this statement. It simply cited its prior, precedential decision. *See VRG Linhas*, 605 F. App'x at 60–61 (citing *VRG Linhas*, 717 F.3d at 325). But the prior decision did not involve the preclusive effect of foreign-court judgments. Rather, it dealt with the allocation of decisional authority between arbitral panels and federal courts. *See VRG Linhas*,

717 F.3d at 325–27. That is not the same issue. Whether a federal court or an *arbitral panel* decides an issue is distinct from whether the doctrine of issue-preclusion applies to *foreign court judgments* when a federal court does decide an issue.

Another aspect of *VRG Linhas* further distinguishes that case. The respondent in *VRG Linhas* raised a defense under Article V(2)(a). *See id.* at 325. That is a meaningfully distinct provision of the New York Convention. It permits a court to refuse confirmation where "'[t]he subject matter of the difference is not capable of settlement by arbitration *under the law of' the [country] in which enforcement is sought*." *Id.* (emphasis added) (quoting New York Convention, art. V(2)(a)). Because "[w]hether a given dispute is arbitrable . . . is . . . a question to be decided" by federal courts "under United States arbitration law," *id.*, a foreign court's decision as to whether foreign law permitted settlement of the dispute by arbitration could not have preclusive effect on whether U.S. law does the same, *see* Restatement (Third) of U.S. L. of Int'l Comm. Inv.-State Arb. § 4.8 rep. n.(d) (Am. L. Inst. 2023). By contrast, Russia does not contend that the law governing the scope of the BIT differs between the Swiss high court and this Court. It urges this Court to follow the same principles of treaty interpretation applied by the Swiss high court. *See infra* Part III.B.3. So Russia does not get far with these Second Circuit decisions.

Russia next argues against issue preclusion based on the text and structure of the New York Convention. It argues that the "New York Convention expressly contemplates that enforcing courts in each Contracting State retain an independent role in evaluating the limited defenses enumerated in Article V, including the validity of the arbitration agreement and questions of arbitrability." Resp. at 36. As an example, it points to Article V(1)(e). *Id.* at 37. Article V(1)(e) permits, but does not require, courts of secondary jurisdiction to refuse

confirmation if the award is set aside at the seat of arbitration. There is no equivalent provision permitting courts to enforce an award solely because it was *confirmed* by a court with primary jurisdiction. *See id.*

Russia adds that set-aside proceedings in the primary jurisdiction (Switzerland) differ from confirmation proceedings in secondary jurisdictions (this Court) because they have different structures, governing laws, and consequences. *Id.* Russia concludes that recognizing the issue-preclusive effect of a primary-jurisdiction judgment would undermine Article V by reducing secondary-jurisdiction confirmation to a "one-shot adjudication" at the seat of arbitration. *Id.* at 38.

For starters, Russia's framing ignores that confirmation proceedings ought to be "summary in nature." *Argentine Republic*, 637 F.3d at 369. Russia's argument that there is no corresponding provision to Article V(1)(e) ignores the fact that Article V is simply a set of narrow exceptions to the default position that a foreign arbitral award should be confirmed. *See TermoRio*, 487 F.3d at 934–35. More, issue preclusion will not transform confirmation proceedings into one-shot adjudications at the seat of arbitration. The Companies do not argue that the Swiss high court's refusal to set aside the arbitral award automatically entitles them to enforcement regardless of whether Russia could establish any Article V defenses. Rather, they contend that Russia's Article V(1)(c) defense fails because the Swiss high court already rejected Russia's interpretation of the BIT. Reply at 9.

This distinction matters because not all issues implicated by the Article V defenses are (or even can be) raised in a set-aside proceeding in the primary jurisdiction. For example, whether enforcement violates the secondary jurisdiction's public policy definitionally raises issues specific to the secondary jurisdiction. *See* New York Convention, art. V(2)(b). As just

discussed, so does the defense that an issue is not subject to arbitration in the secondary jurisdiction. *See id.* art. V(2)(a). Thus, there is no risk of one-shot adjudication because there will always be at least some Article V defenses that could not have been decided in the primary jurisdiction. Nor does issue preclusion render the other provisions of Article V superfluous. It is always possible that a respondent will raise a defense for the first time in a confirmation proceeding, so that there is no preclusive foreign judgment. And as explained below, the standards for both foreign-preclusion and issue-preclusion doctrines require courts to do more than merely rubberstamp primary-jurisdiction judgments.

Even one of Russia's secondary sources endorses the application of issue preclusion here. *See* Resp. at 36. Russia invokes the Restatement, which ultimately adopts the view that "when granting post-award relief[,] the court may grant issue-preclusive effect to certain findings that the foreign court may have made in the confirmation or set-aside ruling it rendered." Restatement (Third) Comm. Inv.-State Arb. § 4.8 (c)(ii); *see also* Gary Born, *International Commercial Arbitration*, § 27.02[B][2] (3d ed. 2021) (acknowledging a "serious argument" in support of preclusion, though ultimately disagreeing with this approach). Russia points to a separate provision of the Restatement but read in full it merely explains the point noted above that some defenses (like public policy) are not subject to issue preclusion because they are governed by the secondary jurisdiction's law. *See* Restatement (Third) Comm. Inv.-State Arb. § 4.8 rep. n.(d). And although a different treatise agrees with Russia that issue preclusion is inapplicable in this context, the sole U.S. case on which that treatise relies is an unpublished decision discussing the limited preclusive effect of judgments issued under quasi-in-rem jurisdiction. *See* Born, *International Commercial Arbitration*, § 27.02[D] (citing *CME Media*

*Enters. BV v. Zelezny*, 2001 WL 1035138, at *4 (S.D.N.Y. Sept. 10, 2001)). That principle is irrelevant here.

Having concluded that preclusion applies to foreign judgments in this context, the Court now applies the *Hilton* factors to determine whether the judgment of the Swiss high court has preclusive effect here. *See Hulley*, 149 F.4th at 692 (outlining steps for assessing preclusion in this setting). Federal courts will give preclusive effect to foreign judgments that followed "a full and fair trial abroad before a court of competent jurisdiction," conducted "upon regular proceedings," after "due citation or voluntary appearance of the defendant," and under a system "likely to secure impartial administration of justice." *Hilton*, 159 U.S. at 202. When a party does not contest the foreign court's jurisdiction or the general integrity of the foreign judicial system, the D.C. Circuit has glossed *Hilton* as asking whether there was "effective service of process" and whether the judgment would violate U.S. public policy. *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981).[5] Applied here, *Hilton* counsels for the Swiss decision's preclusive effect.

To start, Russia does not contend that the *Hilton* factors are unsatisfied in this case. Regardless, Russia initiated both proceedings before the Swiss court. That eliminates any concern over improper notice. Russia submitted briefing to the Swiss high court on its objections to the arbitral proceedings and award, and it received a reasoned decision on the scope

---

[5] *Hilton* also considered whether an American judgment would be reexamined on the merits in the foreign country. *See Tahan*, 662 F.2d at 864. However, the D.C. Circuit has cast significant doubt on the continued validity of this reciprocity requirement. *See id.* at 867–68 & n.21; *see also Phillips USA, Inc. v. Allflex USA, Inc.*, 77 F.3d 354, 359 n.6 (10th Cir. 1996) ("[C]ourts have concluded that reciprocity is no longer an element of the federal law enforcement of foreign judgments [under *Hilton*]."). Russia does not argue that this inquiry still applies under *Hilton*. And Switzerland does at least give claim-preclusive effect to U.S. judgments. *See* Systematische Sammlung des Bundesrechts, Dec. 18, 1987, SR 291, arts. 25 & 27 (Switz.).

of the BIT. BGer Oct. 16, 2018, 4A_398/2017, c. ¶¶ 4.3.2, 4.4.7; BGer Dec. 12, 2019, 4A_246/2019, c. ¶ 4.2. There is no reason to suspect that holding Russia to the judgment of proceedings it initiated would violate U.S. public policy. The *Hilton* factors are therefore satisfied.

Next the Court applies the usual issue-preclusion factors. *See Hulley*, 149 F.4th at 692 (collecting cases that apply *Hilton* factors and issue-preclusion factors sequentially). "There are three conditions for issue preclusion to apply": (1) "the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case," (2) "the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case," and (3) "preclusion in the second case must not work a basic unfairness to the party bound by the first determination." *Aenergy*, 123 F.4th at 1356 (cleaned up).

All the issue-preclusion factors are satisfied here. The parties contested the scope of the BIT in both prior Swiss proceedings, and the Swiss high court twice rejected Russia's arguments (discussed below) that the Companies' disputes fall outside the scope of the BIT. BGer Oct. 16, 2018, 4A_398/2017, c. ¶¶ 4.4.7, 5; BGer Dec. 12, 2019, 4A_246/2019, c. ¶¶ 4.2, 5. Russia concedes that it contested whether the BIT applies to Crimea, whether the Companies qualify as "investors" under Article 1(2) of the BIT, and whether the investments in this case are "investments" under Article 1(1) of the BIT. Resp. at 39. These are essentially the same arguments on the same issue Russia raises here. *See id.* at 25–27.

Russia tries to distinguish the issues decided by the Swiss court by again arguing that this case turns on the existence of an agreement to arbitrate. *See id.* at 39–40. As already explained, that is wrong. There is no unfairness in holding that Russia is bound by the judgments in the two prior proceedings it initiated. Issue preclusion applies.

Weeks after the hearing, and months after it responded to the Petition, Russia filed a notice of supplemental authority. Under the pretext of alerting the Court to a months-old decision by an *English* court, Russia argued for the first time that the Swiss judgments cannot have preclusive effect because Swiss law does not recognize issue preclusion. *See* Notice of Suppl. Authority ("Notice") at 1, ECF No. 55 (citing *Yukos Cap. Ltd. v. Russian Federation*, [2026] EWHC 1918 (Comm), CL-2023-000799, (July 17, 2026)). The real grounds for Russia's argument seem to be a handful of decades-old U.S. cases. *See id.* at 2. But the parties' original briefing assumed that American, not Swiss, issue-preclusion law would apply. Resp. at 39–40; Reply at 15–16.

The Court will not consider an argument, available since this litigation began, that Russia waited until the last possible moment to raise. Permitting parties to raise new arguments via supplemental authority without an intervening change in law "invites an unsavory degree of tactical sandbagging by litigants in future cases: why bother pursuing a potentially winning issue at the outset when you can wait to introduce it at the last second and leave your opponent without the chance to respond?" *See Niemi v. Lasshofer*, 728 F.3d 1252, 1262 (10th Cir. 2013) (Gorsuch, J.). The Companies did manage to respond two days later, *see* Resp. to Notice, ECF No. 56, but this is no way to brief an argument. Since the parties assumed in their original briefing and at the hearing that U.S. law applies, the Court will hold them to this assumption. *See United States v. Kashamu*, 656 F.3d 679, 684–85 (7th Cir. 2011) (Posner, J.) (applying American, rather than foreign, issue-preclusion law where the parties assumed its application in their arguments).

Regardless, Russia's argument is unconvincing. One of its federal cases relied on New York, not federal, preclusion rules. *See Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397, 404–05 (S.D.N.Y. 2003). Its other federal case summarily applied a factor-

intensive analysis unlike this circuit's approach to foreign-judgment preclusion. *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 178–79 (S.D.N.Y. 1995). It also noted that the absence of issue-preclusion in Swiss law was not "dispositive." *Id.* at 179. And more broadly, these cases offer a skewed picture of the law. In their federal-question jurisdiction, most courts will recognize a foreign judgment's issue-preclusive effect even where the foreign law does not recognize issue preclusion because the federal law of preclusion, not the foreign law, applies. *See Hurst v. Socialist People's Libyan Arab Jamahiriya*, 474 F. Supp. 2d 19, 32–33 (D.D.C. 2007) (reviewing cases and the Restatement and "agree[ing] with the majority of U.S. courts that have addressed the issue . . . that it is appropriate to apply federal standards in determining whether to give [a foreign judgment] [issue-]preclusive effect").

In sum, the Court holds that the Companies have satisfied both the *Hilton* factors and the issue-preclusion factors. The Swiss Federal Supreme Court's decision that this dispute falls within the scope of the BIT has issue-preclusive effect on this Court. Russia's objection under Article V(1)(c) of the New York Convention thus fails.

**2.**

Even if issue preclusion did not apply, the Companies would prevail. They alternatively counter that the Court should defer to the arbitral tribunal's determination that this dispute falls within the scope of the BIT. Reply at 17. In short, they contend that the BIT delegates issues of arbitrability to arbitrators themselves, and so the tribunal's decisions on arbitrability are entitled to deference. Though a closer question, the Court ultimately agrees.

Return to first principles. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam*,

537 U.S. at 83 (cleaned up). Whether a specific dispute is subject to arbitration turns on the arbitration agreement. *See Hulley*, 149 F.4th at 689. But this first-order question raises a second-order question: *Which decisionmaker* resolves the scope of the arbitration agreement?

As a default, courts decide issues of arbitrability. *See First Options*, 514 U.S. at 944–45. However, parties can agree to submit disputes over the scope of an arbitration agreement to the arbitrators themselves if the parties do so "clearly and unmistakably." *Howsam*, 537 U.S. at 83 (cleaned up); *see Deutsche Telekom*, 155 F.4th at 701. And it is courts that resolve this third-order question as to whether clear and unmistakable evidence exists. *See First Options*, 514 U.S. at 944–45. When there is such evidence, "courts should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *Id.* at 943; *see Hulley*, 149 F.4th at 689 ("[W]hen parties delegate questions of arbitrability to an arbitral tribunal, [the] court is bound by the tribunal's determinations.").

In the D.C. Circuit, a treaty's incorporation of the Rules on Arbitration of the United Nations Commission on International Trade Law ("UNCITRAL") generally constitutes "clear and unmistakable" evidence that the parties intend arbitrators to decide issues of arbitrability. *LLC SPC Stileks v. Rep. of Moldova*, 985 F.3d 871, 878–79 (D.C. Cir. 2021) (cleaned up). That is because the UNCITRAL rules state that the "arbitral tribunal shall have the power to rule on its own jurisdiction." *Id.* at 878 (quoting UNCITRAL Arbitration Rules, art. 23, ¶ 1 (rev. 2010 ed.)). Recently, however, the D.C. Circuit has recognized a "narrow[]" exception to this rule where an arbitration agreement is "narrow, vague, or contains exclusionary language suggesting that the parties consented to arbitrate only a limited subset of disputes." *Deutsche Telekom*, 155 F.4th at 702 (cleaned up). "[C]ontext matters" to this inquiry. *Id.* (cleaned up).

The facts of *Deutsche Telekom* give color to this exception. It involved a bilateral investment treaty between Germany and India that incorporated the UNCITRAL Arbitration Rules. *Id.* at 698. Still, "several considerations cut against treating the incorporation of UNCITRAL rules as dispositive." *Id.* at 702. First, "German and Indian law *always* permit courts to review arbitrability, even when arbitrators have opined on the issue themselves." *Id.* (emphasis in original) (citing German and Indian case law). "Because the BIT was drafted against the backdrop of this domestic law, it would be unnatural to read its arbitration provisions as displacing that law." *Id.* (cleaned up). Second, the treaty "expressly incorporate[d] background principles of German and Indian law in confirmation proceedings." *Id.* The relevant treaty article "state[d] that an arbitral award 'shall be enforced in accordance with national laws of the [country] where the investment has been made.'" *Id.* (second alteration in original). The relevant country was India, which "sharply distinguishes between authorizing arbitrators to consider arbitrability on the front end and foreclosing courts from doing so on the back end." *Id.*

Now consider the BIT here. It incorporates the UNCITRAL Arbitration Rules. One of the BIT's three options for arbitrating disputes involves "an 'ad hoc' arbitration tribunal, in accordance with the [UNCITRAL Arbitration Rules]." BIT, art. 9(2)(c). The Companies accepted Russia's standing offer to arbitrate under the UNCITRAL Arbitration Rules by filing their Notice of Arbitration. *See* Notice of Arb. at 16. Russia does not contest that the UNCITRAL Arbitration Rules are incorporated in the BIT. Rather, it contends that the BIT falls within the narrow exception recognized by *Deutsche Telekom*. Resp. at 30–33. Based on *Deutsche Telekom*, this question turns on the background law of arbitrability in Ukraine and Russia and the presence of an enforcement provision in the BIT. If Russian and Ukrainian law are like German and Indian law in permitting courts to review arbitrability even when arbitrators

have opined on the issue, and if the enforcement provisions in the two BITs are similar, the exception would apply.

Start with the background law in Ukraine and Russia. Russia follows what is called the "competence-competence" principle of judicial review of arbitral jurisdiction. Andrey Kotelnikov, Sergey Kurochkin & Oleg Skvortsov, *Arbitration in Russia*, § 7.02. Under that principle, an arbitral tribunal "shall decide on its own whether or not it has jurisdiction to hear the dispute between the parties." *Id.* This initial determination, however, is subject to judicial review. "The arbitrators shall not be regarded as the sole but as the first persons to rule on the competence of the arbitral tribunal to deal with the parties' dispute." *Id.*

Ukraine too follows the competence-competence principle and "allows an arbitral tribunal to determine its own jurisdiction." Olena Perepelynska, "Ukraine," in *Law and Practice of International Arbitration in the CIS Region*, § 10.05[A] (2017). An arbitral tribunal's initial determination that it has jurisdiction is also subject to judicial review. "The functions of making decision on jurisdiction of the arbitral tribunal, when the latter rules on its own jurisdiction as a preliminary question, as well as decisions on setting aside of the final arbitral awards rendered in Ukraine are performed by local civil courts of Ukraine at the seat of arbitration." *Id.* § 10.05[C]. If an arbitral tribunal determines as a preliminary matter that it has jurisdiction, a party may request within 30 days that the appropriate civil court decide the issue. *See id.* § 10.08[D].

Relying on these secondary sources, the Companies would distinguish Ukrainian and Russian law from the background law in *Deutsche Telekom* because "both [Ukraine and Russia's] laws contemplate review of a tribunal's arbitrability determinations only by the courts of the country in which the arbitration is seated." Reply at 20. But these secondary sources merely describe challenges to the jurisdiction of tribunals seated in Ukraine and Russia brought

in those countries' respective courts. *See, e.g.*, Kotelnikov, *Arbitration in Russia*, § 7.02 (discussing practices of "state courts" "[i]n Russia"); Perepelynska, "Ukraine," § 10.05[C] (discussing "local civil courts of Ukraine"). That is not the end of the story, though.

As signatories to the New York Convention, both Ukraine and Russia recognize that foreign countries can subsequently conduct enforcement proceedings subject to Article V defenses. *See TermoRio*, 487 F.3d at 935 (distinguishing primary and secondary jurisdictions for purposes of the New York Convention); Born, *International Commercial Arbitration*, § 26.03[B][3][a] (noting that, generally, "[i]t is the responsibility of the recognition court to interpret and apply the provisions of Articles V(1) and V(2)."). And federal courts, foreign courts, and commentators note with near uniformity that proceedings to invalidate an award are permissible only at the seat of arbitration under the New York Convention. *See TermoRio*, 487 F.3d at 935; Restatement (Third) Comm. Inv.-State Arb. § 4.2 rep. n.(b) (collecting sources). Thus, the Companies have not shown that Ukrainian and Russian law are meaningfully different in this regard from the foreign law at issue in *Deutsche Telekom*.

Other similarities between this case and *Deutsche Telekom* reinforce this conclusion. *Deutsche Telekom* relied on the fact that "German and Indian law *always* permit courts to review arbitrability, even when arbitrators have opined on the issue themselves." 155 F.4th at 702 (emphasis in original). But what does "*always*" mean here? It could mean that all German or Indian courts, at any times during litigation, can review an arbitral tribunal's jurisdiction. Or it could mean that in *all cases* parties will have an opportunity to seek judicial review of the tribunal's jurisdiction at *some time* in *some court* in that country. This distinction matters. Ukraine gives parties a 30-day window to challenge a tribunal's preliminary determination that it has jurisdiction. *See* Perepelynska, "Ukraine," § 10.08[D]. Similarly, Russia restricts judicial

review to "competent state courts." Alexey Kostin & Dmitry Davydenko, "Russia," in *Law and Practice*, § 7.05[C]. So although both countries always provide some opportunity for judicial review of an arbitral tribunal's jurisdiction, these opportunities are procedurally conscribed.

To resolve the meaning of "always" in *Deutsche Telekom*, the Court looks primarily to Indian law, since it applied to the investments in that case under the terms of the parties' treaty. *See* 155 F.4th at 702. India also follows the so-called "competence-competence" principle; parties to an arbitral proceeding in India will always have some opportunity to obtain judicial review by Indian courts of a tribunal's determination that it has jurisdiction. *See id.* (citing *Chloro Controls (India) Priv. Ltd. v. Severn Trent Water Purification*, (2013) 1 SCC 641, ¶ 129 (India)). But a party usually must wait and challenge an arbitral tribunal's jurisdiction determination through the standard procedure for challenging final arbitral awards. *See M/s. MCM Worldwide Priv. Ltd. v. M/s. Constr. Indus. Dev. Council*, 2026 INSC 425, ¶¶ 15–17 (2026) (India). And a party has only three months to apply for a court to set aside an arbitral award. Arbitration and Conciliation Act, 1996, § 34(3) (India). More, a party can bring its motion to set aside the award only in the district encompassing the seat of arbitration. *See J&K Econ. Reconstruction Agency v. Rash Builders India Priv. Ltd.*, 2026 INSC 368, ¶¶ 17–18, 24 (2026) (India). More still, only certain types of courts can hear these challenges. *See* Arbitration and Conciliation Act, 1996, § 2(1)(e) (India). Thus, the relevant question under *Deutsche Telekom* is whether there is an opportunity for judicial review of an arbitral tribunal's jurisdictional determination in all cases. The question is not whether a party can seek judicial review anywhere at any time.

Within the meaning of *Deutsche Telekom*, then, Russian and Ukrainian law "*always* permit courts to review arbitrability, even when arbitrators have opined on the issue themselves."

*See* 155 F.4th at 702. That is because parties always have some opportunity to challenge an arbitral tribunal's jurisdiction in a Ukrainian or Russian court, despite certain procedural constraints on that challenge.

But the inquiry about *Deutsche Telekom*'s application to this case does not stop there. Consider now the enforcement clause. There is a notable distinction between the Ukraine-Russia BIT and its counterpart in *Deutsche Telekom*. The treaty in *Deutsche Telekom* stated that an arbitral award "shall be enforced in accordance with [the] national laws of the [country] where the investment has been made." *Id.* (second alteration in original). This sentence ties the law applicable to enforcement to the location of the investment. It is in the passive voice, and so is ambivalent as to which country ultimately enforces an arbitral award. In short, it is a choice-of-laws provision, not a venue provision.

Now consider the provision in this case: "Each Contracting Party agrees to execute [awards under the BIT] in conformity with its respective legislation." BIT, art. 9(3). This sentence is in the active voice. Closely read, it guarantees that if either Ukraine or Russia executes an arbitral award under the BIT, it will do so in compliance with its own laws. Unlike the Germany-India treaty provision, it does not tie the law governing an award to the country in which the underlying investment was made. It is unclear whether the BIT in this case reaches how other countries' courts enforce an award. Russia is thus mistaken to conclude that the language of the BIT and the *Deutsche Telekom* treaty are "nearly identical." Resp. at 33. Russia also points to several other provisions of the BIT that state that the parties' "rights and obligations are to conform with the laws of one or both of the contracting parties." *Id.* (citing BIT, arts. 1, 2, 4, 7, 8). Whatever the merit of Russia's reading of the cited provisions, it does not alter the relevant phrasing of Article 9(3).

This distinction dooms Russia's argument. Since no "treaty clause expressly invok[es] these countries' award-confirmation laws" for purposes of this enforcement proceeding, the BIT does not fall within *Deutsche Telekom*'s "narrow[]" exception. 155 F.4th at 702. Rather, the BIT's incorporation of the UNCITRAL Arbitration Rules is clear and unmistakable evidence that the parties have committed issues of arbitration to the arbitral panel. *See Stileks*, 985 F.3d at 878–79. The Court is therefore "bound by the tribunal's determination[]" that this dispute falls within the scope of the arbitration agreement. *Hulley*, 149 F.4th at 689; *see* 1st Boykin Decl., Ex. D ("Award on Jurisdiction") ¶¶ 175–76, ECF No. 2-4.[6]

**3.**

Finally, Russia fails to establish its defense even construing the BIT de novo. Because a treaty is essentially a contract between nations, treaty interpretation is a matter of "determining the parties' intent." *BG Grp., PLC v. Rep. of Argentina*, 572 U.S. 25, 37 (2014). "[A]nalysis must begin . . . with the text of the treaty and the context in which the written words are used." *Air France v. Saks*, 470 U.S. 392, 396–97 (1985); *see Zhongshan Fucheng*, 112 F.4th at 1070–71 ("The clear import of treaty language controls unless application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories." (cleaned up)). Even reviewing de novo, the Court refers to the decision of the Swiss court for its persuasive value.

Russia and Ukraine both urge that the Vienna Convention on the Law of Treaties ("VCLT") should also guide the Court's interpretation. Resp. at 30; Reply at 23; Hr'g Tr. 11:14–

---

[6] Though Russia elected not to participate in the arbitration proceeding, it submitted the same objection to the tribunal about the scope of the arbitration agreement that it advanced before the Swiss high court and that it presses here. *See* Award on Jurisdiction ¶ 81.

16, ECF No. 54. The Swiss court and the arbitral tribunal both interpreted the BIT in light of the VCLT. *See* BGer Oct. 16, 2018, 4A_398/2017, c. ¶¶ 4.3.2, 4.4.2; Award on Jurisdiction ¶ 92. The VCLT requires courts to interpret treaties "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." VCLT, art. 31(1). It is unclear when, if ever, the VCLT applies in U.S. courts, since the United States is not a signatory. *Compare BG Grp.*, 572 U.S. at 37 (not mentioning the VCLT), *with Bank of N.Y. v. Yugoimport*, 745 F.3d 599, 609–10 (2d Cir. 2014) (applying the VCLT to treaty interpretation under New York choice-of-law rules).

The Court need not resolve this question. Ukraine and Russia are both signatories to the VCLT, so they presumably "inten[d]" the text of their treaties to be interpreted in light of the VCLT's principles. *See BG Group*, 572 U.S. at 37. Their agreement that the VCLT applies to the BIT bolsters this conclusion. Regardless, neither party argues that different standards would lead to different interpretations of the BIT here.

The BIT was executed "in two counterparts, each one in the Russian and Ukrainian languages, both texts having equal force." BIT, art. 14. Thus, the original Ukrainian and Russian texts "must guide" the Court's analysis. *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991). The Court may consult bilingual dictionaries as well as foreign legal materials to determine the proper translation of relevant terms. *See id.* at 536–38; *Martinez v. United States*, 828 F.3d 451, 459 (6th Cir. 2016). Unhelpfully, the Companies provided *two* English-language translations of the BIT to the Court. Before the translation the Companies filed with their Opposition to Russia's Motion to Dismiss—the translation that the Court has utilized until now—the Companies filed a different translation with their Petition. *See* 1st Boykin Decl., Ex. B, ECF No. 2-2. The origin of this first translation is unclear. As for the second translation, it

was produced by an independent expert on translation appointed by the arbitral tribunal. Award on Jurisdiction ¶¶ 29–31, 139 n.168. The Companies rely on the wording of the second translation. *See, e.g.*, Reply at 24. Given its expert pedigree and the parties' agreement at the hearing that their success generally does not depend on one translation over the other, Hr'g Tr. 15:22–25, 41:7–8, the Court will rely on the second translation.

The parties agree that Article 9 of the BIT contains the terms of the standing offer to arbitrate: "Any dispute between one Contracting Party and an investor of the other Contracting Party arising in connection with investments" is subject to arbitration. BIT, art. 9. "Investments," in turn, are defined as "any kind of tangible and intangible assets [which are] invested by an investor of one Contracting Party in the territory of the other Contracting Party." *Id.* art. 1(1) (brackets in original).

The Companies' investments in Crimea fall within the scope of this standing offer. They contend that Crimea is Russian territory because it is under Russia's de facto control. Reply at 25. Ukraine, for its part, made a "non-disputing party submission" to the tribunal claiming that "[w]ithin the meaning of the [BIT], 'territory of the Russian Federation' presently includes Crimea because it is occupied and administered by the Russian Federation, despite Russia's lack of a valid claim to sovereignty." Award on Jurisdiction ¶¶ 82–83, 145 (cleaned up). And at the hearing, Russia conceded (as it must) that Crimea "has been annexed by Russia." Hr'g Tr. 25:5. Thus, the disputed investments are now "tangible . . . assets [which are] invested . . . in the territory of" Russia by Ukrainian investors and fall within the scope of the standing offer. BIT, arts. 1(1), 9.

The controlling text of the BIT confirms this interpretation. The Russian ("вкладываются") and Ukrainian ("вкладаються") verbs in Article 1(1) translated as "invested"

are in the "imperfective" aspect. BGer Oct. 16, 2018, 4A_398/2017, c. ¶ 4.4.2; *see* Reply at 24. "The imperfective aspect is a special form of a verb that is used mostly to describe incomplete, habitual, or continuing actions." Anna Classing, *What is the imperfect aspect in Russian?*, Mango Languages (Sept. 11, 2026), https://perma.cc/62U6-CMLJ (emphasis omitted). For example, the English phrase "Why are you looking at me like that?" involves one sort of continuing action (looking) expressed by the imperfective aspect in Russian or Ukrainian. *See id.* In other words, a verb in the imperfective aspect "does not describe an action that must have been completed at a certain point in time." BGer Oct. 16, 2018, 4A_398/2017, c. ¶ 4.4.2. Though awkward to phrase in English, the disputed investments are in a continuing state of being "invested" in Russian-controlled Crimea. They thus fall within Article 9.

Russia raises several counterarguments to this interpretation.[7] First, Russia notes that the definitions for "investments" and "investor of the a Contracting Party" narrow those terms' applications to investments "in the territory of the other Contracting Party." BIT, art. 1(1), 1(2); Resp. at 26. "Territory" is in turn defined as "the territory of the Russian Federation or the territory of Ukraine." BIT, art. 1(4). Russia seems to make two technically distinct arguments premised on this definition, though it does not clearly separate them.

The first argument relies on the "principle of contemporaneity" in international law, which purportedly "requires that the terms of a treaty . . . be interpreted in light of the circumstances known to the parties at the time the treaty was ratified." Resp. at 24–25

---

[7] Russia raises these objections as part of its argument that no valid agreement to arbitrate exists. *See* Resp. at 24–29. The Court has already rejected Russia's argument that no valid arbitration agreement exists. Properly construed, Russia's textual arguments go to the scope of this agreement to arbitrate.

(collecting international sources). According to Russia, "[s]ince there is no dispute that Crimea was Ukrainian territory at the time [the Companies] made their investments, Russia's offer simply did not extend to [the Companies]." Reply at 26; *see also* Hr'g Tr. 25:22–24 ("And in 1992, when they entered into the treaty [sic],[8] there was no dispute that Crimea was part of Ukraine and would be covered by the territorial scope of this treaty."). Put simply, Russia argues that the word "territory" is frozen in time at the moment the BIT was executed in 1998. Since Crimea was Ukrainian territory in 1998, concludes Russia, it cannot qualify as Ukrainian "territory" for purposes of the BIT today, and so this dispute does not involve either an "investment[]" or an "Investor of the Other Contracting Party" under the BIT.

Russia confuses literalism for interpretive subtlety. Ordinarily, fixing a word's meaning in time means fixing its definition—not its literal application. So the "press" in the First Amendment sweeps in television providers, even though they were unknown at the Founding. *See, e.g.*, *Leathers v. Medlock*, 499 U.S. 439, 444 (1991). Or consider an auto retailer's promise to a car manufacturer not to purchase "cars" from a competing manufacturer. That promise would doubtless apply to the next year's car models, even though they did not exist at the time of the agreement. This principle comfortably applies to the BIT, too. Although presumably the signers did not anticipate that Russia would violently invade Crimea a couple decades later, it is not unusual for countries to experience minor boundary changes over time. *See List of national border changes (1914-present)*, Wikipedia (Nov. 19, 2026), https://perma.cc/58VT-NSHX. Surely both parties would expect the BIT to equally apply to these newly acquired areas.

[8] Though the BIT applies to investments made after January 1, 1992, Ukraine and Russia executed the treaty in 1998. BIT, art. 14.

Thus, if the principle of contemporaneity has any purchase, it is with definitions. In contrast, Russia's approach would inject a unique and unworkable norm into international agreements. Promises would be practically impossible if the meaning of every word were restricted to its literal application at the moment of agreement. For example, would a treaty obligating the "His Majesty's Government" have any effect after a British monarch dies? And Russia's theory proves too much even with respect to the BIT. If "territory" really means "territory as of 1998," then "investments" should also mean "investments as of 1998." But if that were true, the BIT would be nearly meaningless because it would not apply to any new investments. No wonder that under international law, "in the event of territorial changes, a treaty is still applicable to the entire territory (i.e., the territory that is now changed)." BGer Oct. 16, 2018, 4A_398/2017, c. ¶ 4.3.2 (collecting sources).

Russia's second argument in this vein is that "disputed territory" like Crimea falls outside the BIT because the treaty can only apply to "mutually recognized" territory. Resp. at 26–27. Putting aside the hypocrisy of an aggressor nation making this claim, Russia offers no support for this argument other than a list of countries that have refused to recognize that their bilateral investment treaties with Russia now extend to Crimea. *Id.* at 27 n.6. But those letters more likely express the international community's protest of Russia's claim to sovereignty over Crimea. More, it is unclear what dispute is actually at issue here. Russia acknowledges that Crimea "was undisputedly part of Ukrainian territory" in 1992 (and, presumably, in 1998). Hr'g Tr. 24:10–11. And Ukraine does not dispute that Crimea has been Russian territory since 2014 because it is under de facto Russian administration and control. Award on Jurisdiction ¶¶ 82–83, 145. These agreements undermine the premise of Russia's argument.

Next, Russia points to Article 12 of the BIT. It states that the BIT "shall apply to all investments made by the investors of one Contracting Party in the territory of the other Contracting Party, on or after January 1, 1992." BIT, art. 12. Russia argues that the word "made" "carries a temporal element" requiring investments to have been originally completed in the territory of the other Contracting State. Resp. at 28; Hr'g Tr. 30:15–17. Russia concludes that because the disputed investments were made in Crimea when it was the territory of Ukraine, they do not satisfy this provision.

Russia gets things backwards. Article 12 sets out a straightforward temporal requirement: An investment must have been made after January 1, 1992. But Russia reads into this simple sentence a second rule that compounds time and location. Under this rule, an investment made after January 1, 1992, is not necessarily made at a late-enough date depending on the investment's location. The Court will not interpret Article 12 to impose a compound requirement at odds with its own plain text. "Here, as often is the case, the best interpretation is the straightforward one." *Jones v. Hendrix*, 599 U.S. 465, 480 (2023). January 1, 1992, is the BIT's start date—full stop. More, as the Swiss court recognized, Russia's preferred requirement would spring into effect at the unilateral option of a party that has expanded its territory, and so would "be incompatible with the principle of good faith" and would "conflict with the intent and purpose" of the BIT. BGer Oct. 16, 2018, 4A_398/2017, c. ¶ 4.4.5.

At the hearing, Russia offered a slight variant of this argument. Russia seemed to object to the Companies' interpretation of the word "investments" on the ground that it would apply to investments made before 1992, and so would violate Article 12. *See* Hr'g Tr. 42:2–7. This objection makes little sense because it overlooks the mechanics of a multi-article treaty. The Companies argue that Article 9 provides the BIT's geographic scope and Article 12 its temporal

scope. Reply at 23–24. Of course, some investments could satisfy one condition but not the other. Otherwise, the articles would be redundant.

Finally, Russia makes an argument from purpose. It notes that the preamble to the BIT states that its purpose is to "create and maintain favorable conditions for mutual investments" and for "the expansion of economic cooperation between the Contracting Parties." Resp. at 29 (quoting BIT, Preamble). Somehow, Russia believes that this stated purpose "is not achieved if the BIT is interpreted so as to create obligations of Russia towards Ukrainian investors who made investments in Ukrainian territory." *Id.* The Court fails to see how permitting Russia to prejudice Ukrainian investors in Crimea will benefit the "expansion of economic cooperation" between the two countries. Rather, Russia's attempt to dodge responsibility for expropriating the Companies' investments on Russian territory threatens economic cooperation. *See also* BGer Oct. 16, 2018, 4A_398/2017, c. ¶ 4.4.3 (observing that the BIT must aim to protect investments as much as encourage them, since it applies to investments made after 1992 but before the effective date of the agreement).

Russia fails to show that the BIT excludes investments made in Crimea before its invasion and annexation by Russia.

* * *

Whether because of issue preclusion, arbitral deference, or de novo textual interpretation, Russia fails to establish for purposes of Article V(c)(1) of the New York Convention that this

dispute falls outside the scope of the BIT. And to be clear, the Companies need only be correct about one of these theories. One way or the other, the Companies succeed on the merits.

**C.**

Russia asks for limited discovery to develop an argument that enforcement of the award would violate U.S. public policy. Resp. at 46. Under Article V(2)(b) of the New York Convention, a court may refuse to enforce an arbitral award if "recognition or enforcement of the award would be contrary to the public policy" of the country where enforcement is sought. The standard for violation of public policy "is high, and infrequently met." *TermoRio*, 487 F.3d at 938 (cleaned up). "[T]he public policy defense is to be construed narrowly to be applied only where enforcement would violate the United States' most basic notions of morality and justice." *Belize Bank*, 852 F.3d at 1111 (cleaned up).

To refuse enforcement of an arbitral award, a public policy "must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 697 (D.C. Cir. 2013) (cleaned up) (discussing domestic arbitral awards). Courts ultimately resolve "question[s] of public policy," giving "significant weight" to "the arbitrator's findings of fact." *Enron Nigeria*, 844 F.3d at 288–89 (cleaned up). And "when assessing discovery requests in the context of [enforcement] proceedings[,] the court must weigh the asserted need for hitherto undisclosed information and assess the impact of granting such discovery on the arbitral process." *Vantage Deepwater Co. v. Petrobras Am., Inc.*, 966 F.3d 361,

372–73 (5th Cir. 2020) (cleaned up). "The party seeking discovery bears the burden of showing its necessity." *Id.* at 373 (cleaned up).

Russia argues that enforcement of the award would violate the well-established public policy that "no one shall be permitted to profit by his own fraud, or to take [advantage] of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." Resp. at 40 (quoting *Enron Nigeria*, 844 F.3d at 286). This "fundamental equitable principle" has deep roots in our legal system. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 119 (1991) (cleaned up). In its canonical application, the New York Court of Appeals barred a grandson from inheriting his grandfather's estate after he murdered his grandfather to avoid being removed from the grandfather's will. *See Riggs v. Palmer*, 115 N.Y. 506, 508–09 (1889). Thus, Russia is correct that a court should not enforce an arbitral award if doing so would violate this principle. *See Enron Nigeria*, 844 F.3d at 287.

The D.C. Circuit considered the application of this principle to a foreign arbitral award in *Enron Nigeria*. In that case, Enron Nigeria Power Holding, Ltd. ("ENPH") sought enforcement of an arbitral award against Nigeria resolving a dispute over the breakdown of a power purchase agreement. *Id.* at 282–83. Nigeria argued that enforcement of the award would violate the principle that a party should not profit from its own wrongs because ENPH "is the offshore shell affiliate of [Enron,] a corporation that committed one of the great financial frauds of recent years." *Id.* at 289 (cleaned up). The district court had rejected this argument because Nigeria "identified no basis to impute Enron's accounting fraud to ENPH merely because it was an Enron special purpose vehicle." *Id.* (cleaned up). Nor had Nigeria provided "any evidence of accounting fraud in connection to" the relevant phase of the power purchase agreement. *Id.* (cleaned up). The D.C. Circuit affirmed. It relied on the arbitral tribunal's determination that

Enron was not a party to the power purchase agreement, as well as its finding that Nigeria was not fraudulently induced to execute the agreement. *Id.* at 290. Simply put, Nigeria failed to connect Enron's wrongdoings to the power purchase agreement.

Russia's public-policy play suffers from similar defects. Just as Nigeria invoked the specter of Enron, Russia invokes the shadowy figure of Igor Kolomoisky. Resp. at 42. Kolomoisky is "a beneficial owner" of the Companies. Final Arb. Award ¶ 99.[9] Russia devotes several pages to recounting ongoing civil and criminal investigations and proceedings, across the United States and Europe, against Kolomoisky for financial fraud associated with many of his corporations. *See* Resp. at 42–45. However, Russia stops short of connecting the dots to the award in this case, simply concluding that "it is highly unlikely that the 11 [Companies], . . . owned by Mr. Kolomoisky and also involved in the oil business in Ukraine, have absolutely no connection to fraudulently obtained and/or laundered funds." *Id.* at 45.

Russia contends that discovery will provide it the chance to flesh out this theory. *Id.* at 46. The Court disagrees. Russia's failure to connect any of Kolomoisky's alleged wrongs to the Companies, let alone the award the Companies seek to enforce, resembles Nigeria's failure to connect Enron's fraud to ENPH and the power purchase agreement. *See Enron Nigeria*, 844 F.3d at 289–90. Russia's ability to point to so many investigations against Kolomoisky's other businesses, but not one legal impropriety implicating the eleven Companies, further undermines its position. Russia's parade of investigations does not prove wrongdoing, and it falls far short of

[9] Russia asserts that Kolomoisky is "the" beneficial owner of the Companies. Resp. at 42. But the paragraph Russia cites does not support that proposition. *See* Award on Jurisdiction ¶ 3 (describing Kolomoisky as "one of" the Companies' beneficial owners).

proof that it is "necess[ary]" to further delay confirmation so that Russia can indulge its barebones theory in discovery. *Vantage Deepwater Co.*, 966 F.3d at 373 (cleaned up).

More, unlike the daughters of the decedent who sued in *Riggs* to prevent their murderous nephew from profiting under the will, *see* 115 N.Y. at 508–09, Russia seeks to avoid responsibility for *its own* wrongs by casting speculative aspersions on the Companies. Russia plucks at a mote while ignoring its own beam. Equity does not favor such a litigant. The Court will not further delay confirmation to indulge a conspiracy theory of tenuous relevance to this case. Given the "emphatic federal policy in favor of arbitral dispute resolution," *Venez. US SRL v. Bolivarian Rep. of Venezuela*, 178 F.4th 679, 682 (D.C. Cir. 2026) (cleaned up), and the years that have passed since the award was made in 2019, discovery is inappropriate. The Court will leave any further investigation of Kolomoisky to the appropriate domestic and international authorities. It is beyond the scope of this "summary" proceeding. *Argentine Republic*, 637 F.3d at 369.

**IV.**

Russia seeks leave to file a supplemental brief. Mot. for Leave; Merits Suppl. Br. The Companies oppose this motion. Opp'n to Merits Suppl. Br. This supplemental brief would raise two additional arguments against confirmation. The first is a public-policy argument premised on the D.C. Circuit's recent decision in *Venezuela U.S. SRL*. Mot. for Leave at 2–3. The second argument is that the BIT is suspended in times of international armed conflict. *Id.* at 3. District

courts have "discretion" to grant or deny supplemental briefing. *Tatneft v. Ukraine*, 21 F.4th 829, 835 (D.C. Cir. 2021). The Court denies Russia's motion.

Start with the public policy argument. Russia may be correct that parties cannot forfeit or waive arguments that enforcing a foreign arbitral award would violate U.S. public policy under Article V(2)(b) of the New York Convention. Mot. for Leave at 3. This is because courts have a "duty to resolve the public policy question[s]" that "implicate the integrity of the enforcing court." *Enron Nigeria*, 844 F.3d at 288; *but see Técnicas Reunidas de Talara S.A.C. v. SSK Ingeniería y Construcción S.A.C.*, 40 F.4th 1339, 1346 (11th Cir. 2022) (reading *Enron Nigeria* as cabined to parties' attempts to waive public policy arguments ex ante by contract and holding that "a party can waive a public-policy defense by failing to raise its objection in a timely manner"). Nonetheless, such a "duty" could exist only where the underlying public policy argument is potentially meritorious. Russia's is not.

Russia argues that enforcing the award would violate U.S. public policy by amounting to a judicial recognition of Crimea as part of Russia. Suppl. Br. at 13–14. Russia grounds this argument in *Venezuela U.S. SRL*, which it cites for the proposition that "[t]he Executive's exclusive recognition power . . . is precisely the type of basic legal principle that qualifies as a public policy within the ambit of Article V(2)(b)." *Id.* at 10 (citing *Venez. U.S. SRL*, 178 F.4th at 683); *see also* Mot. for Leave at 2 (emphasizing "important public policy considerations raised by [*Venezuela U.S. SRL*]").

But *Venezuela U.S. SRL* does not so hold. It involved a challenge to a foreign arbitral award against Venezuela on the grounds that the arbitration was litigated in part by lawyers chosen by the Maduro Regime, which the Executive did not recognize as the legitimate government of Venezuela. *See Venez. U.S. SRL*, 178 F.4th at 681–82. It expressly declined to

consider this very question: "We need not decide whether the President's recognition authority is a cognizable public policy under the New York Convention or whether recognition and enforcement of an arbitral award could ever violate that authority." *Id.* at 683. And what it did say on this issue cuts sharply against Russia. On the facts of that case, "[r]ecognition of the damages award [was] not a formal acknowledgment or express declaration that the Maduro Regime was the effective government of Venezuela," and "[e]nforcement of the damages award . . . d[id] not imply a denial of the President's recognition of what was then the Guaidó government." *Id.* at 683–84 (cleaned up); *see also id.* at 684 ("[N]othing in our enforcement of the damages award forces the Executive to contradict his statements recognizing the Guaidó regime." (cleaned up)).

This case is similar. Indeed, the D.C. Circuit has already rejected "Russia's insistence" that the "award resolved a geopolitical dispute" because "the tribunal[] expressly declined to determine whether Crimea falls under Russia's sovereignty." *Stabil*, 167 F.4th at 525–26; *see* Final Arb. Award ¶ 100. Since Russia's public-policy argument is wrong on both the law and the facts, the Court need not entertain its supplemental briefing.

Next, Russia raises a defense under Article V(1)(a) or (c) that the BIT does not apply because such treaties are suspended as a matter of international law during war. Suppl Br. at 14. But Russia makes no contention that defenses under these provisions of the New York Convention cannot be waived for forfeited. *See id.* And it provides no reason it could not timely have raised this complex international-law argument in its Response. The Court will not permit

untimely supplemental briefing on an arcane argument of dubious legal merit. *See Tatneft*, 21 F.4th at 836 (upholding denial of motion to file supplemental brief on argument untimely raised).

The Court will deny Russia's Motion for Leave to File Supplemental Brief.

**V.**

Finally, there is the question of what interest rate should apply to the award. There is no dispute here. At the parties' agreement, the three-month U.S. dollar London interbank offered rate ("LIBOR") plus 1%, compounded annually, including the synthetic LIBOR published after June 30, 2023, will apply to the award for the period through September 30, 2024. *See* Pet'rs' Suppl. Br. on Interest Rate at 5; Resp't's Suppl. Br. on Interest Rate at 1. The three-month Chicago Mercantile Exchange term secured overnight financing rate ("SOFR") plus 0.26161%, compounded annually, will apply to the period beginning October 1, 2024, until the entry of judgment. *See* Pet'rs' Suppl. Br. on Interest Rate at 5; Resp't's Suppl. Br. on Interest Rate at 1.

**VI.**

Russia has failed to carry its significant burden to establish a defense to enforcement under Article V of the New York Convention. The Court will grant the Companies' Petition for Award Enforcement and deny Russia's Motion for Leave to File a Supplemental Brief.

A separate order will issue today.

2026.11.24
16:20:25 -05'00'

Dated: November 24, 2026

TREVOR N. McFADDEN
United States District Judge